No. 25-1916

# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

---

CITY OF CHICAGO,

*Plaintiff-Appellee,*

v.

BP P.L.C., ET AL.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:24-cv-02496 – Hon. Franklin U. Valderrama

---

## STIPULATED JOINT SEPARATE APPENDIX VOL. I

---

Thomas G. Hungar
Lochlan F. Shelfer
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, D.C. 20036
Telephone: (202) 887-3784
thungar@gibsondunn.com
lshelfer@gibsondunn.com

Theodore J. Boutrous, Jr.
William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
tboutrous@gibsondunn.com
wthomson@gibsondunn.com

Joshua D. Dick
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8200
jdick@gibsondunn.com

*Attorneys for Defendants-Appellants Chevron Corporation and Chevron U.S.A. Inc*
*[Additional counsel listed on signature page of opening brief]*

**Stipulated Joint Separate Appendix**

| Document | File Date | Docket Number | Page Number |
|---|---|---|---|
| **Volume I** | | | |
| Notice of Appeal | 05/18/2025 | 123 | 1 |
| Complaint | 02/20/2024 | 1-1 | 14 |
| Notice of Removal | 03/28/2024 | 1 | 218 |
| Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-2 | 309 |
| **Volume II** | | | |
| **Exhibit 1** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-3 | 324 |
| **Exhibit 2** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-4 | 369 |
| **Exhibit 3** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-5 | 373 |
| **Exhibit 4** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-6 | 380 |
| **Exhibit 5** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-7 | 396 |
| **Exhibit 6** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-8 | 403 |
| **Exhibit 7** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-9 | 414 |
| **Exhibit 8** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-10 | 426 |
| **Exhibit 9** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-11 | 430 |

| | | | |
|---|---|---|---|
| **Exhibit 10** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-12 | 433 |
| **Exhibit 11** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-13 | 441 |
| **Exhibit 12** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-14 | 449 |
| **Exhibit 13** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-15 | 455 |
| **Exhibit 15** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-17 | 457 |
| **Exhibit 17** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-19 | 491 |
| **Exhibit 18** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-20 | 496 |
| **Exhibit 19** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-21 | 500 |
| **Exhibit 20** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-22 | 528 |
| **Exhibit 21** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-23 | 534 |
| **Exhibit 22** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-24 | 544 |
| **Exhibit 23** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 1-25 | 547 |
| **Exhibit 39** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 2-14 | 550 |
| **Volume III** | | | |
| **Exhibit 41** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 2-16 | 566 |
| **Exhibit 42** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 2-17 | 804 |
| **Exhibit 43** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 2-18 | 827 |
| **Exhibit 44** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 2-19 | 895 |

| | | | |
|---|---|---|---|
| **Volume IV** | | | |
| **Exhibit 45** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 2-20 | 925 |
| **Exhibit 46** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 2-21 | 937 |
| **Exhibit 47** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 2-22 | 941 |
| **Exhibit 48** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 2-23 | 958 |
| **Exhibit 49** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3 | 972 |
| **Exhibit 50** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-1 | 995 |
| **Exhibit 51** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-2 | 1014 |
| **Exhibit 52** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-3 | 1039 |
| **Exhibit 53** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-4 | 1083 |
| **Volume V** | | | |
| **Exhibit 54** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-5 | 1103 |
| **Exhibit 55** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-6 | 1106 |
| **Exhibit 56** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-7 | 1112 |
| **Exhibit 57** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-8 | 1127 |
| **Exhibit 58** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-9 | 1164 |
| **Exhibit 59** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-10 | 1182 |
| **Volume VI** | | | |
| **Exhibit 60** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-11 | 1202 |
| **Exhibit 61** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-12 | 1274 |

| | | | |
|---|---|---|---|
| **Exhibit 62** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-13 | 1296 |
| **Exhibit 63** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-14 | 1306 |
| **Exhibit 64** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-15 | 1309 |
| **Exhibit 65** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-16 | 1314 |
| **Exhibit 66** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-17 | 1338 |
| **Exhibit 70** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-21 | 1357 |
| **Exhibit 72** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 3-23 | 1439 |
| **Exhibit 82** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 4-9 | 1454 |
| **Exhibit 84** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 4-11 | 1459 |
| **Exhibit 85** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 4-12 | 1468 |
| **Volume VII** | | | |
| **Exhibit 86** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 4-13 | 1537 |
| **Exhibit 87** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 4-14 | 1545 |
| **Exhibit 88** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 4-15 | 1547 |
| **Exhibit 89** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal | 03/28/2024 | 4-16 | 1563 |
| Motion to Remand | 05/16/2024 | 66 | 1582 |
| Docket Sheet | - | - | 1584 |
| **Exhibit 14** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal: Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen in Support of Petitioners, filed in *BP p.l.c. v. Mayor & City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020) | 03/28/2024 | 1-16 | 1614 |

iv

| | | | |
|---|---|---|---|
| **Exhibit 25** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal: CIA Doc. No. CIARDP67B00074R000500440006-9, Contract No. AF33(657)-12525 (SH-515), dated September 20, 1963 | 03/28/2024 | 2 | 1648 |
| **Exhibit 34** to Declaration Of Joshua D. Dick In Support Of Notice Of Removal: Report reflecting procurement contract SP060010D0470, dated April 26, 2010, last modified June 2, 2011, available at https://www.fpds.gov/fpdsng_cms/indphp/en/ | 03/28/2024 | 2-9 | 1684 |
| **Exhibit 92** to Declaration of Joshua D. Dick In Support of Notice of Removal: Certificate of Dissolution of War Emergency Pipelines, Inc., dated August 28, 1947 | 03/28/2024 | 4-19 | 1687 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CITY OF CHICAGO,

        Plaintiff,

        v.

BP P.L.C.; BP AMERICA INC.; BP
PRODUCTS NORTH AMERICA INC.;
CHEVRON CORPORATION; CHEVRON
U.S.A. INC.; CONOCOPHILLIPS
COMPANY; CONOCOPHILLIPS; PHILLIPS
66 COMPANY; PHILLIPS 66; EXXON
MOBIL CORPORATION; EXXONMOBIL
OIL CORPORATION; SHELL OIL
PRODUCTS COMPANY LLC; SHELL PLC;
SHELL USA, INC.; and AMERICAN
PETROLEUM INSTITUTE,

        Defendants.

Civil Action No. 1:24-cv-02496

Hon. Franklin U. Valderrama

**<u>DEFENDANTS' JOINT NOTICE OF APPEAL</u>**

**S.A. 1**

Notice is given that Defendants BP p.l.c.; BP America Inc.; BP Products North America Inc.; Chevron Corporation; Chevron U.S.A. Inc.; ConocoPhillips Company; ConocoPhillips; Phillips 66 Company; Phillips 66; Exxon Mobil Corporation; ExxonMobil Oil Corporation; Shell Oil Products Company LLC; Shell plc (*f/k/a* Royal Dutch Shell plc); Shell USA, Inc. (*f/k/a* Shell Oil Company); and American Petroleum Institute, pursuant to 28 U.S.C. §§ 1291 and 1447(d), appeal to the United States Court of Appeals for the Seventh Circuit from the Memorandum Opinion and Order granting Plaintiff's Motion to Remand, ECF No. 113, entered in this action on May 16, 2025.[1]

---

[1] This Notice of Appeal is submitted subject to and without waiver of any defense, affirmative defense, or objection, including personal jurisdiction.

**S.A. 2**

Dated: May 28, 2025                    Respectfully submitted,

                                       By:   _s/ Patricia Brown Holmes_
                                       **RILEY SAFER HOLMES & CANCILA LLP**
                                       Patricia Brown Holmes
                                       Ronald S. Safer
                                       Lauren E. Jaffe
                                       Christopher L. Schaeffer
                                       1 S. Dearborn St., Ste. 2200
                                       Chicago, Illinois 60603
                                       (312) 471-8700 (main)
                                       (312) 471-8701 (fax)
                                       pholmes@rshc-law.com
                                       rsafer@rshc-law.com
                                       ljaffe@rshc-law.com
                                       cschaeffer@rshc-law.com
                                       docketdept@rshc-law.com

                                       **GIBSON, DUNN & CRUTCHER LLP**
                                       Theodore J. Boutrous, Jr., _pro hac vice_
                                       tboutrous@gibsondunn.com
                                       William E. Thomson, _pro hac vice_
                                       wthomson@gibsondunn.com
                                       333 South Grand Avenue
                                       Los Angeles, CA 90071
                                       Telephone: 213.229.7000
                                       Facsimile: 213.229.7520

                                       Joshua D. Dick, _pro hac vice_
                                       jdick@gibsondunn.com
                                       One Embarcadero Center, Suite 2600
                                       San Francisco, CA 94111
                                       Telephone: 415.393.8200
                                       Facsimile: 415.374.8451

                                       Thomas G. Hungar, _pro hac vice_
                                       thungar@gibsondunn.com
                                       1700 M St., N.W.
                                       Washington, D.C. 20036
                                       Telephone: 202.887.3784
                                       Facsimile: 202.467.0539

                                       **SUSMAN GODFREY L.L.P.**
                                       Erica W. Harris, _pro hac vice forthcoming_
                                       eharris@susmangodfrey.com
                                       1000 Louisiana, Suite 5100

**S.A. 3**

Houston, TX 77002
Telephone: 713.651.9366
Facsimile: 713.654.6666

**STERN, KILCULLEN & RUFOLO, LLC**
Herbert J. Stern, *pro hac vice forthcoming*
hstern@sgklaw.com
Joel M. Silverstein, *pro hac vice forthcoming*
jsilverstein@sgklaw.com
325 Columbia Turnpike, Suite 110
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Defendants Chevron Corporation and
Chevron U.S.A. Inc.*

By:   *s/ Stephanie A. Scharf*
**SCHARF BANKS MARMOR LLC**
Stephanie A. Scharf
30 West Hubbard Street, Suite 500
Chicago, IL 60654
Tel: (312) 662-6999
Fax: (312) 726-6045
sscharf@scharfbanks.com

**ARNOLD & PORTER KAYE SCHOLER LLP**
Jonathan W. Hughes
(*pro hac vice*)
3 Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Tel: (415) 471-3100
Fax: (415) 471-3400
jonathan.hughes@arnoldporter.com

John D. Lombardo (*pro hac vice*)
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel: (213) 243-4000
Fax: (213) 243-4199
john.lombardo@arnoldporter.com

Diana E. Reiter (*pro hac vice*)
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000

**S.A. 4**

Fax: (212) 836-8689
diana.reiter@arnoldporter.com

*Attorneys for Defendants BP p.l.c., BP America Inc.
and BP Products North America Inc.*

By:   *s/ Nicole C. Mueller*
Nicole C. Mueller
Kenn Brotman
**K&L GATES LLP**
70 West Madison Street
Suite 3300
Chicago, Illinois 60602
Telephone: (312) 372-1211
Facsimile: (312) 345-9976
nicole.mueller@klgates.com
kenn.brotman@klgates.com

*Attorneys for Defendants Shell plc, Shell USA, Inc.,
and Shell Oil Products Company LLC*

By:   *s/ H. Patrick Morris*
**JOHNSON & BELL, LTD.**
H. Patrick Morris
David F. Fanning
Danielle Austriaco
33 W. Monroe St., Suite 2700
Chicago, IL  60603
(312) 372-0770 (main)
(312) 372-9818 (Fax)
morrisp@jbltd.com
fanningd@jbltd.com
austriacod@jbltd.com

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Theodore V. Wells, Jr. (*pro hac vice*)
Email: twells@paulweiss.com
Daniel J. Toal (*pro hac vice*)
Email: dtoal@paulweiss.com
Yahonnes Cleary (*pro hac vice*)
Email: ycleary@paulweiss.com
Caitlin Grusauskas (*pro hac vice*)
Email: cgrusauskas@paulweiss.com
1285 Avenue of the Americas
New York, NY 10019-6064

**S.A. 5**

Tel: (212) 373-3000

*Attorneys for Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation*

By:   *s/ Patrick P. Clyder*
**MCGUIREWOODS LLP**
Patrick P. Clyder #6292573
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
Telephone: (312) 750-8668
pclyder@mcguirewoods.com

Jeremiah J. Anderson (*pro hac vice*)
845 Texas Avenue, 24th Floor
Houston, TX 77002-2906
Telephone: (713) 571-9191
jjanderson@mcguirewoods.com

Brian D. Schmalzbach (*pro hac vice*)
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-4746
bschmalzbach@mcguirewoods.com

*Attorneys for Defendant American Petroleum Institute*

By:   *s/ Hallie B. Levin*
Hallie B. Levin
**WILMER CUTLER PICKERING HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
E-mail: hallie.levin@wilmerhale.com

Matthew T. Martens (admission forthcoming)
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 663-6000

**S.A. 6**

Facsimile: (202) 663-6363
E-mail: matthew.martens@wilmerhale.com

Robert Kingsley Smith (admission forthcoming)
**WILMER CUTLER PICKERING HALE
AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
E-mail: robert.smith@wilmerhale.com

*Attorneys for Defendants ConocoPhillips Company
and ConocoPhillips*

By:   *s/ Sean M. Berkowitz*
Sean M. Berkowitz
**LATHAM & WATKINS LLP**
330 N. Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: sean.berkowitz@lw.com

Nicole C. Valco (*pro hac vice*)
Katherine A. Rouse (*pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: nicole.valco@lw.com
Email: katherine.rouse@lw.com

*Attorneys for Defendants Phillips 66 and Phillips 66
Company*

**S.A. 7**

## REPRESENTATION STATEMENT

Pursuant to Rule 12(b) of the Federal Rules of Appellate Procedure, Defendants submit this Representation Statement.  The following list identifies all parties to the action, and also identifies their respective counsel by name, firm, address, telephone number, and email, where appropriate.

| PARTIES | COUNSEL OF RECORD |
|---|---|
| Plaintiff-Appellee City of Chicago | Stephen J. Kane<br>Rebecca A. Hirsch<br>Chelsey B. Metcalf<br>CITY OF CHICAGO<br>DEPARTMENT OF LAW<br>AFFIRMATIVE LITIGATION DIVISION<br>121 North LaSalle Street, Room 600<br>Chicago, Illinois 60602<br>Tel: (312) 744-6934<br>stephen.kane@cityofchicago.org<br>rebecca.hirsch2@cityofchicago.org<br>chelsey.metcalf@cityofchicago.org<br><br>DICELLO LEVITT LLP<br>Adam J. Levitt<br>Daniel Rock Flynn<br>Anna Claire Skinner<br>Ten North Dearborn Street, Sixth Floor<br>Chicago, Illinois 60602<br>Tel: (312) 214-7900<br>alevitt@dicellolevitt.com<br>dflynn@dicellolevitt.com<br>askinner@dicellolevitt.com<br><br>SHER EDLING LLP<br>Victor M. Sher<br>Matthew K. Edling<br>Paul Stephan<br>100 Montgomery St., Ste. 1410<br>San Francisco, CA 94104<br>Tel: (628) 231-2500<br>vic@sheredling.com<br>matt@sheredling.com<br>paul@sheredling.com |

**S.A. 8**

| Defendants-Appellants Chevron Corp. and Chevron U.S.A., Inc. | RILEY SAFER HOLMES & CANCILA LLP<br>Patricia Brown Holmes<br>Ronald S. Safer<br>Lauren E. Jaffe<br>Christopher L. Schaeffer<br>1 S. Dearborn Street, Ste 2200<br>Chicago, Illinois 60603<br>(312) 471-8700 (main)<br>pholmes@rshc-law.com<br>rsafer@rshc-law.com<br>ljaffe@rshc-law.com<br>cschaeffer@rshc-law.com<br>docketdept@rshc-law.com<br><br>GIBSON, DUNN & CRUTCHER LLP<br>Theodore J. Boutrous, Jr.<br>William E. Thomson<br>tboutrous@gibsondunn.com<br>wthomson@gibsondunn.com<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>Telephone: 213.229.7000<br><br>Joshua D. Dick<br>jdick@gibsondunn.com<br>555 Mission Street<br>San Francisco, CA 94105<br>Telephone: 415.393.8200<br><br>Thomas G. Hungar<br>thungar@gibsondunn.com<br>1700 M St., N.W.<br>Washington, D.C. 20036<br>Telephone: 202.887.3784<br><br>SUSMAN GODFREY L.L.P.<br>Erica W. Harris<br>eharris@susmangodfrey.com<br>1000 Louisiana, Suite 5100<br>Houston, TX 77002<br>Telephone: 713.651.9366 |

**S.A. 9**

| | |
|---|---|
| | STERN, KILCULLEN & RUFOLO, LLC<br>Herbert J. Stern<br>hstern@sgklaw.com<br>Joel M. Silverstein<br>jsilverstein@sgklaw.com<br>325 Columbia Turnpike, Suite 110<br>Florham Park, New Jersey 07932-0992<br>Telephone: 973.535.1900 |
| Defendants-Appellants BP p.l.c., BP America Inc., BP Products North America Inc. | SCHARF BANKS MARMOR LLC<br>Stephanie A. Scharf<br>George D. Sax<br>30 West Hubbard Street, Suite 500<br>Chicago, IL 60654<br>Tel: (312) 662-6999<br>Fax: (312) 726-6045<br>sscharf@scharfbanks.com<br>gsax@scharfbanks.com<br><br>ARNOLD & PORTER KAYE SCHOLER LLP<br>Jonathan W. Hughes<br>3 Embarcadero Center, 10th Floor<br>San Francisco, CA 94111-4024<br>Tel: (415) 471-3100<br>Fax: (415) 471-3400<br>jonathan.hughes@arnoldporter.com<br><br>John D. Lombardo<br>777 South Figueroa Street, 44th Floor<br>Los Angeles, CA 90017-5844<br>Tel: (213) 243-4000<br>Fax: (213) 243-4199<br>john.lombardo@arnoldporter.com<br><br>Diana E. Reiter<br>250 West 55th Street<br>New York, NY 10019-9710<br>Tel: (212) 836-8000<br>Fax: (212) 836-8689<br>diana.reiter@arnoldporter.com |
| Defendants-Appellants Phillips 66 and Phillips 66 Company | LATHAM & WATKINS LLP<br>Sean M. Berkowitz<br>330 N. Wabash Avenue, Suite 2800<br>Chicago, IL 60611<br>Telephone: (312) 876-7700 |

**S.A. 10**

| | Email: sean.berkowitz@lw.com<br><br>LATHAM & WATKINS LLP<br>Nicole C. Valco<br>Katherine A. Rouse<br>505 Montgomery Street, Suite 2000<br>San Francisco, CA 94111-6538<br>Telephone: (415) 391-0600<br>Email: nicole.valco@lw.com<br>Email: katherine.rouse@lw.com |
|---|---|
| Defendants-Appellants ConocoPhillips and ConocoPhillips Company | WILMER CUTLER PICKERING HALE AND DORR LLP<br>Hallie B. Levin<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>Telephone: (212) 230-8800<br>E-mail: hallie.levin@wilmerhale.com<br><br>Matthew T. Martens<br>2100 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20037<br>Telephone: (202) 663-6000<br>E-mail: matthew.martens@wilmerhale.com<br><br>Robert Kingsley Smith<br>60 State Street<br>Boston, MA 02109<br>Telephone: (617) 526-6000<br>E-mail: robert.smith@wilmerhale.com<br><br>MASSEY & GAIL LLP<br>Constance Grieves<br>Suyash Agrawal<br>50 East Washington<br>Suite 400<br>Chicago, IL 60602<br>(312) 809-0183<br>Email: cgrieves@masseygail.com<br>sagrawal@masseygail.com |
| Defendants-Appellants Shell plc (f/k/a Royal Dutch Shell plc), Shell USA, Inc. (f/k/a Shell Oil Company), and Shell Oil Products Company LLC | K&L GATES LLP<br>Nicole C. Mueller<br>Kenn Brotman<br>70 West Madison Street<br>Suite 3300 |

**S.A. 11**

| | |
|---|---|
| | Chicago, Illinois 60602<br>Telephone: (312) 372-1211<br>nicole.mueller@klgates.com<br>kenn.brotman@klgates.com |
| Defendants-Appellants Exxon Mobil Corporation and ExxonMobil Oil Corporation | JOHNSON & BELL, LTD.<br>H. Patrick Morris<br>David F. Fanning<br>Danielle Austriaco<br>33 W. Monroe St., Suite 2700<br>Chicago, IL  60603<br>(312) 372-0770 (main)<br>morrisp@jbltd.com<br>fanningd@jbltd.com<br>austriacod@jbltd.com<br><br>PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP<br>Theodore V. Wells, Jr.<br>Email: twells@paulweiss.com<br>Daniel J. Toal<br>Email: dtoal@paulweiss.com<br>Yahonnes Cleary<br>Email: ycleary@paulweiss.com<br>Caitlin Grusauskas<br>Email: cgrusauskas@paulweiss.com<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Tel: (212) 373-3000 |
| Defendant-Appellant American Petroleum Institute | MCGUIREWOODS LLP<br>Patrick P. Clyder<br>77 West Wacker Drive<br>Suite 4100<br>Chicago, IL 60601-1818<br>Telephone: (312) 750-8668<br>pclyder@mcguirewoods.com<br><br>Jeremiah J. Anderson<br>845 Texas Avenue, 24th Floor<br>Houston, TX 77002-2906<br>Telephone: (713) 571-9191<br>jjanderson@mcguirewoods.com<br><br>Brian D. Schmalzbach<br>800 East Canal Street |

|  | Richmond, VA 23219-3916<br>Telephone: (804) 775-4746<br>bschmalzbach@mcguirewoods.com |
|---|---|

# EXHIBIT 1

2/28/24, 10:52 AM Delaware.gov

Case: 1:24-cv-02496 Document #: 1-1 Filed: 03/28/24 Page 2 of 204 PageID #:93
Case: 25-1916 Document: 66-1 Filed: 07/08/2025 Pages: 329

Division of Corporations - Filing
Governor | General Assembly | Courts | Elected Officials | State Agencies

*C S C*

---

**Department of State: Division of Corporations**

Allowable Characters

| HOME | Entity Details |
|------|----------------|

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| File Number: | 3963043 | Incorporation Date / Formation Date: | 4/29/2005 (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | **CHEVRON CORPORATION** | | |
| Entity Kind: | **Corporation** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| Name: | **CORPORATION SERVICE COMPANY** | | |
|---|---|---|---|
| Address: | **251 LITTLE FALLS DRIVE** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19808** |
| Phone: | **302-636-5401** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]     [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

Hearing Date: No hearing scheduled   This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts.
Location: <<CourtRoomNumber>>                                          Forms are free at ilcourts.info/forms.
Judge: Calendar, 3

| STATE OF ILLINOIS, CIRCUIT COURT | SUMMONS | For Court Use Only |
|---|---|---|
| Cook ▼ COUNTY | | **FILED** 2/21/2024 1:15 PM IRIS Y. MARTINEZ CIRCUIT CLERK COOK COUNTY, IL 2024CH01024 Calendar, 3 26497894 |

| Instructions ▼ | | |
|---|---|---|
| Enter above the county name where the case was filed. | City of Chicago **Plaintiff / Petitioner** (First, middle, last name) | |
| Enter your name as Plaintiff/Petitioner. | v. | |
| Below "Defendants/ Respondents," enter the names of all people you are suing. | **Defendants / Respondents** (First, middle, last name) BP P.L.C., et al. | **2024 CH 01024** **Case Number** |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** (Check this box if this is not the 1st Summons issued for this Defendant.) | |

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

---

## IMPORTANT: You have been sued.

- Read all documents attached to this Summons.

- You MUST file an official document with the court within the time stated on this Summons called an *Appearance* and a document called an *Answer/Response*. If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

- All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.

- You may be charged filing fees, but if you cannot pay them, you can file an Application for Waiver of Court Fees.

- It is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

- Need help? Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents. You can also get free legal information and legal referrals at illinoislegalaid.org. All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

- ¿Necesita ayuda? Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.

---

**Plaintiff/Petitioner:**

**Do not use this form** in these types of cases:

| | | |
|---|---|---|
| • All criminal cases | • Order of protection | • Adult guardianship |
| • Eviction | • Paternity | • Detinue |
| • Small Claims | • Stalking no contact orders | • Foreclosure |
| • Divorce | • Civil no contact orders | • Administrative review cases |

For eviction, small claims, divorce, and orders of protection, use the forms available at ilcourts.info/forms. If your case is a detinue, visit illinoislegalaid.org for help.

**If you are suing more than 1 Defendant/Respondent,** attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

SU-S 1503.4                                    **S**U-S **A**-**16** Page 1 of 2                                    (05/23)

Enter the Case Number given by the Circuit Clerk: 2024 CH 01024

1. **Defendant/Respondent's address and service information:**

   a. Defendant/Respondent's primary address/information for service:

   Name *(First, Middle, Last)*: BP P.L.C.

   Registered Agent's name, if any: _____

   Street Address, Unit #: 1 St. James's Square

   City, State, ZIP: London, United Kingdom, SW1Y 4PD

   Telephone: _____ Email: _____

   b. If you have more than one address where Defendant/Respondent might be found, list that here:

   Name *(First, Middle, Last)*: _____

   Street Address, Unit #: _____

   City, State, ZIP: _____

   Telephone: _____ Email: _____

   c. Method of service on Defendant/Respondent:

   ☐ Sheriff          ☐ Sheriff outside Illinois: _____
                                                  *County & State*

   ☑ Special process server     ☐ Licensed private detective

☑ **I am serving more than 1 Defendant/Respondent.**

   I have attached   14   *Additional Defendant/Respondent Address*
                    *Number*

   *and Service Information* forms.

2. **Information about the lawsuit:**

   a. Amount claimed:  $ _____

   ☐ b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession).

3. **Contact information for the Plaintiff/Petitioner:**

   Name *(First, Middle, Last)*: Daniel R. Flynn

   Street Address, Unit #: Ten North LaSalle Street, Sixth Floor

   City, State, ZIP: Chicago, IL 60602

   Telephone: (312) 214-7900     Email: dflynn@dicellolevitt.com

---

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

---

**Important information for the person getting this form**

You have been sued. Read all of the documents attached to this *Summons.*
To participate in the case, you must follow the instructions listed below. If you do not, the court may decide the case without hearing from you and you could lose the case. *Appearance* and *Answer/Response* forms can be found at: ilcourts.info/forms.

4. **Instructions for person receiving this *Summons* (Defendant):**

   ☑ a. To respond to this *Summons,* you must file *Appearance* and *Answer/Response* forms with the court within 30 days after you have been served *(not counting the day of service)* by e-filing or at:

   Address: 50 W. Washington, Room 802, Chancery Division

   City, State, ZIP: Chicago, Illinois 60602

---

**Side margin notes:**

In **1a**, enter the name and address of the first Defendant/ Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here.

In **1b**, enter a second address for the first Defendant/ Respondent, if you have one.

In **1c**, check how you are sending your documents to this Defendant/ Respondent.

Check here if you are serving more than 1 Defendant/ Respondent. Attach an *Additional Defendant/ Respondent Address and Service Information* form for each additional Defendant/Respondent and write the number of forms you attached.

In **2a**, enter the amount of money owed to you. Check **2b** if you are asking for the return of tangible personal property.

In **3**, enter your complete address, telephone number, and email address, if you have one.

Check **4a** or **4b**. If Defendant/Respondent only needs to file an *Appearance* and *Answer/Response* within 30 days, check box **4a**. Otherwise, if the clerk gives you a court date, check box **4b**.

---

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

In 4a, fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/ Response.*

In 4b, fill out:
- The court date and time the clerk gave you.
- The courtroom and address of the court building.
- The call-in or video information for remote appearances (if applicable).
- The clerk's phone number and website. All of this information is available from the Circuit Clerk.

☐ **b. Attend court:**

On: _____ at _____ ☐ a.m. ☐ p.m. in _____
    *Date*          *Time*               *Courtroom*

**In-person at:**

_____
*Courthouse Address*      *City*           *State*      *ZIP*

OR

**Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance"):

     By telephone: _____
                   *Call-in number for telephone remote appearance*

     By video conference: _____
                         *Video conference website*

     _____
     *Video conference log-in information (meeting ID, password, etc.)*

Call the Circuit Clerk at: _____ or visit their website
                    *Circuit Clerk's phone number*

at: _____ to find out more about how to do this.
     *Website*

| STOP!<br>The Circuit Clerk will fill in this section. | **Witness this Date:** _____ |
| :--- | :--- |
| | **Clerk of the Court:** 2/21/2024 1:15 PM IRIS Y. MARTINEZ |

**STOP! The officer or process server will fill in the Date of Service**

**Note to officer or process server:**

- If 4a is checked, this *Summons* must be served within 30 days of the witness date.
- If 4b is checked, this *Summons* must be served at least 40 days before the court date, unless 2b is also checked.
  - If 4b and 2b are checked, the *Summons* must be served at least 3 days before the court date.

Date of Service: _____
                *(Date to be entered by an officer or process server on the copy of this Summons left with the Defendant or other person.)*

Enter the Case Number given by the Circuit Clerk: 2024 CH 01024

**This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts.**
**Forms are free at ilcourts.info/forms.**

<table>
<tr><td>

**STATE OF ILLINOIS,**
**CIRCUIT COURT**

Cook  ▼  **COUNTY**

</td><td>

**PROOF OF SERVICE OF**
**SUMMONS AND**
**COMPLAINT/PETITION**

</td><td>

For Court Use Only

</td></tr>
</table>

| **Instructions** | |
|---|---|
| Enter above the county name where the case was filed. | City of Chicago _____ **Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | |
| Enter the names of all people you are suing as Defendants/ Respondents. | v. _____ Please see attachment _____ **Defendant / Respondent** *(First, middle, last name)* |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* |

2024 CH 01024
_____
**Case Number**

**\*\*Stop. Do not complete the form. The sheriff or special process server will fill in the form. Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent.\*\***

**My name is** _____ **and I state**
        *First, Middle, Last*

☐ **I served the *Summons* and Complaint/Petition on the Defendant/Respondent**

_____ **as follows:**
*First, Middle, Last*

 ☐ Personally on the Defendant/Respondent:
  ☐ Male  ☐ Female  ☐ Non-Binary    Approx. Age: _____ Race: _____
  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
  Address, Unit#: _____
  City, State, ZIP: _____

 ☐ On someone else at the Defendant/Respondent's home who is at least 13 years old and is a family
   member or lives there:
  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
  Address, Unit#: _____
  City, State, ZIP: _____
  And left it with: _____
           *First, Middle, Last*
  ☐ Male  ☐ Female  ☐ Non-Binary    Approx. Age: _____ Race: _____
  and by sending a copy to this defendant in a postage-paid, sealed envelope to the
  above address on this date: _____

 ☐ On the Corporation's agent, _____
            *First, Middle, Last*
  ☐ Male  ☐ Female  ☐ Non-Binary    Approx. Age: _____ Race: _____
  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
  Address: _____
  City, State, ZIP: _____

**S.A. 19**

*(left margin: FILED DATE: 2/21/2024 1:15 PM  2024CH01024)*

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

☐ **I was not able to serve the *Summons* and Complaint/Petition on Defendant/Respondent:**

_____
*First, Middle, Last*

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

1.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

2.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

3.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

| | |
|---|---|
| **DO NOT** complete this section. The sheriff or private process server will complete it. | **If you are a special process server, sheriff outside Illinois, or licensed private detective, your signature certifies that everything on the *Proof of Service of Summons* is true and correct to the best of your knowledge. You understand that making a false statement on this form could be perjury.** |

**By:**

Under the Code of Civil Procedure, <u>735 ILCS 5/1-109,</u> making a statement on this form that you know to be false is perjury, a Class 3 Felony.

_____

*Signature by:*   ☐ Sheriff
                  ☐ Sheriff outside Illinois:

_____
*County and State*
☐ Special process server
☐ Licensed private detective

**FEES**
Service and Return:   $ _____
Miles _____      $ _____
Total                 $ 0.00

_____
*Print Name*

If *Summons* is served by licensed private detective or private detective agency:
License Number: _____

**S.A. 20**    Page 5 of 6    (05/23)

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 3    This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts. Forms are free at
ilcourts.info/forms.

| STATE OF ILLINOIS, CIRCUIT COURT<br><br>Cook ☑ COUNTY | ADDITIONAL DEFENDANT/RESPONDENT ADDRESS AND SERVICE INFORMATION FOR SUMMONS | FILED<br>For Court Use 2/21/2024 1:15 PM<br>IRIS Y. MARTINEZ<br>CIRCUIT CLERK<br>COOK COUNTY, IL<br>2024CH01024<br>Calendar, 3<br>26497894 |

FILED DATE: 2/21/2024 1:15 PM    2024CH01024

**Instructions**

Enter above the county name where the case was filed.

Enter your name as Plaintiff/Petitioner.

Below "Defendants/ Respondents," enter the names of all people you are suing.

Enter the Case Number given by the Circuit Clerk.

**Plaintiff / Petitioner** *(First, middle, last name)*

Chicago of Chicago

v.

**Defendants / Respondents** *(First, middle, last name)*

BP P.L.C., et al.

2024 CH 01024

**Case Number**

☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)*

---

In **1a**, enter the name and address of the next Defendant/ Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here.

In **1b**, enter a second address for this Defendant/ Respondent if you have one.

In **1c**, check how you are sending your documents to this Defendant/ Respondent.

1. Next Defendant/Respondent's address and service information:
   a. Defendant/Respondent's primary address/information for service:
      Name *(First, Middle, Last)*:   Chevron Corporation
      Registered Agent's name, if any:  Corporation Service Company
      Street Address, Unit #:   251 Little Falls Drive
      City, State, ZIP:   Wilmington, Delaware 19808
      Telephone:  (302) 636-5401    Email:
   b. If you have more than one address where Defendant/Respondent might be found, list that here:
      Name *(First, Middle, Last)*:
      Street Address, Unit #:
      City, State, ZIP:
      Telephone:            Email:
   c. Method of service on Defendant/Respondent:
      ☐ Sheriff       ☐ Sheriff outside Illinois: _____
                                            *County & State*
      ☑ Special process server    ☐ Licensed private detective

SU-S 1503.3                 Page 1 of 1                    (05/23)

**S.A. 21**

| In 4a, fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/ Response*. | ☐ b. | Attend court: |
| --- | --- | --- |

In 4a, fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/ Response*.

**b.** Attend court:

On: _____ at _____ ☐ a.m. ☐ p.m. in _____
     *Date*           *Time*                           *Courtroom*

**In-person at:**

_____   _____       _____   _____
*Courthouse Address*    *City*          *State*     *ZIP*

OR

**Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance"):

By telephone: _____
                      *Call-in number for telephone remote appearance*

By video conference: _____
                          *Video conference website*

_____
*Video conference log-in information (meeting ID, password, etc.)*

Call the Circuit Clerk at: _____ or visit their website
                      *Circuit Clerk's phone number*

at: _____ to find out more about how to do this.
   *Website*

In 4b, fill out:
- The court date and time the clerk gave you.
- The courtroom and address of the court building.
- The call-in or video information for remote appearances (if applicable).
- The clerk's phone number and website. All of this information is available from the Circuit Clerk.

| STOP! The Circuit Clerk will fill in this section. | |
| --- | --- |

**Witness this Date:** _____

2/21/2024 1:15 PM IRIS Y. MARTINEZ

**Clerk of the Court:** _____

| **STOP! The officer or process server will fill in the Date of Service** |
| --- |

**Note to officer or process server:**
- If 4a is checked, this *Summons* must be served within 30 days of the witness date.
- If 4b is checked, this *Summons* must be served at least 40 days before the court date, unless 2b is also checked.
  - If 4b and 2b are checked, the *Summons* must be served at least 3 days before the court date.

Date of Service: _____
          *(Date to be entered by an officer or process server on the copy of this Summons left with the Defendant or other person.)*

**S.A. 22**

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

Enter the Case Number given by the Circuit Clerk: 2024 CH 01024

**This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts.**
**Forms are free at ilcourts.info/forms.**

| | | |
|---|---|---|
| **STATE OF ILLINOIS, CIRCUIT COURT**<br>Cook ___ **COUNTY** | **PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION** | *For Court Use Only* |

| **Instructions** | |
|---|---|
| Enter above the county name where the case was filed. | City of Chicago |
| | **Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | |
| Enter the names of all people you are suing as Defendants/ Respondents. | v.<br><br>Please see attachment |
| | **Defendant / Respondent** *(First, middle, last name)* |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* |

2024 CH 01024
**Case Number**

**\*\*Stop. Do not complete the form. The sheriff or special process server will fill in the form. Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent.\*\***

**My name is** _____ **and I state**
*First, Middle, Last*

☐ **I served the** *Summons* **and Complaint/Petition on the Defendant/Respondent**

_____ **as follows:**
*First, Middle, Last*

☐ Personally on the Defendant/Respondent:
  ☐ Male  ☐ Female  ☐ Non-Binary   Approx. Age: _____   Race: _____
  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
  Address, Unit#: _____
  City, State, ZIP: _____

☐ On someone else at the Defendant/Respondent's home who is at least 13 years old and is a family member or lives there:
  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
  Address, Unit#: _____
  City, State, ZIP: _____
  And left it with: _____
  *First, Middle, Last*
  ☐ Male  ☐ Female  ☐ Non-Binary   Approx. Age: _____   Race: _____
  and by sending a copy to this defendant in a postage-paid, sealed envelope to the above address on this date: _____

☐ On the Corporation's agent, _____
  *First, Middle, Last*
  ☐ Male  ☐ Female  ☐ Non-Binary   Approx. Age: _____   Race: _____
  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
  Address: _____
  City, State, ZIP: _____

S.A. 23

☐ **I was not able to serve the *Summons* and Complaint/Petition on Defendant/Respondent:**

_____
*First, Middle, Last*

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

1. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____

2. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____

3. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____

| | |
|---|---|
| **DO NOT** complete this section. The sheriff or private process server will complete it. | **If you are a special process server, sheriff outside Illinois, or licensed private detective, your signature certifies that everything on the *Proof of Service of Summons* is true and correct to the best of your knowledge. You understand that making a false statement on this form could be perjury.** |

**By:** _____

Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony.

*Signature by:*  ☐ Sheriff
                 ☐ Sheriff outside Illinois:

_____
*County and State*
☐ Special process server
☐ Licensed private detective

_____
*Print Name*

**FEES**

Service and Return: $ _____
Miles _____ $ _____
Total              $ 0.00

If *Summons* is served by licensed private detective or private detective agency:
License Number: _____

**S.A. 24**

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 3

FILED
2/21/2024 1:30 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH01024
Calendar, 3
26498415

FILED DATE: 2/21/2024 1:30 PM    2024CH01024

## ATTACHMENT TO SUMMONS

**Full List of Named Parties:**

CITY OF CHICAGO,

     *Plaintiff,*

v.

BP P.L.C., BP AMERICA INC., BP PRODUCTS NORTH AMERICA INC., CHEVRON
CORPORATION, CHEVRON U.S.A. INC., CONOCOPHILLIPS COMPANY,
CONOCOPHILLIPS, PHILLIPS 66 COMPANY, PHILLIPS 66, EXXON MOBIL
CORPORATION, EXXONMOBIL OIL CORPORATION, SHELL OIL PRODUCTS
COMPANY LLC, SHELL PLC, SHELL USA INC., and AMERICAN PETROLEUM
INSTITUTE,

     *Defendants.*

Hearing Date: 6/20/2024 9:30 AM
Location: Court Room 2402
Judge: Price Walker, Allen

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

CITY OF CHICAGO,

       *Plaintiff,*

    v.

BP P.L.C.;
BP AMERICA INC.;
BP PRODUCTS NORTH AMERICA INC.;
CHEVRON CORPORATION;
CHEVRON U.S.A. INC.;
CONOCOPHILLIPS COMPANY;
CONOCOPHILLIPS;
PHILLIPS 66 COMPANY;
PHILLIPS 66;
EXXON MOBIL CORPORATION;
EXXONMOBIL OIL CORPORATION;
SHELL OIL PRODUCTS COMPANY LLC;
SHELL PLC;
SHELL USA, INC.; and
AMERICAN PETROLEUM INSTITUTE,

       *Defendants.*

Case No.   **2024CH01024**

**S.A. 26**

**TABLE OF CONTENTS**

COMPLAINT AND DEMAND FOR JURY TRIAL ...................................................... 1

I. INTRODUCTION.............................................................................................. 1

II. PARTIES .......................................................................................................... 5

   A. Relevant Non-Parties: Defendants' Agents/Front Groups.............................. 32

III. JURISDICTION AND VENUE ....................................................................... 33

IV. FACTUAL ALLEGATIONS ........................................................................... 36

   A. Defendants Are Substantially Responsible for Causing and Accelerating Climate Change. ........................................................................................................................ 36

   B. Defendants Went to Great Lengths to Understand the Dangers Associated with Fossil Fuel Products, and Either Knew or Should Have Known of Those Dangers........................ 43

   C. Defendants Did Not Disclose Known Harms Associated with the Intended Use of Fossil Fuel Products, and Instead Affirmatively Concealed Those Harms by Engaging in a Campaign of Deception to Increase the Use of Those Products. ........................................... 65

   D. Defendants Could Have Chosen to Facilitate, and Be Part of, a Lower-Carbon Future, but Instead Chose Corporate Profits and Continued Deception. ........................................... 92

   E. Defendants' Internal Actions Demonstrate Their Awareness of the Impacts of Climate Change and Their Intent to Continue to Profit from the Unabated Use of Fossil Fuel Products. ...................................................................................................................... 93

   F. Defendants' Actions Have Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis. ................................................................................. 95

   G. Defendants Continue to Deceive Chicago Consumers Through Misleading Advertisements That Portray Defendants as Climate-Friendly Energy Companies and Obscure Their Role in Causing Climate Change................................................................. 103

   H. Defendants' Concealments and Misrepresentations Regarding the Dangers of Fossil Fuel Products Encouraged Continued Use of Fossil Fuels and Discouraged Concerted Action on Greenhouse Gas Emissions.................................................................................. 132

   I. The Effects of Defendants' Deceit Are Ongoing.......................................................... 134

   J. The City Has Suffered, Is Suffering, and Will Continue to Suffer Injuries from Defendants' Wrongful Conduct. ........................................................................................... 136

CAUSES OF ACTION ............................................................................................. 149

COUNT I STRICT PRODUCTS LIABILITY – FAILURE TO WARN (Against Fossil Fuel Defendants) ............................................................................................................... 149

**S.A. 28**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

COUNT II NEGLIGENT PRODUCTS LIABILITY – FAILURE TO WARN (Against Fossil Fuel Defendants) ................................................................................................................ 155

COUNT III NEGLIGENCE (Against All Defendants) ............................................................ 160

COUNT IV PUBLIC NUISANCE (Against All Defendants) ................................................... 163

COUNT V PRIVATE NUISANCE  (Against All Defendants) .................................................. 166

COUNT VI NUISANCE VIOLATIONS OF MCC § 7-28-030 (Against All Defendants) ........ 170

COUNT VII CIVIL CONSPIRACY  (Against All Defendants) ................................................ 171

COUNT VII UNJUST ENRICHMENT (Against All Defendants) ........................................... 173

COUNT IX CONSUMER FRAUD—MISLEADING, UNFAIR, AND DECEPTIVE PRACTICES IN VIOLATION OF MCC § 2-25-090 (Against All Defendants) ...................... 176

COUNT X MISREPRESENTATIONS IN CONNECTION WITH SALE OR ADVERTISEMENT OF MERCHANDISE IN VIOLATION OF MCC §§ 4-276-470, *et seq.* (Against All Defendants) ............................................................................................................ 180

COUNT XI RECOVERY OF CITY COSTS OF PROVIDING SERVICES IN VIOLATION OF MCC § 1-20-020 (Against All Defendants) ............................................................................. 183

REQUEST FOR RELIEF ........................................................................................................ 184

JURY TRIAL DEMANDED .................................................................................................... 185

**S.A. 29**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff City of Chicago ("Chicago" or the "City") brings this action against Defendants BP p.l.c., BP America Inc., and BP Products North America Inc. (collectively, "BP"); Chevron Corporation and Chevron U.S.A. Inc. (collectively, "Chevron"); ConocoPhillips Company, ConocoPhillips, Phillips 66 Company, and Phillips 66 (collectively, "ConocoPhillips"); Exxon Mobil Corporation and ExxonMobil Oil Corporation (collectively, "ExxonMobil"); Shell Oil Products Company LLC, Shell plc, and Shell USA, Inc. (collectively, "Shell"); and the American Petroleum Institute ("API") (collectively, "Defendants").

## I.    **INTRODUCTION**

1.    For decades, the fossil fuel industry has misled consumers and the public about climate change. Since at least the 1950s, its own scientists have consistently concluded that fossil fuels produce carbon dioxide and other greenhouse gas pollution that can have catastrophic consequences for the planet and its people. The industry took these internal scientific findings seriously, investing heavily to protect its own assets and infrastructure from rising seas, stronger storms, and other climate change impacts. Rather than warn consumers and the public, fossil fuel companies and their surrogates mounted a disinformation campaign to discredit the scientific consensus on climate change; create doubt in the minds of consumers, the media, teachers, and the public about the climate change impacts of burning fossil fuels; and delay the energy economy's transition to a lower-carbon future. This successful climate deception campaign had the purpose and effect of inflating and sustaining the market for fossil fuels, which—in turn—drove up greenhouse gas emissions, accelerated global warming, and brought about devastating climate change impacts to the City of Chicago.

2.    Major members of the fossil fuel industry have known for decades that fossil fuels—their chief products—are the primary cause of climate change and that, if unabated, climate

1

**S.A. 30**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

change could result in catastrophic impacts, including droughts, flooding, and severe weather events that would impose enormous harms on cities such as Chicago. Despite this knowledge, these corporations and their trade associations have embarked on tobacco-industry-style campaigns to deceive and mislead the public about the damaging nature of their fossil fuel products.

3.    Defendants (save for API) (collectively "Fossil Fuel Defendants") are large companies in the fossil fuel industry, which advertise, promote, and sell oil, coal, and natural gas products (collectively, "fossil fuel products"). Each Defendant funded, staffed, organized, and otherwise supported efforts to deceive the public and consumers—in and outside of Chicago— about the role of fossil fuel products in causing the global climate crisis.

4.    The rate at which Fossil Fuel Defendants have extracted and sold fossil fuel products has exploded since the Second World War, as have carbon dioxide ("$CO_2$") and other emissions from those products. Fossil fuel emissions—especially $CO_2$—are far and away the dominant driver of global warming.[1] The substantial majority of all anthropogenic greenhouse gas emissions in history have occurred from the 1950s to the present, a period known as the "Great Acceleration."[2] About three-quarters of all industrial $CO_2$ emissions in history have occurred since

---

[1] *See Summary for Policymakers in Climate Change 2021: The Physical Science Basis. Contribution of Working Group I in the Sixth Assessment Report*, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE ("IPCC"), at 4-9 (2021), https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_SPM.pdf.

[2] Will Steffen et al., *The Trajectory of the Anthropocene: The Great Acceleration*, 2 THE ANTHROPOCENE REV. 81, 81 (2015).

S.A. 31

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

the 1960s,[3] and more than half have occurred since the late 1980s.[4] The annual rate of $CO_2$ emissions caused by fossil fuels has increased substantially since 1990.[5]

5.     Defendants' awareness of the negative impacts of fossil fuel consumption almost exactly tracks the onset of the Great Acceleration. Defendants have known since at least the 1950s that fossil fuels produce carbon dioxide and other greenhouse gas ("GHG") pollution that would warm the planet and change our climate. Defendants' own scientists knew as early as the 1950s that these climate impacts would be catastrophic, and that there was only a narrow window of time in which action could be taken before the consequences became catastrophic.

6.     Rather than warn of these tremendous harms, however, Defendants mounted a disinformation campaign beginning as early as the 1970s to discredit the burgeoning scientific consensus on climate change; deny their own knowledge of climate change-related threats; create doubt in the minds of consumers, the media, teachers, and the public about the reality and consequences of burning fossil fuels; and delay the necessary transition to a lower-carbon future.

7.     Defendants have further deceived customers and the public by misrepresenting the climate impacts of their products sold in the City. In a bid to reassure consumers that purchasing these products is good for the planet, Defendants advertise them as "cleaner," "emissions-reducing," and the like, while failing to disclose their harmful effects on the climate. This strategy comes straight out of the advertising playbook of Big Tobacco, which deceptively promoted "low tar" and "light" cigarettes as healthier smoking options, when they knew that any use of cigarettes

---

[3] R.J. Andres et al., *A Synthesis of Carbon Dioxide Emissions from Fossil-Fuel Combustion*, 9 BIOGEOSCIENCES 1845, 1851 (2012).

[4] *Id.*

[5] *Global Carbon Budget 2021*, GLOBAL CARBON PROJECT (2021), https://www.globalcarbonproject.org/global/images/carbonbudget/Infographic_Emissions2021.pdf.

**S.A. 32**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

was harmful. Defendants also falsely present themselves as corporate leaders in the fight against climate change, claiming to invest substantially in low-emission technologies and zero-emission energy sources, while their business continues to be overwhelmingly focused on fossil fuel production and sales.

8.    Defendant API is the oil and gas industry's largest trade association. API, along with Fossil Fuel Defendants, have known for decades about the relationship between fossil fuel products and the catastrophic impacts of climate change. And like other Defendants, API has spread its own deceptive advertising. Additionally, API has long served as a hub both for Defendants to share their knowledge about the link between fossil fuel products and climate change impacts, and for Defendants' climate deception campaign. Indeed, much of Defendants' climate deception campaign was planned, coordinated, and supported by API.

9.    Defendants misrepresented and concealed the hazards of fossil fuel products to deceive consumers and the public about the consequences of everyday use of fossil fuel products. Defendants' climate deception campaign, and aggressive promotion of the use of fossil fuel products while knowing the dangers associated with them, had the purpose and effect of unduly and substantially inflating and sustaining the market for fossil fuels. Defendants' tortious and deceptive conduct, both individually and collectively, drove fossil fuel consumption and delayed the transition to a lower-carbon future. This caused an enormous, foreseeable, and avoidable increase in anthropogenic GHG emissions and accelerated global warming, bringing devastating consequences to the City and its people.

10.    While Defendants have promoted and profited from their deceptive conduct, the City and its residents have spent, and will continue to spend, substantial sums to recover from the effects of climate change. The climate change impacts that Chicago has faced and will continue to

**S.A. 33**

face – including more frequent and intense storms, flooding, droughts, extreme heat events, and shoreline erosion – are felt throughout every part of the City, and disproportionately in low-income communities and communities that have historically experienced racial, social, health, and economic inequities. These effects of climate change require large investments to protect the City's people, infrastructure, environment, and natural areas.

11.     Defendants' misconduct has resulted in tremendous harm to people, property, and the environment in the City. Chicagoans and their families, communities, and small businesses should not have to bear the costs of climate change alone. The companies that have profited from the deception campaign designed to drive profits at the expense of Chicagoans must be made to mitigate the harms they have brought upon the City. This lawsuit seeks to hold those companies accountable for the lies they have told and the damage they have caused.[6]

## II.     **PARTIES**

12.     Plaintiff City of Chicago is a municipal corporation and a home-rule unit organized and existing under the laws of the State of Illinois.

13.     Defendants include some of the largest oil and gas companies in the world, and a national oil and gas industry trade association. The fossil fuels produced by the defendant companies (and promoted by the defendant trade association) are individually and collectively responsible for the emission of billions of tons of greenhouse gases and attendant harms to the City.

14.     When this Complaint references an act or omission of Defendants, unless specifically attributed or otherwise stated, such references mean that the officers, directors, agents,

---

[6] Plaintiff hereby disclaims injuries arising on federal property and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes. Plaintiff seeks no recovery or relief attributable to these injuries.

## S.A. 34

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

employees, or representatives of Defendants committed or authorized such an act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

15. **BP Entities: BP p.l.c.; BP America Inc.; and BP Products North America Inc.**

a. Defendant **BP p.l.c.** is a multinational, vertically integrated energy and petrochemical public limited company registered in England and Wales, with its principal place of business in London, England. BP p.l.c. consists of three main operating segments: (1) exploration and production, (2) refining and marketing, and (3) gas power and renewables. BP p.l.c. is the ultimate parent company of numerous subsidiaries, including Atlantic Richfield Company, referred to collectively herein as the "BP Group," which explore for and extract oil and gas worldwide; refine oil into fossil fuel products such as gasoline; and market and sell oil, fuel, other refined petroleum products and natural gas worldwide. BP p.l.c.'s subsidiaries explore for oil and natural gas under a wide range of licensing and other contractual agreements. BP p.l.c. was formerly known as, did or does business as, and/or is the successor in liability to British Petroleum Company, British Petroleum Company p.l.c., BP Amoco p.l.c., Amoco Corporation, and Atlantic Richfield Company.

b. BP p.l.c. controls and has controlled company-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. BP p.l.c. is the ultimate decision-maker with respect to fundamental decisions about the BP Group's core business, *e.g.*, the level of fossil fuel production companywide, including production among BP p.l.c.'s subsidiaries. BP p.l.c.'s 2022 Annual Report summarizes the company's "Strategic progress," including on offshore projects in the Gulf of Mexico, Brazil, and Angola, as well as

**S.A. 35**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

acquisitions and sales of various oil and gas operations. In 2016 to 2017, BP p.l.c. reported that it brought online 13 major exploration and production projects, contributing to a 12 percent increase in the BP Group's overall fossil fuel product production. These projects were carried out by BP p.l.c.'s subsidiaries.

c.     BP p.l.c. controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions, and climate change resulting from the company's fossil fuel products, as well as communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. BP p.l.c. makes fossil fuel production decisions for the entire BP Group based on factors including climate change. BP p.l.c.'s Board of Directors is the highest decision-making body within the company, with direct responsibility for the BP Group's climate change policy. BP p.l.c.'s chief executive is responsible for maintaining the BP Group's system of internal control that governs the BP Group's business conduct. BP p.l.c.'s senior leadership directly oversees a "carbon steering group," which manages climate change-related matters and consists of two committees—both overseen directly by the Board of Directors—that focus on climate change-related investments.

d.     Defendant **BP America Inc.** is a wholly owned subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP America Inc. is a vertically integrated energy and petrochemical company incorporated in the State of Delaware, with its headquarters and principal place of business in Houston, Texas. BP America Inc. consists of numerous divisions and affiliates in all aspects of fossil fuel production, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, marketing, and sale of crude oil, natural gas, and petroleum products. BP America

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

Inc. was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Amoco Oil Company; Amoco Production Company; ARCO Products Company; BP Exploration & Oil, Inc.; BP Products North America Inc.; BP Amoco Corporation; BP Oil, Inc.; BP Oil Company; Sohio Oil Company; Standard Oil of Ohio (SOHIO); Standard Oil (Indiana); and Atlantic Richfield Company (a Pennsylvania Corporation) and its division, the Arco Chemical Company.

      e.    Defendant **BP Products North America Inc.** is a wholly-owned subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP Products North America Inc. is a vertically integrated energy and petrochemical company incorporated in the State of Maryland, with its headquarters and principal place of business in Chicago, Illinois, and has been registered to do business in Illinois since 1956.[7] BP Products North America, Inc. explores, develops, refines, and markets oil and natural gas and other fossil fuel products, including gasoline, kerosene, fuel oils, and lubricants.[8]

      f.    BP Products North America Inc. operates retail gasoline stations in the State of Illinois and throughout the United States,[9] and, "[u]nder an exclusive license from its parent

---

[7] BP Products North America Inc. has confirmed that it is an Illinois citizen. *See Cline v. BP Prods. N. Am. Inc.*, No. 23-856, Dkt. 1 at 8 (E.D. La. Mar. 8, 2023) ("BP Products North America Inc., individually and as successor in interest to Amoco Oil Company and The American Oil Company, is incorporated in the State of Maryland, with its principal place of business in Illinois. BP Products North America Inc. is therefore (and was at the time of filing of the state court action) a citizen of Maryland and Illinois for purposes of federal diversity jurisdiction."); *see also Heath v. BP Prods. N. Am., Inc.*, No. 13-4741, Dkt. 50 ¶ 3 (N.D. Ill. Sept. 27, 2013) ("Diversity of citizenship fails in this case as Plaintiff and Defendant BP PRODUCTS NORTH AMERICA INC. and BP PIPELINES (NORTH AMERICA) INC. are both citizens of Illinois.").

[8] *BP Products North America Settlement*, U.S. ENVT'L. PROT. AGENCY (Sept. 30, 2010) https://www.epa.gov/enforcement/bp-north-america-settlement ("BP Products North America, Inc. engages in the exploration, development, production, refining, and marketing of oil and natural gas.").

[9] *BP Expands Mobility and Convenience Network Completing the Purchase of Leading Travel Center Operator, TravelCenters of America*, BP (May 15, 2023),

**S.A. 37**

company BP p.l.c., located in London, United Kingdom, BP Products [North America] markets a variety of automotive products, including, among other things, gasoline, and related goods and services through automotive service stations and convenience stores in Illinois and throughout the United States on its own and through authorized sub-licensees."[10]

g.    BP Products North America Inc. recently stated that it "is a longtime supplier of motor fuel in the Midwest, including in Chicagoland. [BP Products North America Inc.] refines motor fuel and markets it to the public through BP-branded and Amoco-branded stations located all across the Chicago area. There are more than 400 BP-branded retail motor fuel stations in the State of Illinois alone."[11]

h.    BP Products North America Inc. was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Air BP, Amoco Oil Company; Amoco Production Company; ARCO Products Company; BP Exploration & Oil, Inc.; BP America Inc.; BP Amoco Corporation; BP Oil, Inc.; BP Oil Company; Sohio Oil Company; Standard Oil of Ohio (SOHIO); Standard Oil (Indiana); and Atlantic Richfield Company (a Pennsylvania Corporation) and its division, the Arco Chemical Company.

i.    Defendants BP p.l.c., BP America Inc., and BP Products North America Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "BP."

---

https://www.bp.com/en/global/corporate/news-and-insights/press-releases/bp-expands-mobility-and-convenience-network-completing-the-purchase-of-leading-travel-center-operator-travelcenters-of-america.html.

[10] *BP Prods. N. Am. Inc. v. Sandhu Petroleum, Inc.*, No. 05-586, Dkt. 1 ¶ 7 (N.D. Ill. Feb. 1, 2005).

[11] *BP Prods. N. Am. Inc. v. 4401 Inc.*, No. 2021 CH 02246, Am. Compl. ¶ 7 (Ill. Cir. Ct. July 27, 2021); *see also Diamond v. BP Prods. N. Am. Inc.*, Case No. 10-471, Dkt. 52 at 2 (N.D. Ill. Aug. 20, 2010) (BP Products North America Inc. "market[s] motor fuel through retail outlets in the Chicago area").

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

j.     The City's claims against BP arise out of and are related to the acts and omissions of BP in the City of Chicago and BP's actions elsewhere that caused and will cause injuries in the City.

k.     BP has purposefully directed its tortious conduct toward Chicago by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Chicago, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Chicago, including injuries to the City. BP's statements in Chicago, in Illinois, and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and BP's affirmative promotion of its fossil fuel products as safe despite knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the City and its residents, about the serious adverse consequences that would result from continued use of BP's products. That conduct was purposefully directed to reach and influence the City and its residents to continue the unabated use of BP's fossil fuel products in Chicago, thereby resulting in the City's injuries.

l.     Over the last several decades and continuing to the present day, BP spent millions of dollars on radio, television, online, social media, and outdoor advertisements in the Chicago market related to its fossil fuel products.[12] Since at least 1988 and continuing to the present day, BP has advertised in print publications circulated widely to Chicago consumers, including but not limited to the following: *The Chicago Tribune*; *The Chicago Sun-Times*; *The Atlantic*; *Life*; *Newsweek*; *The New York Times*; *Sports Illustrated*, *Time*; *The Wall Street Journal*;

---

[12] *See 4401 Inc.*, No. 2021 CH 02246, Am. Compl. ¶ 12 (stating in a Chicago filing that BP Products North America "has spent many hundreds of millions of dollars promoting and advertising its goods and services under the BP name and mark.").

10

**S.A. 39**

and *The Washington Post*. BP has acknowledged the widespread impact of its marketing techniques "in the Chicago market where it has worked to establish and maintain brand awareness and goodwill."[13] As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of BP's fossil fuel products and climate change, and/or misrepresenting BP's products and BP itself as environmentally friendly.

m.     Significant quantities of BP's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Chicago and in Illinois, from which activities BP derives and has derived substantial revenue.

n.     BP conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations throughout Chicago and Illinois, at which locations it promotes, advertises, and sells its fossil fuel products. Its "retail presence includes over 750 bp, Amoco-, Thorntons- and TravelCenters of America-branded sites" in Illinois.[14] There are 208 BP- and Amoco-branded petroleum stations in Chicago alone.

o.     BP also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Chicago and Illinois consumers under its Castrol brand name.

p.     BP markets and advertises its fossil fuel products in Chicago to its residents by maintaining an interactive website available to prospective customers by which it directs the City's residents to its nearby retail service stations and/or lubricant distributors.[15]

q.     Further, BP promotes its products in Chicago and Illinois by regularly updating and actively promoting its "BPme Rewards" app and rewards program, which encourages

---

[13] *Id.* ¶ 26.

[14] *Illinois*, BP, https://permanent.link/to/bpinchicago/whereweoperate (last visited Dec. 6, 2023).

[15] *bp in Illinois*, BP, https://permanent.link/to/bpinchicago/illinois (last visited Dec. 6, 2023).

**S.A. 40**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

customers to buy fuel at its stations in Chicago and Illinois in exchange for rewards on fuel purchase.

r.     By the company's own description, "bp has a rich, proud history in Chicago dating back more than a century. Over the years, its investments have made the company part of the [C]ity's cultural fabric."[16] The Aon Center was built as the Standard Oil Building in Chicago and was subsequently renamed the Amoco Building.[17] BP claims to "support[] nearly 7,000 jobs across Illinois," including at least 3,100 BP employees, and has invested $740 million through vendors in the State.[18] Additionally, "[s]ince 2012, bp has contributed more than $11 million in research at the University of Illinois at Urbana – Champaign including student-led technology projects."[19]

s.     Many of BP's corporate level decisions—including its decisions surrounding the transportation, distribution, promotion, and marketing of fossil fuels—take place in Chicago.[20] "Chicago is also home to the US headquarters of Air bp, one of the world's leading suppliers of aviation fuel products and services,"[21] and as discussed below, BP's greenwashing campaign included statements about its aviation fuel products.

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* ("Chicago is the headquarters for control centers in Oklahoma and Washington that manage more than 4,200 miles of pipelines within the US.").

[21] *Id.*

**S.A. 41**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

16.     **Chevron Entities: Chevron Corporation and Chevron U.S.A. Inc.**

a.      Defendant **Chevron Corporation** is a multinational, vertically integrated energy and chemicals company incorporated in Delaware, with its global headquarters and principal place of business in San Ramon, California.

b.      Chevron Corporation operates through a web of United States and international subsidiaries at all levels of the fossil fuel supply chain. Chevron Corporation and its subsidiaries' operations include, but are not limited to, exploration, development, production, storage, transportation, and marketing of crude oil and natural gas; refining crude oil into petroleum products and marketing those products; and manufacturing and marketing commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

c.      Chevron Corporation controls and has controlled company-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Chevron Corporation determines whether and to what extent its corporate holdings market, produce, and/or distribute fossil fuel products.

d.      Chevron Corporation controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. Overall accountability for climate change within Chevron Corporation lies with Chevron Corporation's Board of Directors and Executive Committee.

e.      Defendant **Chevron U.S.A. Inc.** is a Pennsylvania corporation with its principal place of business located in San Ramon, California. Chevron U.S.A. Inc. is registered to do business in Illinois, since 1954. Chevron U.S.A. Inc. is a wholly owned subsidiary of Chevron

13

**S.A. 42**

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

Corporation that acts on Chevron Corporation's behalf and is subject to Chevron Corporation's control. Chevron U.S.A. Inc. was formerly known as, did or does business as, and/or is the successor in liability to Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company, and Chevron Chemical Company.

       f.     Defendants Chevron Corporation and Chevron U.S.A. Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Chevron."

       g.     The City's claims against Chevron arise out of and are related to the acts and omissions of Chevron in Chicago and elsewhere that caused and will cause injuries in Chicago.

       h.     Chevron has purposefully directed its tortious conduct toward Chicago by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Chicago, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Chicago, including the City's injuries. Chevron's statements in Chicago, in Illinois, and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Chevron's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the City and its residents, about the serious adverse consequences that would result from continued use of Chevron's products. That conduct was purposefully directed to reach and influence the City and its residents to continue the unabated use of Chevron's fossil fuel products in Chicago, thereby resulting in the City's injuries.

       i.     Over the last several decades and continuing to the present day, Chevron spent millions of dollars on radio, television, online, social media, and outdoor advertisements in

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

the Chicago market related to its fossil fuel products. Since at least 1970, and continuing to the present day, Chevron has advertised in print publications circulated widely to Chicago consumers, including but not limited to the following: *The Chicago Tribune*; *The Chicago Sun-Times*; *The Atlantic*; *Life*; *National Geographic*; *The New York Times*; *Sports Illustrated*; *Time Magazine*; *The Wall Street Journal*; and *The Washington Post*. As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Chevron's fossil fuel products and climate change, and/or misrepresenting Chevron's products or Chevron itself as environmentally friendly.

j.     Significant quantities of Chevron's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Chicago, from which activities Chevron derives and has derived substantial revenue.

k.     Chevron conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations, at which locations it promotes, advertises, and sells its fossil fuel products under its various brand names, including Chevron, Texaco, and other brand names.

l.     Chevron also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Chicago and Illinois consumers under its Starplex/Delo, IsoClean, Techron, and Havoline brand names. Chevron markets and advertises its fossil fuel products in Chicago to its residents by maintaining an interactive website available to prospective customers by which it directs the City's residents to its nearby retail service stations and/or lubricant distributors.[22] Further, Chevron promotes its products in Chicago and Illinois by regularly updating

---

[22] *Where to Buy*, CHEVRON LUBRICANTS, https://www.chevronlubricants.com/en_us/home/where-to-buy/find-a-retailer.html (last visited Nov. 15, 2023).

**S.A. 44**

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

and actively promoting its "Chevron Texaco Rewards" app and rewards program, which encourages customers to buy fuel at its stations in exchange for rewards on fuel purchases.

m. Chevron operates the Seneca biorefinery in Seneca, Illinois,[23] as well as the Danville biodiesel refinery in Danville, Illinois.[24]

n. Chevron Energy Solutions has an office in Oak Brook, Illinois.

17. **ConocoPhillips Entities: ConocoPhillips; ConocoPhillips Company; Phillips 66 Company; and Phillips 66**

a. Defendant **ConocoPhillips** is a multinational energy company incorporated in Delaware, with its principal place of business in Houston, Texas. ConocoPhillips consists of numerous divisions, subsidiaries, and affiliates that execute ConocoPhillips's fundamental decisions related to all aspects of fossil fuel production, including exploration, extraction, production, manufacture, transport, and marketing.

b. ConocoPhillips controls and has controlled company-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. ConocoPhillips determines whether and to what extent its corporate holdings market, produce, and/or distribute fossil fuel products. ConocoPhillips's most recent annual report to the Securities and Exchange Commission ("SEC") subsumes the operations of ConocoPhillips's subsidiaries. In ConocoPhillips's Form 10-K filed with the SEC for Fiscal Year 2022, the company represents that its value—for which ConocoPhillips maintains ultimate responsibility—is a function of its decisions directing subsidiaries to develop crude oil, bitumen, natural gas, and natural gas liquids

---

[23] *Seneca, IL*, CHEVRON, https://www.regi.com/services/find-fuels/seneca-il (last visited Nov. 15, 2023).

[24] *Danville, IL*, CHEVRON, https://www.regi.com/services/find-fuels/danville-il (last visited Nov. 15, 2023).

**S.A. 45**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

from ConocoPhillips's reserves into fossil fuel products and to explore for and replace those reserves with more fossil fuels: "Unless we successfully develop resources, the scope of our business will decline, resulting in an adverse impact to our business. . . . If we are not successful in replacing the resources we produce with good prospects for future organic development or through acquisitions, our business will decline."[25]

       c.     ConocoPhillips optimizes the ConocoPhillips group's oil and gas portfolio to fit ConocoPhillips's strategic plan. For example, ConocoPhillips' 10-K in 2022 summaries the "continued development of onshore assets" in the United States and new exploration activities in Alaska, Canada, the North Sea, and elsewhere.[26] Similarly, in November 2016, ConocoPhillips announced a plan to generate five to eight billion dollars of proceeds over two years by optimizing its business portfolio, including its fossil fuel product business, to focus on low cost-of-supply fossil fuel production projects that strategically fit its development plans.

       d.     ConocoPhillips controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. For instance, ConocoPhillips's Board of Directors has the highest level of direct responsibility for climate change policy within the company. ConocoPhillips has developed and purportedly implements a corporate Climate Change Action Plan to govern climate change decision-making across all entities in the ConocoPhillips group.

---

[25] ConocoPhillips, Annual Report (Form 10-K) (Feb. 16, 2023).
[26] *Id.*

17

**S.A. 46**

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

e. Defendant **ConocoPhillips Company** is a wholly-owned subsidiary of ConocoPhillips that acts on ConocoPhillips' behalf and is subject to ConocoPhillips' control. ConocoPhillips Company is incorporated in Delaware, with its principal place of business in Houston, Texas. ConocoPhillips Company was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Phillips Petroleum Company.

f. Defendant **Phillips 66 Company** is a wholly-owned subsidiary of Phillips 66 that acts on Phillips 66's behalf and is subject to Phillips 66's control. Phillips 66 Company is incorporated in Delaware, with its principal place of business in Houston, Texas. Phillips 66 Company had been registered to do business since 1964 under a different name, Phillips Chemical Company, which was a wholly-owned subsidiary of the Phillips Petroleum Company. Phillips Chemical Company changed its name to Phillips 66 Company in 1985, and that iteration of Phillips 66 Company was terminated in 1991. Phillips 66 Company was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Phillips Petroleum Company; Phillips Chemical Company; Conoco, Inc.; Tosco Corporation; and Tosco Refining Co.

g. Defendant **Phillips 66** is a multinational energy and petrochemical company incorporated in Delaware, with its principal place of business in Houston, Texas. It encompasses downstream fossil fuel processing, refining, transport, and marketing segments that were formerly owned and/or controlled by ConocoPhillips.

h. Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, and Phillips 66 Company, as well as their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "ConocoPhillips."

**S.A. 47**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

i.    The City's claims against ConocoPhillips arise out of and are related to the acts and omissions of ConocoPhillips in Chicago and elsewhere that caused and will cause injuries in Chicago.

j.    ConocoPhillips has purposefully directed its tortious conduct toward Chicago by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Chicago, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Chicago, including the City's injuries. ConocoPhillips's statements in Chicago, in Illinois, and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and ConocoPhillips's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the City and its residents, about the serious adverse consequences that would result from continued use of ConocoPhillips's products. That conduct was purposefully directed to reach and influence the City and its residents to continue the unabated use of ConocoPhillips's fossil fuel products in Chicago, thereby resulting in the City's injuries.

k.    Over the last several decades and continuing to the present day, ConocoPhillips spent millions of dollars on radio, television, online, social media, and outdoor advertisements in the Chicago market related to its fossil fuel products. Since at least 1970, and continuing to the present day, ConocoPhillips has advertised in print publications circulated widely to Chicago consumers, including but not limited to the following: *The Chicago Tribune*; *The Chicago Sun-Times*; *The Atlantic*; *Life*; *National Geographic*; *Newsweek*; *The New York Times*; *People*; *Sports Illustrated*; *Time Magazine*; *The Wall Street Journal*; and *The Washington Post*. As further detailed herein, these include advertisements containing false or misleading statements,

**S.A. 48**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

misrepresentations, and/or material omissions obfuscating the connection between the production and use of ConocoPhillips's fossil fuel products and climate change, and/or misrepresenting ConocoPhillips's products or ConocoPhillips itself as environmentally friendly.

l.      Significant quantities of ConocoPhillips' fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Chicago and in Illinois, from which activities ConocoPhillips derives and has derived substantial revenue.

m.      ConocoPhillips conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations throughout Chicago and Illinois, at which locations it promotes, advertises, and sells its fossil fuel products under its various brand names, including Conoco, Phillips 66, and other brands. There are 191 such gas stations in Illinois, including in and around Chicago.

n.      ConocoPhillips also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Chicago and Illinois consumers under its Phillips 66, Kendall, and Red Line brand names.

o.      ConocoPhillips markets and advertises its fossil fuel products in Chicago to its residents by maintaining interactive websites available to prospective customers by which it directs the City's residents to its nearby retail service stations and/or lubricant distributors.[27] Further, ConocoPhillips promotes its products in Chicago and Illinois by regularly updating and actively promoting its "KickBack Rewards" and "Phillips 66 Credit Card Rewards Program,"

---

[27] *Station Finder*, CONOCO, https://www.conoco.com/station-finder/ (last visited Nov. 15, 2023); *Station Finder*, PHILLIPS 66, https://www.phillips66gas.com/station-finder/ (last visited Nov. 15, 2023); *Find a Distributor*, PHILLIPS 66, https://phillips66lubricants.com/find-distributor/ (last visited Nov. 15, 2023).

**S.A. 49**

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

which encourages customers to buy fuel at its stations in Chicago and Illinois in exchange for rewards on fuel purchases.

      p.    Phillips 66 operates the Wood River Refinery in Roxana, Illinois, which is in Southern Illinois.[28] This is the largest refinery in Illinois, and it processes 356,000 barrels of crude oil per day.

18.    **Exxon Entities: Exxon Mobil Corporation and ExxonMobil Oil Corporation**

      a.    Defendant **Exxon Mobil Corporation** is a New Jersey corporation headquartered in Irving, Texas. Exxon Mobil Corporation is a multinational, vertically integrated energy and chemical company and one of the largest publicly traded international oil and gas companies in the world. Exxon Mobil Corporation was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Exxon Corporation; ExxonMobil Refining and Supply Company; Exxon Chemical U.S.A.; ExxonMobil Chemical Corporation; ExxonMobil Chemical U.S.A.; ExxonMobil Refining & Supply Corporation; Exxon Company, U.S.A.; Standard Oil Company of New Jersey; and Mobil Corporation.

      b.    Exxon Mobil Corporation controls and has controlled company-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Exxon Mobil Corporation's 2022 Form 10-K filed with the SEC represents that its success, including its "ability to mitigate risk and provide attractive returns to shareholders, depends on [its] ability to successfully manage [its] overall portfolio, including diversification among types and locations of [its] projects, products produced, and strategies to divest assets."[29] Exxon Mobil Corporation determines whether and to what extent its subsidiaries market, produce,

---

[28] *Wood River Refinery*, PHILLIPS 66, https://www.phillips66.com/refining/wood-river-refinery/ (last visited Nov. 15, 2023).

[29] Exxon Mobil Corp., Annual Report Form (10-K) (Feb. 22, 2023).

**S.A. 50**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

and/or distribute fossil fuel products. For example, on October 11, 2023, Exxon Mobil Corporation announced its acquisition of Pioneer Natural Resources in a press release that referred to the corporate family generally as "ExxonMobil."[30]

c.        Exxon Mobil Corporation controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. Exxon Mobil Corporation's Board holds the highest level of direct responsibility for climate change policy within the company. Exxon Mobil Corporation's Chairman of the Board and Chief Executive Officer, its President, and the other members of its Management Committee have been actively engaged in discussions relating to GHG emissions and the risks of climate change on an ongoing basis. Exxon Mobil Corporation requires its subsidiaries, when seeking funding for capital investments, to provide estimates of project costs related to GHG emissions.

d.        Defendant **ExxonMobil Oil Corporation** is a wholly-owned subsidiary of Exxon Mobil Corporation, acts on Exxon Mobil Corporation's behalf, and is subject to Exxon Mobil Corporation's control. ExxonMobil Oil Corporation is a New York corporation with its headquarters in Irving, Texas. ExxonMobil Oil Corporation was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Mobil Oil Corporation.

---

[30] *ExxonMobil announces merger with Pioneer Natural Resources in an all-stock transaction*, EXXONMOBIL (Oct. 11, 2023), https://corporate.exxonmobil.com/news/news-releases/2023/1011_exxonmobil-announces-merger-with-pioneer-natural-resources-in-an-all-stock-transaction.

22

**S.A. 51**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

e.      Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Exxon."

f.      Exxon consists of numerous divisions and affiliates in all areas of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, promotion, marketing, and sale of crude oil, natural gas, and petroleum products. Exxon is also a major manufacturer and marketer of commodity petrochemical products.

g.      Exxon has purposefully directed its tortious conduct toward Chicago by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Chicago, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Chicago, including the City's injuries. Exxon's statements in Chicago, in Illinois, and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Exxon's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the City and its residents, about the serious adverse consequences that would result from continued use of Exxon's products. That conduct was purposefully directed to reach and influence the City and its residents to continue the unabated use of Exxon's fossil fuel products in Chicago, thereby resulting in the City's injuries.

h.      Over the past several decades and continuing to the present day, Exxon spent millions of dollars on radio, television, online, social media, and outdoor advertisements in the Chicago market related to its fossil fuel products. Since at least 1972, and continuing to the

**S.A. 52**

present day, Exxon has advertised its fossil fuel products in print publications circulated widely to

Chicago consumers, including but not limited to: *The Chicago Tribune*; *The Chicago Sun-Times*;

*The Atlantic*; *Ebony*; *Life*; *National Geographic*; *The New York Times*; *People*; *Sports Illustrated*;

*Time*; *The Wall Street Journal*; and *The Washington Post*. As further detailed herein, these include

advertisements containing false or misleading statements, misrepresentations, and/or material

omissions designed to hide the connection between the production and use of Exxon's fossil fuel

products and climate change, and/or misrepresenting Exxon's products or Exxon itself as

environmentally friendly.

          i.     Significant quantities of Exxon's fossil fuel products are or have been

transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in

Chicago and in Illinois, from which activities Exxon derives and has derived substantial revenue.

          j.     Exxon conducts and controls, either directly or through franchise

agreements, retail fossil fuel sales at gas station locations throughout Chicago and Illinois, at which

locations it promotes, advertises, and sells its fossil fuel products. There are 54 Exxon- and Mobil-

branded gas stations in Chicago, and 463 throughout Illinois.

          k.     Exxon also markets and sells other fossil fuel products, including engine

lubricants and motor oils, to Chicago and Illinois consumers under its Mobil 1 brand name.

          l.     Exxon markets and advertises its fossil fuel products in Chicago to its

residents by maintaining an interactive website available to prospective customers by which it

directs the City's residents to its nearby retail service stations and/or lubricant distributors.[31]

Further, Exxon promotes its products in Chicago and Illinois by regularly updating and actively

---

[31] *Find a Gas Station Near Me*, EXXON MOBIL, https://www.exxon.com/en/find-station (last visited
Nov. 15, 2023); *Stores Nearby Selling Mobil 1 and Mobil Motor Oil*, MOBIL,
https://www.mobil.com/en/lubricants/where-to-buy/motor-oil-product-locator (last visited Nov.
15, 2023).

**S.A. 53**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

promoting its "Exxon Mobil Rewards+" app and rewards program, which encourages customers to buy fuel at its stations in Chicago and Illinois in exchange for rewards on fuel purchases.

19.    **Shell Entities: Shell Oil Products Company LLC; Shell plc; and Shell USA, Inc.**

a.    Defendant **Shell Oil Products Company LLC** is a wholly-owned subsidiary of Shell USA, Inc., that acts on Shell USA, Inc.'s behalf and is subject to Shell USA, Inc.'s control. Shell Oil Products Company LLC is incorporated in Delaware, with its principal place of business in Houston, Texas, and has been registered to do business in Illinois since 2001. Shell Oil Products Company LLC was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Shell Oil Products Company, which was a Delaware corporation that converted to a limited liability company in 2001.

b.    Defendant **Shell plc** (formerly Royal Dutch Shell PLC) is a vertically integrated multinational energy and petrochemical company. Shell plc is incorporated in England and Wales, with its headquarters and principal place of business in The Hague, Netherlands. Shell plc is the ultimate parent company of numerous divisions, subsidiaries, and affiliates, referred to collectively as the "Shell Group," that engage in all aspects of fossil fuel production, including exploration, development, extraction, manufacturing and energy production, transport, trading, marketing, and sales.

c.    Shell plc controls and has controlled company-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Shell plc's Board of Directors determines whether and to what extent Shell subsidiary holdings around the globe produce Shell-branded fossil fuel products.

**S.A. 55**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

   d. Shell plc controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. Overall accountability for climate change within the Shell Group lies with Shell plc's Chief Executive Officer and Executive Committee. For instance, at least as early as 1988, Shell plc, through its predecessors and subsidiaries, was researching company-wide carbon dioxide ("$CO_2$") emissions and concluded that the Shell Group accounted for four percent of the $CO_2$ emitted worldwide from combustion, and that climatic changes could compel the Shell Group, as controlled by Shell plc, to examine the possibilities of expanding and contracting its business accordingly.

   e. Defendant **Shell USA, Inc.** (formerly Shell Oil Company) is a wholly-owned subsidiary of Shell plc that acts on Shell plc's behalf and is subject to Shell plc's control. Shell USA, Inc. is incorporated in Delaware, with its principal place of business in Houston, Texas. Shell USA, Inc. has been registered to do business in California since 1949. Shell USA, Inc. was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Shell Oil Company; Shell Oil; Deer Park Refining LP; Shell Oil Products US; Shell Chemical LP; Shell Trading (US) Company; Shell Energy Resources Company; Shell Energy Services Company, L.L.C.; The Pennzoil Company; and Pennzoil-Quaker State Company.

   f. Defendants Shell plc, Shell USA, Inc., Shell Oil Products Company LLC, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "Shell."

**S.A. 57**

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

g.      Shell has purposefully directed its tortious conduct toward Chicago by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Chicago, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Chicago, including the City's injuries. Shell's statements in Chicago, in Illinois, and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Shell's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the City and its residents, about the serious adverse consequences that would result from continued use of Shell's products. That conduct was purposefully directed to reach and influence the City and its residents to continue the unabated use of Shell's fossil fuel products in Chicago, thereby resulting in the City's injuries.

h.      Over the last several decades and continuing to the present day, Shell spent millions of dollars on radio, television, online, social media, and outdoor advertisements in the Chicago market related to its fossil fuel products. Since at least 1970, and continuing to the present day, Shell has advertised its fossil fuel products in print publications circulated widely to Chicago consumers, including but not limited to the following: *The Chicago Tribune*; *The Chicago Sun-Times*; *The Atlantic*; *Ebony*; *The Economist*; *Life*; *National Geographic*; *Newsweek*; *The New York Times*; *Sports Illustrated*; *Time Magazine*; *The Wall Street Journal*; and *The Washington Post*. As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Shell's fossil fuel products and climate change, and/or misrepresenting Shell's products or Shell itself as environmentally friendly.

27

**S.A. 59**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

i.      Significant quantities of Shell's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Chicago and in Illinois, from which activities Shell derives and has derived substantial revenue.

j.      Shell conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations throughout Chicago and Illinois, at which locations it promotes, advertises, and sells its fossil fuel products. There are 89 Shell-branded gas stations in Chicago, and 637 throughout Illinois.

k.      Shell also markets and sells other fossil fuel products, including engine lubricants and motor oils, to Chicago and Illinois customers under its Penzoil brand name.

l.      Shell markets and advertises its fossil fuel products in Chicago to its residents by maintaining an interactive website available to prospective customers by which it directs the City's residents to its nearby retail service stations and/or lubricant distributors.[32] Further, Shell promotes its products in Chicago and Illinois by regularly updating and actively promoting its "Fuel Rewards Program," which encourages customers to buy fuel at its stations in Chicago and Illinois in exchange for rewards on fuel purchases. Shell offers a proprietary credit card known as the "Shell Fuel Rewards Card," which allows consumers in Chicago and in Illinois to pay for gasoline and other products at Shell-branded service stations, and which encourages consumers to use Shell-branded gas stations by offering various rewards, including discounts on gasoline purchases. Shell further maintains a smartphone application known as the "Shell US App" that offers Chicago and Illinois consumers a cashless payment method for gasoline and other products at Shell-branded service stations. Chicago and Illinois consumers can also receive

---

[32] *Gas Station Near Me*, SHELL, https://www.shell.us/motorist/gas-station-near-me.html (last visited Nov. 15, 2023); *Retail Locations & Oil Change Near Me*, PENNZOIL, https://www.pennzoil.com/en_us/oil-change-retail-locations.html (last visited Nov. 15, 2023).

**S.A. 60**

rewards, including discounts on gasoline purchases, by registering their personal identifying information in the Shell US App and using the application to identify and activate gas pumps at Shell service stations during a purchase.

m.    Shell was the original operator of the Wood River refinery in Roxana, Illinois (now operated by Phillips 66), and ran the refinery for over 80 years.[33]

20.    **American Petroleum Institute**

a.    Defendant American Petroleum Institute, referred to herein as API, is a nonprofit corporation based in the District of Columbia. API was created in 1919 to represent the American oil and gas industry as a whole. With more than 600 members, API is the country's largest oil trade association. API's purpose is to advance its members' collective business interests, which include increasing consumer consumption of oil and gas for the financial profit of oil and gas companies, including the Fossil Fuel Defendants. Among other functions, API also coordinates members of the petroleum industry, gathers information of interest to the industry, and disseminates that information to its members.

b.    Acting on behalf of and under the supervision and control of the Fossil Fuel Defendants, API has, since at least 1988, participated in and led several coalitions, front groups, and organizations that have promoted disinformation about the climate impacts of fossil fuel products to consumers—including, but not limited to, the Global Climate Coalition, Partnership for a Better Energy Future, Coalition for American Jobs, Alliance for Energy and Economic Growth, and Alliance for Climate Strategies. These front groups were formed to promote climate disinformation and advocacy from a purportedly objective source, when in fact these groups were

---

[33] *Post-Shell at the Wood River Refinery*, MADISON CNTY. HISTORICAL SOCIETY (2017), https://madcohistory.org/online-exhibits/wood-river-refinerys-first-100-years/post-shell-at-the-wood-river-refinery/.

**S.A. 61**

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

financed and controlled by the Fossil Fuel Defendants and other oil and gas companies. The Fossil Fuel Defendants have benefited from the spread of this disinformation because, among other things, it has ensured a thriving consumer market for oil and gas, resulting in substantial profits for the Fossil Fuel Defendants.

c.     API's mission includes increasing consumers' consumption of oil and gas for the financial benefit of the Fossil Fuel Defendants and other oil and gas companies. In effect, API acts and has acted as a marketing arm for its member companies, including the Fossil Fuel Defendants. Over the last several decades, API has spent millions of dollars on television, newspaper, radio, social media, and internet advertisements in the Chicago and Illinois markets.

d.     Member companies participate in API strategy, governance, and operation through their membership dues and by contributing company officers and other personnel to API boards, committees, and task forces. The Fossil Fuel Defendants have collectively steered the policies and trade practices of API through membership, Executive Committee roles, and/or providing budgetary funding for API. The Fossil Fuel Defendants have used their control over and involvement in API to develop and execute a long-term advertising and communications campaign centered on climate change denialism. The goal of the campaign was to influence consumer demand for the Fossil Fuel Defendants' fossil fuel products. The Fossil Fuel Defendants directly controlled, supervised, and participated in API's misleading messaging regarding climate change.

e.     In addition to national promotional campaigns circulated in Chicago, API has also targeted Chicago and Illinois consumers directly by creating and disseminating misleading advertisements that distinctly promote consumption of fossil fuel products in Chicago and Illinois. API has run numerous press releases within Illinois touting the direct and indirect benefits to Illinois of the oil and gas industries' operations in Chicago, in Illinois, and elsewhere in the United

**S.A. 62**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

States.[34] The reports, sponsored by API, on which API bases its claims, do not mention climate change at all, nor do the reports mention any of the direct and indirect harms to Chicago caused by the production, marketing, sale, and use of API members' fossil fuel products.

f.     API hosts various events in Chicago. For instance, in 2022, API sponsored the "2022 Spring Refining and Equipment Standards Meeting" held in Chicago. Likewise, in November 2023, API sponsored the 2023 API/AFPM Fall Operating Practices Symposium and Roundtable in Chicago.[35]

g.     All of the Fossil Fuel Defendants and/or their predecessors-in-interest have been key API members and have closely coordinated their tortious conduct with API at all times relevant to this Complaint. All of the Fossil Fuel Defendants are currently members of API. Executives from Exxon, Shell, Chevron, ConocoPhillips, and BP have served on the API Executive Committee and/or as API Chairman, essentially serving as corporate officers. For example, Exxon's CEO served on API's Executive Committee for 15 of the 25 years between 1991 and 2016 (specifically, 1991, 1996-1997, 2001, and 2005-2016). BP's CEO served as API's Chairman in 1988, 1989, and 1998. Chevron's CEO served as API Chairman in 1994, 1995, 2003, and 2012. Executives from ConocoPhillips also served as members of API's Board of Directors at various times. Shell's President served on API's Executive Committee from 2005 to 2006. ConocoPhillips Chairman and CEO Ryan Lance was API Board President from 2016 to 2018, and Exxon President and CEO Darren Woods was API Board President from 2018 to 2020. In 2020,

---

[34] *See, e.g.*, *Energy Works: The people of Illinois are part of the oil and natural gas industry*, API (2015), https://www.api.org/~/media/files/policy/jobs/energyworks/energyworks_illinois-api.pdf.

[35] *2023 API/AMPF Fall Operating Practices Symposium*, API (2023), https://events.api.org/2023-api-afpm-fall-operating-practices-symposium-and-roundtable/#:~:text=The%202023%20API%2FAFPM%20Fall,the%20lessons%20learned%20from%20facility.

**S.A. 63**

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

API elected Phillips 66 Chairman and CEO Greg Garland to serve a two-year term as its Board President. In 2022, API elected Chevron CEO and Chairman Mike Wirth to succeed Mr. Garland as Board Chairman.

> h. Relevant information was shared among API and the Fossil Fuel Defendants and the Fossil Fuel Defendants' predecessors-in-interest through the following: (1) API's distribution of information to its members, and/or (2) participation of the Fossil Fuel Defendants' officers and other personnel, and those of the Fossil Fuel Defendants' predecessors-in-interest, on API boards, committees, and task forces.

> i. The City's claims against API arise out of and are related to the acts and omissions of API in Chicago, in Illinois, and elsewhere that caused and will cause injuries in Chicago.

### A. Relevant Non-Parties: Defendants' Agents/Front Groups

21. As detailed below, each Fossil Fuel Defendant had actual knowledge, or should have known, that its fossil fuel products were hazardous in that the intended use of the fossil fuel products for combustion would substantially contribute to climate change and result in harms to the City. The Fossil Fuel Defendants obtained knowledge of the hazards of their products independently and through their membership and involvement in trade associations such as API.

22. The Fossil Fuel Defendants and API employed, financed, and participated in several industry-created front groups to serve their mission of flooding the markets with climate change disinformation and denialism. These organizations, acting on behalf of and under the supervision and control of the Fossil Fuel Defendants, assisted the deception campaign by implementing public advertising and outreach campaigns to discredit climate science and funding scientists to cast doubt upon climate science and upon the extent to which climate change is caused by human activity. In sum, the Fossil Fuel Defendants, through their front groups, engaged in a

**S.A. 64**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

significant marketing campaign that misrepresented and concealed the dangers of their fossil fuel products with the aim of protecting or enhancing sales of these products to consumers, including consumers in Chicago and in Illinois. Defendants actively supervised, facilitated, consented to, and/or directly participated in the misleading messaging of these front groups, from which the Fossil Fuel Defendants profited significantly, including in the form of increased sales in Chicago and Illinois.

23.     **The Global Climate Coalition ("GCC")** was an industry group formed to preserve and expand consumer demand for fossil fuels by publicly casting doubt on climate science and opposing GHG emission-reduction initiatives. GCC was founded in 1989 in reaction to the first meeting of the Intergovernmental Panel on Climate Change ("IPCC"), the United Nations body for assessing the science related to climate change, and to NASA scientist James Hansen's presentation to the Senate Committee on Energy and Natural Resources, in which Mr. Hansen emphasized that climate change was already happening and would lead to dire consequences if left unaddressed. GCC disbanded in or around 2001. Founding members included API, Shell Oil Company (currently, Shell); Texaco, Inc. (currently, Chevron); Amoco (currently, BP); ARCO (owned by BP at the time); and Phillips Petroleum Company (currently, ConocoPhillips). Tom Lambrix, director of government relations for Phillips Petroleum, was chairman of GCC.

**III.     JURISDICTION AND VENUE**

24.     This Court has jurisdiction over this action pursuant to the Illinois Constitution, art. VI § 9. This Court has personal jurisdiction over Defendants because they transacted business; committed tortious acts; owned, used, or possessed real property; made or performed contracts or promises; acquired ownership, possession, or control of assets or things of value; performed corporate duties; and/or were organized or had their principal places of businesses in Illinois, including in Cook County. 735 ILCS 5/2-209.

**S.A. 65**

25.     Jurisdiction is proper over each resident Defendant because they are incorporated or have their principal place of business in Illinois.

26.     Additionally, jurisdiction is proper over each non-resident Defendant for the following reasons:

a.     With respect to its subsidiaries, each non-resident Fossil Fuel Defendant parent controls and has controlled decisions about the quantity and extent of its fossil fuel production and sales; determines whether and to what extent to market, produce, and/or distribute its fossil fuel products; and controls and has controlled decisions related to its marketing and advertising, specifically communications strategies concerning climate change and the link between fossil fuel use and impacts on the environment. Each non-resident Fossil Fuel Defendant parent has the power to direct and control its non-resident subsidiaries named here. Thus, each subsidiary is the agent of its parent. As agents, the subsidiaries of each non-resident Fossil Fuel Defendant conducted activities in Chicago and Illinois at the direction and for the benefit of its parent company. Specifically, the subsidiaries furthered each parent company's campaign of deception and denial through misrepresentations, omissions, and affirmative promotion of the company's fossil fuel products as safe with knowledge of the climate change-related harms that would result from the intended use of those products, all of which resulted in climate change-related injuries in Chicago and increased sales to the parent company. Therefore, the subsidiaries' jurisdictional activities are properly attributed to each parent company and serve as a basis to assert jurisdiction over each of the non-resident Fossil Fuel Defendant parent companies.

b.     Through their various agreements with dealers, franchises, or otherwise, the Fossil Fuel Defendants direct and control the branding, marketing, sales, promotions, image development, signage, and advertising of their branded fossil fuel products at their respectively

34

**S.A. 66**

branded gas stations in Chicago and in Illinois, including point-of-sale advertising and marketing. The Fossil Fuel Defendants dictate which grades and formulations of their gasoline may be sold at their respectively branded stations.

   c.  The Fossil Fuel Defendants, by and through API and other organizations like GCC, conspired to conceal and misrepresent the known dangers of burning fossil fuels, to knowingly withhold material information regarding the consequences of using fossil fuel products, to spread knowingly false and misleading information to the public regarding the weight of climate science research, and to engage in massive campaigns to promote continued and increased use of their fossil fuel products, which they knew would result in injuries to the City. Through their own actions and through their membership and participation in climate denialist front groups, API and each Fossil Fuel Defendant were and are members of this conspiracy. Defendants committed substantial acts to further the conspiracy in Chicago and Illinois by making affirmative misrepresentations to Chicago and Illinois consumers, as well as misleading them by omission, about the existence, causes, and effects of global warming; and by affirmatively promoting the Fossil Fuel Defendants' fossil fuel products as safe, with knowledge of the disastrous impacts that would result from the intended use of those products. A substantial effect of this conspiracy has also and will also occur in Chicago, as the City has suffered and will continue to suffer injuries from Defendants' wrongful conduct, including but not limited to the following: extreme heat, severe droughts, massive storms, flooding, increased seasonal temperatures, negative impacts on Lake Michigan, coastal erosion, damage to ecosystems and habitat, biodiversity disruption, public health injuries, and other social and economic consequences of these environmental changes. Defendants knew or should have known—based on information provided to them from their internal research divisions, affiliates, trade associations, and industry groups—that their actions in

S.A. 67

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

Chicago, Illinois, and elsewhere would result in these injuries in and to the City. Finally, the climate effects described herein are direct and foreseeable results of Defendants' conduct in furtherance of the conspiracy.

27.    Venue for this action is proper in the Circuit Court of Cook County because any Defendant resides in Cook County, and because some part of the transactions out of which the causes of action arose occurred in Cook County. 735 ILCS 5/2-101.

## IV.    FACTUAL ALLEGATIONS

### A.    Defendants Are Substantially Responsible for Causing and Accelerating Climate Change.

28.    The earth's atmosphere is warming, sea level is rising, snow and ice cover is diminishing, oceans are warming and acidifying, and hydrologic systems have been altered, among other rapidly accelerating changes to our climate. These changes are directly harming people's health, lives, lifestyles, and livelihoods, including in Chicago.

29.    In the geological short term, ocean and land surface temperatures have increased at a rapid pace during the late 20th and early 21st centuries:

a.    2023 was the hottest year on record by globally averaged surface temperatures, exceeding mid-20th century mean ocean and land surface temperatures by approximately 2.12° F. Each month in 2023 was hotter by globally averaged surface temperatures than those respective months in any previous year. June, July, August, September, October, November, and December 2023 were all the hottest average surface temperatures for those months.[36]

---

[36] NOAA National Center for Environmental Information, NOAA, Annual 2023 Global Climate Report (Jan. 2024), https://www.ncei.noaa.gov/access/monitoring/monthly-report/global/202313.

36

**S.A. 68**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

b.      The second hottest year on record by globally averaged surface temperatures was 2016, and the third hottest was 2020.[37]

c.      The ten hottest years on record by globally averaged surface temperature have all occurred since 2014.[38]

30.     The average global surface and ocean temperature in 2023 was approximately 2.12° F warmer than the 20th century baseline, which is the greatest positive anomaly observed since at least 1850.[39] The increase in hotter temperatures and more frequent positive anomalies during the Great Acceleration is occurring both globally and locally, including in Chicago. The graph below shows the increase in global land and ocean temperature anomalies since 1850, as measured against the 1901–2000 global average temperature.[40]

**Global Land and Ocean**
January-December Temperature Anomalies



Figure 1: NOAA Global Land and Ocean Temperatures[41]

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *See id.*

[41] *Id.*

**S.A. 69**

31.     According to the IPCC, the evidence that humans are causing this warming of the Earth is unequivocal.[42]

32.     Greenhouse gas emissions caused by human activities are the most significant driver of climate change and ocean acidification.[43] Over the past couple of decades, those emission rates have exceeded those predicted under previous "worst case" global emissions scenarios. The severity of the continuing impacts of climate change on Chicago will depend on the success of mitigation and adaptation efforts in the City and on the reduction of fossil fuel consumption.[44]

33.     Greenhouse gases are largely byproducts of human combustion of fossil fuels to produce energy and use of fossil fuels to create petrochemical products. While there are several greenhouse gases contributing to climate change, $CO_2$ is the primary greenhouse gas emitted as a result of human activities.

34.     Prior to World War II, most anthropogenic $CO_2$ emissions were caused by land-use practices, such as forestry and agriculture, which altered the ability of the land and global biosphere to absorb $CO_2$ from the atmosphere. The impacts of such activities on Earth's climate were relatively minor. Since that time, however, both the annual rate and total volume of anthropogenic $CO_2$ emissions have increased enormously following the dramatic rise of the combustion of oil, gas, and coal, in particular in the transportation industry and in the stationary energy market.

---

[42] *Climate Change 2021: The Physical Science Basis*, THE INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, at v, 4, 41, 63, 150, 425, 506 (2021), https://report.ipcc.ch/ar6/wg1/IPCC_AR6_WGI_FullReport.pdf.

[43] *Id.* at 41.

[44] *See Climate Action Plan for the Chicago Region Appendix G: Climate Risk And Vulnerability Assessment*, METROPOLITAN MAYORS CAUCUS & NOAA, at 95-108 (Dec. 2016) https://mayorscaucus.org/wp-content/uploads/2021/06/RegionalCAP_primary_and_appendices_062321-02.pdf

**S.A. 70**

35.    The graph below illustrates that fossil fuel emissions are the dominant source of increases in atmospheric $CO_2$ since the mid-twentieth century:



**Figure 2: Annual Global Emissions, 1850–2020[45]**

36.    This acceleration of fossil fuel emissions has led to a correspondingly sharp rise in atmospheric concentration of $CO_2$. Since 1960, the concentration of $CO_2$ in the atmosphere has spiked from under 320 parts per million ("ppm") to approximately 423 ppm.[46] The concentration of atmospheric $CO_2$ has also been accelerating. From 1960 to 1970, atmospheric $CO_2$ increased by an average of approximately 0.9 ppm per year; over the last five years, it has increased by approximately 2.4 ppm per year.[47]

---

[45]    *Global Carbon Budget 2021*, GLOBAL CARBON PROJECT, at 83 (Nov. 4, 2021), https://www.globalcarbonproject.org/carbonbudget/archive/2021/GCP_CarbonBudget_2021.pdf.

[46]    *Trends in Atmospheric Carbon Dioxide: Full Record*, GLOBAL MONITORING LABORATORY, https://gml.noaa.gov/ccgg/trends/mlo.html (last visited Nov. 15, 2023).

[47]    *Trends in Atmospheric Carbon Dioxide: Growth Rate*, GLOBAL MONITORING LABORATORY https://gml.noaa.gov/ccgg/trends/gr.html (last visited Nov. 15, 2023).

**S.A. 71**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

37.    Figure 3 indicates the tight nexus between the sharp increase in emissions from the combustion of fossil fuels and the steep rise of atmospheric concentrations of $CO_2$.



**Figure 3: Atmospheric $CO_2$ Concentration and Annual Emissions[48]**

38.    Because of the increased burning of fossil fuel products, concentrations of greenhouse gases in the atmosphere are now at an unprecedented level, one not seen in at least three million years.[49]

39.    As greenhouse gases accumulate in the atmosphere, the Earth radiates less energy back to space. This accumulation and associated disruption of the Earth's energy balance have a myriad of environmental and physical consequences, including, but not limited to, the following:

a.    Warming of the Earth's average surface temperature, both locally and globally, and increased frequency and intensity of heat waves. To date, global average surface

---

[48] Rebecca Lindsey, *Climate Change: Atmospheric Carbon Dioxide*, CLIMATE.GOV (May 12, 2023), https://www.climate.gov/news-features/understanding-climate/climate-change-atmospheric-carbon-dioxide.

[49] *More CO2 than ever before in 3 million years, shows unprecedented computer simulation*, SCIENCE DAILY (Apr. 3, 2019), https://www.sciencedaily.com/releases/2019/04/190403155436.htm.

**S.A. 72**

temperatures have risen approximately 1.09°C (1.96°F) above preindustrial temperatures; temperatures in particular locations have risen more.

       b.     Changes to the global climate generally, bringing about longer droughts and dry periods interspersed with fewer and more severe periods of precipitation, and associated impacts to the quantity and quality of water resources available to both human and ecological systems.

       c.     Increased frequency and intensity of extreme weather events due to increases in evaporation, evapotranspiration, and precipitation, a consequence of the warming atmosphere's increased ability to hold moisture.

       d.     Adverse impacts on human health associated with extreme weather, extreme heat, worsening air quality, and vector-borne illnesses.

       e.     Flooding and inundation of land and infrastructure, increased erosion, higher wave run-up and tides, increased frequency and severity of storm surges, saltwater intrusion, and other impacts of higher sea levels.

       f.     Sea level rise, due to the thermal expansion of warming ocean waters and runoff from melting glaciers and ice sheets.

       g.     Ocean acidification, primarily due to the increased uptake of atmospheric carbon dioxide by the oceans.

       h.     Changes to terrestrial and marine ecosystems, and consequent impacts on the populations and ranges of flora and fauna.

       40.   Chicago specifically has seen environmental and physical consequences, including winters warming by almost four degrees since 1980, winter ice coverage decreasing on Lake

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

41

**S.A. 73**

Michigan and smaller lakes in the area, several major heat waves, shifts in the water cycle including less snow and earlier snowmelt, and heavy rainfall events occurring twice as frequently.

41. As further discussed below, these consequences of Defendants' tortious and deceptive conduct and its exacerbation of the climate crisis are already impacting Chicago, its communities, its people's health, and its natural resources, and these impacts will continue to increase in severity. Absent Defendants' tortious and deceptive conduct and resultant contributions to global warming, these harmful effects would have been far less extreme than those currently occurring. Similarly, future harmful effects would also have been far less detrimental—or would have been avoided entirely.[50]

42. From at least 1965 until the present, Defendants unduly inflated the market for fossil fuel products by aggressively promoting the use of these products while knowing their associated dangers, and by misrepresenting and concealing the hazards of those products to deceive consumers and the public about the consequences of everyday use of fossil fuel products. Consequently, substantially more anthropogenic greenhouse gases have been emitted into the environment than would have been emitted absent Defendants' tortious and deceptive conduct.

43. By quantifying GHG pollution attributable to the Fossil Fuel Defendants' products and conduct, climatic and environmental responses to those emissions are also calculable and can be attributed to the Fossil Fuel Defendants both on an individual and an aggregate basis.[51]

---

[50] *See, e.g.*, Peter U. Clark et al., *Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change*, 6 NATURE CLIMATE CHANGE 360, 365 (2016) ("Our modelling suggests that the human carbon footprint of about [470 billion tons] by 2000 . . . has already committed Earth to a [global mean sea level] rise of ~1.7m (range of 1.2 to 2.2 m).").

[51] *See* Richard Heede, *Tracing anthropogenic carbon dioxide and methane emissions to fossil fuel and cement producers, 1854–2010*, 122 CLIMATIC CHANGE 229 (2013), https://link.springer.com/article/10.1007/s10584-013-0986-y.

**S.A. 74**

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

44.     Defendants' tortious, deceptive, and unconscionable conduct, as alleged herein, caused a substantial portion of the global atmospheric GHG concentrations, and the past, ongoing, and future disruptions to the environment—and consequent injuries to Chicago, its communities, and its resources—associated therewith.

45.     Defendants, individually and collectively, have substantially and measurably contributed to Chicago's climate crisis-related injuries.

46.     Defendants have known for decades that fossil fuels—their chief products—are the primary cause of climate change and that, if unabated, climate change could result in catastrophic impacts, including droughts, flooding, and severe weather events that would impose enormous harms on cities such as Chicago. Despite this knowledge, these corporations and their trade associations have embarked on tobacco-industry-style campaigns to deceive and mislead the public about the damaging nature of their fossil fuel products. These campaigns initially took the form of denial of the reality of climate change or attempts to cast the science surrounding these issues as uncertain or subject to reasonable debate. Later, these campaigns transformed in part to falsely suggest that continued consumption of Defendants' products is consonant with mitigating climate change.

**B.     Defendants Went to Great Lengths to Understand the Dangers Associated with Fossil Fuel Products, and Either Knew or Should Have Known of Those Dangers.**

47.     Defendants have known about the potential warming effects of GHG emissions since as early as the 1950s, and they developed a sophisticated understanding of climate change that far exceeded the knowledge of the general public. Although it was concealed at the time, the

**S.A. 75**

industry's knowledge was uncovered in 2015 by journalists at *Inside Climate News* and the *Los Angeles Times*, among others.[52]

48.     In 1954, geochemist Harrison Brown and his colleagues at the California Institute of Technology wrote to API, informing the trade association of their finding that fossil fuels had caused atmospheric carbon dioxide levels to increase by about five percent since 1840.[53] API continued to fund the scientists for various research projects and measurements of carbon dioxide, but the results were never published.[54] In 1957, H.R. Brannon of Humble Oil Company (a predecessor-in-interest to Exxon) measured an increase in atmospheric carbon dioxide attributable to fossil fuels, similar to—and in agreement with—that measured by Harrison Brown.[55]

49.     In 1959, API organized an oil industry celebration in New York City.[56] High-level oil industry executives were in attendance, and one of the keynote speakers was the nuclear physicist, Edward Teller. Mr. Teller warned the industry that "a temperature rise corresponding to a 10 percent increase in carbon dioxide will be sufficient to melt the icecap and submerge . . . [a]ll

---

[52] *See, e.g.*, Neela Banerjee et al., *Exxon's Own Research Confirmed Fossil Fuels' Role in Global Warming Decades Ago*, INSIDE CLIMATE NEWS (Sept. 16, 2015), https://insideclimatenews.org/news/16092015/exxons-own-research-confirmed-fossil-fuels-role-in-global-warming/; Katie Jennings et al., *How Exxon went from leader to skeptic on climate change research*, L.A. TIMES (Oct. 23, 2015), https://graphics.latimes.com/exxon-research; Sarah Jerving et al., *What Exxon knew about the Earth's melting Arctic*, L.A. TIMES (Oct. 9, 2015), https://graphics.latimes.com/exxon-arctic/; Amy Lieberman & Susanne Rust, *Big Oil Braced for Global Warming While It Fought Regulations*, L.A. TIMES (Dec. 31, 2015), https://graphics.latimes.com/oil-operations.

[53] Benjamin Franta, *Early oil industry knowledge of* $CO_2$ *and global warming*, 8 NATURE CLIMATE CHANGE 1024, 1024 (2018).

[54] *Id.*

[55] *Id.*; H. R. Brannon, Jr. et al., *Radiocarbon evidence on the dilution of atmospheric and oceanic carbon from fossil fuels*, 38 AM. GEOPHYSICAL UNION TRANSACTIONS 643, 644-46 (1957).

[56] *See* Allan Nevins & Robert G. Dunlop, *Energy and Man: A Symposium* (1960); *see also* Franta, *supra* note 53, at 1024.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

the coastal cities." Mr. Teller added that since "a considerable percentage of the human race lives in coastal regions, [he] think[s] that this chemical contamination is more serious than most people tend to believe."[57] Following his speech, Mr. Teller was asked to "summarize briefly the danger from increased carbon dioxide content in the atmosphere in this century." He responded that "there is a possibility the icecaps will start melting and the level of the oceans will begin to rise."[58]

50.     "In 1962, Marion King Hubbert, Chief Geology Consultant at Shell and former director of its research labs, produced a book-length report on the earth's Energy Resources for a committee of the National Academy of Sciences. The report, which draws heavily upon a 1956 analysis [Mr.] Hubbert prepared for [API], demonstrates Shell's profound understanding of the earth's energy balance, including the differences in the reflection of long- and short-wave solar radiation back into space, the role of global atmospheric temperatures in driving global weather, and the intrinsic and delicate natural balance between the heat energy absorbed by plants through photosynthesis with the equivalent energy released by plant matter through natural decay."[59]

51.     In 1965, the president of API, Frank Ikard, addressed leaders of the petroleum industry at the trade association's annual meeting. Mr. Ikard relayed the findings of a recent report to industry leaders, saying, "[o]ne of the most important predictions of the report is that carbon dioxide is being added to the earth's atmosphere by the burning of coal, oil, and natural gas at such a rate that by the year 2000 the heat balance will be so modified as possibly to cause marked changes in climate beyond local or even national efforts," and quoting the report's finding that "the pollution from internal combustion engines is so serious, and is growing so fast, that an

---

[57] Edward Teller, *Energy Patterns of the Future, in Energy and Man: A Symposium*, at 58 (1960).

[58] *Id.* at 70.

[59] *A Crack in the Shell: New Documents Expose a Hidden Climate History (April 2018)*, CENTER FOR INTERNATIONAL ENVIRONMENTAL LAW (2018), https://www.ciel.org/reports/a-crack-in-the-shell/.

**S.A. 77**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

alternative nonpolluting means of powering automobiles, buses, and trucks is likely to become a national necessity."[60]

52.     Thus, at least by 1965, Defendants and their predecessors-in-interest were aware that the scientific community had found that fossil fuel products, if their use continued to grow, would cause global warming by the end of the century, and that such global warming would have wide-ranging and costly consequences.

53.     In 1968, API received a report from the Stanford Research Institute, which it had hired to assess the state of research on environmental pollutants, including carbon dioxide.[61] The assessment stated: "Significant temperature changes are almost certain to occur by the year 2000, and . . . there seems to be no doubt that the potential damage to our environment could be severe." The scientists warned of "melting of the Antarctic ice cap" and informed API that "[p]ast and present studies of $CO_2$ are detailed and seem to explain adequately the present state of $CO_2$ in the atmosphere." What was missing, the scientists said, was work on "air pollution technology and . . . systems in which $CO_2$ emissions would be brought under control."[62]

54.     In 1969, the Stanford Research Institute delivered a supplemental report on air pollution to API, projecting with alarming particularity that atmospheric $CO_2$ concentrations would reach 370 ppm by 2000.[63] This projection turned out to almost exactly match the actual $CO_2$

---

[60] Frank Ikard, *Proceedings 1965: Meeting the Challenges of 1966*, AM. PETROLEUM INST., at 13 (1965) https://www.documentcloud.org/documents/5348130-1965-API-Proceedings.

[61] E. Robinson & R.C. Robbins, *Sources, abundance, and fate of atmospheric pollutants*, SMOKE & FUMES, at 109-10 (1968) https://www.smokeandfumes.org/documents/document16 (last visited Nov. 15, 2023).

[62] *Id.* at 108, 112.

[63] *Id.* at 3.

**S.A. 78**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

concentrations measured in 2000 of 369.64 ppm.[64] The report explicitly connected the rise in $CO_2$ levels to the combustion of fossil fuels, finding it "unlikely that the observed rise in atmospheric $CO_2$ has been due to changes in the biosphere."[65] By virtue of their membership and participation in API at that time, the Fossil Fuel Defendants received or should have received the Stanford Research Institute reports, and thus were on notice of the conclusions in those reports.[66]

55.    Continuing through the 1970s and beyond, Defendants continued to devote resources to understanding the role that GHG emissions play in creating global climate change, and they continued to share what they found among themselves.

56.    Among other Defendants, "Shell was actively supporting research that clearly underscored the dangers posed by burning its fossil fuel products from the mid-1970s."[67]

57.    In 1977, James Black of Exxon gave a presentation to Exxon executives on the "greenhouse effect," which was summarized in an internal memo the following year. Mr. Black reported that "current scientific opinion overwhelmingly favors attributing atmospheric carbon dioxide increase to fossil fuel consumption," and that doubling atmospheric carbon dioxide would, according to the best climate model available, "produce a mean temperature increase of about 2°C to 3°C over most of the earth," with two to three times as much warming at the poles.[68] Mr. Black

---

[64]    *Global Mean CO$_2$ Mixing Ratios (ppm): Observations*, NASA, https://data.giss.nasa.gov/modelforce/ghgases/Fig1A.ext.txt (last visited Nov. 15, 2023).

[65] Robinson & Robbins, *supra* note 61, at 19.

[66] Abstracts of the Stanford Research Institute studies were included in a 1972 API status report to its members. *See Environmental Research: A Status Report*, AM. PETROLEUM INST., at 103 (Jan. 1972) http://files.eric.ed.gov/fulltext/ED066339.pdf.

[67] Matthew Green, *Lost Decade: How Shell Downplayed Early Warnings Over Climate Change*, DESMOG (Mar. 31, 2023), https://www.desmog.com/2023/03/31/lost-decade-how-shell-downplayed-early-warnings-over-climate-change/.

[68] J.F. Black, *Memo to F.G. Turpin on Greenhouse Effect for Exxon Corporation Management Committee*, Exxon Research and Engineering Co. re The Greenhouse Effect, EXXON RESEARCH AND ENGINEERING CO., at 2, 23 (June 6, 1978)

**S.A. 79**

reported that the impacts of global warming would include "more rainfall," which would "benefit some areas and would harm others," and that "[s]ome countries would benefit, but others could have their agricultural output reduced or destroyed." "Even those nations which are favored, however, would be damaged for a while since their agricultural and industrial patterns have been established on the basis of the present climate." Finally, Mr. Black reported that "[p]resent thinking holds that man has a time window of five to ten years before the need for hard decisions regarding changes in energy strategies might become critical."[69] The figure below, reproduced from Black's memo, illustrates Exxon's understanding of the timescale and magnitude of global warming that its products would cause.



**Figure 4: Future Global Warming Predicted Internally by Exxon in 1978[70]**

https://www.documentcloud.org/documents/2805568-1978-Exxon-Presentation-on-Greenhouse-Effect.

[69] *Id.* at 2.

[70] *Id.* at 26 (The company predicted global warming of 1°C to 3°C by 2050, with 10°C warming in polar regions. The difference between the lower dashed and solid curves prior to 1977 represents global warming that Exxon believed may already have been occurring).

**S.A. 80**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

58.     In 1979, an internal Exxon memorandum stated, "The most widely held theory [about the increase in $CO_2$ concentration in the atmosphere] is that: The increase is due to fossil fuel combustion; [i]ncreasing $CO_2$ concentration will cause a warming of the earth's surface; [and t]he present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050. . . . The potential problem is great and urgent." The memo added that, if limits were not placed on fossil fuel production, the following would occur:

> Noticeable temperature changes would occur around 2010 as the [$CO_2$] concentration reaches 400 ppm. Significant climatic changes occur around 2035 when the concentration approaches 500 ppm. A doubling of the pre-industrial concentration [*i.e.*, 580 ppm] occurs around 2050. The doubling would bring about dramatic changes in the world's environment[.][71]

59.     The memo highlighted that there was "no practical means" to capture and store carbon emissions and so "dramatic changes in patterns of energy use would be required" to avoid environmental damage. Significantly, in order to limit $CO_2$ emissions to avoid these harms, fossil fuel emissions would have to peak in the 1990s and alternative energies must be rapidly deployed. Eighty percent of fossil fuel resources would remain undeveloped, thus "coal and possibly other fossil fuel resources could not be utilized to an appreciable extent." Certain fossil fuels, such as shale oil, could not be substantially exploited at all.[72]

60.     Those projections proved remarkably accurate. Annual average atmospheric $CO_2$ concentrations surpassed 400 ppm in 2015 for the first time in millions of years.[73] Limiting the $CO_2$ concentration in the atmosphere to 440 ppm, or a 50 percent increase over preindustrial levels,

---

[71] W.L. Ferrall, *Memo to Dr. R.L. Hirsch on Controlling $CO_2$ Concentration in the Atmosphere*, EXXON RESEARCH AND ENGINEERING CO., at 1-2, 5 (Oct. 16, 1979) https://www.industrydocuments.ucsf.edu/docs/mqwl0228.

[72] *Id.*

[73] Nicola Jones, *How the World Passed a Carbon Threshold and Why It Matters*, YALE ENV'T 360 (Jan. 26, 2017), http://e360.yale.edu/features/how-the-world-passed-a-carbon-threshold-400ppm-and-why-it-matters.

S.A. 81

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

which the Exxon memo said was "assumed to be a relatively safe level for the environment," would require fossil fuel emissions to peak in the 1990s and non-fossil energy systems to be rapidly deployed. Eighty percent of fossil fuel resources, the memo calculated, would have to be left in the ground to avoid doubling atmospheric $CO_2$ concentrations. Certain fossil fuels, such as shale oil, could not be substantially exploited at all.[74]

61.    But instead of heeding these dire and repeated warnings, in November 1979, according to internal correspondence, Exxon urged "a very aggressive defensive program in . . . atmospheric science and climate because there [wa]s a good probability that legislation affecting [its] business w[ould] be passed."[75] It urged an expanded research effort to "influence possible legislation on environmental controls" and suggested the formation of a "small task force" to evaluate a potential program in $CO_2$ and climate, acid rain, carcinogens, fine particulates, and other pollution issues caused by fossil fuels.[76]

62.    In 1979, API and its members, including the Fossil Fuel Defendants, convened a Task Force to monitor and share cutting-edge climate research among members of the oil industry. This Climate and Energy Task Force (hereinafter referred to as "$CO_2$ Task Force") included senior scientists and engineers from nearly every major U.S. and multinational oil and gas company— including Exxon, Mobil, Amoco, Phillips, Texaco, Shell, and Standard Oil of Ohio, as well as Standard Oil of California and Gulf Oil, the predecessors to Chevron—and was charged with monitoring research, evaluating the implications of emerging science for the petroleum and gas

---

[74] Ferrall, *supra* note 71 at 3, 6-7.

[75] Henry Shaw, *Memo from H. Shaw to H.N. Weinberg Regarding Research in Atmospheric Science,* at 2 (Nov. 19, 1979).

[76] *Id*. at 1-2.

**S.A. 82**

industries, and identifying where potential reductions in GHG emissions from Defendants' fossil fuel products could be made.[77]

63.     In 1979, a paper prepared by API for the $CO_2$ Task Force asserted that $CO_2$ concentrations were rising, and predicted that, although global warming would occur, it would likely go undetected until approximately the year 2000 because its effects were being temporarily masked by a natural cooling trend, which would revert to a warming trend around 1990, adding to the warming caused by $CO_2$.[78]

64.     In 1980, at the invitation of the $CO_2$ Task Force, climate expert J. Laurman delivered to API members a presentation providing a "complete technical discussion" of global warming caused by fossil fuels, including "the scientific basis and technical evidence of $CO_2$ buildup, impact on society, methods of modeling and their consequences, uncertainties, policy implications, and conclusions that can be drawn from present knowledge."[79] Mr. Laurman informed the $CO_2$ Task Force of the "scientific consensus on the potential for large future climatic response to increased $CO_2$ levels" and that there was "strong empirical evidence that [the carbon dioxide] rise [was] caused by anthropogenic release of $CO_2$, mainly from fossil fuel burning."[80] According to Mr. Laurman, unless fossil fuel production and use were controlled, atmospheric

---

[77] Neela Banerjee, *Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too*, INSIDE CLIMATE NEWS (Dec. 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco/.

[78] R.J. Campion, *Memorandum from RJ Campion to J.T. Burgess Regarding the API's Background Paper on $CO_2$ Effects* (Sept. 6, 1979), https://www.industrydocuments.ucsf.edu/docs/lqwl0228.

[79] J. J. Nelson, *Letter to AQ-9 Task Force regarding The $CO_2$ Problem; Addressing Research Agenda Development*, at 2 (Mar. 18, 1980) https://www.industrydocuments.ucsf.edu/docs/gffl0228.

[80] *Id.* at 9-10 (full capitalization in original removed).

carbon dioxide would be twice preindustrial levels by 2038, using a three percent per annum growth of atmospheric release rate, with "likely impacts" along the following trajectory:

1°C RISE (2005): BARELY NOTICEABLE

2.5°C RISE (2038): MAJOR ECONOMIC CONSEQUENCES, STRONG REGIONAL DEPENDENCE

5°C RISE (2067): GLOBALLY CATASTROPHIC EFFECTS

Mr. Laurman warned the $CO_2$ Task Force that global warming of 2.5°C would "bring[] world economic growth to a halt." The minutes of the meeting, which were distributed to the entire $CO_2$ Task Force, show that one of the Task Force's goals was "to help develop ground rules for . . . the cleanup of fuels as they relate to $CO_2$ creation," and the Task Force discussed potential research into the market and technical requirements for a worldwide "energy source changeover" away from fossil fuels.[81]

65.     In 1980, Imperial Oil Limited, an Exxon subsidiary, reported to managers and staff at affiliated Esso and Exxon companies that there was "no doubt" that fossil fuels were aggravating the build-up of $CO_2$ in the atmosphere, and that "[t]echnology exist[ed] to remove $CO_2$ from stack gases but removal of only 50 [percent] of the $CO_2$ would double the cost of power generation."[82]

66.     In December 1980, an Exxon manager distributed a memorandum on the "$CO_2$ Greenhouse Effect" attributing future buildup of carbon dioxide to fossil fuel use, and explaining that internal calculations indicated that atmospheric carbon dioxide could double by around 2060, "most likely" resulting in global warming of approximately $3.0 \pm 1.5$°C.[83] Calculations predicting

---

[81] *Id.* at 1, 13.

[82] Imperial Oil Ltd., *Review of Environmental Protection Activities for 1978–1979*, at 2 (Aug. 6, 1980) http://www.documentcloud.org/documents/2827784-1980-Imperial-Oil-Review-of-Environmental.html#document/.

[83] Henry Shaw & P. P. McCall, *Memorandum to T.K. Kett on Exxon Research and Engineering Company's Technological Forecast: $CO_2$ Greenhouse Effect*, at 3 (Dec. 18, 1980)

**S.A. 84**

a lower temperature increase, such as 0.25°C, were "not held in high regard by the scientific community[.]" The memo also reported that such global warming would cause "increased rainfall[] and increased evaporation," which would have a "dramatic impact on soil moisture, and in turn, on agriculture" and other "serious global problems[.]" The memo called for "society" to pay the bill, estimating that some adaptive measures would cost no more than "a few percent" of Gross National Product.[84] Henry Shaw also reported that Exxon had studied various responses for avoiding or reducing a carbon dioxide build-up, including "stopping all fossil fuel combustion at the 1980 rate" and "investigat[ing] the market penetration of non-fossil fuel technologies." The memo estimated that such non-fossil energy technologies "would need about 50 years to penetrate and achieve roughly half of the total [energy] market."[85] The memo included the figure below, which illustrates both the global warming anticipated by Exxon and the company's understanding that significant global warming would occur:

---

https://www.documentcloud.org/documents/2805573-1980-Exxon-Memo-Summarizing-Current-Models-And.html.

[84] *Id.* at 3-5.

[85] *Id.* at 5-6.

**S.A. 85**

FILED DATE: 2/20/2024 12:34 PM  2024CH01024



**Figure 5: Future Global Warming Predicted Internally by Exxon in 1980[86]**

67.     In February 1981, Exxon's Contract Research Office prepared and distributed a

"Scoping Study on CO₂" to the leadership of Exxon Research and Engineering Company.[87] The

study reviewed Exxon's carbon dioxide research and considered whether to expand its research on

carbon dioxide or global warming further. It recommended against expanding those research areas

because Exxon's current research programs were sufficient for achieving the company's goals of

closely monitoring federal research, building credibility and public relations value, and developing

in-house expertise regarding CO₂ and global warming, and noted that Exxon employees were

actively monitoring and keeping the company apprised of outside research developments,

---

[86] *Id.* at 12. The company anticipated a doubling of carbon dioxide by around 2060 and that the
oceans would delay the warming effect by a few decades, leading to approximately 3°C warming
by the end of the century.

[87] G.H. Long, *Letter to P.J. Lucchesi et al. Regarding Atmospheric CO Scoping Study*, EXXON
RESEARCH      AND      ENGINEERING      CO.      (Feb.      5,      1981),
https://www.industrydocuments.ucsf.edu/docs/yxfl0228.

**S.A. 86**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

including those on climate modeling and "$CO_2$-induced effects." In discussing "options for reducing $CO_2$ build-up in the atmosphere," the study noted that although capturing $CO_2$ from flue gases (*i.e.*, exhaust gas produced by combustion) was technologically possible, the cost was high, and "energy conservation or shifting to renewable energy sources[] represent[ed] the only options that might make sense."[88]

68.    Thus, by 1981, Exxon and other fossil fuel companies were actively monitoring all aspects of $CO_2$ and global warming research, and Exxon had recognized that a shift away from fossil fuels and towards renewable energy sources would be necessary to avoid a large $CO_2$ build-up in the atmosphere and resultant global warming.

69.    An Exxon scientist warned colleagues in a 1981 internal memorandum that "future developments in global data gathering and analysis, along with advances in climate modeling, may provide strong evidence for a delayed $CO_2$ effect of a truly substantial magnitude," and that under certain circumstances it would be "very likely that we will unambiguously recognize the threat by the year 2000."[89] The memo expressed concern about the potential effects of unabated $CO_2$ emissions from Defendants' fossil fuel products, saying, "it is distinctly possible that [Exxon Planning Division's] scenario will later produce effects which will indeed be catastrophic (at least for a substantial fraction of the world's population)."[90]

70.    In 1981, Exxon stated its position on the growth of carbon dioxide in the atmosphere. According to Exxon, growing fossil fuel consumption would lead atmospheric $CO_2$

---

[88] *Id.*

[89] R.W. Cohen, *Memorandum to W. Glass on Possible Emission Consequences of Fossil Fuel Consumption* (Aug. 18, 1981), http://www.climatefiles.com/exxonmobil/1981-exxon-memo-on-possible-emission-consequences-of-fossil-fuel-consumption.

[90] *Id.*

S.A. 87

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

levels to double, and doubling $CO_2$ levels would lead to a global average temperature rise of 3°C. This would cause "[m]ajor shifts in rainfall/agriculture" and "polar ice may melt."[91]

71.     In 1982, another report prepared for API by climate scientists recognized that the atmospheric $CO_2$ concentration had risen significantly compared to the concentration at the beginning of the industrial revolution. It went further, warning that "[s]uch a warming can have serious consequences for man's comfort and survival since patterns of aridity and rainfall can change, the height of the sea level can increase considerably and the world food supply can be affected."[92] Exxon's own modeling research confirmed this.[93] In a 1982 internal memorandum, Exxon's Corporate Research and Science Laboratories acknowledged a consensus "that a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)$°C $[5.4 \pm 2.7$ °F]" as well as "unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate[.]"[94]

72.     Also in 1982, Exxon's Environmental Affairs Manager distributed a primer on climate change to Exxon management; it was "restricted to Exxon personnel and not [to be]

---

[91] Henry Shaw, *CO2 Position Statement*, INSIDE CLIMATE NEWS (May 15, 1981) (footnote omitted), https://insideclimatenews.org/documents/exxon-position-co2-1981.

[92] *Climate Models and CO2 Warming: A Selective Review and Summary*, AM. PETROLEUM INST., at 4 (Mar. 1982), https://www.climatefiles.com/trade-group/american-petroleum-institute/api-climate-models-and-co2-warming-a-selective-review-and-summary/.

[93] *See* Roger W. Cohen, *Memorandum to A.M. Natkin Summarizing Climate Modeling and CO2 Greenhouse Effect Research*, EXXON RESEARCH AND ENGINEERING CO. (Sept. 2, 1982), https://www.climatefiles.com/exxonmobil/1982-exxon-memo-summarizing-climate-modeling-and-co2-greenhouse-effect-research/.

[94] *Id.* at 1.

**S.A. 88**

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

distributed externally."[95] The primer explained the science behind climate change, confirmed fossil fuel combustion as a primary anthropogenic contributor to global warming, and estimated a $CO_2$ doubling by 2090 with a "Most Probable Temperature Increase" of more than 2°C over the 1979 level, as shown in the figure on the following page.[96] The report also warned that "disturbances in the existing global water distribution balance would have dramatic impact on soil moisture, and in turn, on agriculture," and that the American Midwest would become much drier. It further warned of "potentially catastrophic effects that must be considered[.]"[97] It concluded that "[a]ll biological systems are likely to be affected," and "the most severe economic effects could be on agriculture."[98]

---

[95] M.B. Glaser, *Memorandum to R.W. Cohen et al. re CO₂ "Greenhouse" Effect*, EXXON RESEARCH AND ENGINEERING CO., at 1 (Nov. 12, 1982), https://insideclimatenews.org/wp-content/uploads/2015/09/1982-Exxon-Primer-on-CO2-Greenhouse-Effect.pdf.

[96] *Id.* at 1, 7.

[97] *Id.* at 11.

[98] *Id.* at 14.

**S.A. 89**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024



**Figure 6: Exxon's Internal Prediction of Future CO2 Increase and
Global Warming from 1982[99]**

73.    The report recommended studying "soil erosion, salinization, or the collapse of

irrigation systems" in order to understand how society might be affected and might respond to

global warming, as well as "[h]ealth effects" and "stress associated with climate related famine or

migration[.]"[100] The report estimated that undertaking "[s]ome adaptive measures" (but not all of

---

[99] *Id.* at 7. The company predicted a doubling of atmospheric carbon dioxide concentrations above
preindustrial levels by around 2090 (left curve), with a temperature increase of more than 2° Cover
the 1979 level (right curve).

[100] *Id.* at 14.

58

**S.A. 90**

them) would cost "a few percent of the gross national product estimated in the middle of the next century" (gross national product was $25,640 billion in 2022).[101] To avoid such impacts, the report discussed a scientific analysis which studied energy alternatives and requirements for introducing them into widespread use, and which recommended that "vigorous development of non-fossil energy sources be initiated as soon as possible."[102] The primer also noted that the analysis indicated that other greenhouse gases related to fossil fuel production, such as methane (which is a more powerful GHG than $CO_2$), "may significantly contribute to a global warming," and that concerns over $CO_2$ would be reduced if fossil fuel use were decreased due to "high price, scarcity, [or] unavailability."[103] "Mitigation of the 'greenhouse effect' would require major reductions in fossil fuel combustion," the primer stated.[104] The primer was widely distributed to Exxon leadership.

74.     In September 1982, the Director of Exxon's Theoretical and Mathematical Sciences Laboratory, Roger Cohen, wrote Alvin Natkin of Exxon's Office of Science and Technology to summarize Exxon's internal research on climate modeling.[105] Mr. Cohen reported:

> [O]ver the past several years a clear scientific consensus has emerged regarding the expected climatic effects of increased atmospheric $CO_2$. The consensus is that a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)$ °C .... The temperature rise is predicted to be distributed nonuniformly over the earth, with above-average temperature elevations in the polar regions and relatively small increases near the equator. There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations in the biosphere. The time required for doubling of atmospheric $CO_2$ depends on future world consumption of fossil fuels. Current projections indicate that doubling will occur sometime in the latter half of the 21st century. The models predict that $CO_2$ climate

---

[101] *Id.*; *see also Gross National Product*, FED. RESERVE BANK OF ST. LOUIS https://fred.stlouisfed.org/series/GNPA (last visited Nov. 15, 2023).

[102] Glaser, *supra* note 95 at 18.

[103] *Id.* at 18, 29.

[104] *Id.* at 2.

[105] Cohen, *supra* note 89.

59

changes should be observable well before doubling. It is generally believed that the first $CO_2$-induced temperature increase will not be observable until around the year 2000.

Mr. Cohen described Exxon's own climate modeling experiments, reporting that they produced "a global averaged temperature increase that falls well within the range of the scientific consensus," which were "consistent with the published predictions of more complex climate models," and were "also in agreement with estimates of the global temperature distribution during a certain prehistoric period when the earth was much warmer than today." "In summary," Mr. Cohen wrote, "the results of our research are in accord with the scientific consensus on the effect of increased atmospheric $CO_2$ on climate."

75.     Throughout the early 1980s, at Exxon's direction, Exxon climate scientist Henry Shaw forecasted emissions of $CO_2$ from fossil fuel use. Those estimates were incorporated into Exxon's twenty-first century energy projections and were distributed among Exxon's various divisions. Mr. Shaw's conclusions included an expectation that atmospheric $CO_2$ concentrations would double in 2090 per the Exxon model, with an attendant 2.3–5.6°F average global temperature increase.[106]

76.     During the 1980s, many Defendants formed their own research units focused on climate modeling. API, including the API $CO_2$ Task Force, provided a forum for the Fossil Fuel Defendants to share their research efforts and corroborate their findings related to anthropogenic GHG emissions.[107]

---

[106] Neela Banerjee, *More Exxon Documents Show How Much It Knew About Climate 35 Years Ago*, INSIDE CLIMATE NEWS (Dec. 1, 2015), https://insideclimatenews.org/news/01122015/documents-exxons-early-co2-position-senior-executives-engage-and-warming-forecast/.

[107] Banerjee, *supra* note 77.

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

77.    In 1987, Shell published an internal "brief for companies of the Royal Dutch/Shell Group," which includes its U.S. based subsidiaries, titled "Air pollution: an oil industry perspective," in which the company described the greenhouse effect, occurring "largely as a result of the burning of fossil fuels and deforestation."[108] And it acknowledged the "concern that further increases in carbon dioxide levels could cause climatic changes, notably a rise in overall temperature, having major environmental, social and economic consequences."[109]

78.    In 1988, the Shell Greenhouse Effect Working Group issued a confidential internal report, "The Greenhouse Effect," which acknowledged global warming's anthropogenic nature: "Man-made carbon dioxide, released into and accumulated in the atmosphere, is believed to warm the earth through the so-called greenhouse effect." The authors also noted the burning of fossil fuels as a primary driver of $CO_2$ buildup and warned that warming could "create significant changes in sea level, ocean currents, precipitation patterns, regional temperature and weather." They further pointed to the potential for "direct operational consequences" of sea level rise on "offshore installations, coastal facilities and operations (*e.g.*, platforms, harbors, refineries, depots)."[110]

79.    The Shell report noted that "by the time the global warming becomes detectable it could be too late to take effective countermeasures to reduce the effects or even to stabilise the situation." The authors mentioned the need to consider policy changes, noting that "the potential implications for the world are . . . so large that policy options need to be considered much earlier,"

---

[108]    Shell Briefing Service, *Air pollution: an oil industry perspective* 4 (1987), https://www.documentcloud.org/documents/24359057-shell-briefing-service-air-pollution-an-oil-industry-perspective-nr1-1987.

[109] *Id.* at 5.

[110] *The Greenhouse Effect*, SHELL INTERNATIONALE PETROLEUM, at 1, 27 (May 1988) https://www.documentcloud.org/documents/4411090-Document3.html#document/p9/a411239.

S.A. 93

and that research should be "directed more to the analysis of policy and energy options than to studies of what we will be facing exactly."[111]

80.    Shell wrote a confidential report in 1989 that modeled $CO_2$ emissions under "SUSTAINABLE WORLD" and "GLOBAL MERCANTILISM" scenarios. The report noted that "SUSTAINABLE WORLD will not prevent the problem arising, but it could mitigate the problem," and predicted that "GLOBAL MERCANTILISM" would "most dramatically change[]" agricultural patterns and "disrupt[] eco-systems."[112] It also predicted effects on humanity: "The potential refugee problem in GLOBAL MERCANTILISM could be unprecedented. . . . Conflicts would abound. Civilisation could prove a fragile thing. The logic of SUSTAINABLE WORLD is a society choosing to channel some investments into environmental maintenance against this contingency."[113]

81.    Shell even predicted in 1989, in its confidential scenario planning, that minimizing emissions to prevent global warming would in turn spur innovation necessary to mitigate climate change. It stated that conditions surrounding emissions reduction "foster[] R&D, aiding innovation necessary to meet environmental standards." Shell predicted that under this scenario, there would be innovation in structural materials to support "energy conservation and transport efficiency," and advances in lubricants would support "efficiency rather than performance."[114].

---

[111] *Id.* at 1, 6.

[112] *Id.* at 35-36.

[113] Shell, SCENARIOS: 1989–2010: CHALLENGE AND RESPONSE, at 35-36 (1989), https://www.documentcloud.org/documents/23735737-1989-oct-confidential-shell-group-planning-scenarios-1989-2010-challenge-and-response-disc-climate-refugees-and-shift-to-non-fossil-fuels.

[114] *See* Shell UK, UK SCENARIOS 1989 (Nov. 1989), https://embed.documentcloud.org/documents/24359062-snippets-of-confidential-shell-uk-november-1989-scenarios.

S.A. 94

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

82. In 1991, a researcher for Exxon's subsidiary Imperial Oil stated to an audience of engineers that greenhouse gases were rising "due to the burning of fossil fuels. . . . Nobody disputes this fact."[115]

83. Also in 1991, BP released a short film called "The Earth – What Makes Weather?" In it, a narrator states: "Our . . . dependence on carbon-based fuels is now a cause for concern. When coal, oil or gas are burned, they release carbon dioxide and other reactive gases." The narrator then went on to explain:

> As the earth gives off heat, carbon dioxide, together with water vapor, absorbs and radiates it back, acting like a blanket. . . . If world population growth is matched by energy consumption, even more carbon dioxide will be released, making this greenhouse effect even stronger. An overall increase in temperature of even a few degrees could disrupt our climate with devastating consequences. If oceans got warmer and the ice sheets began to melt, sea levels would rise, encroaching on coastal lowlands. From warmer seas, more water would evaporate, making storms and the havoc they cause more frequent. . . . Catastrophic floods could become commonplace, and low-lying countries like Bangladesh would be defenseless against them. Too much water or too little. Away from the coasts we could see a return to the conditions which devastated America's Midwest in the 1930s. Global warming could repeat on a more disastrous scale the dustbowl phenomenon which virtually destroyed farming on the Great Plains. . . . The threat of such climatic change is now one of our most urgent concerns.[116]

The film was not widely distributed.

84. The fossil fuel industry was at the forefront of carbon dioxide research for much of the latter half of the twentieth century. It worked with many of the field's top researchers to produce exceptionally sophisticated studies and models. For instance, in the mid-1990s, Shell began developing and employing scenarios to plan how the company could respond to various

---

[115] Sara Jerving et al., *Special Report: What Exxon Knew About Global Warming's Impact on the Arctic*, L.A. TIMES (Oct. 10, 2015, 12:00 AM PT), https://www.latimes.com/business/la-na-adv-exxon-arctic-20151011-story.html.

[116] Vatan Hüzeir, *BP Knew the Truth About Climate Change 30 Years Ago*, FOLLOW THE MONEY (May 26, 2020), https://www.ftm.nl/artikelen/bp-video-climate-change-1990-engels; *see also This Earth – What Makes Weather?*, BP VIDEO LIBRARY (Jan. 1, 1991), https://www.bpvideolibrary.com/record/463.

global forces in the future. In one scenario, published in a 1998 internal report, Shell paints an

eerily prescient scene:

> In 2010, a series of violent storms causes extensive damage to the eastern coast of the US. Although it is not clear whether the storms are caused by climate change, people are not willing to take further chances. The insurance industry refuses to accept liability, setting off a fierce debate over who is liable: the insurance industry, or the government. After all, two successive IPCC reports since 1995 have reinforced the human connection to climate change . . . Following the storms, a coalition of environmental NGOs brings a class-action suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: that something must be done. A social reaction to the use of fossil fuels grows, and individuals become 'vigilante environmentalists' in the same way, a generation earlier, they had become fiercely anti-tobacco. Direct-action campaigns against companies escalate. Young consumers, especially, demand action.[117]

85.     Fossil fuel companies did not just consider climate change impacts in scenarios; they also incorporated those impacts in their on-the-ground planning. In the mid-1990s, Exxon, Shell, and Imperial Oil (Exxon) jointly undertook the Sable Offshore Energy Project in Nova Scotia. The project's own Environmental Impact Statement declared, "The impact of a global warming sea-level rise may be particularly significant in Nova Scotia. The long-term tide gauge records at a number of locations along the N.S. coast have shown sea level has been rising over the past century. . . . For the design of coastal and offshore structures, an estimated rise in water level, due to global warming, of 0.5 m [1.64 feet] may be assumed for the proposed project life (25 years)."[118]

86.     Climate change research conducted by Defendants and their industry associations frequently acknowledged uncertainties in their climate modeling. Those uncertainties, however,

---

[117]     *Group Scenarios 1998–2020*, at 115, 118 (1998), http://www.documentcloud.org/documents/4430277-27-1-Compiled.html.

[118] *Sable Project Development Plan: Environmental Impact Statement*, EXXONMOBIL, at 4-77 (Feb. 1996), https://web.archive.org/web/20151106083051/http://soep.com/about-the-project/development-plan-application/.

S.A. 96

were largely with respect to the magnitude and timing of climate impacts resulting from fossil fuel consumption, not with respect to whether significant changes would eventually occur. Defendants' researchers and the researchers at their industry associations harbored little doubt that climate change was occurring and that fossil fuel products were, and are, the primary cause.

87.     Despite the overwhelming information about the threats to people and the planet posed by the continued unabated use of their fossil fuel products, the Fossil Fuel Defendants failed to act as they reasonably should have to avoid or mitigate those dire adverse impacts. The Fossil Fuel Defendants instead undertook affirmative efforts to promote their fossil fuel products as safe and cast doubt in the public's mind about the burgeoning scientific consensus on climate change, as described below. This was an abdication of the Fossil Fuel Defendants' responsibility to consumers and the public, including the City, to act on their knowledge of the reasonably foreseeable hazards of unabated production and consumption of their fossil fuel products.

**C.     Defendants Did Not Disclose Known Harms Associated with the Intended Use of Fossil Fuel Products, and Instead Affirmatively Concealed Those Harms by Engaging in a Campaign of Deception to Increase the Use of Those Products.**

88.     By 1988, Defendants had amassed a compelling body of knowledge about the role of anthropogenic greenhouse gases, specifically those emitted from the use of fossil fuel products, in causing climate change and its cascading impacts, including disruptions to the hydrologic cycle, extreme precipitation, extreme drought, increasing temperatures, and associated consequences for human communities and the environment.

89.     On notice that their products were causing global climate change and dire effects on the planet, Defendants faced the decision whether to take steps to limit the damage that the use of fossil fuel products was causing and would continue to cause Earth's inhabitants, including the people of Chicago. Before or thereafter, Defendants could and reasonably should have taken any number of steps to mitigate the damage caused by the use of fossil fuel products. Their own

S.A. 97

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

comments reveal an awareness of what steps should have been taken. In particular, Defendants should have warned civil society and Chicago consumers of the dangers known to Defendants of the unabated use of fossil fuel products, and they could and should have taken reasonable steps to limit the greenhouse gases emitted by use of fossil fuel products. Instead, the actions necessary to mitigate the significant climate harms to the City were wrongfully delayed by Defendants' deception. Simply put, Defendants should have issued warnings commensurate with their own understanding of the risks posed by the expected and intended uses of fossil fuel products.

90.     Not only did Defendants fail to issue any warnings, but several key events during the period between 1988 and 1992 prompted them to change their tactics from general research and internal discussion on climate change to a public campaign aimed at deceiving consumers and the public, including the inhabitants of Chicago. These key events included the following:

a.      In 1988, National Aeronautics and Space Administration ("NASA") scientists confirmed that human activities were contributing to global warming. On June 23, 1988, NASA scientist James Hansen's presentation of this information to Congress engendered significant news coverage and publicity for the announcement, including coverage on the front page of *The New York Times*.[119]

b.      On July 28, 1988, Senator Robert Stafford and four bipartisan co-sponsors introduced S. 2666, "The Global Environmental Protection Act," to regulate $CO_2$ and other greenhouse gases. Three more bipartisan bills to significantly reduce $CO_2$ pollution were introduced over the following ten weeks, and in August, U.S. Presidential candidate George H.W. Bush pledged that his presidency would combat the greenhouse effect with "the White House

---

[119] *See* Peter C. Frumhoff et al., *The climate responsibilities of industrial carbon producers* 132 CLIMATIC CHANGE 157, 161 (2015), http://dx.doi.org/10.1007/s10584-015-1472-5.

**S.A. 98**

FILED DATE: 2/20/2024 12:34 PM  2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

effect."[120] Political will in the United States to reduce anthropogenic GHG emissions and mitigate the harms associated with Defendants' fossil fuel products was gaining momentum.

       c.      In December 1988, the United Nations formed the IPCC, a scientific panel dedicated to providing the world's governments with an objective, scientific analysis of climate change and its environmental, political, and economic impacts.

       d.      In 1990, the IPCC published its First Assessment Report on anthropogenic climate change,[121] which concluded that (1) "there is a natural greenhouse effect which already keeps the Earth warmer than it would otherwise be," and (2) that

> emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases: carbon dioxide, methane, chlorofluorocarbons (CFCs) and nitrous oxide. These increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface. The main greenhouse gas, water vapour, will increase in response to global warming and further enhance it.[122]

The IPCC reconfirmed those conclusions in a 1992 supplement to the First Assessment Report.[123]

       e.      The United Nations held the 1992 Earth Summit in Rio de Janeiro, Brazil, a major, newsworthy gathering of over 170 world governments, of which more than 100 sent their heads of state. The Summit resulted in the United Nations Framework Convention on Climate Change, an international environmental treaty providing protocols for future negotiations aimed at

---

[120] *The White House and the Greenhouse*, N.Y. TIMES (May 9, 1989), http://www.nytimes.com/1989/05/09/opinion/the-white-house-and-the-greenhouse.html.

[121] *See Reports*, IPCC, https://www.ipcc.ch/reports/ (last visited Nov. 15, 2023).

[122] J.T. Houghton et al., *Climate Change: The IPCC Scientific Assessment*, IPPC (1990) https://www.ipcc.ch/report/ar1/wg1/.

[123] *Climate Change: The 1990 and 1992 IPCC Assessments*, THE INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, at 52 (1992) https://www.ipcc.ch/report/climate-change-the-ipcc-1990-and-1992-assessments.

**S.A. 99**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

"stabiliz[ing] greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."[124]

91.　　Defendants' campaign of deception focused on concealing, discrediting, and/or misrepresenting information that tended to support restricting the use of fossil fuels and transitioning society to a lower-carbon future, which would thereby decrease demand for the Fossil Fuel Defendants' products. The campaign enabled the Fossil Fuel Defendants to continue their business practice of exploiting fossil fuel reserves and concurrently externalize the social and environmental costs of their fossil fuel products. Those activities ran counter to Defendants' own prior recognition that the science of anthropogenic climate change was clear, and that action was needed to avoid or mitigate dire consequences to the planet and to communities like Chicago's.

92.　　The Fossil Fuel Defendants—both on their own and jointly through industry and front groups such as API and the GCC—funded, conceived, planned, and carried out a sustained and widespread campaign of denial and disinformation about the existence of climate change and their products' contribution to it. The campaign included a long-term pattern of direct misrepresentations and material omissions, as well as a plan to influence consumers indirectly by affecting public opinion through the dissemination of misleading information to the press, government, and academia. Although the Fossil Fuel Defendants were competitors in the marketplace, they combined and collaborated with each other and with API on this public campaign to misdirect and stifle public knowledge in order to increase sales and protect profits. This effort included promoting hazardous fossil fuel products through advertising campaigns that failed to warn of the existential risks associated with the use of those products and that were

---

[124] *United Nations Framework Convention on Climate Change*, UNITED NATIONS, at 4 (1992), https://unfccc.int/resource/docs/convkp/conveng.pdf.

S.A. 100

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

designed to influence consumers to continue using the Fossil Fuel Defendants' fossil fuel products, irrespective of those products' damage to communities, like that of Chicago, and the environment.

93.    In a secretly-recorded video from 2021, an Exxon executive stated:

Did we aggressively fight against some of the science? Yes.
Did we join some of these shadow groups to work against some of the early efforts? Yes, that's true. There's nothing illegal about that.
We were looking out for our investments. We were looking out for our shareholders."[125]

94.    For example, in 1988, Joseph Carlson, an Exxon public affairs manager, stated in an internal memo that Exxon was "providing leadership through API in developing the petroleum industry position" on "the greenhouse effect."[126] He then went on to describe the "Exxon Position," which included two important messaging tenets, among others: (1) "[e]mphasiz[ing] the uncertainty in scientific conclusions regarding the potential enhanced Greenhouse effect"; and (2) "[r]esist[ing] the overstatement and sensationalization of potential Greenhouse effect which could lead to noneconomic development of nonfossil fuel resources."[127]

95.    Reflecting on his time as an Exxon consultant in the 1980s, Professor Martin Hoffert, a former New York University physicist who researched climate change, expressed regret over Exxon's "climate science denial program campaign" in his sworn testimony before Congress:

[O]ur research [at Exxon] was consistent with findings of the United Nations Intergovernmental Panel on Climate Change on human impacts of fossil fuel burning, which is that they are increasingly having a perceptible influence on Earth's climate. . . . If anything, adverse climate change from elevated $CO_2$ is proceeding faster than the average of the prior IPCC mild projections and fully consistent with what we knew back in the early 1980's at Exxon. . . . I was greatly

---

[125] Jeff Brady, *Exxon Lobbyist Caught on Video Talking About Undermining Biden's Climate Push*, NPR (July 1, 2021, 11:37 AM ET), https://www.npr.org/2021/07/01/1012138741/exxon-lobbyist-caught-on-video-talks-about-undermining-bidens-climate-push.

[126] Joseph M: Carlson, *Memorandum re The Greenhouse Effect*, at 7 (Aug. 3, 1988) https://assets.documentcloud.org/documents/3024180/1998-Exxon-Memo-on-the-Greenhouse-Effect.pdf.

[127] *Id.* at 7-8.

**S.A. 101**

distressed by the climate science denial program campaign that Exxon's front office launched around the time I stopped working as a consultant—but not collaborator—for Exxon. The advertisements that Exxon ran in major newspapers raising doubt about climate change were contradicted by the scientific work we had done and continue to do. Exxon was publicly promoting views that its own scientists knew were wrong, and we knew that because we were the major group working on this.[128]

96.      "Shell shaped a series of influential industry-backed publications that downplayed or omitted key risks; emphasized scientific uncertainties; and pushed for more fossil fuels, particularly coal."[129] In 1992, Shell put out a publication for wide external distribution on what it called the "Basic Scientific Facts" of the "Potential Augmented Greenhouse Effect," in which it downplayed the scientific consensus by referring to the "relatively few established scientific fundamentals." It also misleadingly suggested that a "particular cause" of global warming was "difficult" to identify, despite having identified the use of their products as a significant contributor in the previous decade.[130] For example, in 1985, a Shell UK environmental scientist published an article laying out the scientific fact that "[b]urning of fossil fuels which have taken millions of years to form has effectively upset the balance [of the Carbon Cycle] leading to an increase in CO2 in the atmosphere."[131]

---

[128] *Examining the Oil Industry's Efforts to Suppress the Truth About Climate Change: Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Civil Rights and Civil Liberties*, 116th Cong., 1st Sess., at 7-8 (Oct. 23, 2019) (statement of Martin Hoffert, Former Exxon Consultant), https://www.congress.gov/event/116th-congress/house-event/110126.

[129] Matthew Green, *Lost Decade: How Shell Downplayed Early Warnings Over Climate Change*, DESMOG (Mar. 31, 2023, 21:00 PDT), https://www.desmog.com/2023/03/31/lost-decade-how-shell-downplayed-early-warnings-over-climate-change/.

[130] *See* Jan Kuyper, *Shell Group Planning, Business Environment Occasional Paper, Potential Augmented Greenhouse Effect: Basic Scientific Facts* (Sept. 1992), https://www.documentcloud.org/documents/24359060-1992-internal-shell-group-planning-report-potential-augmented-greenhouse-effect-and-depletion-of-the-ozone-layer.

[131] T.G. Wilkinson, *Why and How to Control Energy Pollution: Can Harmonisation Work?*, 8 CONSERVATION & RECYCLING 7, 19 (1985), https://www.documentcloud.org/documents/24359067-1985-03-why-and-how-to-control-energy-pollution-by-tg-wilkinson-shell.

**S.A. 102**

97.     A 1994 Shell report entitled "The Enhanced Greenhouse Effect: A Review of the Scientific Aspects" by Royal Dutch Shell's Peter Langcake stands in stark contrast to the company's 1988 report on the same topic. Whereas before the authors had recommended consideration of policy solutions early on, Mr. Langcake warned of the potentially dramatic "economic effects of ill-advised policy measures." While the report recognized the IPCC conclusions as the mainstream view, Mr. Langcake still emphasized scientific uncertainty, noting, for example, that "the postulated link between any observed temperature rise and human activities has to be seen in relation to natural climate variability, which is still largely unpredictable." The Shell position is stated clearly in the report: "Scientific uncertainty and the evolution of energy systems indicate that policies to curb greenhouse gas emissions beyond 'no regrets' measures could be premature, divert resources from more pressing needs and further distort markets."[132] Shell published further reports in 1995 titled "Is Climate Change Occurring Already?" and "Climate of Concern," both of which emphasized uncertainty surrounding the greenhouse effect that Shell's own internal analyses had rejected.[133]

98.     In 1996, Exxon released a publication called "Global Warming: Who's Right? Facts about a debate that's turned up more questions than answers." In the publication's preface, Exxon CEO Lee Raymond inaccurately stated that "taking drastic action immediately is unnecessary since many scientists agree there's ample time to better understand the climate system." The publication described the greenhouse effect as "unquestionably real and definitely a

---

[132] P. Langcake, *The Enhanced Greenhouse Effect: A Review of the Scientific Aspects*, SHELL INTERNATIONALE PETROLEUM, at 1, 9, 14 (updated Dec. 1994), https://www.documentcloud.org/documents/4411099-Document11.html#document/p15/a411511.

[133] *A Crack in the Shell: New Documents Expose a Hidden Climate History*, CENTER FOR INTERNATIONAL ENVIRONMENTAL LAW, at 10-11 (2018), https://www.ciel.org/wp-content/uploads/2018/04/A-Crack-in-the-Shell-April-2018.pdf.

S.A. 103

good thing," while ignoring the severe consequences that would result from the influence of the increased $CO_2$ concentration on the Earth's climate. Instead, it characterized the greenhouse effect as simply "what makes the earth's atmosphere livable." Directly contradicting Exxon's own internal knowledge and peer-reviewed science, the publication ascribed the rise in temperature since the late nineteenth century to "natural fluctuations that occur over long periods of time" rather than to the anthropogenic emissions that Exxon itself and other scientists had confirmed were responsible. The publication also falsely challenged the computer models that projected the future impacts of unabated fossil fuel product consumption, including those developed by Exxon's own employees, as having been "proved to be inaccurate." The publication contradicted the numerous reports prepared by and circulated among Exxon's staff, and by API, stating that "the indications are that a warmer world would be far more benign than many imagine . . . moderate warming would reduce mortality rates in the U.S., so a slightly warmer climate would be more healthful." Mr. Raymond concluded his preface by attacking advocates for limiting the use of his company's fossil fuel products as "drawing on bad science, faulty logic or unrealistic assumptions"—despite the important role that Exxon's own scientists had played in compiling those same scientific underpinnings.[134]

99.     API published an extensive report in the same year warning against concern over $CO_2$ buildup and any need to curb consumption. The introduction stated that "there is no persuasive basis for forcing Americans to dramatically change their lifestyles to use less oil."[135] The authors discouraged the further development of certain alternative energy sources, writing that

---

[134] *Global Warming: Who's Right?*, EXXON CORP., at 3, 5-7, (1996) https://www.documentcloud.org/documents/2805542-Exxon-Global-Warming-Whos-Right.html.

[135] Sally Gentille et al., *Reinventing Energy: Making the Right Choices*, AM. PETROLEUM INST., at 2, 11, 63, 79, (1996) https://www.documentcloud.org/documents/4224133-Reinventing-Energy.

**S.A. 104**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

"government agencies have advocated the increased use of ethanol and the electric car, without the facts to support the assertion that either is superior to existing fuels and technologies" and that "[p]olicies that mandate replacing oil with specific alternative fuel technologies freeze progress at the current level of technology, and reduce the chance that innovation will develop better solutions."[136] The paper also denied the human connection to climate change, by falsely stating that "no conclusive—or even strongly suggestive—scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms."[137] The report's message was false but clear: "facts don't support the arguments for restraining oil use."[138]

100.     In a speech presented at the World Petroleum Congress in Beijing in 1997 at which many of the Defendants were present, Exxon CEO Lee Raymond reiterated those views. This time, he presented a false dichotomy between stable energy markets and abatement of the marketing, promotion, and sale of fossil fuel products Defendants knew to be hazardous. He stated:

> [S]ome people . . . argue that we should drastically curtail our use of fossil fuels for environmental reasons . . . my belief [is] that such proposals are neither prudent nor practical. With no readily available economic alternatives on the horizon, fossil fuels will continue to supply most of the world's and this region's energy for the foreseeable future.
>
> . . . .
>
> Governments also need to provide a stable investment climate . . . . They should avoid the temptation to intervene in energy markets in ways that give advantage to one competitor over another—or one fuel over another.
>
> . . . .
>
> We also have to keep in mind that most of the greenhouse effect comes from natural sources . . . . Leaping to radically cut this tiny sliver of the greenhouse pie on the

---

[136] *Id.* at 2, 11.

[137] *Id.* at 63.

[138] *Id.* at 79.

premise that it will affect climate defies common sense and lacks foundation in our current understanding of the climate system.

. . . .

[L]et's agree there's a lot we really don't know about how climate will change in the 21st century and beyond . . . . It is highly unlikely that the temperature in the middle of the next century will be significantly affected whether policies are enacted now or 20 years from now. . . . It's bad public policy to impose very costly regulations and restrictions when their need has yet to be proven.[139]

101.    Imperial Oil (Exxon) CEO Robert Peterson falsely denied the established connection between the Fossil Fuel Defendants' fossil fuel products and anthropogenic climate change in an essay in the Summer 1998 issue of Imperial Oil's magazine, "Imperial Oil Review":

[Climate change] has absolutely nothing to do with pollution and air quality. Carbon dioxide is not a pollutant but an essential ingredient of life on this planet. . . . [T]he question of whether or not the trapping of "greenhouse" gases will result in the planet's getting warmer . . . has no connection whatsoever with our day-to-day weather.

. . . .

There is absolutely no agreement among climatologists on whether or not the planet is getting warmer or, if it is, on whether the warming is the result of man-made factors or natural variations in the climate. . . . I feel very safe in saying that the view that burning fossil fuels will result in global climate change remains an unproved hypothesis.[140]

102.    Mobil (Exxon) paid for a series of "advertorials," advertisements located in the editorial section of *The New York Times* and meant to look like editorials rather than paid advertisements. Many of those advertorials communicated doubt about the reality and severity of

---

[139] Lee R. Raymond, *Energy – Key to growth and a better environment for Asia-Pacific nations*, WORLD PETROLEUM CONGRESS (Oct. 13, 1997), https://assets.documentcloud.org/documents/2840902/1997-Lee-Raymond-Speech-at-China-World-Petroleum.pdf.

[140] Robert Peterson, *A Cleaner Canada*, IMPERIAL OIL REV., at 29 (1998) https://www.documentcloud.org/documents/6555577-1998-Robert-PetersonA-Cleaner-Canada-Imperial.html.

74

**S.A. 106**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

human-caused climate change, even as industry scientists contemporaneously reiterated that climate change was real, serious, and caused by human activity. The advertisements addressed various aspects of the public discussion of climate change and sought to undermine the justifications for tackling GHG emissions as unsettled science. The 1997 advertorial on the following page argued that economic analysis of emissions restrictions was faulty and inconclusive and therefore provided a justification for delaying action on climate change.

**S.A. 107**

# When facts don't square with the theory, throw out the facts



That seems to characterize the administration's attitude on two of its own studies which show that international efforts to curb global warming could spark a big run-up in energy prices.

For months, the administration—playing its cards close to the vest—has promised to provide details of the emission reduction plan it will put on the table at the climate change meeting in Kyoto, Japan, later this year. It also promised to evaluate the economics of that policy and measure its impact. Those results are important because the proposals submitted by other countries thus far would be disruptive and costly to the U.S. economy.

Yet, when the results from its own economic models were finally generated, the administration started distancing itself from the findings and models that produced them. The administration's top economic adviser said that economic models can't provide a "definitive answer" on the impact of controlling emissions. The effort, she said, was "futile." At best, the models can only provide a "range of potential impacts."

Frankly, we're puzzled. The White House has promised to lay the economic facts before the public. Yet, the administration's top advisor said such an analysis won't be based on models and it will "preclude... detailed numbers." If you don't provide numbers and don't rely on models, what kind of rigorous economic examination can Congress and the public expect?

We're also puzzled by ambivalence over models. The administration downplays the utility of economic models to forecast cost impacts 10–15 years from now, yet its negotiators accept as gospel the 50–100-year predictions of global warming that have been generated by climate models—many of which have been criticized as seriously flawed.

The second study, conducted by Argonne National Laboratory under a contract with the Energy Department, examined what would

happen if the U.S. had to commit to higher energy prices under the emission reduction plans that several nations had advanced last year. Such increases, the report concluded, would result in "significant reductions in output and employment" in six industries—aluminum, cement, chemical, paper and pulp, petroleum refining and steel.

Hit hardest, the study noted, would be the chemical industry, with estimates that up to 30 percent of U.S. chemical manufacturing capacity would move offshore to developing countries. Job losses could amount to some 200,000 in that industry, with another 100,000 in the steel sector. And despite the substantial loss of U.S. jobs and manufacturing capacity, the net emission reduction could be insignificant since developing countries will not be bound by the emission targets of a global warming treaty.

Downplaying Argonne's findings, the Energy Department noted that the study used outdated energy prices (mid-1995), didn't reflect the gains that would come from international emissions trading and failed to factor in the benefits of accelerated developments in energy efficiency and low-carbon technologies.

What it failed to mention is just what these new technologies are and when we can expect their benefits to kick in. As for emissions trading, many economists have theorized about the role they could play in reducing emissions, but few have grappled with the practicality of implementing and policing such a scheme.

We applaud the goals the U.S. wants to achieve in these upcoming negotiations—namely, that a final agreement must be "flexible, cost-effective, realistic, achievable and ultimately global in scope." But until we see the details of the administration's policy, we are concerned that plans are being developed in the absence of rigorous economic analysis. Too much is at stake to simply ignore facts that don't square with preconceived theories.



http://www.mobil.com

©1997 Mobil Corporation

**Figure 7: 1997 Mobil Advertorial[141]**

---

[141] *When Facts Don't Square with the Theory, Throw Out the Facts*, N.Y. TIMES (Aug. 14, 1997), https://www.documentcloud.org/documents/705550-mob-nyt-1997-aug-14-whenfactsdontsquare.html.

S.A. 108

103.   Mobil ran the following advertorial in *The New York Times* in 1993:



# Apocalypse no

For the first half of 1992, America was inundated by the media with dire predictions of global warming catastrophes, all of which seemed to be aimed at heating up the rhetoric from the Earth Summit in Rio de Janeiro last June.

Unfortunately, the media hype proclaiming that the sky was falling did not properly portray the consensus of the scientific community. After the Earth Summit, there was a noticeable lack of evidence of the sky actually falling and subsequent colder than normal temperatures across the country cooled the warming hysteria as well.

Everybody, of course, remembers the Earth Summit and the tons of paper used up in reporting on it—paper now buried in landfills around the world. But few people ever heard of a major document issued at the same time and called the "Heidelberg Appeal." The reason? It just didn't make "news."

Perhaps that is because the Appeal urged Summit attendees to avoid making important environmental decisions based on "pseudo-scientific arguments or false and non-relevant data."

The Heidelberg Appeal was issued initially by some 264 scientists from around the world, including 52 Nobel Prize winners. Today, the Appeal carries the signatures of more than 2,300 scientists—65 of them Nobel Prize winners—from 79 countries. If nothing else, its message is illustrative of what's wrong with so much of the global warming rhetoric. The lack of solid scientific data.

Scientists can agree on certain facts pertaining to global warming. First, the greenhouse effect is a natural phenomenon; it accounts for the moderate temperature that makes our planet habitable. Second, the concentration of greenhouse gases (mainly carbon dioxide) has increased and there has been a slight increase in global temperatures over the past century. Finally, if present trends continue, carbon dioxide levels will double over the next 50 to 100 years.

Controversy arises when trying to link past changes in temperatures to increased concentrations of greenhouse gases. And it arises again when climate prediction models are used to conclude Earth's temperature will climb drastically in the next century and—based on such models—to propose policy decisions that could drastically affect the economy.

According to Arizona State University climatologist Dr. Robert C. Balling in his book, *The Heated Debate* (San Francisco: Pacific Research Institute for Public Policy, 1992), until knowledge of the interplay between oceans and the atmosphere improves, "model predictions must be treated with considerable caution." Moreover, models don't simulate the complexity of clouds, nor do they deal adequately with sea ice, snow or changes in intensity of the sun's energy.

And they don't stand up to reality testing. Comparing actual temperatures over the last 100 years against model calculations, the models predicted temperature increases higher than those that actually occurred. Moreover, most of the earth's temperature increase over the last century occurred before 1940. Yet, the real build-up in man-made $CO_2$ didn't occur until after 1940. Temperatures actually fell between 1940 and 1970.

Sifting through such data, Dr. Balling has concluded, "there is a large amount of empirical evidence suggesting that the apocalyptic vision is in error and that the highly touted greenhouse disaster is most improbable."

Other scientists have an even more interesting viewpoint. Notes atmospheric physicist S. Fred Singer, president of the Washington, D.C.-based Science & Environmental Policy Project, "the net impact [of a modest warming] may well be beneficial."

All of which would seem to suggest that the jury's still out on whether drastic steps to curb $CO_2$ emissions are needed. It would seem that the phenomenon—and its impact on the economy—are important enough to warrant considerably more research before proposing actions we may later regret.

Perhaps the sky isn't falling, after all.

## Mobil®

**Figure 8: 1997 Mobil Advertorial**

104.   The advertorial quotes Fred Singer, a physicist who tobacco companies funded to promote his claim that second-hand smoke did not cause cancer.

77

**S.A. 109**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

105.    The advertisement also presents Robert C. Balling as another neutral scientific expert. Yet five years after Mobil ran this advertorial, Mr. Balling acknowledged that he had received $408,000 in funding from the fossil fuel industry, including from ExxonMobil.[142]

106.    The advertorial misleadingly portrays the "Heidelberg Appeal" as evidence that there was insufficient scientific data for action on climate change. In fact, the Heidelberg Appeal did not discuss climate change or the validity of scientific reasoning or evidence showing that climate change is happening, is human-caused, and will cause severe environmental damage.[143]

107.    Many other Exxon and Mobil advertorials falsely or misleadingly characterized the state of climate science research to the readership of *The New York Times*'s op-ed page. A sample of misleading or outright untruthful statements in paid advertisements that resembled op-eds includes the following:

> "We don't know enough about the factors that affect global warming and the degree to which—if any—that man-made emissions (namely, carbon dioxide) contribute to increases in Earth's temperature."[144]

> "[G]reenhouse-gas emissions, which have a warming effect, are offset by another combustion product—particulates—which leads to cooling."[145]

> "Even after two decades of progress, climatologists are still uncertain how—or even if—the buildup of man-made greenhouse gases is linked to global warming."[146]

---

[142] *Determination 18,*.    Minn.    News    Council    (Apr.    16,    1998), http://www.mtn.org/~newscncl/complaints/hearings/det_118.html.

[143] *Heidelberg Appeal*, DESMOG, desmog.com/heidelberg-appeal/ (last visited Nov. 16, 2023).

[144] *Climate change: a prudent approach*, N.Y. TIMES (Nov. 13, 1997) https://www.documentcloud.org/documents/705548-mob-nyt-1997-11-13-climateprudentapproach.html.

[145] *Less heat, more light on climate change*, N.Y. TIMES (July 18, 1996) https://www.documentcloud.org/documents/705544-mob-nyt-1996-jul-18-lessheatmorelight.html.

[146] *Climate change: where we come out*, N.Y. TIMES (Nov. 20, 1997) https://www.documentcloud.org/documents/705549-mob-nyt-1997-11-20-ccwherewecomeout.html (emphasis in original).

S.A. 110

"[I]t is impossible for scientists to attribute the recent small surface temperature increase to human causes."[147]

108.    A quantitative analysis of Exxon's climate communications between 1989 and 2004 found that, while 83 percent of the company's peer-reviewed papers and 80 percent of its internal documents acknowledged the reality and human origins of climate change, 81 percent of its advertorials communicated doubt about those conclusions.[148] Based on this "statistically significant" discrepancy between internal and external communications, the authors concluded that "ExxonMobil misled the public."[149]

109.    The Fossil Fuel Defendants' public campaign of deception was accomplished individually, through API, and through various other trade associations and front groups. This campaign was mounted in order to allow Fossil Fuel Defendants to continue wrongfully promoting and marketing their fossil fuel products, despite their own knowledge and the growing national and international scientific consensus about the hazards of doing so.

110.    One of the key organizations formed by the Fossil Fuel Defendants to coordinate the fossil fuel industry's response to the world's growing awareness of climate change was the International Petroleum Industry Environmental Conservation Association ("IPIECA"). In 1988, IPIECA formed a "Working Group on Global Climate Change" chaired by Duane LeVine, Exxon's manager for science and strategy development. The Working Group also included Brian Flannery from Exxon, Leonard Bernstein from Mobil, Terry Yosie from API, and representatives

---

[147]    *Unsettled    Science*,    N.Y.    TIMES,    (Mar.    23,    2000), https://www.documentcloud.org/documents/705605-xom-nyt-2000-3-23-unsettledscience.

[148] Geoffrey Supran & Naomi Oreskes, *Addendum to 'Assessing ExxonMobil's climate change communications    (1977–2014)'*,    12    ENV'T    RSCH.    LETTERS    084019,    at    8    (2020) https://iopscience.iop.org/article/10.1088/1748-9326/aa815f/pdf.

[149] *Id.* at 15.

79

S.A. 111

from BP, Shell, and Texaco (Chevron). In 1990, the Working Group sent a strategy memo created by Mr. LeVine to IPIECA member companies. This memo explained that, to forestall a global shift away from burning fossil fuels for energy, the industry should emphasize uncertainties in climate science, call for further research, and promote industry-friendly policies that would leave the fossil fuel business intact.[150]

111.   In 1991, the Information Council for the Environment ("ICE"), whose members included Defendants, launched a national climate change science denial campaign with full-page newspaper advertisements, radio commercials, a public relations tour schedule, "mailers," and research tools to measure campaign success. The campaign's top strategy was to "[r]eposition global warming as theory (not fact)." Its target audiences included younger, lower-income women who "are likely to be 'green' consumers, to believe the earth is warming, and to think the problem is serious . . . These women are good targets for magazine advertisements.[151]

112.   The campaign planned to "use a spokesman from the scientific community" based on consumer research that found "technical and expert sources have the highest credibility among a broad range of members of the public."[152]

113.   The following images are examples of ICE-funded print advertisements challenging the validity of climate science and intended to obscure the scientific consensus on anthropogenic climate change.[153]

---

[150] Christopher Bonneuil et al., *Early warnings and emerging accountability: Total's responses to global warming, 1971-2021*, 71 GLOBAL ENV'T. CHANGE 102386, at 5 (2021) https://www.sciencedirect.com/science/article/pii/S0959378021001655.

[151] *Climate Deception Dossier*, INFORMATION COUNCIL FOR THE ENV'T (May 15, 1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-5_ICE.pdf.

[152] *Id.*

[153] *Id.* at 47-49.

FILED DATE: 2/20/2024 12:34 PM     2024CH01024



**Figure 9: Information Council for the Environment Advertisements**

114.    The GCC, on behalf of the Fossil Fuel Defendants and other fossil fuel companies, also funded deceptive advertising campaigns and distributed misleading material to generate public uncertainty around the climate debate, seeking to prevent U.S. adoption of a 1997 international agreement to limit and reduce GHG emissions known as the Kyoto Protocol and thereby inflate the market for fossil fuels, despite the leading role that the U.S. had played in negotiating the Protocol.[154] The GCC's position on climate change contradicted decades of its members' internal scientific reports by asserting that natural trends, not human combustion of fossil fuels, were responsible for rising global temperatures:

> The GCC believes that the preponderance of the evidence indicates that most, if not all, of the observed warming is part of a natural warming trend which began approximately 400 years ago. If there is an anthropogenic component to this

---

[154] Robert J. Brulle, *Advocating inaction: a historical analysis of the Global Climate Coalition*, ENV'T POLITICS, at 2, 13-14 (2022) https://cssn.org/wp-content/uploads/2022/04/GCC-Paper.pdf (Mr. Brulle notes in particular the effectiveness of the GCC in opposing the Kyoto protocol: "In one final compliment, the GCC's effectiveness was acknowledged in a meeting with White House staff on 21 June 2001. The talking points for that meeting noted that 'POTUS rejected Kyoto, in part, based on input from you.'").

**S.A. 113**

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

observed warming, the GCC believes that it must be very small and must be superimposed on a much larger natural warming trend.[155]

115.    The GCC's promotion of overt climate change skepticism also contravened its internal assessment that such theories lacked scientific support. Despite an internal primer acknowledging that various "contrarian theories" (*i.e.*, climate change skepticism) "do not offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change,"[156] the GCC excluded this section from the publicly released version of the backgrounder,[157] and instead funded and promoted some of those same contrarian theories. Between 1989 and 1998, the GCC spent $13 million on advertisements as part of a campaign to obfuscate the facts and the science relating to climate change and undermine the public's trust in climate scientists.[158] Ultimately, the GCC's efforts "created an influential discourse of climate skepticism in the U.S. that continues to be an influential political current."[159]

116.    For example, in a 1994 report, the GCC stated that "observations have not yet confirmed evidence of global warming that can be attributed to human activities," and that "[t]he

---

[155] *Global Climate Coalition: An Overview*, GLOBAL CLIMATE COALITION, at 2 (1996) https://www.documentcloud.org/documents/5453339-1996-GCC-Overview-and-Reports.

[156] Gregory J. Dana, *GLOBAL CLIMTE COALITION (GCC) – Primer on Climate Change Science – Final Draft*, ASSOC. OF INT'L AUTO. MFRS. (Jan. 18, 1996) http://www.webcitation.org/6FyqHawb9 (providing a "Primer on Climate Change Science" developed by the GCC).

[157] *See* Gregory J. Dana, *GLOBAL CLIMATE COALITION (GCC) – Science and Technology Assessment Committee (STAC) Meeting – February 15, 1996 – Summary*, ASSOC. OF INT'L AUTO. MFRS., at 7 (Feb. 27, 1996) https://www.documentcloud.org/documents/5631461-AIAM-050835.html ("Most suggestions [at the STAC meeting] had been to drop the 'contrarian' part. This idea was accepted and that portion of the paper will be dropped.").

[158] Wendy E. Franz, *Science, skeptics and non-state actors in the greenhouse*, BELFER CENTER FOR SCIENCE & INT'L AFFAIRS, at 13 (Sept. 1998) https://www.belfercenter.org/sites/default/files/legacy/files/Science%20Skeptics%20and%20Non-State%20Actors%20in%20the%20Greenhouse%20-%20E-98-18.pdf.

[159] Marten Boon, *A Climate of Change? The Oil Industry and Decarbonization in Historical Perspective*, 93 BUS. HISTORY REV. 101, 110 (2019).

S.A. 114

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

claim that serious impacts from climate change have occurred or will occur in the future simply has not been proven," so "there is no basis for the design of effective policy actions that would eliminate the potential for climate change."[160] In 1995, the GCC published a booklet called "Climate Change: Your Passport to the Facts," which stated, "While many warnings have reached the popular press about the consequences of a potential man-made warming of the Earth's atmosphere during the next 100 years, there remains no scientific evidence that such a dangerous warming will actually occur."[161]

117.    In 1997, William O'Keefe, chairman of the GCC and executive vice president of API, made the following false statement in a *Washington Post* op-ed: "Climate scientists don't say that burning oil, gas, and coal is steadily warming the earth."[162] This statement contradicted the established scientific consensus as well as Defendants' own knowledge. Yet Defendants did nothing to correct the public record, and instead continued to fund the GCC's anti-scientific climate skepticism.

118.    In addition to publicly spreading false and misleading information about the climate science consensus, the GCC also sought to undermine credible climate science from within the IPCC. After becoming a reviewer of IPCC's Second Assessment Report in 1996, the GCC used its position to accuse the lead author of a key chapter in the Report of modifying the chapter's conclusions. The GCC claimed that the author, climatologist Ben Santer, had engaged in

---

[160] *Issues and Options: Potential Global Climate Change*, GLOBAL CLIMATE COALITION, at preface, 43 (Apr. 1994) https://www.documentcloud.org/documents/5628164-Potential-Global-Climate-Change-Issues-and-Options.

[161] *Climate Change: Your Passport to the Facts*, GLOBAL CLIMATE COALITION (1995) https://www.documentcloud.org/documents/5628109-Climate-Change-Your-Passport-to-the-Facts.

[162] William F. O'Keefe, *A Climate Policy*, WASH. POST (July 5, 1997), https://www.washingtonpost.com/archive/opinions/1997/07/05/a-climate-policy/6a11899a-c020-4d59-a185-b0e7eebf19cc/.

S.A. 115

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

"scientific cleansing" that "understate[d] uncertainties about climate change causes and effects . . . to increase the apparent scientific support for attribution of changes to climate to human activities."[163] The GCC also arranged to spread the accusation among legislators, reporters, and scientists, and similar accusations were published in a *Wall Street Journal* op-ed.[164] This effort "was widely perceived to be an attempt on the part of the GCC to undermine the credibility of the IPCC."[165]

119.    In the late 1990s, Defendants shifted away from openly denying anthropogenic warming and toward peddling a subtler form of climate change skepticism. Defendants became alarmed by the enormous legal judgments the tobacco industry then faced as a result of decades spent publicly denying the health risks of smoking cigarettes; a Shell employee explained that the company "didn't want to fall into the same trap as the tobacco companies who have become trapped in all their lies."[166] Defendants began to shift their communications strategy, claiming they had accepted climate science all along.[167] Several large fossil fuel companies, including BP and Shell, left the GCC (although all the Fossil Fuel Defendants remained members of API).[168] At this point in time, Defendants publicly claimed to accept the reality of anthropogenic climate change, while insisting that the costs of climate action were unacceptably high in light of the yet-unresolved uncertainties in climate science—especially around the severity and timeframe of future climate

---

[163] Franz, *supra* note 158, at 14.

[164] NAOMI ORESKES & ERIK M. CONWAY, MERCHANTS OF DOUBT: HOW A HANDFUL OF SCIENTISTS OBSCURED THE TRUTH ON ISSUES FROM TOBACCO SMOKE TO GLOBAL WARMING, 207 (Bloomsbury Press, 1st ed. 2011); *see also* S. Fred Singer, *Climate Change and Consensus*, 271 SCIENCE 581 (Feb. 2, 1996); Frederick Seitz, *A Major Deception on Global Warming*, THE WALL STREET J. (June 12, 1996, 12:01 AM ET) https://www.wsj.com/articles/SB834512411338954000.

[165] Franz, *supra* note 158, at 15.

[166] NATHANIEL RICH, LOSING EARTH: A RECENT HISTORY, 186 (MCD 1st ed., 2020).

[167] Bonneuil, *supra* note 150, at 6.

[168] *Id.*

# S.A. 116

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

impacts. Reflecting this new strategy, API Executive Vice President (and GCC chairman) William

O'Keefe announced in November 1998 that "[w]e are committed to being part of the solution to

the climate risk and to active participation in the debate to forge a clear, defensible policy." "[T]he

debate is not about action or inaction," Mr. O'Keefe wrote, "but what set of actions is consistent

with our state of knowledge and economic well-being."[169] Rather than publicly deny the need to

address climate change, Defendants' new communications strategy sought to forestall policy

actions that might decrease consumption of fossil fuel products.

120.    Despite their public about-face, Defendants surreptitiously continued to organize

and fund programs designed to deceive the public about the weight and veracity of the climate

science consensus. In 1998, API convened a Global Climate Science Communications Team

("GCSCT") whose members included Exxon's senior environmental lobbyist, an API public

relations representative, and a federal relations representative from Chevron. There were no

climate scientists on the GCSCT. Steve Milloy and his organization, The Advancement of Sound

Science Coalition ("TASSC"), were founding members of the GCSCT. TASSC was an

organization created by the tobacco industry to give the impression of a "grassroots" movement,

which aimed to sow uncertainty by discrediting the scientific link between exposure to second-

hand cigarette smoke and increased rates of cancer and heart disease. Philip Morris had launched

TASSC on the advice of its public relations firm, which advised Philip Morris that the tobacco

company itself would not be a credible voice on the issue of smoking and public health. TASSC

also became a front group for the fossil fuel industry, using the same tactics it had honed while

operating on behalf of tobacco companies to spread doubt about climate science.

---

[169] *API: U.S. oil industry recognizes climate change risk*, OIL & GAS J. (Nov. 2, 1998)
https://www.ogj.com/home/article/17225896/api-us-oil-industry-recognizes-climate-change-risk.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

121.    The GCSCT continued Defendants' efforts to deceive the public about the dangers of fossil fuel use by launching a campaign in 1998 to convince the public that the scientific basis for climate change was in doubt. The GCSCT "developed an action plan to inform the American public that science does not support the precipitous actions Kyoto would dictate [*i.e.*, reducing use of fossil fuels]." The multi-million-dollar, multi-year "Global Climate Science Communications Action Plan" sought, among other things, to do the following: (a) "[d]evelop and implement a national media relations program to inform the media about uncertainties in climate science"; (b) "to generate national, regional and local media coverage on the scientific uncertainties"; (c) "[d]evelop a global climate science information kit for media including peer-reviewed papers that undercut the 'conventional wisdom' on climate science"; (d) "[p]roduce . . . a steady stream of op-ed columns"; and (e) "[d]evelop and implement a direct outreach program to inform and educate members of Congress, state officials, . . . and school teachers/students about uncertainties in climate science" to "begin to erect a barrier against further efforts to impose Kyoto [Protocol]-like measures in the future."[170]

122.    Exxon, Chevron, and API directed and contributed to the development of the plan, which plainly set forth the criteria by which the contributors would know when their efforts to manufacture doubt had been successful. "Victory," they wrote, "will be achieved when . . . average citizens 'understand' (recognize) uncertainties in climate science" and "recognition of uncertainties becomes part of the 'conventional wisdom.'"[171] In other words, the plan was part of

---

[170] Joe Walker, *Draft Global Climate Science Communications Plan*, at 4-9 (Apr. 3, 1998) https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

[171] *Id.* at 4.

S.A. 118

Defendants' goal to use disinformation to plant doubt about the reality of climate change in an effort to maintain consumer demand for their fossil fuel products and their large profits.

123.    Soon after, API distributed a memo to its members illuminating API's and the Fossil Fuel Defendants' concern over the potential regulation of their fossil fuel products: "Climate is at the center of the industry's business interests. Policies limiting carbon emissions reduce petroleum product use. That is why it is API's highest priority issue and defined as 'strategic.'"[172] The API memo stressed many of the strategies that Defendants collectively utilized to combat the perception of fossil fuel products as hazardous. These strategies included the following:

a.    Influencing the tenor of the climate change "debate" as a means to establish that greenhouse gas reduction policies like the Kyoto Protocol were not necessary to responsibly address climate change;

b.    Maintaining strong working relationships between government regulators and communications-oriented organizations like the GCC, the Heartland Institute, and other groups carrying Defendants' message minimizing the hazards of the unabated use of fossil fuel products and opposing regulation thereof; and

c.    Presenting Defendants' positions on climate change in domestic and international forums, including by presenting an "alternative" to the IPCC.

124.    In furtherance of the strategies described in these memoranda, Defendants made misleading statements about climate change, the relationship between climate change and fossil fuel products, and the urgency of the problem. Defendants made these statements in public fora and in advertisements published in newspapers and other media with substantial circulation in

---

[172] *Allegations of Political Interference with Government Climate Change Science: Hearing Before the Comm. on Oversight and Government Reform*, 110th Cong. 324 (Mar. 19, 2007) (statement of Philip A. Cooney), https://www.govinfo.gov/content/pkg/CHRG-110hhrg37415/html/CHRG-110hhrg37415.htm).

**S.A. 119**

Chicago, including national publications such as *The New York Times*, *The Wall Street Journal*, and *The Washington Post*.

125.    Another key strategy in Defendants' efforts to discredit the scientific consensus on climate change as well as the IPCC itself was to fund scientists who held fringe opinions. Those scientists obtained part or all of their research budget from the Fossil Fuel Defendants, either directly or through Fossil Fuel Defendant-funded organizations like API,[173] but frequently failed to disclose their funding sources.[174] Defendants intended for the research of scientists they funded to be distributed to and relied on by consumers when buying Fossil Fuel Defendants' products, including by consumers in Chicago.

126.    One such scientist, Dr. Wei-Hock ("Willie") Soon, received over $1.2 million from the fossil fuel industry, including Exxon and API. Dr. Soon did not disclose these funding sources on at least eleven published papers. "Dr. Soon, in correspondence with his corporate funders, described many of his scientific papers as 'deliverables' that he completed in exchange for their money."[175] Dr. Soon also took the highly unusual approach of contractually agreeing to allow donors to review his research before publication, and his housing institution, the Smithsonian Institute, agreed not to disclose the funding arrangement without prior permission from his fossil

---

[173] *See e.g.*, Willie Soon & Sallie Baliunas, *Proxy climatic and environmental changes of the past 1000 Years*, 23 CLIMATE RSCH. 89, 105 (2003), https://www.int-res.com/articles/cr2003/23/c023p089.pdf.

[174] William Allman, *Climate Change Researcher Received Funds From Fossil Fuel Industry*, SMITHSONIAN MAG. (Feb. 26, 2015), https://www.smithsonianmag.com/smithsonianmag/smithsonian-climate-change-scientist-180954380/.

[175] Justin Gillis & John Schwarz, *Deeper Ties to Corporate Cash for Doubtful Climate Researcher*, THE N.Y. TIMES (Feb. 21, 2015), https://www.nytimes.com/2015/02/22/us/ties-to-corporate-cash-for-climate-change-researcher-Wei-Hock-Soon.html.

**S.A. 120**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

fuel donors.[176] This Defendant-funded research includes articles in scientific journals accusing the IPCC of overstating the negative environmental effects of carbon dioxide emissions and arguing that the sun is responsible for recent climate trends.

127.    Creating a false perception of disagreement in the scientific community (despite the consensus previously acknowledged within the industry) has evidently disrupted vital channels of communication between scientists and the public. A 2007 Yale University-Gallup poll found that while 71 percent of Americans personally believed global warming was happening, only 48 percent believed that there was a consensus among the scientific community, and 40 percent believed, falsely, that there was substantial disagreement among scientists over whether global warming was occurring.[177] Eight years later, a 2015 Yale-George Mason University poll found that "[o]nly about one in ten Americans understands that nearly all climate scientists (over 90 [percent]) are convinced that human-caused global warming is happening, and just half . . . believe a majority do."[178] Further, it found that 33 percent of Americans believe that climate change is mostly due to natural changes in the environment, in stark contrast to the 97 percent of peer-reviewed climate science papers that acknowledge that global warming is happening and at least partly human-caused.[179] The lack of progress, and indeed the regression, in the public's understanding of climate science over this period—during which Defendants professed to accept

---

[176] Kathy Mulvey et al., *The Climate Deception Dossiers: Internal Fossil Fuel Industry Memos Reveal Decades of Disinformation*, UNION OF CONCERNED SCIENTISTS, at 6-9 (July 2015), https://www.ucsusa.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf.

[177] *American Opinions on Global Warming: A Yale/Gallup/Clearvision Poll*, YALE PROGRAM ON CLIMATE CHANGE COMMC'N (July 31, 2007), https://climatecommunication.yale.edu/publications/american-opinions-on-global-warming/.

[178] Anthony Leiserowitz et al., *Climate Change in the American Mind*, YALE PROGRAM ON CLIMATE CHANGE COMMC'N (Oct. 2015), https://climatecommunication.yale.edu/wp-content/uploads/2015/11/Climate-Change-American-Mind-October-20151.pdf.

[179] *Id.*

**S.A. 121**

the conclusions of mainstream climate science—demonstrates the success of Defendants'
deception campaign in thwarting the dissemination of accurate scientific information to the public
regarding the effects of the use of fossil fuels.

128.    Defendants have funded dozens of think tanks and front groups promoting climate
change denial. These organizations include the Competitive Enterprise Institute, the Heartland
Institute, Frontiers of Freedom, Committee for a Constructive Tomorrow, and the Heritage
Foundation. According to the Union of Concerned Scientists, from 1998 to 2017, Exxon spent
over $36 million funding numerous organizations misrepresenting the scientific consensus that
fossil fuel products were causing climate change, sea level rise, and injuries to Chicago, among
other communities.[180] Several Defendants have been linked to other groups that undermine the
scientific basis linking fossil fuel products to climate change and sea level rise, including the
Frontiers of Freedom Institute and the George C. Marshall Institute.

129.    Phillip Cooney, an attorney at API from 1996 to 2001, testified at a 2007
Congressional hearing that it was "typical" for API to fund think tanks and advocacy groups that
minimized fossil fuels' role in climate change.[181]

130.    In 2007, Exxon publicly reported: "In 2008, we will discontinue contributions to
several public policy research groups whose position on climate change could divert attention from
the important discussion on how the world will secure the energy required for economic growth in

---

[180] *ExxonMobil Foundation & Corporate Giving to Climate Change Denier & Obstructionist
Organizations*, UNION OF CONCERNED SCIENTISTS (2017),
https://www.ucsusa.org/sites/default/files/attach/2019/ExxonMobil-Worldwide-Giving-1998-
2017.pdf.

[181] *Allegations of Political Interference with Government Climate Change Science: Hearing Before
the Comm. on Oversight and Government Reform*, 110th Cong. 324 (Mar. 19, 2007) (statement of
Philip A. Cooney), https://www.govinfo.gov/content/pkg/CHRG-110hhrg37415/html/CHRG-
110hhrg37415.htm).

**S.A. 122**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

an environmentally responsible manner."[182] While Exxon acknowledged that funding climate denial was affecting the public debate on climate change, Exxon did not keep its promise to stop. Exxon continued to support groups denying climate science in 2008 and beyond.

131.    Beginning in 2015, journalists began to uncover mounting evidence of Defendants' campaign of deception. In September 2015, journalists at *Inside Climate News* reported that, as far back as the 1970s, Exxon had sophisticated knowledge of the causes and consequences of climate change and of the role its products played in contributing to climate change.[183]

132.    Between October and December 2015, several journalists at the Energy and Environment Reporting Project at Columbia University's Graduate School of Journalism and the *Los Angeles Times* also exposed the fact that, as far back as the 1970s, Exxon and other members of the fossil fuel industry had superior knowledge of the causes and consequences of climate change and the role their products played in causing it.[184]

133.    In November 2017, the Center for International Environmental Law issued a report revealing that Defendants, including API, had superior knowledge of the causes and consequences of climate change and the role fossil fuel products played in causing it as early as the 1970s.[185]

---

[182] *2007 Corporate Citizenship Report*, EXXONMOBIL, at 41 (2007), http://www.documentcloud.org/documents/2799777-ExxonMobil-2007-Corporate-Citizenship-Report.html.

[183] Neela Banerjee et al., *Exxon: The Road Not Taken*, INSIDE CLIMATE NEWS, https://insideclimatenews.org/project/exxon-the-road-not-taken/ (last visited Dec. 6, 2023).

[184] The Los Angeles Times published a series of three articles between October and December 2015. *See* Jennings et al., *supra* note 52; Jerving et al., *supra* note 115; Lieberman & Rust, *supra* note 52.

[185] Carol Muffett & Steven Feit, *Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis*, CENTER FOR INT'L ENV'T L. (2017), https://www.ciel.org/reports/smoke-and-fumes.

S.A. 123

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

134.     In September 2023, the *Wall Street Journal* reported that Exxon worked "behind closed doors" to sow public doubt about climate change. The article was based on "documents reviewed by the Journal, which haven't been previously reported."[186]

**D.     Defendants Could Have Chosen to Facilitate, and Be Part of, a Lower-Carbon Future, but Instead Chose Corporate Profits and Continued Deception.**

135.     Defendants could have chosen a different path. They could have refrained from undermining the global effort to mitigate the impacts of GHG emissions, or even contributed to it by, for example, delineating practical technical strategies, policy goals, and regulatory structures that would have allowed them to continue their business ventures while reducing GHG emissions and supporting a transition to a lower-carbon future. Instead, Defendants devoted significant efforts to deceiving consumers, including in Chicago, and the public about the existential hazards of burning fossil fuels—all with the purpose and effect of perpetuating and inflating usage of fossil fuels and delaying the advent of alternative energy sources not based on fossil fuels.

136.     As a result of Defendants' tortious, deceptive, and misleading conduct, consumers of Defendants' fossil fuel products and the public in Chicago as elsewhere, have been deliberately and unnecessarily deceived about the following: the role of fossil fuel products in causing global warming, sea level rise, disruptions to the hydrologic cycle, more extreme precipitation, heat waves, droughts, and other consequences of the climate crisis; the acceleration of global warming since the mid-twentieth century; and the fact that continued increases in fossil fuel consumption create increasingly severe environmental threats and increasingly significant economic costs for Chicago and other communities. Consumers and the public in Chicago and elsewhere have also been deceived about the depth and breadth of the state of the scientific evidence on anthropogenic

---

[186] Christopher M. Matthews & Collin Eaton, *Inside Exxon's Strategy to Downplay Climate Change*, THE WALL STREET J. (Sept. 14, 2023, 5:30 AM ET), https://www.wsj.com/business/energy-oil/exxon-climate-change-documents-e2e9e6af.

S.A. 124

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

climate change, and, in particular, about the strength of the scientific consensus regarding the role

of fossil fuels in causing both climate change and a wide range of potentially destructive impacts.

137.    Defendants' deception also significantly delayed the transition to alternative energy

sources that could have prevented some of the worst impacts of climate change in Chicago and

elsewhere. By sowing doubt about the future consequences of unrestricted fossil fuel consumption,

Defendants' deception campaign successfully forestalled development and dissemination of

alternative fuels, as well as legislation supporting a broad-based transition to alternative energy

sources. This delay led to emission of huge amounts of avoidable greenhouse gases, thereby

ensuring that the damage caused by climate change will be substantially more severe than if

Defendants had acted in a manner commensurate with their internal knowledge of climate risks.

> **E.    Defendants' Internal Actions Demonstrate Their Awareness of the Impacts of Climate Change and Their Intent to Continue to Profit from the Unabated Use of Fossil Fuel Products.**

138.    In contrast to their public-facing efforts challenging the validity of the scientific

consensus about anthropogenic climate change, the Fossil Fuel Defendants' acts and omissions

since the 1970s—including taking expensive actions to protect their own investments from the

impacts of climate change—have evinced their clear understanding of the realities of climate

change and its likely consequences. These actions have included making multi-billion-dollar

infrastructure investments for their own operations, including, among others, the following: raising

offshore oil platforms to protect against sea level rise; reinforcing offshore oil platforms to

withstand increased wave strength and storm severity; and developing technology and

infrastructure to extract, store, and transport fossil fuels in a warming Arctic environment.[187]

---

[187] Lieberman & Rust, *supra* note 52.

**S.A. 125**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

139.     For example, oil and gas reserves in the Arctic that were not previously reachable due to sea ice are becoming increasingly reachable as sea ice thins and melts due to climate change.[188] In 1973, Exxon obtained a patent for a cargo vessel, such as a tank ship, capable of breaking through sea ice for use in Arctic operations[189] and for an oil tanker[190] designed for Arctic operations.

140.     In 1974, Texaco (Chevron) obtained a patent for a mobile Arctic drilling platform designed to withstand significant interference from lateral ice masses.[191]

141.     Shell obtained a patent for an Arctic offshore platform adapted for conducting operations in the Beaufort Sea in 1984.[192]

142.     In 1989, Norske Shell, Royal Dutch Shell's Norwegian subsidiary, altered designs for a natural gas platform planned for construction in the North Sea to account for anticipated sea level rise. Those design changes added substantial costs to the project.[193]

     a.     In 1979, Norske Shell was approved by Norwegian oil and gas regulators to operate a portion of the Troll oil and gas field.

---

[188] James Henderson & Julia Loe, *The Prospects and Challenges for Arctic Oil Development*, OXFORD INST. FOR ENERGY STUDIES, at 1 (Nov. 2014) https://www.oxfordenergy.org/publications/the-prospects-and-challenges-for-arctic-oil-development/.

[189] Icebreaking Cargo Vessel, U.S. Patent No. 3,727,571 (filed July 7, 1971) (issued Apr. 17, 1973), https://www.google.com/patents/US3727571.

[190] Tanker Vessel, U.S. Patent No. 3,745,960 (filed May 6, 1971) (issued July 17, 1973), https://www.google.com/patents/US3745960.

[191] Mobile, Arctic Drilling and Production Platform, U.S. Patent No. 3,793,840 (filed Oct. 18, 1971) (issued Feb. 26, 1974), https://www.google.com/patents/US3793840.

[192] Arctic offshore platform, U.S. Patent No. 4,427,320 (filed Feb. 19, 1982) (issued Jan. 24, 1984), https://www.google.com/patents/US4427320.

[193] *Greenhouse Effect: Shell Anticipates A Sea Change*, THE N.Y. TIMES (Dec. 20, 1989), https://www.nytimes.com/1989/12/20/business/greenhouse-effect-shell-anticipates-a-sea-change.html; Lieberman & Rust, *supra* note 52.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

b.     In 1986, the Norwegian parliament granted Norske Shell authority to complete the first development phase of the Troll field gas deposits, and Norske Shell began designing the "Troll A" gas platform, with the intent to begin operation of the platform in approximately 1995. Based on the very large size of the gas deposits in the Troll field, the Troll A platform was projected to operate for approximately 70 years.

c.     The platform was originally designed to stand approximately 100 feet above sea level—the height necessary to stay above the waves in a once-in-a-century-strength storm.

d.     In 1989, Shell engineers revised their plans to increase the above-water height of the platform by three to six feet in order to account for higher anticipated average sea levels and increased storm intensities due to global warming over the platform's 70-year operational life.[194]

e.     Shell projected that the additional three to six feet of above-water construction would increase the cost of the Troll A platform by tens of millions of dollars.

**F.     Defendants' Actions Have Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis.**

143.    As GHG pollution accumulates in the atmosphere, some of which (namely $CO_2$) does not dissipate for potentially thousands of years, climate changes and consequent adverse environmental changes compound, and their frequencies and magnitudes increase. As those adverse environmental changes compound, and their frequencies and magnitudes increase, so too do the physical, environmental, economic, and social injuries resulting therefrom.

144.    Delayed societal development and adoption of alternative energy sources and related efforts to curb anthropogenic GHG emissions have therefore increased environmental

---

[194] *Id.*

**S.A. 127**

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

harms and increased the magnitude and cost to address harms, including to Chicago, that have already occurred or are locked in as a result of historical emissions.

145.     Therefore, Defendants' campaign to obscure the science of climate change to protect and expand the use of fossil fuels greatly increased and continues to increase the injuries suffered by Chicago and its residents. Had concerted action to reduce GHG emissions begun earlier, the subsequent impacts of climate change could have been avoided or mitigated.

146.     Defendants have been aware for decades that clean energy presents a feasible alternative to fossil fuels. In 1980, Exxon forecasted that non-fossil fuel energy sources, if pursued, could penetrate half of a competitive energy market in approximately 50 years.[195] This internal estimate was based on extensive modeling within the academic community, including research conducted by the Massachusetts Institute of Technology's David Rose, which concluded that a transition to non-fossil energy could be achieved in around 50 years. Exxon circulated an internal memo approving of Mr. Rose's conclusions, stating they were "based on reasonable assumptions."[196] But instead of pursuing a clean energy transition or warning the public about the dangers of burning fossil fuels, Defendants chose to deceive consumers, including those in Chicago, to preserve Fossil Fuel Defendants' profits and assets. As a result, much time has been lost in which consumers could have done much to mitigate the climate crisis in Chicago.

147.     The costs of inaction on anthropogenic climate change and its adverse environmental effects were not lost on Defendants. In a 1997 speech by John Browne, Group Chief

---

[195] Henry Shaw, *Memorandum to T.K. Kett re Exxon Research and Engineering Company's Technological Forecast: CO2 Greenhouse Effect*, CLIMATEFILES, at 5 (Dec. 18, 1980), https://www.climatefiles.com/exxonmobil/1980-exxon-memo-on-the-co2-greenhouse-effect-and-current-programs-studying-the-issue/.

[196] M.B. Glaser, *Memorandum to Exxon re CO2 "Greenhouse" Effect*, EXXON RSCH. AND ENGINEERING CO., at 17-18 (Apr. 1, 1982), https://www.climatefiles.com/exxonmobil/1982-memo-to-exxon-management-about-co2-greenhouse-effect/.

**S.A. 128**

Executive for BP America, at Stanford University, Mr. Browne described Defendants' and the

entire fossil fuel industry's responsibility and opportunity to reduce the use of fossil fuel products,

reduce global $CO_2$ emissions, and mitigate the harms associated with the use and consumption of

such products:

> [W]e need to go beyond analysis and to take action. It is a moment for change and
> for a rethinking of corporate responsibility.
>
> . . . .
>
> [T]here is now an effective consensus among the world's leading scientists and
> serious and well informed people outside the scientific community that there is a
> discernible human influence on the climate, and a link between the concentration
> of carbon dioxide and the increase in temperature.
>
> . . . .
>
> [The fossil fuel industry] ha[s] a responsibility to act, and I hope that through our
> actions we can contribute to the much wider process which is desirable and
> necessary.
>
> BP accepts that responsibility and we're therefore taking some specific steps.
>
> To control our own emissions.
>
> To fund continuing scientific research.
>
> To take initiatives for joint implementation.
>
> To develop alternative fuels for the long term.
>
> And to contribute to the public policy debate in search of the wider global answers
> to the problem.[197]

148.    Despite Defendants' knowledge of the foreseeable, measurable, and significant

harms associated with the unrestrained consumption and use of fossil fuel products, in Chicago as

elsewhere, and despite Defendants' knowledge of technologies and practices that could have

---

[197] John Browne, *BP Climate Change Speech to Stanford*, EXXON RSCH. AND ENGINEERING CO.
(May 19, 1997), http://www.climatefiles.com/bp/bp-climate-change-speech-to-stanford.

S.A. 129

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

helped to reduce the foreseeable dangers associated with their fossil fuel products, Defendants continued to promote heavy fossil fuel use, and mounted a campaign to obscure the connection between fossil fuel products and the climate crisis, thus dramatically adding to the costs of abatement. This campaign was intended to, and did, reach and influence Chicago consumers, along with consumers elsewhere.

149.    For example, in 2006, Exxon wrote a letter to the Royal Society recognizing that "the accumulation of greenhouse gases in the Earth's atmosphere poses risks that may prove significant for society and ecosystems." "Yet behind closed doors, Exxon took a very different tack: Its executives strategized over how to diminish concerns about warming temperatures, and they sought to muddle scientific findings that might hurt its oil-and-gas business."[198]

150.    At all relevant times, Defendants were deeply familiar with opportunities to reduce the use of fossil fuel products and associated GHG emissions, mitigate the harms associated with the use and consumption of these products, and promote development of alternative, clean energy sources. Examples of that recognition date back to the 1960s, and include, but are not limited to, the following:

a.    In 1980, Imperial Oil (Exxon) wrote in its "Review of Environmental Protection Activities for 1978–79": "There is no doubt that increases in fossil fuel usage and decreases in forest cover are aggravating the potential problem of increased $CO_2$ in the atmosphere. Technology exists to remove $CO_2$ from stack gases but removal of only 50 percent of the $CO_2$ would double the cost of power generation."[199]

---

[198] Matthews & Eaton, *supra* note 186.

[199] *Review of Environmental Protection Activities for 1978–1979*, IMPERIAL OIL LTD., at 2 (Aug. 6, 1980), https://www.climatefiles.com/exxonmobil/1980-imperial-oil-review-of-environmental-protection-activities-for-1978-1979/.

S.A. 130

b.    A 1987 company briefing produced by Shell on "Synthetic Fuels and Renewable Energy" emphasized the importance of immediate research and development of alternative fuel sources, noting that "the task of replacing oil resources is likely to become increasingly difficult and expensive and there will be a growing need to develop clean, convenient alternatives. . . . New energy sources take decades to make a major global contribution. Sustained commitment is therefore needed during the remainder of this century to ensure that new technologies and those currently at a relatively early stage of development are available to meet energy needs in the next century."[200]

c.    A 1989 article in a publication from Exxon Corporate Research for company use only stated:

> $CO_2$ emissions contribute about half the forcing leading to a potential enhancement of the Greenhouse Effect. Since energy generation from fossil fuels dominates modern $CO_2$ emissions, strategies to limit $CO_2$ growth focus near term on energy efficiency and long term on developing alternative energy sources. Practiced at a level to significantly reduce the growth of greenhouse gases, these actions would have substantial impact on society and our industry—near-term from reduced demand for current products, long term from transition to entirely new energy systems.[201]

151.    Despite these repeated recognitions of opportunities to reduce emissions and mitigate corresponding harms from climate change, Defendants continued to sow doubt and disinformation in the minds of the public, including to Chicago residents, regarding the causes and effects of climate change, and methods of reducing emissions. Examples of those efforts include, but are not limited to, the following:

---

[200] *Synthetic Fuels and Renewable Energy*, SHELL BRIEFING SERVICE (1987) https://www.climatefiles.com/shell/1987-shell-synthetic-fuels-renewable-energy-briefing/.

[201] Brian Flannery, *Greenhouse Science, Connections: Corporate Research*, EXXON RSCH. AND ENGINEERING CO. (1989), https://www.climatefiles.com/exxonmobil/1989-exxon-mobil-article-technologys-place-marketing-mix/.

99

**S.A. 131**

FILED DATE: 2/20/2024 12:34 PM　2024CH01024

a.　　In 1996, more than 30 years after API's president told petroleum industry leaders that carbon emissions from fossil fuels could "cause marked changes in climate" by the year 2000 if not abated,[202] API published the book *Reinventing Energy: Making the Right Choices* to refute this very conclusion. Contradicting the scientific consensus of which its members had been aware for decades, the book claims: "Currently, no conclusive—or even strongly suggestive—scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures, or the intensity and frequency of storms."[203] The book also suggested that even if some warming does occur, such warming "would present few if any problems" because, for example, farmers could be "smart enough to change their crop plans" and low-lying areas would "likely adapt" to sea level rise.[204]

b.　　In the publication, API also contended that "[t]he state of the environment does not justify the call for the radical lifestyle changes Americans would have to make to substantially reduce the use of oil and other fossil fuels" and that the "benefits of alternatives aren't worth the cost of forcing their use." "Some jobs definitely will be created in making, distributing and selling alternatives. But they will come at the expense of lost jobs in the traditional automobile and petroleum industries," the authors continued. "[A]lternatives will likely be more expensive than conventional fuel/vehicle technology. Consumers, obviously, will bear these increased

---

[202] Frank Ikard, *Meeting the Challenges of 1966, in Proceedings of the American Petroleum Institute*, at 13 (1965), https://www.documentcloud.org/documents/5348130-1965-API-Proceedings.

[203] *Reinventing Energy: Making the Right Choices*, AM. PETROLEUM INST., at 79 (1996), https://www.climatefiles.com/trade-group/american-petroleum-institute/1996-reinventing-energy/ (emphasis in original).

[204] *Id.* at 85-87.

100

S.A. 132

expenses, which means they will have less to spend on other products. This in turn will . . . cost jobs."[205]

      c.      API published this book to ensure its members could continue to produce and sell fossil fuels in massive quantities that it knew would devastate the planet. The book's final section reveals this purpose. API concluded: "[S]evere reductions in greenhouse gas emissions by the United States, or even all developed countries, would impose large costs on those countries but yield little in the way of benefits—even under drastic climate change scenarios."[206]

152.    The Fossil Fuel Defendants could have made major inroads towards mitigating the harms they caused, and in particular, the City's injuries, by developing and employing technologies to capture and sequester GHG emissions associated with conventional use of their fossil fuel products. The Fossil Fuel Defendants had knowledge of these technologies dating back at least to the 1960s, and, had indeed, internally researched many such technologies.

153.    Even if the Fossil Fuel Defendants did not adopt technological or energy source alternatives that would have reduced the use of fossil fuel products, reduced global GHG pollution, and/or mitigated the harms associated with the use and consumption of such products, the Fossil Fuel Defendants could have taken other practical, cost-effective steps to mitigate the harms caused by their fossil fuel products. Those alternatives could have included, among other measures, the following:

      a.      Refraining from affirmative efforts, whether directly, through coalitions, or through front groups, to distort public perception and cause many consumers and businesses to think the relevant science is far less certain than it actually is;

---

[205] *Id.* at 59, 68, 69.

[206] *Id.* at 89.

**S.A. 133**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

b.      Acknowledging the validity of scientific evidence on anthropogenic climate change and the damages it will cause people, communities (including the City), and the environment, thereby contributing to an earlier and quicker transition to cleaner energy sources that could help minimize catastrophic climatic consequences;

c.      Forthrightly communicating with consumers and the general public about the global warming hazards of fossil fuel products that were known to Defendants, which would have enabled those groups to make informed decisions about whether to curb the use of these products—including whether and to what extent to invest in alternative clean energy sources instead of in fossil fuels;

d.      Sharing their internal scientific research with consumers, lawmakers, and the public, including with Chicago and its residents, as well as with other scientists and business leaders, to increase public understanding of the scientific underpinnings of climate change and its relation to fossil fuel products; and

e.      Prioritizing development of alternative sources of energy through sustained investment and research on renewable energy sources to replace dependence on hazardous fossil fuel products.

154.    Despite their knowledge of the foreseeable harms associated with the consumption of fossil fuel products, and despite the existence of, and the fossil fuel industry's knowledge of, opportunities to reduce the foreseeable dangers associated with those products, Defendants wrongfully promoted and concealed the hazards of using fossil fuel products, delaying meaningful development of alternative energy sources and exacerbating the costs of adapting to and mitigating the adverse impacts of the climate crisis, including the climate crisis in Chicago.

S.A. 134

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

G.     **Defendants Continue to Deceive Chicago Consumers Through Misleading Advertisements That Portray Defendants as Climate-Friendly Energy Companies and Obscure Their Role in Causing Climate Change.**

155.     Defendants' deceptive conduct continues to the present day, albeit through updated messaging. Now, rather than engaging solely in outright denials of the existence of climate change, Defendants deflect attention from their role in causing climate change by falsely portraying fossil fuel products as environmentally friendly, climate-friendly, or otherwise less environmentally damaging than those products really are.

156.     Defendants have continued to mislead the public about the impact of fossil fuel products on climate change through "greenwashing." Through recent advertising campaigns and public statements in Chicago and Illinois and/or intended to reach Chicago and Illinois, including but not limited to online advertisements and social media posts, Defendants falsely and misleadingly portray these products as "green," "clean," "cleaner," and/or "environmentally friendly," and the Fossil Fuel Defendants portray themselves as climate-friendly energy companies that are deeply engaged in finding solutions to climate change. By advertising fossil fuel products and their businesses as environmentally friendly, and with words, phrases, colors, and imagery that evoke positive environmental attributes, Defendants seek to convince consumers that their industry is beneficial to the environment. Reasonable consumers—*i.e.*, a significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances— are likely to be misled by Defendants' advertisements into believing that their products do not contribute to substantial injury to the environment. In reality, Fossil Fuel Defendants continue to primarily invest in, develop, promote, and profit from fossil fuel products and heavily market those products to consumers, including to consumers in Chicago, with full knowledge that those products will continue to exacerbate climate change harms.

103

**S.A. 135**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

157.    Defendants' greenwashing exploits Chicago and Illinois consumers' concerns about climate change and their desire to purchase "green" products and spend their consumer dollars on products and businesses that are taking substantial and effective measures to combat climate change. By deceptively portraying themselves and their products as part of the climate solution, rather than as the problem, Defendants' advertisements induce consumers to purchase fossil fuel products and develop brand affinity under the misimpression that purchasing and using fossil fuel products supports genuine, substantial, and effective measures to mitigate climate change, rather than contributing to climate change. Defendants' false advertisements are thus likely to mislead Chicago and Illinois consumers.

158.    At all times relevant to this complaint, Defendants have attempted to deceive consumers by promoting certain of the Fossil Fuel Defendants' fossil fuel products as environmentally beneficial, when in fact Defendants knew that those products would continue to contribute to climate change, and thus imperil the environment, if used as intended. These products, which Defendants tout, in fact result in the increase of GHG emissions, despite Defendants' knowledge that, when used as designed and intended, these products lead to climate change.

159.    Defendants' marketing of fossil fuel products as environmentally beneficial follows in the footsteps of the tobacco industry's advertising campaigns to de-emphasize, and confuse the public, including in Chicago, about the deadly effects of smoking cigarettes. Just as tobacco companies promoted "low-tar" and "light" cigarettes, inducing consumers to think of them as healthy alternatives to quitting smoking, while knowing that smoking "healthy" cigarettes was still harmful to human health, so too do Defendants peddle "low-carbon" and "emissions-reducing" fossil fuel products to persuade consumers that those products are climate-friendly alternatives to

traditional fossil fuels. In reality, the fossil fuel products they describe as "low-carbon," "clean" and/or "cleaner," "green," and "emissions-reducing" in fact contribute to climate change and are harmful to the health of the planet and its people.

160.    Below are representative examples of Defendants' advertisements to Chicago and Illinois consumers that misleadingly portray fossil fuels as environmentally beneficial or benign and fail to mention the products' role in causing environmentally injurious climate change. The emphasis on lower emissions, "cleaning" terminology, and positive environmental imagery and messaging—individually and together—in Defendants' advertisements are likely to mislead reasonable consumers by suggesting that Defendants' fuels are environmentally beneficial or benign when they contribute to climate change like any other fossil fuel product. The examples are representative of Defendants' other advertisements and public statements in Defendants' greater greenwashing strategy to confuse consumers about the consequences of using fossil fuel products and consequently to increase demand for those fossil fuel products.

a.    BP advertises Invigorate—one of its gasoline additives—as better than "ordinary fuels" that produce "increased emissions." BP advertises that "gasoline with invigorate helps clean & protect."[207] The company omits any mention of its products' leading role in causing climate change. In 2020, BP launched a new campaign focused on fuel efficiency. The campaign also includes significant investment in both digital advertising and on signage at BP and Amoco stations.

b.    Since at least 2016, Exxon has offered for sale and marketed its Synergy fossil fuels, including, since at least 2020, at a substantial number of Exxon-branded gas stations in Chicago and Illinois. In Exxon's advertisements for its Synergy fuels, including those on or

---

[207] BP PROD. N. AM. INC., CHICAGO TRIBUNE, at 1 (Nov. 2, 2008).

S.A. 137

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

near the gas pumps at Exxon-branded gas stations in Chicago and Illinois, Exxon makes several claims that a reasonable consumer would understand to mean that the Synergy fuels are beneficial or benign, and not harmful, to the environment. For example, Exxon consistently promotes Synergy fuels as "clean" or "cleaner," and the company's climate strategy mentions its Synergy fuel, claiming it can help reduce GHG emissions. Exxon also cites Synergy's alleged reduction of $CO_2$ emissions in Exxon's advertisement of the company's improved environmental performance. An advertisement on Exxon's website, which is reproduced on the following page, includes an image featuring a bright sunrise in a clear sky over hills of green grass, green trees, and little to no industrial or urban development.

S.A. 138

FILED DATE: 2/20/2024 12:34 PM    2024CH01024



**Figure 10: ExxonMobil Fuels "Environmental Performance" website**

  c.  In addition to its Synergy fuels, Exxon offers for sale, and has marketed,

Mobil 1™ ESP x2 motor oil to Chicago and Illinois consumers. From 2016 through at least 2022,

**S.A. 139**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

Exxon promoted Mobil 1™ ESP x2 on the website Energy Factor—effectively a corporate blog for Exxon, in which Exxon claims to discuss developing safe and reliable energy sources for the future—in a post titled, "Green motor oil? ExxonMobil scientists deliver an unexpected solution."[208] According to its advertisement of Mobil 1™ ESP x2, Exxon specially formulated the green oil to "contribute to [] carbon-emission reduction efforts." Exxon's advertising suggests to the consumer that purchase and use of this motor oil conveys an environmental benefit, when in fact the opposite is true.

   d.  Shell also describes its products as "cleaning" and that their use "produces fewer emissions."[209] Shell's repeated claim that its products are clean, and its frequent use of green and environmentally positive imagery in its marketing materials, individually and together, are likely to mislead reasonable consumers into believing that Shell's fuels are environmentally beneficial or benign, when in fact they are fossil fuels which, when used as designed and intended, contribute to climate change.

   e.  Similarly, Chevron's gasoline offered for sale and marketed throughout the country, is marketed as having "cleaning power" that minimizes emissions. Chevron's repeated emphasis on "cleaning" terminology, its focus in its marketing materials on "advancing a lower carbon future," and its express solicitation of consumers who "care for the environment," are

---

[208] *Green motor oil? ExxonMobil scientists deliver an unexpected solution*, EXXONMOBIL (Jul. 19, 2016) https://web.archive.org/web/20220221083851/https://energyfactor.exxonmobil.com/energy-innovation/transportation/green-motor-oil-exxonmobil-scientists-deliver-unexpected-solution/.

[209] *Shell Gasoline*, SHELL https://web.archive.org/web/20231213183548/https://www.shell.us/motorist/shell-fuels/shell-gasoline.html (last visited Dec. 13, 2023).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

likely to mislead reasonable consumers by suggesting that Chevron's fuels are environmentally beneficial or benign, when they are not.[210]

       f.    ConocoPhillips, through its 76-branded gas stations in Chicago and Illinois, offers for sale and markets its 76-brand fossil fuels. In ConocoPhillips's advertisements for its 76-brand fuels, including advertisements on or near the pumps at 76-branded gas stations in Chicago and Illinois, ConocoPhillips claims that its fuels "clean" a car's engine, resulting in "lower emissions," and that deposits left from other gasolines "can increase emissions." ConocoPhillips advertises that 76's fossil fuels are "better for the environment."[211] The 76 website for 76's fuels contains the marketing materials shown below, in which ConocoPhillips makes the claim—superimposed on an image of a bluebird standing on a car's side mirror and looking at the viewer, with silhouetted trees in the background—that 76 and its fossil fuels align with the values of environmentally conscious consumers: "We're on the driver's side®. And the environment's."

---

[210]    Chevron, *Corporate Sustainability Report: The Energy Transition*, LINKEDIN https://web.archive.org/web/20231213184101/https://www.linkedin.com/posts/chevron_corporat e-sustainability-report-the-energy-activity-7061799648075657217-fa21/ (last visited Dec. 13, 2023).

[211]    *TOP TIER® Gas*, 76 GAS STATIONS https://web.archive.org/web/20231213204301/https://www.76.com/top-tier-gas/ (last visited Dec. 13, 2023).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024



**Figure 11: ConocoPhillips 76 Fuels Website: Top Tier Gas**

161.    Defendants also misleadingly portray natural gas as environmentally beneficial or benign, failing to mention the products' role in causing environmentally injurious climate change. Defendants' misleading messaging regarding the alleged environmental benefits of natural gas is likely to mislead reasonable consumers by suggesting that fossil fuels, in particular natural gas, are environmentally beneficial and not harmful to the climate. In reality, the majority of natural gas is derived from fossil fuels, and its primary constituent is methane, a potent greenhouse gas which plays a significant role in accelerating climate change. Methane has a relatively short lifespan, but its "global warming potential" is approximately 28 times greater than an equivalent weight of carbon dioxide over a 100-year time period, and approximately 84 times greater than carbon dioxide over a 20-year timeframe. Accounting for methane leaks, flaring, and venting in production and supply chains, the net GHG emissions of natural gas are on par with—and sometimes higher than—the GHG emissions from coal combustion. Moreover, combustion of methane for use as a fuel emits carbon dioxide.

S.A. 142

162.     In 2005, Exxon Mobil advertised in the *Chicago Tribune*, stating, "We are making significant investments in the future supply of clean-burning natural gas."[212]

163.     ConocoPhillips has released advertisements on Facebook stating, "Natural Gas: efficient, affordable, environmentally-friendly. Find out how natural gas is meeting global energy demand while reducing climate-related risks," and linking to a page on their website.[213]

164.     In advertisements in *The New York Times* and *The Washington Post*, Shell touts its investments in "lower-carbon transport fuels," including natural gas. In "The Mobility Quandary," under a "Finding Sustainable Solutions" banner, Shell singles out natural gas as "a critical component of a sustainable energy mix" and a "cleaner-burning fossil fuel."[214] In "The Making of Sustainable Mobility," Shell describes natural gas as "a cleaner fossil fuel" with a "lighter carbon footprint."

165.     In 2017, the Dutch Advertising Code Authority censured Shell and Exxon for advertising natural gas as the "cleanest fossil fuel." The Advertising Code Authority reasoned that the claim "suggested that fossil fuels can be clean in that they do not cause environmental damage. It is firm . . . that that suggestion is not correct."[215] Yet Shell, along with other Defendants, continues to make the same representations in the United States, including in Chicago.

---

[212] *Tomorrow's Energy, Today's Investments*, CHICAGO TRIBUNE (Nov. 6, 2005), https://www.newspapers.com/image/231451774/?terms=%22ExxonMobil%22&match=1.

[213] ConocoPhillips, *Natural gas makes renewables possible*, FACEBOOK AD LIBRARY, https://www.facebook.com/ads/library/?id=222072331979534 (last visited Dec. 13, 2023).

[214] *The Mobility Quandary*, WASH. POST CREATIVE GROUP https://www.washingtonpost.com/brand-studio/shell/the-mobility-quandary/ (last visited Dec. 13, 2023).

[215] Arthur Neslen, *Shell and Exxon Face Censure Over Claim Gas Was 'Cleanest Fossil Fuel'*, THE GUARDIAN (Aug. 14, 2017, 12:14 PM EDT), https://www.theguardian.com/environment/2017/aug/14/shell-and-exxon-face-censure-over-claim-gas-was-cleanest-fossil-fuel.

S.A. 143

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

166.    The Fossil Fuel Defendants also collectively promote their fossil fuel products through Defendant API, which makes public statements and claims about oil and natural gas. These include advertisements and promotional campaign websites that have been directed at and/or reached Chicago and Illinois, which reasonable consumers would understand to mean that the Fossil Fuel Defendants' fossil fuels are beneficial or benign and not harmful to the environment. In particular, API's marketing material falsely promotes the narrative that natural gas is an environmentally friendly fuel. A Facebook advertisement by API states, "Cleaner burning natural gas reduces $CO_2$ emissions at home and bolsters energy security abroad."[216]

167.    In several advertisements in *The Washington Post*—*e.g.*, "Why natural gas will thrive in the age of renewables," "Real climate solutions won't happen without natural gas and oil," and "Low- and no-carbon future starts with natural gas"—API has misleadingly touted natural gas as "part of the solution" to climate change. API claims natural gas is "clean."[217] API also promotes natural gas's purported benefits through a campaign titled "Energy for a Cleaner Environment."

168.    API further claims, falsely, that, "[n]atural gas is an economical, environmentally friendly complement to renewable energy. The sooner green activists realize that, the more effective they'll be at continuing to slash emissions."[218]

---

[216] American Petroleum Institute, *LNG is pro-environment and pro-energy security*, FACEBOOK AD LIBRARY https://www.facebook.com/ads/library/?id=321331956671661 (last visited Dec. 13, 2023).

[217] *Why natural gas with thrive in the age of renewables*, WASH. POST CREATIVE GROUP https://www.washingtonpost.com/brand-studio/api-why-natural-gas-will-thrive-in-the-age-of-renewables/ (last visited Dec. 13, 2023); Mike Sommers, *Real climate solutions won't happen without natural gas and oil*, WASH. POST (Dec. 14, 2020) https://www.washingtonpost.com/brand-studio/wp/2020/12/14/real-climate-solutions-wont-happen-without-natural-gas-and-oil/.

[218] WP Brand Studio Content from API, *Low- and no-carbon future starts with natural gas*, WASH. POST CREATIVE GROUP (Feb. 15, 2019) https://www.washingtonpost.com/brand-studio/wp/2019/02/15/low-and-no-carbon-future-starts-with-natural-gas/.

S.A. 144

169.    Additionally, Defendants often represent hydrogen fuel as "clean," "renewable," or "zero / low carbon." These representations omit that the vast majority of hydrogen fuel is produced from fossil gas.[219] For example, ExxonMobil issued an advertisement on Twitter stating, "Hydrogen is the most abundant element on earth. And because hydrogen fuel is versatile - and produces no emissions at point-of-use, #hydrogen can play a big role helping society meet its net-zero goals."[220] In another example, Shell has posted on Twitter, "A car that only emits water and heat? Learn more about #hydrogen, a fuel for the future that can help clean up transport today #makethefuture."[221]

170.    Defendants also misrepresent the characteristics of biofuels. These misrepresentations fail to disclose that biofuels created from bioethanol and used in gasoline engines are typically still majority fossil fuel, and Fossil Fuel Defendants' production of biofuels is insignificant compared to fossil fuel production and fuel demand. For example, Chevron has a Renewable Energy Group that produces "EnDura Fuels," which it advertises as "A Simple Lower Carbon Solution Now."[222] The front page of Chevron's website, as of September 8, 2023, features

---

[219] *See Hydrogen Production: Natural Gas Reforming,* U.S. DEP'T OF ENERGY EFFICIENCY & RENEWABLE ENERGY, https://www.energy.gov/eere/fuelcells/hydrogen-production-natural-gas-reforming (last visited Nov. 15, 2023).

[220] ExxonMobil (@ExxonMobil), TWITTER (Aug. 3, 2023, 10:00 AM), https://twitter.com/exxonmobil/status/1687116317302870016 (The advertisement also includes a video where an Exxon employee touts hydrogen as "decarbonizing." The advertisement later shows a diagram (but nothing spoken) showing that hydrogen comes from natural gas.).

[221] Shell USA (@Shell USA), TWITTER (Dec. 20, 2017, 2:45 AM), https://twitter.com/Shell_USA/status/943401985193242625.

[222] *Endura Fuels: A Simple Lower Carbon,* CHEVRON RENEWABLE ENERGY GROUP https://www.regi.com/ (last visited Nov. 15, 2023).

S.A. 145

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

"renewable diesel,"[223] and another page on its website touts biofuels used on ships[224] and an ad campaign linking to that page.[225] The page says, "Biofuels can quickly change transportation sectors for the better. When used as a marine fuel, biofuels can reduce greenhouse gas (GHG) emissions on a lifecycle analysis." Similarly, BP claims in ads that "We're making motor oil that's 25 [percent] sugarcane based" to "make energy cleaner and better."[226]

171.    ExxonMobil has numerous advertisements, including in the *Chicago Tribune*, touting its biofuel development while omitting the fact that the company spent only 0.2 percent of its capital investments on bioenergy from 2010 to 2018.[227] Exxon's investment in potential renewable fuels, such as biofuels, has been miniscule compared to its overall profits and to its investments in developing and expanding its fossil fuels business. One analysis comparing Exxon's advertised goal of producing 10,000 barrels of biofuels per day by 2025 to Exxon's fossil fuel refinery operations found that the goal for biofuel production would amount to only 0.2 percent of Exxon's refinery capacity, as reported in 2019—in essence, a rounding error. Also, Exxon's advertisements touting the development of biofuels from plant waste substantially overplayed the likely environmental benefits by failing to acknowledge the intensive energy

---

[223] *advancing energy progress*, CHEVRON, https://www.chevron.com/ (last visited Nov. 15, 2023); *see also* Chevron, *Energy Everywhere: Renewable Diesel – Episode 2*, YOUTUBE https://www.youtube.com/watch?v=8VToz7w4uRg&t=6s (last visited Nov. 15, 2023) (video embedded on front page).

[224] *biofuels steer into maritime sector,* CHEVRON (July 5, 2023), https://www.chevron.com/newsroom/2023/q3/biofuels-steer-into-maritime-sector?utm_source=facebook&utm_medium=social&utm_campaign=corporate.

[225] Chevron, *Biofuels Steer into Maritime Sector*, FACEBOOK AD LIBRARY https://www.facebook.com/ads/library/?id=1241282153250811 (last visited Nov. 15, 2023).

[226] BP America, *Possibilities Everywhere,* FACEBOOK AD LIBRARY, https://www.facebook.com/ads/library/?id=353302112007843 (last visited Nov. 15, 2023).

[227] Anjli Raval & Leslie Hook, *Oil and Gas Advertising Spree Signals Industry's Dilemma*, FINANCIAL TIMES, (March 6, 2019), https://www.ft.com/content/5ab7edb2-3366-11e9-bd3a-8b2a211d90d5.

S.A. 146

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

required to process that plant waste, which would create substantial additional GHG emissions. In recent years, Exxon has quietly abandoned its investments in developing algae as a biofuel, but Exxon continues to invest in its development of fossil fuels, as it has done for decades.

172.    Exxon regularly advertises its efforts to capture and store carbon, leaving consumers, including those in Chicago, with the impression that Exxon does this to benefit the climate. Exxon does not disclose that the massive energy required to capture that carbon is powered by fossil fuels emitting more greenhouse gasses into the air.[228] Further, nearly all the carbon Exxon has captured was not simply stored, but used to drill for more oil.

173.    Defendants also regularly portray themselves and their businesses as sustainable, healthy, or compatible with a low carbon economy, and style themselves as corporate leaders in developing and providing non-fossil energy systems, such as solar, wind, and biofuels, and in lowering greenhouse gas emissions. But in reality, these companies' capital investments in non-fossil energy systems are extremely low compared to their investments in fossil fuel production—and are much lower than implied to consumers in advertisements. For example, from 2010 to 2018,

- BP spent only 2.3 percent of its capital investments on low-carbon energy sources;

- Chevron 0.2 percent (0.1 percent of which was in carbon capture, utilization, and storage);

- ConocoPhillips 0.0 percent;

- ExxonMobil 0.2 percent; and

---

[228] Nicholas Kusnetz, *Exxon's Long-Shot Embrace of Carbon Capture in the Houston Area Just Got Massive Support from Congress*, INSIDE CLIMATE NEWS (Sept. 25, 2022), https://insideclimatenews.org/news/25092022/exxon-houston-ship-channel-carbon-capture/.

S.A. 147

- Shell 1.2 percent (0.3 percent of which was in carbon capture, utilization, and storage).[229]

174.    There is little evidence that those figures have increased since 2018.[230] On the contrary, Defendants are ramping up fossil fuel production. Exxon is projected to increase oil production by more than 35 percent between 2018 and 2030—a sharper rise than over the previous 12 years.[231] Shell is forecast to increase output by 38 percent by 2030, by increasing its crude oil production by more than half and its gas production by over a quarter.[232] BP is projected to increase production of oil and gas by 20 percent by 2030.[233] Chevron set an oil production record in 2018 of 2.93 million barrels per day.[234] A 2019 investor report touted Chevron's "significant reserve additions in 2018" in the multiple regions in North America and around the world, as well as significant capital projects involving construction of refineries worldwide.[235]

175.    Moreover, revenue and other business data from non-fossil energy systems are typically absent from fossil fuel companies' annual reports—an implicit admission that these

---

[229] Raval & Hook, *supra* note 227.

[230] Stuart Braun, *Shell, BP boost profit, sink investment in renewable energy*, DW (Feb. 10, 2023), https://www.dw.com/en/shell-bp-boost-profit-sink-investment-in-renewable-energy/a-64656800; Lauren Kent, *Big oil companies are spending millions to appear 'green.' Their investments tell a different story, report shows*, CNN (updated Sept. 8, 2022, 11:09 AM EDT), https://www.cnn.com/2022/09/07/energy/big-oil-green-claims-report-climate-intl/index.html.

[231] Jonathan Watts et al., *Oil firms to pour extra 7m barrels per day into markets, data shows*, THE GUARDIAN          (Oct.          10,          2019,          7:00          EDT), https://www.theguardian.com/environment/2019/oct/10/oil-firms-barrels-markets.

[232] *Id.*

[233] *Id.*

[234] Kevin Crowley & Eric Roston, *Chevron Aligns Strategy With Paris Deal But Won't Cap Output*, BLOOMBERG          (updated          Feb.          7,          2019,          12:29          PM          CST), https://www.bloomberg.com/news/articles/2019-02-07/chevron-pledges-alignment-with-paris-accord-but-won-t-cap-output.

[235] *Chevron 2019 Investor Presentation*, CHEVRON (Feb. 2019), https://chevroncorp.gcs-web.com/static-files/c3815b42-4deb-4604-8c51-bde9026f6e45.

**S.A. 148**

companies do not view non-fossil energy systems as material to their business or company value. In contrast, advertisements often misleadingly portray non-fossil energy systems as a significant or predominant part of company business.

176.     As part of their greenwashing efforts, Defendants have cast their businesses as committed to addressing environmental challenges like climate change, and even as leaders in efforts to mitigate climate change. In so doing, Defendants have cast their businesses—overwhelmingly dedicated to the further development, production, and sale of fossil fuels—as environmentally sustainable.

177.     BP has misleadingly portrayed itself, and continues to misleadingly portray itself, as a climate leader, claiming that it aims to be a net-zero company by 2050 or sooner. Beginning in 2000, BP began a $200 million campaign claiming it was moving "beyond petroleum" with advertisements portraying BP as predominantly invested in clean energy sources. Messages from that campaign included some projects, plans, and an overall theme that BP was going to materially reduce its emissions and transition away from petroleum. These advertisements used phrases such as, "It's time to go on a low carbon diet," "It's time to pull the plug on carbon emissions," and "It's time to think outside the barrel," and "New energy solutions require new schools of thought" for "finding new sources of clean and renewable energy."[236]

---

[236] BP Prod. N. Am. Inc., Newsweek (June 18, 2007).

S.A. 149



**Figure 12: BP Products North America Inc. in *Newsweek***

178. In 2000, BP published a full-page advertisement in the *Chicago Tribune*, describing itself as "a new company able to offer global energy solutions," "a company that makes gasoline and diesel that produces lower emissions," and "the world's leading producer of solar power;" the advertisement also used BP's "beyond petroleum" slogan.[237] In another full-page advertisement in the *Chicago Tribune* in 2001, BP touted that it is "more than halfway" to

---

[237] BP, CHI. TRIBUNE at 13 (Aug. 9, 2000).

**S.A. 150**

"reduc[ing its] own greenhouse gas emissions to 10 [percent] below 1990 levels by 2010." In the same advertisement, BP described itself as "one of the largest producers, as well as consumers of solar power in the world," and wrote, "We are in the oil business. But we are also in the natural gas business, the solar business, the technology business, the yet-to-be-discovered-energy business."[238] In another advertisement in the *Chicago Tribune* the following year, BP said it was "the first in [its] industry to recognize the risks of global climate change and set a target to reduce [its] own greenhouse gas emissions. [BP] just reached that target, [eight] years ahead of schedule. It's a start."[239] In another full-page advertisement in the *Chicago Tribune* in 2015, BP described its developments of "cleaner-burning fuels" in Chicagoland, as shown by the figure below.[240]

---

[238] BP, CHI. TRIBUNE at 11 (Sept. 5, 2001).

[239] BP, CHI. TRIBUNE Section at 14 (Aug. 8, 2002).

[240] BP PROD. N. AM. INC., CHI. TRIBUNE at 5 (Oct. 1, 2015).

119

**S.A. 151**

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024



**Figure 13: BP Products North America Inc. advertisement in the *Chicago Tribune***

179.    BP's "Possibilities Everywhere" campaign portrayed the company as a leader in clean energy. In its "Blade Runner" advertisement, BP claims that it is "one of the major wind

120

**S.A. 152**

energy businesses in the US."[241] BP's recent Facebook advertising campaigns targeted Illinois Facebook users, claiming: "To help the US meet its climate goals, federal methane rules are critical. All natural gas production needs to emit less;"[242] "Why advocate for carbon pricing? Because it's good for the people of Illinois, good for business, and good for the planet;"[243] and "We agree – the world needs fewer emissions. That's why we're working to make all forms of energy cleaner and better."[244]

180. BP's representations contain substantial omissions about the company's commitment to combatting climate change. At the time of its "Blade Runner" advertisement touting itself as "one of the major wind energy businesses in the US," BP only owned about one percent of the installed wind capacity in the U.S. Moreover, at a time of record-breaking profits, BP is scaling back its plan to lower emissions by 2030, and BP continues to make significant investments in fossil fuel production, refining, and sales.

---

[241] BP's installed wind capacity in the US is only about one percent of the market.

[242] BP America, *BP Supports Methane Regulation*, FACEBOOK AD LIBRARY (July 2021), https://www.facebook.com/ads/library/?active_status=all&ad_type=political_and_issue_ads&country=US&id=216888343522285&view_all_page_id=97279934919&search_type=page&media_type=all.

[243] BP America, *Bring Carbon Pricing to Illinois*, FACEBOOK AD LIBRARY (Sept.-Oct. 2020), https://www.facebook.com/ads/library/?active_status=all&ad_type=political_and_issue_ads&country=US&id=327792575094720&view_all_page_id=97279934919&search_type=page&media_type=all.

[244] BP America, *Possibilities to Realities*, FACEBOOK AD LIBRARY (Nov. 2019), https://www.facebook.com/ads/library/?active_status=all&ad_type=political_and_issue_ads&country=US&id=435441174014180&view_all_page_id=97279934919&search_type=page&media_type=all.

121

S.A. 153

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

181.    In 2008, ConocoPhillips published this full-page advertisement in *The Atlantic:*



**Figure 14: ConocoPhillips advertisement in *The Atlantic***

182.    ConocoPhillips claims that its "actions for our oil and gas operations are aligned with the aims of the Paris Agreement" and touts its actions and achievements toward the net-zero energy transition. ConocoPhillips also touts its "Net-Zero Roadmap," which it describes as a "Paris-Aligned Climate Risk Strategy" and "a comprehensive framework with an ambition to

**S.A. 154**

FILED DATE: 2/20/2024 12:34 PM  2024CH01024

become a net-zero company for operational emissions by 2050."[245] ConocoPhillips thus focuses on its "operational" emissions while ignoring that combustion of its product continues to emit large amounts of greenhouse gases.

183.    In June 2023, ConocoPhillips published a profile on its Methane Measurement Manager Milind Bhatte, who it claims is helping move the company toward its goal of "net-zero."[246]

184.    ConocoPhillips' claims are contradicted by the company's substantial investments in expanding its fossil fuel production and sales. For example, the company's new Willow Project in Alaska is expected to produce approximately 576 million barrels of oil, with associated indirect GHG emissions equivalent to 239 million tons of $CO_2$.

185.    Exxon has announced its ambition to achieve net-zero GHG emissions by 2050 and touts its commitment to helping society reach a lower-emissions future. Exxon has heavily promoted its investment in developing algae for use as a biofuel to reduce emissions and combat climate change. Exxon's advertising tells consumers that Exxon is working to decrease its carbon footprint and that its research is leading toward "A Greener Energy Future. Literally."[247]

186.    Chevron claims that it "is committed to addressing climate change" and touts its intentions to invest billions of dollars in carbon reduction projects, as well as its net-zero

---

[245] *Paris-Aligned Climate Risk Strategy*, CONOCOPHILLIPS, https://www.conocophillips.com/ (last visited Nov. 15, 2023); *Operational Net-Zero Roadmap*, CONOCOPHILLIPS https://www.conocophillips.com/sustainability/low-carbon-technologies/operational-net-zero-roadmap/ (last visited Nov. 15, 2023).

[246] Gus Morgan, *Milind Bhatte: Progressing toward net-zero*, CONOCOPHILLIPS (June 27, 2023) https://www.conocophillips.com/spiritnow/story/milind-bhatte-progressing-toward-net-zero/?utm_medium=osocial&utm_source=Twitter&utm_content=image&utm_term=post:16665 04399403316370&utm_campaign=campaign:1601648882546323569.

[247] ExxonMobil, *The Future of Energy? It May Come From Where You Least Expect*, NEW YORK TIMES https://www.nytimes.com/paidpost/exxonmobil/the-future-of-energy-it-may-come-from-where-you-least-expect.html (last visited Dec. 13, 2023).

S.A. 155

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

"aspirations." And Chevron's director states in a 2021 report, "We believe the future of energy will be lower carbon, and we intend to be a leader in that future."[248] Its CEO claims that Chevron's "work to create fuels of the future—like hydrogen, renewable diesel, and sustainable aviation fuel—seeks to lower the carbon intensity of these products and support our customers' efforts to reduce their greenhouse gas emissions."[249] Chevron representatives have even delivered public seminars at top educational institutions, deceptively claiming Chevron uses its "unique capabilities, assets and expertise to deliver progress" toward the global ambition of achieving net-zero carbon emissions.

187.    Chevron's website contains a page titled, "explainer: what is carbon intensity?"[250] The page states that "Chevron's upstream carbon intensity (UCI) metric is used to measure the emission intensity of oil and gas production.," and, "To date, [Chevron] ha[s] identified nearly 100 potential projects to further lower [its] greenhouse gas intensity." This page is misleading because it suggests that Chevron is working to lower the greenhouse gas emissions associated with production of its products, while ignoring that post-production, the combustion of oil and gas in its intended uses creates huge amounts of greenhouse gas emissions.

188.    Chevron's minimal efforts in the area of renewable and lower-carbon energy, coupled with its expansion of its fossil fuel business, belie its statements suggesting that it is part of the climate change solution. Chevron in fact sold its only renewable energy holding in 2018. Moreover, from 2010 to 2018, according to one analysis, Chevron's investments in low-carbon

---

[248]    Roderick Green, *Energy Transition Spotlight*, CHEVRON (Sept. 14, 2021) https://chevroncorp.gcs-web.com/static-files/1ba3162e-f798-444b-9368-fc7b4ab7842a#page=5.

[249]    *Climate change resilience: Advancing a lower carbon future*, CHEVRON, at 1 (2021), https://www.chevron.com/-/media/chevron/sustainability/documents/2021-climate-change-resilience-report.pdf#page=3.

[250]    *Explainer: What is Carbon Intensity*, CHEVRON (Nov. 22, 2022) https://www.chevron.com/newsroom/2022/q4/explainer-what-is-carbon-intensity.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

energy sources were only 0.2 percent of Chevron's capital spending, compared to 99.8 percent in continuing its fossil fuel exploration and development.[251] Chevron to this day continues to prioritize capital expenditures in its traditional fossil fuel business over its investments in renewable and low-carbon energy.

189.    Shell also falsely portrays itself to consumers, including in Chicago, as part of the climate solution. For example, in 2006, Shell issued a full-page advertisement in the *Chicago Tribune* stating "The world needs to tackle $CO_2$ emissions" and touting the company's investment in carbon capture and storage as part of that project.

190.    Shell published another advertisement in the *Chicago Tribune* casting Shell as a corporate leader in responding to climate change.

---

[251] *Greenwashing Files: Chevron*, CLIENTEARTH, https://www.clientearth.org/projects/the-greenwashing-files/chevron/ (last visited Dec. 7, 2023).

126



Figure 15: Shell advertisement in the *Chicago Tribune*

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

191.    Shell claims that it aims to become a net-zero emissions[252] energy business by 2050, and that it is "tackling climate change." Shell has a webpage, and a report co-written by Deloitte, on "Decarbonizing Construction."[253]

192.    One of Shell's public relations firms described the intent of Shell's Make The Future campaign, stating: "As part of their efforts to make consumers, particularly millennials, aware of their commitment to cleaner energy, Shell launched the #makethefuture campaign. The company tasked Edelman with the job of giving millennials a reason to connect emotionally with Shell's commitment to a sustainable future. We needed them to forget their prejudices about 'big oil' and think differently about Shell."[254]

193.    Shell's 2016 #makethefuture advertising campaign targets young people and misleadingly portrays the company as heavily engaged in developing and selling clean energy sources.[255]

194.    In reality, however, Shell spent only 1.3 percent of its capital investments in low carbon energy systems from 2010 to 2018.[256] Shell planned to spend four times more money on oil and gas development than on renewable technology in 2022.[257] In the first half of 2023, Shell

---

[252] "Net-zero" means achieving a balance between the carbon emitted into the atmosphere, and the carbon removed from it.

[253] *Decarbonizing    Construction:    Building    a    Low-Carbon    Future*,    SHELL https://www.shell.com/business-customers/construction-and-road/decarbonising-construction.html (last visited Nov. 15, 2023).

[254] *Shell: South Pole Energy Challenge*, EDELMAN, https://archive.ph/lZ8Qz (last visited Nov. 16, 2023).

[255] *See* Graham Readfearn, *Hey millennials, don't fall for Shell's pop star PR*, THE GUARDIAN (April    25,    2018),    https://www.theguardian.com/environment/planet-oz/2018/apr/25/hey-millennials-dont-fall-for-shells-pop-star-pr.

[256] Raval & Hook, *supra* note 227.

[257] Simon Jack, *Oil giant Shell says it needs oil to pay for green shift*, BBC NEWS (Nov. 3, 2021, 2:51 PM CDT), https://www.bbc.com/news/business-59154930.

S.A. 159

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

reported $11.6 billion in total spending, of which less than one billion went to renewables and "energy solutions"—a category that also includes fossil fuel investments, such as marketing and trading of pipeline gas. Independent analysis of Shell's spending plans shows that the company will be emitting *more* greenhouse gas by 2030 than it currently emits.[258] On its current trajectory, Shell is projected to miss its emissions reduction targets for both 2030 and 2050.[259]

195.    In June 2023, the U.K.'s Advertising Standards Authority banned Shell's marketing campaign describing Shell as providing renewable energy, installing electric vehicle charging, and driving the energy transition. The Advertising Standards Authority found consumers were likely to interpret the marketing materials as making a "broader claim about Shell as a whole providing cleaner energy." Since the "vast majority" of its operations was not clean energy, the campaign was misleading.[260]

196.    API markets itself as being an environmental steward, committed to helping reduce GHG emissions. API's 2021 Climate Action Framework portrays the organization as a partner in moving towards a climate solution, stating: "Our industry is essential to supplying energy that makes life modern, healthier and better while doing so in ways that tackle the climate challenge: lowering emissions, increasing efficiency, advancing technological innovation, building modern infrastructure and more."[261] As part of this campaign, API has offered on its website, in social media posts, and in other advertisements that have reached residents of Chicago and Illinois, the image on the following page, of lush greenery and a message that "88 [percent] of Americans favor

---

[258] *Id.*

[259] *Id.*

[260] Ed Davey, *Shell's clean energy advertising campaign is misleading, UK watchdog says*, AP NEWS (June 7, 2023, 10:50 AM CST), https://apnews.com/article/shell-climate-ad-ban-clean-energy-a1322233e3ba7e8fa7760367f13dd58c.

[261] *API Climate Action Framework*, AM. PETROLEUM INST. at 5 (2021) https://www.api.org/-/media/files/ehs/climate-change/2021/api-climate-action-framework.pdf#page=3.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

energy companies helping meet environmental challenges." API elaborates within the advertisement that "natural gas and oil [] powers and supports modern living . . . with lower emissions."



**Figure 16: API, We Are America's Generation Energy**

197.    In 2017, API launched an advertising campaign called "Power Past Impossible," which portrayed the oil and gas industry as a sustainable, healthy, and an essential part of societal progress.[262] API President and CEO Jack Gerrard misleadingly stated that "greenhouse gas emissions . . . are near 25 year lows," when greenhouse gas emissions globally were in fact

---

[262] *See* American Petroleum Institute, *API launches Power Past Impossible campaign during Super Bowl showing natural gas and oil benefit to consumers in everyday life*, PR NEWSWIRE (Feb. 5, 2017, 6:32 PM ET) https://www.prnewswire.com/news-releases/api-launches-power-past-impossible-campaign-during-super-bowl-showing-natural-gas-and-oil-benefit-to-consumers-in-everyday-life-300402321.html.

**S.A. 161**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

increasing, and total greenhouse gas emissions in the U.S. (including methane, not just carbon dioxide) had not been shown to decline as claimed.[263] The campaign's opening advertisement, which aired nationally during the Superbowl, stated: "Oil pumps life. Oil runs cleaner." The advertisement ignored, however, the climate and public health harms caused by oil.[264] And as of July 21, 2020, the Power Past Impossible website described oil as "Energy for a Cleaner Environment." In touting the environmental benefits of oil, the website also made the following false or misleading assertions: "This is Energy for a Cleaner Environment," "99 [percent] Fewer Vehicle Emissions," and "Cleanest Air in More Than a Decade."[265] In 2020 API launched a nationwide advertising campaign called "Energy for Progress," which portrays the oil and gas industry as a leader in reducing greenhouse gas emissions.[266] The opening advertisement for the campaign states that "natural gas and oil companies have . . . reduced carbon emission levels to the lowest in a generation."[267] Similarly, in a September 2023 Twitter post, API stated "American natural gas & oil is committed to creating climate solutions."[268]

198.    The Energy for Progress website also contains advertisements such as "Five Ways We're Helping to Cut Greenhouse Gas Emissions," which misleadingly portrays the oil and gas

---

[263] *Id.*

[264] American Petroleum Institute, *Oil: Power Past Impossible*, YOUTUBE (Feb. 4, 2017), https://www.youtube.com/watch?v=w4KvOJlu5Xo.

[265] *See Energy for a Cleaner Environment,* POWER PAST IMPOSSIBLE https://web.archive.org/web/20200602111024/https://powerpastimpossible.org/state-of-american-energy/energy-for-a-cleaner-environment/ (last visited Nov. 15, 2023).

[266] *See API Launches New National Campaign 'Energy for Progress', Highlights U.S. Energy Leadership in Annual State of American Energy Event*, AM. PETROLEUM INST. (Jan. 7, 2010), https://www.api.org/news-policy-and-issues/news/2020/01/07/soae-2020-release.

[267] *See* API, *Solving Big Challenges Requires Energy*, YOUTUBE (Jan. 7, 2020), https://www.youtube.com/watch?v=87ObTFn68ic&feature=youtu.be.

[268] American Petroleum Institute (@APIenergy), TWITTER (Sept. 5, 2023, 12:25 PM) https://twitter.com/APIenergy/status/1699111447593210289.

**S.A. 162**

FILED DATE: 2/20/2024 12:34 PM      2024CH01024

industry as an environmental leader by focusing on marginal improvements in operational emissions while ignoring the much greater emissions from the industry's products.[269]



**Figure 17: API advertisement from its Energy for Progress campaign, used as the campaign's Facebook banner.**

199.    Tellingly, however, API's strategy does not advocate for or even mention reduction in fossil fuel production as a strategy to protect the climate. Rather, it focuses on potential technical advances and shifting to heavier reliance on natural gas as a "clean fuel." And an internal API email shows that its Climate Action Framework was in fact organized around the purpose of "the continued promotion of natural gas in a carbon constrained economy."[270] As discussed above, natural gas is far from a "clean" fuel, as API misleadingly claims, as natural gas production and use contributes substantially to climate change through the release of methane, an extremely potent greenhouse gas.

---

[269] *See Five Ways We're Helping to Cut Greenhouse Gas Emissions*, ENERGY FOR PROGRESS (Apr. 17, 2020), https://energyforprogress.org/article/five-ways-were-helping-to-cut-greenhouse-gas-emissions/.

[270] *See Oversight Committee Releases New Documents Showing Big Oil's Greenwashing Campaign and Failure to Reduce Emissions*, U.S. HOUSE COMM. ON OVERSIGHT & ACCOUNTABILITY: DEMOCRATS (Dec. 9, 2022), https://oversightdemocrats.house.gov/news/press-releases/oversight-committee-releases-new-documents-showing-big-oil-s-greenwashing#:~:text=Ro%20Khanna%2C%20Chairman%20of%20the,failure%20to%20meaningfully%20reduce%20emissions.

**H.      Defendants' Concealments and Misrepresentations Regarding the Dangers of Fossil Fuel Products Encouraged Continued Use of Fossil Fuels and Discouraged Concerted Action on Greenhouse Gas Emissions.**

200.    Consumer use of fossil fuel products is a significant contributor to climate change. As a result of Defendants' sustained and widespread campaign of disinformation, many Chicago and Illinois consumers have been unaware of the magnitude of the threat posed by their use of fossil fuels, or of the relationship between their purchasing behavior and climate change.

201.    For example, Edelman, the PR firm hired by Shell to carry out its #makethefuture campaign, found that as a result of the campaign, "Audience members are 31 [percent] more likely to believe Shell is committed to cleaner fuels" and "Positive attitudes towards the brand increased by 12 [percent]."[271]

202.    As a result of Defendants' efforts to deny and undermine climate science and conceal the dangers of fossil fuel consumption, Defendants encouraged consumers to continue to use fossil fuels. As a result of Defendants' sustained and widespread campaign of disinformation, many Chicago and Illinois consumers have been unaware of the strength of the scientific consensus about the relationship between consumption of fossil fuels and climate change, the magnitude of the threat posed by their own use of fossil fuels, or of the contribution their purchasing behavior makes to aggravating the effects of climate change.

203.    In addition to Defendants misleading Chicago consumers by affirmatively misrepresenting the state of their and the scientific community's knowledge of climate change and by failing to disclose the dangerous effects of using their products, Defendants have sought to mislead consumers, and induce purchases and brand affinity, with greenwashing advertisements designed to represent Defendants as environmentally responsible companies developing

---

[271] *Shell: South Pole Energy Challenge*, EDELMAN, https://archive.ph/IZ8Qz (last visited Nov. 16, 2023).

**S.A. 164**

innovative green technologies and products. In reality, however, Defendants' business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change.

204.    By misleading Chicago consumers about the climate impacts of using fossil fuel products, and by failing to disclose the climate risks associated with their purchase and use of those products, Defendants deprived consumers, including those in Chicago, of information about the consequences of their purchasing decisions. This led to consumers using more fossil fuels, and using fossil fuels less efficiently, than they otherwise would have done in the absence of Defendants' deception.

205.    Defendants intended for Chicago consumers to rely on their omissions and concealments and to continue purchasing Defendants' fossil fuel products without regard for the damage such products cause.

206.    Knowledge of the risks associated with the routine use of fossil fuel products is material to Chicago and Illinois consumers' decisions to purchase and use those products. Recent studies and surveys have found that consumers with substantial awareness of climate change are "concerned about climate change, and a majority expect fellow Americans to be willing to change their consumption habits as a result."[272] Similarly, informed consumers often attempt to contribute toward solving environmental problems by supporting companies that they perceive to be developing "green" or more environmentally friendly products.[273] These studies demonstrate that

---

[272] *Changes in Consumers' Habits Related to Climate Change May Require New Marketing and Business Models*, THE CONFERENCE BD. (Oct. 26, 2022), https://www.conference-board.org/topics/consumers-attitudes-sustainability/changes-in-consumer-habits-related-to-climate-change.

[273] *See* Anthony Leiserowitz et al., *Consumer Activism on Global Warming*, YALE PROGRAM ON CLIMATE CHANGE COMMC'N, at 3 (2021), https://climatecommunication.yale.edu/wp-content/uploads/2021/12/consumer-activism-on-global-warming-september-2021.pdf (about a third of American consumers surveyed report "reward[ing] companies that are taking steps to

**S.A. 165**

some Chicago consumers who received accurate information that fossil fuel use was a primary driver of climate change, and about the resultant dangers to the environment and to public health, would have decreased their use of fossil fuel products and/or demanded lower-carbon transportation and product options.

207.     As described herein, by casting doubt upon the scientific consensus on climate change, Defendants deceived Chicago consumers about the relationship between consumption of fossil fuels and climate change, and the magnitude of the threat posed by fossil fuel use. Chicago consumers equipped with complete and accurate knowledge about the climate and the public health effects of continued consumption of fossil fuels would have likely formed a receptive customer base for clean energy alternatives decades before such demand in fact developed. Instead, Defendants' campaign of deception allowed them to exploit public uncertainty to reap substantial profits.

**I.     The Effects of Defendants' Deceit Are Ongoing.**

208.     The consequences of Defendants' tortious misconduct—in the form of misrepresentations, omissions, and deceit—began decades ago, and continue to be felt to this day. As described above, Defendants, directly and/or through membership in other organizations, misrepresented their own activities, the fact that their products cause climate change, and the danger presented by climate change.

209.     Defendants' collective goal was to ensure that "[a] majority of the American public, including industry leadership, recognizes that significant uncertainties exist in climate science, and therefore raises questions among those (e.g. Congress) who chart the future U.S. course on global

---

reduce global warming by buying their products" and "punish[ing] companies that are opposing steps to reduce global warming by not buying their products.").

**S.A. 166**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

climate change."[274] In 2023, only 20 percent of Americans understand how strong the level of consensus is among scientists that human-caused global warming is happening, and 28 percent think climate change is caused mostly by natural changes in the environment.[275]

210.    Defendants' misrepresentations, omissions, and deceit had a significant and long-lasting effect on how the public views climate change and the dangers of fossil fuel use that continues to the present day. By sowing doubt in the minds of the public, Defendants substantially altered the public discourse on climate change, and intentionally delayed action on climate change.

211.    If Defendants had been forthcoming about their own climate research and understanding of the dangers of fossil fuel products, consumers and the public could have made substantial progress in transitioning to a lower-carbon economy, at a much earlier time, potentially averting some of the effects of the climate crisis that Chicago is experiencing today.

212.    The fact that Defendants and their proxies knowingly provided incomplete and misleading information to the public, including to Chicago consumers, only recently became discoverable due to, among other things:

      a.    Defendants' above-described campaign of deception, which continues to this day;

      b.    Defendants' efforts to discredit climate change science and create the appearance that such science is uncertain;

      c.    Defendants' concealment and misrepresentations regarding the fact that their products cause catastrophic harms; and

---

[274] Joe Walker, *Email to Global Climate Science Team re Draft Global Climate Science Communications Plan* (Apr. 3, 1998), https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

[275] Leiserowitz et al., *supra* note 178.

S.A. 167

d.    Defendants' use of front groups such as API, the Global Climate Coalition, and the National Mining Association to obscure their involvement in these actions.

213.    By concealing the very fact of their campaign of deception, including by using front groups to obscure their own involvement in the deception, Defendants concealed their unlawful conduct from the public and the City, thereby preventing it from discovering the facts underlying the claims alleged herein.

**J.    The City Has Suffered, Is Suffering, and Will Continue to Suffer Injuries from Defendants' Wrongful Conduct.**

214.    The City of Chicago has already suffered negative environmental and physical consequences of climate change. Chicago has incurred, and will incur, significant costs to withstand increased hot weather events, effects of increased winter temperatures, increased precipitation and flooding, and negative impacts on Lake Michigan. "Heat waves cause heat-related deaths and illness, worse air quality, and increased reliance on costly electricity for fans and air conditioning. More frequent heavy downpours cause basement flooding and property damage, sewage overflows, contamination of local waterways, and transit disruptions. Warmer spring temperatures lengthen the pollen season and increase exposure to allergens. Changing Lake Michigan water levels and temperature increase shoreline erosion, property damage, and the potential for toxic algae blooms."[276]

215.    The City is committed to protecting Chicagoans from the damaging effects that climate change has, and will continue to have, on the City and its residents. "While all Chicagoans

---

[276]    CITY OF CHICAGO, CHICAGO CLIMATE ACTION PLAN at 14 (2022), https://www.chicago.gov/content/dam/city/sites/climate-action-plan/documents/Chicago-CAP-071822.pdf [hereinafter "Chicago Climate Action Plan"].

136

**S.A. 168**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

directly experience climate change impacts, frontline communities experience the most immediate and worst effects."[277]

<em>Increased Heat Events</em>

216.     Climate change has already resulted in (and will continue to result in) an increase in average summer temperatures and the frequency of extreme heat in Chicago.

217.     2023 was the hottest year on record. Heat waves and high-heat days will continue to be an increasing problem in Chicago.[278]

218.     Heat waves and high-heat days dramatically increase the risk that Chicagoans will suffer from heat-related illnesses that can often be fatal.

219.     In 1995, for example, 739 Chicagoans tragically died as a result of a four-day heat wave. Many of the victims of the 1995 heat wave were elderly, low-income, and Black, living in areas that experience urban heat island effects, apartments without ventilation or air conditioning, and in neighborhoods lacking social infrastructure and critical resources to withstand extreme heat events.

220.     Low-income communities and communities of color are disproportionately impacted by heat waves and high heat days. For example, the maps below depict the average summer surface temperature and the environmental justice areas in the City.

---

[277] *Id.*

[278] Tara Molina, *With 2023 set to be the warmest year on record, experts have warning for Chicago*, CBS NEWS CHICAGO (updated Nov. 9, 2023, 6:34 PM CST), https://www.cbsnews.com/chicago/news/2023-warmest-year-on-record-experts-warning-chicago/.

137

**S.A. 169**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024



**Figure 18: Chicago Heat and Environmental Justice Index Maps**[279]

221.    By mid-century, scientists expect heat waves as intense as the 1995 heat waves to occur between two and five times a decade. By the end of the century, scientists project that heat waves like the 1995 heat wave could occur multiple times each year.[280]

222.    Without implementing costly heat resiliency measures, such as cooling centers and green infrastructure that reduces urban heat islands, the effects of increased heat waves and high-heat days could be catastrophic.

---

[279] Chicago Climate Action Plan, *supra* note 276, at 14; Sarah Macaraeg, *Mapping a threat: Read the investigation on disparities in Chicago's summer heat*, CHICAGO TRIBUNE (May 25, 2023, 5:00 AM), https://www.chicagotribune.com/investigations/chicago-heat-disparities-20230526-2owgm4dyubfbpbby2fchm35zmi-list.html.

[280] CHICAGO METROPOLITAN AGENCY FOR PLANNING, APPENDIX A: PRIMARY IMPACTS OF CLIMATE CHANGE IN THE CHICAGO REGION at 12 (June 2013), https://www.cmap.illinois.gov/documents/10180/14193/Appendix+A+-+Primary+Impacts+of+Climate+Change+in+the+Chicago+Region.pdf/2a85b021-f3bd-4b98-81d1-f64890adc5a7.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

223.     Historically, the high temperature in the Chicago region reaches 95°F only three days each year. By mid-century, the high temperature is expected to reach 95°F at least ten to 15 days annually.[281] By 2090, the number of very hot days is projected to increase to between ten and 90 per year.[282] Overnight average temperatures have historically topped 70°F just 13.5 nights per year. The number of nights with an average temperature over 70°F is expected to increase to 30 to 40 nights per year.[283] Historically, the heat index in Chicago has surpassed 105°F one time per year. By mid-century, Chicago is expected to have between nine and 14 days with a heat index of 105°F or more, and by late century, between 12 and 34 days with a heat index of 105°F or more, depending on whether action is taken to address climate change.[284]

---

[281] CHICAGO METROPOLITAN AGENCY FOR PLANNING, ON TO 2050 STRATEGY PAPER CLIMATE RESILIENCE at 8 (2016), https://www.cmap.illinois.gov/documents/10180/517388/Climate+Resilience+Strategy+Paper.pdf/dd610883-d00f-407d-808b-484f9800a3f6 [hereinafter "Chicago Climate Resiliency Strategy Paper"].

[282] *Climate Change in Illinois*, IL. STATE CLIMATOLOGIST, https://stateclimatologist.web.illinois.edu/climate-change-in-illinois/ (last visited Nov. 15, 2023).

[283] *Id.*

[284] Kristina Dahl et. al, *Killer Heat in the United States Climate Choices and the Future of Dangerously Hot Days*, UNION OF CONCERNED SCIENTISTS (July 2, 2019), https://www.ucsusa.org/resources/killer-heat-united-states-0.

S.A. 171



**Figure 19: Monthly High and Low Temperatures for Chicago**[285]

*Increased Seasonal Temperature*

224.    Climate change is also causing an increase in seasonal temperatures, which creates several problems that Chicago will have to address through resiliency measures.

225.    Since 1970, Chicago's winters have warmed an average of 3.2°F. By mid-century, Chicago is projected to have 22 fewer days per year with a minimum temperature below 32°F. One study of the Chicago region estimates a 50 to 90 percent decline in days below 0°F by the end of the 21st century.[286]

---

[285] *Chicago, IL Top Climate Change Risks: Precipitation, Heat, Drought,* CLIMATE CHECK, https://climatecheck.com/illinois/chicago (last visited Nov. 15, 2023).

[286] *Id.* at 13.; Chicago Climate Resiliency Strategy Paper, *supra* note 281, at 9;  Steve Varus & Jeff Van Dorn, *Projected future temperature and precipitation extremes in Chicago,* J. OF GREAT LAKES RSCH., at 22-32 (2010), https://www.sciencedirect.com/science/article/abs/pii/S0380133009001841.

**S.A. 172**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

226.    Increasing winter temperatures causes an increase in freeze-thaw events (the cycle of moving from below to above freezing conditions). Freeze-thaw cycles lead to wear-and-tear on the built environment, causing more rapid buckling and deterioration of roadways and of other built infrastructure.[287]

227.    Increased winter temperatures have also caused ice cover to diminish in the Great Lakes by 63 percent since the 1970s.[288] Diminished ice cover exposes coastal areas of Lake Michigan to a greater number of storm events each year, increasing the vulnerability of beaches, shorelines, and waterfront infrastructure to large storm surges. "[T]he effect is heightened by the fact that this additional open water occurs during a period of the year when storm intensity is generally greatest."[289] Reduced ice cover is also associated with warmer summer months.

228.    Increased winter temperatures also result in an increased retention of humidity in the atmosphere, which results in more winter rain precipitation rather than snowfall. Although overall snowfall may decrease, snowstorms will be more intense.[290] An increase in intense heavy snowfall accumulation will result in additional risks and damage to both built and green infrastructure, such as downed power lines and tree damage.

### *Increased Precipitation and Flooding*

229.    Climate change has increased, and will continue to increase, the number of extreme precipitation events and flooding in Chicago.

---

[287] Chicago Climate Resiliency Strategy Paper, *supra* note 281, at 16.

[288]   *Id.* at 9; *What Climate Change Means for Wisconsin*, EPA (Aug. 2016) https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-wi.pdf.

[289] *An Assessment of the Impacts of Climate Change on the Great Lakes*, ENV'T LAW & POL'Y CENTER, at 38 (2019), https://elpc.org/wp-content/uploads/2020/04/2019-ELPCPublication-Great-Lakes-Climate-Change-Report.pdf [hereinafter "ELPC Report"].

[290] Chicago Climate Resiliency Strategy Paper, *supra* note 281, at 15.

141

## S.A. 173

230.    Warmer air holds more water vapor, which results in more precipitation. Between 1979 and 2009, the Chicago region experienced 40 percent more precipitation than the prior 30-year period.[291]

231.    The severity of precipitation events has also increased. In recent years, the ten rainiest days resulted in nearly 40 percent of the total annual precipitation.[292]

232.    As the name indicates, 24-hour, 100-year storm events have historically occurred in Chicago, on average, once every 100 years. Since the 1980s, however, Chicago has experienced three of these storm events—a more than eight-fold increase.[293]

233.    Historically, Chicago experienced approximately 11 storms annually, which generated 15.3 inches of precipitation. By 2050, experts project that Chicago will experience approximately 13 storms annually, which will generate 17.5 inches of precipitation.[294]

234.    Increasingly frequent and severe storms will lead to major road, rail, and utility outages, mold in basements, severe erosion, sewer overflows, increased nutrient loading in Lake Michigan and other surface waters from roadway, agricultural, and landscape runoff, closures of local businesses, and increased flooding.

235.    Chicago is among the nearly 860 cities across the United States with combined sewer systems. Combined sewer systems carry both sewage and stormwater. During periods of intense precipitation or snowmelt, Chicago's wastewater treatment systems can become

---

[291] *Id.* at 12.

[292] *Id.*

[293] *Id.*

[294] *Chicago, IL Top Climate Change Risks*, *supra* note 285.

142

**S.A. 174**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

overwhelmed, and Chicago's combined sewer system discharges untreated sewage and stormwater into surface waters.[295]

236.    "If just two-thirds of an inch of rain falls in 24 hours, the Chicago River can become so swollen with sewage and stormwater that the river changes course and flows into Lake Michigan instead of away from it."[296]

237.    In an attempt to mitigate combined sewer overflow events, the Tunnel and Reservoir Plan ("TARP"), commonly referred to as the Deep Tunnel, was designed to hold 2.3 billion gallons of combined, untreated wastewater until storm events subside. Rather than discharging the untreated wastewater into surface waters and Lake Michigan, the Deep Tunnel is designed to hold the wastewater until it can be treated and discharged.[297]

238.    On July 2, 2023, Chicago experienced a rain event that overwhelmed the Deep Tunnel. Untreated wastewater overflowed at 19 locations across Chicagoland, and the Chicago River, which contained untreated wastewater from some of these overflow locations, was reversed, causing untreated wastewater to flow directly into Lake Michigan.[298]

239.    Untreated wastewater contains harmful bacteria. The July 2023 event caused "poor water quality conditions," which closed nearly all of Chicago's beaches.[299]

---

[295] NATURAL RESOURCES DEFENSE COUNCIL, CLIMATE CHANGE AND HEALTH IN ILLINOIS 4-5 (Sept. 2019), https://www.nrdc.org/sites/default/files/climate-change-health-impacts-illinois-ib.pdf.

[296] *Id.* at 4.

[297] Michael Hawthorne & Adriana Perez, *Costly Deep Tunnel flooding project can't handle Chicago area's severe storms fueled by climate change*, CHICAGO TRIBUNE (Jul. 16, 2023, 5:00 AM), https://www.chicagotribune.com/news/environment/ct-rain-deep-tunnel-overwhelmed-20230716-argrp2ruafadbhu4jrov5iplt4-story.html.

[298] *Id.*; *see also* James Neveau, *Chicago officials reverse flow of river into Lake Michigan to ease flooding from heavy rain*, NBC CHICAGO (updated Jul. 2, 2023, 4:25 PM), https://www.nbcchicago.com/weather/chicago-officials-reverse-flow-of-river-into-lake-michigan-to-ease-flooding-from-heavy-rain/3178728/.

[299] Neveau, *supra* note 298.

S.A. 175

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

240.     Storms like the one that occurred on July 2, 2023 illustrate that precipitation events are becoming so severe that they overwhelm stormwater tunnels and result in "sewage overflows and basement backups in the 252 square miles of Chicago and [Cook] County served by the main part of the [Deep Tunnel] system."[300]

241.     Professor Don Wuebbles, an emeritus professor of atmospheric sciences at the University of Illinois, noted that "[e]ssentially we find that every storm is now being affected by climate change."[301]

242.     Rains of more than 2.5 inches a day, the amount that can trigger sewage dumping into Lake Michigan, were expected to increase by 50 percent by 2039, and by the end of the century, the number of big storms could increase by 160 percent.[302]

243.     Since 2008, "nearly 40 billion gallons of runoff and waste have been released into Lake Michigan – three times more than during the previous two decades."[303]

244.     Chicago is located in a historically low-lying, swampy area, which makes the City susceptible to flooding caused by increasingly extreme precipitation. From 1969 to 2009, flooding accounted for 41 percent of disaster losses in Illinois.[304]

245.     "Flood losses in the city and suburbs cost taxpayers $1.8 billion in subsidized grants, loans, and insurance payments between 2004 and 2014, according to a 2019 report from the National Academy of Sciences. Only hurricane-ravaged areas of coastal Louisiana, New York and Texas received more federal flood aid during the decade."[305]

---

[300] Hawthorne & Perez, *supra* note 297.

[301] *Id.*

[302] *Id.*

[303] *Id.*

[304] Chicago Climate Resiliency Strategy Paper, *supra* note 281, at 23.

[305] Hawthorne & Perez, *supra* note 297.

**S.A. 176**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

246.    Of 1,200 census tracts in Chicago, there are 361 where more than half of buildings have significant risk from surface (pluvial) flooding and riverine (fluvial) flooding.[306]

247.    Low-income communities and communities of color are disproportionately impacted by severe precipitation events and flooding. Minority communities accounted for eighty-seven percent of flood damage insurance claims between 2007 and 2016.

248.    The maps below compare the areas of the City with the highest susceptibility to flooding with the environmental justice areas in the City. The map on the left ranks flooding susceptibility on a scale of one (low susceptibility depicted in blue) to ten (high susceptibility depicted in red).



**Figure 20: Chicago Flooding Frequency and Environmental Justice Index Maps[307]**

---

[306] *Chicago, IL Top Climate Change Risks*, *supra* note 285.

[307] Chicago Climate Action Plan, *supra* note 276, at 14; Brett Chase, *Flooding hits poorest communities hardest as climate change intensifies storms*, CRAIN'S CHI. BUS. (Sept. 26, 2019, 1:54 PM), https://www.chicagobusiness.com/crains-forum-water/flooding-hits-poorest-chicago-area-communities-hardest-climate-change.

**S.A. 177**

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

249.    Widespread and chronic flooding has damaged homes—sometimes irreparably—causing evacuations, mold-related health issues, emotional distress, and significant costs. A Center for Neighborhood Technology survey in Cook County found that a majority of respondents reported increased stress (84 percent), lost hours of work to clean up (74 percent), and lost valuables (63 percent) as a result of flooding.[308]

250.    The Federal Reserve Bank of Chicago estimates that the transportation and utility outages and other effects of extreme weather conditions have contributed to Chicago's slow rate of growth, including declines in sales and manufacturing production."[309]

### *Lake Michigan*

251.    The Great Lakes, including Lake Michigan, "are extremely important both to humans and to wildlife—they are an abundant freshwater resource for water supplies, industry, shipping, fishing, and recreation, as well as a rich and diverse ecosystem."[310]

252.    As set forth above, climate change has negatively impacted, and will continue to negatively impact, Lake Michigan's water quality, ice cover, and shoreline. Extreme precipitation events and increased temperatures also negatively impact mixing and oxygenation in Lake Michigan. Vertical mixing of Lake Michigan typically occurs twice a year—once in the spring and once in the fall as the surface water temperature increases and decreases, respectively. When the surface water temperature stays above a certain point, mixing is less likely to fully occur. "That vertical mixing brings nutrients up from the sediment at the bottom of the lake, and oxygen down from the surface, so it is crucial for ecosystems."[311]

---

[308] Chicago Climate Resiliency Strategy Paper, *supra* note 281, at 28.

[309] *Id.*

[310] ELPC Report, *supra* note 289, at 5.

[311] *Id.* at 27.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

253.    Water stagnation from reduced mixing and nutrient loading from extreme precipitation events also increases the risk of harmful algal blooms, which would threaten the drinking water source for the vast majority of Chicagoans, require the City to close public access to beaches, and caution the public against water recreation.[312]

254.    The change to the Lake Michigan ecosystem as a result of the increased nutrient load and lack of water column mixing has resulted in documented impacts to many fish species, including shifts in geographic range, changes in demographics (abundance, growth, recruitment), increased occurrence of diseases, phenological shifts (earlier migration, spawning), extirpation (especially of cold-water species), and hybridization resulting from novel species interaction.[313] These changes negatively impact the City's recreational fishing industry and, in turn, the City's revenue from fishing activities.

255.    Lower water levels and higher summer water temperatures are also affecting some species of Great Lakes birds by encouraging the spread of disease and altering migration patterns. Bird populations in the Chicago area have been impacted by "the increased frequency of botulism outbreaks in Lake Michigan from 1963 to 2008 . . . related to higher summer water temperatures and lower water levels."[314] "[A] large share of the population engages in bird and wildlife viewing, with 30 to 35 percent of the population engaged in this activity within a mile of their home in the Great Lakes States, and eight to 12 percent engaged in this activity further than a mile from their home in the Great Lakes States."[315]

---

[312] *Id.* at 29-30.

[313] *Id.* at 31-32.

[314] *Id.* at 36.

[315] *Id.* at 45.

*Chicago's Climate Resiliency Measures*

256.    The City has committed to invest "$188,000,000 in meaningful, substantive, and justice-oriented climate projects that will provide the City's underserved communities with resilient infrastructure and green workforce development opportunities" to combat the direct results of climate change.[316]

257.    Chicago has and will continue to incur substantial costs to adapt to the impacts of climate change. These resiliency measures include, but are not limited to:

a.    Building critical infrastructure like cooling centers and buses and retrofitting existing buildings with air conditioning or other cooling capabilities;

b.    Recalibrating transportation infrastructure design standards to withstand new thresholds of heat, freeze-thaw cycles, and buckling from changing temperature and precipitation patterns;

c.    Upgrading infrastructure to reduce road and rail network outages during extreme weather events;

d.    Developing critical infrastructure and flood mitigation measures to withstand severe precipitation events;

e.    Providing increased maintenance for roads, transit, and emergency vehicles to withstand infrastructure damage from severe weather events;

f.    Preparing for increased building capital and maintenance costs to repair damage from severe weather events;

---

[316] *Environmental Justice Climate Investments*, CITY OF CHICAGO (July 18, 2022) https://www.chicago.gov/content/dam/city/sites/climate-action-plan/2022-Climate-Bond-Info.pdf.

148

**S.A. 180**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

     g.     Increasing landscaping and urban park maintenance costs related to the maintenance of trees, plants, and flowers as a result of the changing seasonal trends and severe weather events;

     h.     Increasing harbor dredging and treatment costs;

     i.     Increasing water treatment, cooling, and other municipal operations;

     j.     Fortifying the electrical grid to accommodate the increase in demand for heating and cooling; and

     k.     Deploying wellness checks for vulnerable residents.[317]

### CAUSES OF ACTION

### COUNT I
### STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### (Against Fossil Fuel Defendants)

258.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

259.    At all relevant times, the Fossil Fuel Defendants and their affiliates and subsidiaries were engaged in the business of advertising, promoting, and/or selling fossil fuel products and their derivatives. The Fossil Fuel Defendants placed these fossil fuel products and their derivatives into the stream of commerce.

260.    As advertisers, promoters, and/or sellers of fossil fuel products and their derivatives, Defendants had a duty to warn the consumers, the public, and the City of the reasonably foreseeable environmental and health risks posed by fossil fuel products and their derivatives.

---

[317] *Climate Change and Chicago: Projections and Potential Impacts*, CHICAGO CLIMATE ACTION PLAN, at 1-4 (Nov. 7, 2007), https://www.chicago.gov/content/dam/city/progs/env/CCAP/Chicago_climate_impacts_report_Chapter_6_Infrastructure.pdf.

149

**S.A. 181**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

261.    Fossil fuel products and their derivatives are defective and unreasonably dangerous products and pose significant risks to human health and the environment.

262.    Fossil fuel products and their derivatives release greenhouse gases into the atmosphere, causing global warming, more frequent and extreme precipitation events and flooding, more frequent and extreme drought, more frequent and severe heat waves and extreme temperatures, more frequent and extreme other weather events, and the consequences and injuries associated with those physical and environmental changes ("Climate-Related Harms") result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

263.    Defendants knew, or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, of the climate effects inherently caused by the normal use and operation of their fossil fuel products and derivatives, including the Climate-Related Harms and any other harms and injuries sustained by the City as described herein.

264.    At all times relevant to this action, Fossil Fuel Defendants' fossil fuel products and their derivatives were used, distributed, and sold in a manner in which they were reasonably foreseeably intended to be used, distributed, and sold, including but not limited to being combusted for energy, combusted to power automobiles, refined into petrochemicals, and refined and/or incorporated into petrochemical products including, but not limited to, fuels and plastics.

265.    Fossil Fuel Defendants and their affiliates and subsidiaries knew, or should have known, that these fossil fuel products and their derivatives would be used by the City, its residents, and others within the City's limits, amongst others, in the manner reasonably foreseeably intended.

S.A. 182

266.    Fossil Fuel Defendants knew, or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, that the Climate-Related Harms described herein rendered their fossil fuel products and their derivatives dangerous, or likely to be dangerous, when used in the manner reasonably foreseeably intended.

267.    The fossil fuel products and derivatives that Fossil Fuel Defendants refined, formulated, designed, manufactured, merchandised, advertised, promoted, and/or sold—whether used as intended or used in a reasonably foreseeable manner—were not reasonably safe at the time they left Fossil Fuel Defendants' control because they lacked adequate warnings and instructions.

268.    The fossil fuel products and their derivatives reached consumers and the environment substantially unchanged from that in which they left the Fossil Fuel Defendants' control.

269.    Without adequate warnings, Fossil Fuel Defendants' fossil fuel products and their derivatives were unsafe to an extent beyond that which would be contemplated by an ordinary person.

270.    Fossil Fuel Defendants knew that by failing to warn consumers, the City, and the public of the risks posed by fossil fuels, their products would be purchased, transported, stored, handled, and used without users and consumers being aware of the hazards fossil fuels pose to human health and the environment.

271.    At the time of manufacture, merchandising, advertising, promotion, or sale, Fossil Fuel Defendants could have provided warnings or instructions regarding the full and complete risks fossil fuel products and their derivatives posed because they knew and/or should have known of the unreasonable risks of harm associated with the use of these products, as described herein.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

272.    Despite the Fossil Fuel Defendants' superior and unequal knowledge of the risks posed by fossil fuel products and their derivatives, the Fossil Fuel Defendants failed to adequately warn consumers, the City, and the public of the known and foreseeable risks of climate change, Climate-Related Harms, and other dangers that would inevitably follow from the intended or reasonably foreseeable use of these products.

273.    Not only did Fossil Fuel Defendants fail to adequately warn, but the Fossil Fuel Defendants also represented, asserted, claimed, and warranted that their fossil fuel products and derivatives were safe for their intended and foreseeable uses.

274.    Any warnings the Fossil Fuel Defendants may have issued as to the risks of their fossil fuel products and their derivatives were rendered ineffective and inadequate by Fossil Fuel Defendants' false and misleading public relations campaigns and statements about fossil fuel products, and their years-long efforts to conceal and misrepresent the dangers that follow from the intended or reasonably foreseeable use of such products.

275.    Fossil Fuel Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Fossil Fuel Defendants' fossil fuel products and their derivatives would cause grave climate changes, undermining and rendering ineffective any warnings that Fossil Fuel Defendants may have also disseminated.

276.    Accordingly, the ordinary consumer would not recognize that the use of fossil fuel products and their derivatives causes global and localized changes in climate, and would result in injuries to the City, its communities, and its resources, as described herein.

**S.A. 184**

277.    Fossil Fuel Defendants breached their duty to warn by unreasonably failing to provide the City, the public, consumers, and users of fossil fuel products and their derivatives with warnings regarding the potential and/or actual threat to human health and the environment caused by pollution released from the manufacturing and consumption of fossil fuels, despite Fossil Fuel Defendants' vast amounts of knowledge and research demonstrating fossil fuels and their derivatives presented threats to human health and the environment.

278.    Had the Fossil Fuel Defendants provided adequate warnings and not waged a deceptive campaign against climate science, their fossil fuel products and their derivatives would not have earned widespread acceptance in the marketplace, fossil fuel alternatives could have been developed faster, investment in fossil fuel alternatives would be greater, and/or fossil fuel alternatives would be more used in greater amounts.

279.    Moreover, had the Fossil Fuel Defendants provided adequate warnings about the adverse impacts to public health and the environment that results from the intended and reasonably foreseeable use of fossil fuel products and their derivatives, the City and its residents would have taken measures to decrease fossil fuel dependency in order to avoid or lessen the Climate-Related Harms and property damage that would inevitably follow.

280.    As a result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products and their derivatives, Fossil Fuel Defendants are strictly liable to Plaintiff.

281.    The Fossil Fuel Defendants' conduct was heinous, deceitful, and fraudulent. Fossil Fuel Defendants undertook such conduct with conscious disregard for the health, safety, property, and rights of others.

S.A. 185

282.    As a direct and proximate result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products and derivatives, the City has incurred and will continue to incur costs and damages related to physical damage to City property, City infrastructure, human health, and natural resources.

283.    As a direct and proximate result of Fossil Fuel Defendants' acts and omissions as alleged herein, the City and its residents have suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

   a.    finding that Fossil Fuel Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the fossil fuel products and their derivatives;

   b.    holding Fossil Fuel Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Fossil Fuel Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

   c.    awarding any other damages as permitted by law;

   d.    awarding litigation costs and attorneys' fees permitted by law;

   e.    awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

   f.    granting such other and further relief as this Court deems appropriate and just.

S.A. 186

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

## COUNT II
## NEGLIGENT PRODUCTS LIABILITY – FAILURE TO WARN
### (Against Fossil Fuel Defendants)

284.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

285.    At all relevant times, the Fossil Fuel Defendants and their affiliates and subsidiaries were engaged in the business of advertising, promoting, and/or selling fossil fuel products and their derivatives.

286.    As advertisers, promoters, and/or sellers of fossil fuel products and their derivatives, Fossil Fuel Defendants had a duty to warn the public, consumers, and users of such products, including the City, of the reasonably foreseeable environmental and health risks posed by fossil fuel products and their derivatives.

287.    Fossil fuel products and their derivatives release greenhouse gases into the atmosphere, causing Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

288.    Fossil Fuel Defendants knew, or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, of the climate effects inherently caused by the normal use and operation of their fossil fuel products and derivatives, including the Climate-Related Harms and any other harms and injuries sustained by the City as described herein.

289.    At all times relevant to this action, Fossil Fuel Defendants' fossil fuel products and their derivatives were used, distributed, and sold in a manner in which they were reasonably foreseeably intended to be used, distributed, and sold, including but not limited to being combusted

155

**S.A. 187**

for energy, combusted to power automobiles, refined into petrochemicals, and refined and/or incorporated into petrochemical products including, but not limited to, fuels and plastics.

290. Fossil Fuel Defendants and their affiliates and subsidiaries knew, or should have known, that these fossil fuel products and their derivatives would be used by the City, its residents, and others within the City's limits, amongst others, in the manner reasonably foreseeably intended.

291. Fossil Fuel Defendants knew, or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, that the climate effects described herein rendered their fossil fuel products and their derivatives dangerous, or likely to be dangerous, when used in the manner reasonably foreseeably intended.

292. Fossil Fuel Defendants knew that by failing to warn the City, the public, consumers, and users of fossil fuels and their derivatives of the risks posed by fossil fuels, their products would be purchased, transported, stored, handled, and used without users and consumers being aware of the hazards fossil fuels pose to human health and the environment.

293. At the time of manufacture, merchandising, advertising, promotion, or sale, Fossil Fuel Defendants could have provided warnings or instructions regarding the full and complete risks fossil fuel products and their derivatives posed because they knew and/or should have known of the unreasonable risks of harm associated with the use of these products, as described herein.

294. Despite the Fossil Fuel Defendants' superior and unequal knowledge of the risks posed by fossil fuel products and their derivatives, the Fossil Fuel Defendants failed to adequately warn consumers, the City, and the general public of the known and foreseeable risks of climate

S.A. 188

change, Climate-Related Harms, and other dangers that would inevitably follow from the intended or reasonably foreseeable use of these products.

295.    Not only did Fossil Fuel Defendants fail to adequately warn consumers, but the Fossil Fuel Defendants also represented, asserted, claimed, and warranted that their fossil fuel products and derivatives were safe for their intended and foreseeable uses.

296.    Any warnings the Fossil Fuel Defendants may have issued as to the risks of their fossil fuel products and their derivatives were rendered ineffective and inadequate by Fossil Fuel Defendants' false and misleading public relations campaigns and statements about fossil fuel products and their derivatives, and their years-long efforts to conceal and misrepresent the dangers that follow from the intended or reasonably foreseeable use of such products.

297.    Fossil Fuel Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Fossil Fuel Defendants' fossil fuel products and derivatives would cause grave climate changes, undermining and rendering ineffective any warnings that Fossil Fuel Defendants may have also disseminated.

298.    Accordingly, the ordinary consumer would not recognize that the use of fossil fuel products and their derivatives causes global and localized changes in climate, and would result in injuries to the City, its communities, and its resources, as described herein.

299.    Fossil Fuel Defendants breached their duty to warn by unreasonably failing to provide the City, the public, consumers, and users of fossil fuel products and their derivatives with warnings regarding the potential and/or actual threat to human health and the environment caused by pollution released from the manufacturing and consumption of fossil fuels, despite Fossil Fuel

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

157

**S.A. 189**

Defendants' vast amounts of knowledge and research demonstrating fossil fuels and their derivatives presented threats to human health and the environment.

300.    Had the Fossil Fuel Defendants provided adequate warnings and not waged a deceptive campaign against climate science, their fossil fuel products and their derivatives would not have earned widespread acceptance in the marketplace.

301.    Had the Fossil Fuel Defendants provided adequate warnings and not waged a deceptive campaign against climate science, fossil fuel alternatives could have been developed faster, investment in fossil fuel alternatives would be greater, and/or fossil fuel alternatives would be more used in greater amounts.

302.    Moreover, had the Fossil Fuel Defendants provided adequate warnings about the adverse impacts to public health and the environment that results from the intended and reasonably foreseeable use of fossil fuel products and their derivatives, the City and its residents would have taken measures to decrease fossil fuel dependency in order to avoid or lessen the Climate-Related Harms and property damage that would inevitably follow.

303.    As a result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products and their derivatives, Fossil Fuel Defendants are liable to Plaintiff.

304.    The Fossil Fuel Defendants' conduct was heinous, deceitful, and fraudulent. Defendants undertook such conduct with conscious disregard for the health, safety, property, and rights of others.

305.    As a direct and proximate result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products and derivatives, the City has

S.A. 190

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

incurred and will continue to incur costs and damages related to physical damage to City property, City infrastructure, human health, and natural resources.

306.     As a direct and proximate result of Fossil Fuel Defendants' acts and omissions as alleged herein, the City and its residents have suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.     finding that Fossil Fuel Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the fossil fuel products and their derivatives;

b.     holding Fossil Fuel Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Fossil Fuel Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

c.     awarding any other damages as permitted by law;

d.     awarding litigation costs and attorneys' fees permitted by law;

e.     awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

f.     granting such other and further relief as this Court deems appropriate and just.

S.A. 191

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

## COUNT III
## NEGLIGENCE
## (Against All Defendants)

307. The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

308. For years, Defendants possessed knowledge that fossil fuels are the primary cause of climate change and that, if unabated, climate change would cause Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

309. Given the scientific evidence available to and conducted by the Defendants, as referenced herein, such injury was likely and reasonably foreseeable.

310. Under Illinois law, Defendants had a duty to the City and its residents to exercise due care in the marketing, sale, and/or labeling of their products and to act reasonably for the protection of the City and its residents and to avoid inflicting the injuries described herein.

311. Under Illinois law, Defendants also had a duty to honestly communicate their knowledge about the hazards of their products, and a duty not to make false and misleading statements about the hazards of their products.

312. Defendants also had a duty under the City's Consumer Protection Law, as alleged herein *infra*, to provide disclosures of the hazardous impacts of their products to prevent risks to human life and/or human health.

313. The Chicago Consumer Protection Law acts to protect human life, and the injuries the City and its residents have and will continue to suffer are a type of injury this law sought to prevent.

314. Defendants had superior knowledge of the risk posed by fossil fuel products at all times relevant to this Complaint.

160

**S.A. 192**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

315.    Defendants breached their duty of care when they advertised, promoted, and/or sold fossil fuel products and their derivatives, while failing to include warnings of the risk of harm associated with fossil fuel products and their derivatives, in a manner that they knew or should have known would result in injury to human health and safety, damage to City property and infrastructure, loss of use of City services, and other damages to the City.

316.    Defendants further breached their duty of care by waging a years-long deceptive marketing and public relations campaign to discredit climate science.

317.    Any warnings provided by Defendants were rendered ineffective by the years-long deceptive marketing practices and public relations campaign which promulgated false and misleading statements, casted doubt on the consensus of climate scientists, and advanced pseudo-scientific theories.

318.    Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Defendants' fossil fuel products and derivatives would cause grave climate changes, undermining and rendering ineffective any warnings that Defendants may have also disseminated.

319.    A reasonably careful company would not engage in a years-long deceptive marketing practices and public relations campaign to promulgate such false and misleading statements, would not manufacture or distribute fossil fuel products and their derivatives without warning, would warn of these products' hazardous properties, and/or would take steps to enhance the safety and/or reduce the risk of the products.

161

**S.A. 193**

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

320. Defendants were grossly negligent because they failed to exercise even slight care, placing revenue and profit generation above the health and safety of humans and the environment.

321. Defendants' conduct was wanton, willful, and showed a reckless disregard or conscious indifference towards human health and safety, the rights of the City's residents, City property and infrastructure, and City services. As a direct and proximate result of Defendants' acts and omissions as alleged herein, the City suffered monetary losses and damages in amounts to be proven at trial.

322. Defendants' conduct caused injury to the lives and health of the City's residents, and to the City's property and natural resources, including by causing Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a. finding that Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the fossil fuel products and their derivatives;

b. holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

c. awarding any other damages as permitted by law;

162

**S.A. 194**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

d.      awarding litigation costs and attorneys' fees permitted by law;

e.      awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

f.      granting such other and further relief as this Court deems appropriate and just.

## COUNT IV
## PUBLIC NUISANCE
## (Against All Defendants)

323.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

324.    Under Illinois law, the general public has a right to public health, public safety, public peace, public comfort, and public convenience.

325.    The Illinois Constitution also provides the People of the State of Illinois have a common right to a healthful environment. ILL. CONST. art. XI, § 1 (1970).

326.    Defendants, individually and in concert with each other, through their affirmative promotion, sale, and/or distribution of their fossil fuel products and their derivatives in the City have created, caused, contributed to, and assisted in creating Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

327.    Defendants were substantially certain that their promotion, sale, and/or distribution of fossil fuel products and their derivatives would cause Climate-Related Harms to occur, when those products and derivatives were used exactly as intended.

328.    These Climate-Related Harms are injurious to health, indecent and offensive to the senses, interfere with the comfortable enjoyment of life and property, and constitute a substantial and unreasonable interference with rights enjoyed by the public, including rights under Article XI of the Illinois Constitution.

S.A. 195

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

329.    Defendants created, caused, contributed to, and assisted in the creation of these and other Climate-Related Harms in the City by, among other things, affirmatively promoting the sale and use of fossil fuel products and their derivatives in the City, which Defendants knew would cause or exacerbate Climate-Related Harms, while failing to include warnings of the risk of harm associated with fossil fuel products and their derivatives.

330.    The Climate-Related Harms obstruct and interfere with rights common to the public, including the right guaranteed by the Illinois State Constitution to a healthful environment, the public health, the public safety, the public peace, the public comfort, and the public convenience. These interferences with public rights include, among other things:

a.      Extreme heat events, which increase the risk of injury or death from dehydration, heat stroke, heart attack, and respiratory problems;

b.      Frequent and severe droughts, which can result in drinking water shortages and land subsidence due to groundwater depletion;

c.      Increased smog from hotter temperatures, which damages lungs and increases rates of childhood asthma, respiratory and heart disease, and death, and which reduces visibility and obstructs scenic views;

d.      Extreme winter storms, which cause flooding that can damage public infrastructure, obstructing the free passage and use of property;

e.      Flooding and groundwater changes, which obstruct the free passage and use of roads and property, impair water quality in groundwater aquifers, damage critical public infrastructure, and lead to unprecedented levels of water surge into communities that can cause injury or even death; and

S.A. 196

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

      f.     Significant disruptions to the City's ecosystems and biodiversity, including the spread of invasive species.

331.    These Climate-Related Harms obstruct the public's free use and comfortable enjoyment of property and natural resources, and an ordinary person would be reasonably annoyed or disturbed by these Climate-Related Harms.

332.    The Climate-Related Harms caused by Defendants' nuisance-creating conduct are extremely grave, and far outweigh the social utility of that conduct.

333.    As a consequence of their actions, as alleged herein, Defendants have created and maintained, and continue to create and maintain, a public nuisance at common law.

334.    Defendants' conduct caused and will continue to cause harm to the City and its residents many years into the future.

335.    As a direct and proximate result of the Defendants' acts and omissions, the City will be required to expend significant public resources to mitigate the impacts of Climate-Related Harms throughout the City.

336.    The Climate-Related Harms are severe and greater than the City and the public should bear without compensation, and outweigh any utility of the Defendants' conduct.

337.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, the City has suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, the CITY OF CHICAGO, respectfully requests that this Court enter an Order:

      a.     finding that the Defendants' actions alleged herein constituted a common law public nuisance;

S.A. 197

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

b.     holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

c.     awarding any other damages as permitted by law;

d.     awarding litigation costs and attorneys' fees permitted by law;

e.     awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

f.     granting such other and further relief as this Court deems appropriate and just.

**COUNT V**
**PRIVATE NUISANCE**
**(Against All Defendants)**

338.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

339.    The Defendants' affirmative promotion, sale, and/or distribution of their fossil fuel products and their derivatives in the City caused or exacerbated climate change and its impacts, causing Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

340.    Defendants were substantially certain that their promotion, sale, and/or distribution of fossil fuel products and their derivatives would cause Climate-Related Harms to occur, when those products and derivatives were used exactly as intended.

166

**S.A. 198**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

341.    Defendants created, caused, contributed to, and assisted in the creation of these and other Climate-Related Harms in the City by, among other things, affirmatively promoting the sale and use of fossil fuel products and their derivatives in the City, which Defendants knew would cause or exacerbate Climate-Related Harms, while failing to include warnings of the risk of harm associated with fossil fuel products and their derivatives.

342.    The City owns, leases, occupies, and manages extensive real property which has been and will be injured by Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

343.    Defendants, by their acts and omissions, have caused, created, and contributed to conditions on the City's properties, and permitted those conditions to persist, which substantially and unreasonably interfere with the City's use and enjoyment of such property for the public benefit and welfare, and which materially diminishes the values of such property for its public purposes.

344.    The City has not consented to the Defendants' conduct in creating the substantial and unreasonable conditions on its real property or to the associated harms of that conduct.

345.    These substantial and unreasonable conditions affecting real property include, among other things:

    a.    Extreme heat events, which increase the risk of injury or death from dehydration, heat stroke, heart attack, and respiratory problems;

    b.    Frequent and severe droughts, which can result in drinking water shortages and land subsidence due to groundwater depletion;

**S.A. 199**

c.       Increased smog from hotter temperatures, which damages lungs and increases rates of childhood asthma, respiratory and heart disease, and death, and which reduces visibility and obstructs scenic views;

d.       Extreme winter storms, which cause flooding that can damage public infrastructure, obstructing the free passage and use of property;

e.       Flooding and groundwater changes, which obstruct the free passage and use of roads and property, impair water quality in groundwater aquifers, damage critical public infrastructure, and lead to unprecedented levels of water surge into communities that can cause injury or even death; and

f.       Significant disruptions to the City's ecosystems and biodiversity, including the spread of invasive species.

346.    The seriousness of more frequent and extreme precipitation events, more frequent and extreme drought, increased frequency and severity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes, is extremely grave and outweighs the social utility of the Defendants' conduct.

347.    An ordinary person would be reasonably annoyed or disturbed by these Climate-Related Harms.

348.    Defendants' conduct caused and will continue to cause harm to the City's properties many years into the future.

349.    As a direct and proximate result of the Defendants' acts and omissions, the City will be required to expend significant public resources to mitigate the impacts of Climate-Related Harms to its properties throughout the City.

**S.A. 200**

FILED DATE: 2/20/2024 12:34 PM     2024CH01024

350.     The Climate-Related Harms are severe and greater than the City and the public should bear without compensation, and outweigh any utility of the Defendants' conduct.

351.     As a direct and proximate result of Defendants' acts and omissions as alleged herein, the City has suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, the CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.     finding that the Defendants' actions alleged herein constituted a common law private nuisance;

b.     enjoining Defendants from further acts constituting a common law private nuisance;

c.     ordering Defendants to immediately undertake the necessary action that will result in a final and permanent abatement of the common law private nuisance;

d.     holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

e.     awarding any other damages as permitted by law;

f.     awarding litigation costs and attorneys' fees permitted by law;

g.     awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

## S.A. 201

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

h.     granting such other and further relief as this Court deems appropriate and just.

<u>COUNT VI</u>
<u>NUISANCE VIOLATIONS OF MCC § 7-28-030</u>
<u>(Against All Defendants)</u>

352.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, 323-337, and 338-351 as though fully set forth herein.

353.    Under Municipal Code of Chicago ("MCC") Chapter 7-28, nuisance offenses are described in Article I titled "Nuisance in General" as follows:

> [T]hose offenses which are known to the common law of the land and the statutes of Illinois as nuisances may, in case the same exist within the city limits or within one mile thereof, be treated as such, and proceeded against as is provided in this Code, or in accordance with any other provision of law.

§ 7-28-030.

354.    As set forth in Counts IV and V above, Defendants' conduct caused offenses which are known to the common law of the land as nuisances within the city limits or within one mile thereof.

355.    As a result, Defendants have violated MCC Chapter 7-28 for both public and private nuisances and are liable to the City for those violations.

356.    For the avoidance of doubt, the City does not seek any extraterritorial application of MCC § 7-28-030.

WHEREFORE, Plaintiff, the CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.     finding that the Defendants' actions alleged herein constituted a nuisance in violation of MCC § 7-28-030;

b.     enjoining Defendants from further acts constituting a violation of MCC § 7-28-030;

**S.A. 202**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

c.    ordering Defendants to immediately undertake the necessary action that will result in a final and permanent abatement of the violation under MCC § 7-28-030;

d.    holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

e.    assessing Defendants fine for each violation of MCC § 7-28-030, in the amount of $500 for each offense in accordance with MCC § 7-28-800;

f.    awarding any other damages as permitted by law;

g.    awarding litigation costs and attorneys' fees permitted by law;

h.    awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

i.    granting such other and further relief as this Court deems appropriate and just.

### COUNT VII
### CIVIL CONSPIRACY
### (Against All Defendants)

357.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

358.    As alleged herein, Defendants entered into agreements with and joined organized groups, such as API, to promote their commercial interests in maximizing profits from their fossil fuel products and their derivatives.

359.    In furtherance of the agreements and organized groups entered into by various Defendants, Defendants committed the tortious acts described in Counts I-VI set forth herein.

360.    By participating in agreements and organized groups, such as API, Defendants planned, assisted, or encouraged the tortious acts described in Counts I-VI set forth herein.

361.    The collective activities of the API and the Defendants were designed knowingly and purposefully for API's and Fossil Fuel Defendants' economic and pecuniary benefit and were performed in furtherance of API's and Fossil Fuel Defendants' respective and joint business interests, including but not limited to ensuring the public's continued reliance on fossil fuels.

362.    API and Fossil Fuel Defendants engaged in a civil conspiracy to conceal from potential purchasers, consumers, and users in and around the City, including the City, data and information demonstrating the risk that their fossil fuel products and derivatives would cause grave climate changes.

363.    API and Fossil Fuel Defendants further conspired to mislead potential purchasers, consumers, and users in and around the City, including the City, about such data and information by widely disseminating marketing materials, refuting the scientific knowledge generally accepted at the time, advancing and promoting pseudo-scientific theories of their own, and developing public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Defendants' fossil fuel products and derivatives would cause grave climate changes.

364.    As a proximate result of Defendants' civil conspiracy, the City suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

**S.A. 204**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

a.    finding that Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the fossil fuel products and their derivatives;

b.    holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

c.    awarding any other damages as permitted by law;

d.    awarding litigation costs and attorneys' fees permitted by law;

e.    awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

f.    granting such other and further relief as this Court deems appropriate and just.

### COUNT VII
### UNJUST ENRICHMENT
### (Against All Defendants)

365.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

366.    Defendants have knowingly and unjustly retained a benefit to the City's detriment.

367.    Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

368.    Defendants had abundant knowledge that fossil fuel products and their derivatives caused and continue to cause Climate-Related Harms, and actively campaigned to keep that knowledge from becoming open and obvious.

173

**S.A. 205**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

369.    Defendants had a duty to warn consumers, the public, and users of such products about the devastating Climate-Related Harms that they knew would flow from using their fossil fuel products and their derivatives, yet they failed to give adequate warning.

370.    Instead, Defendants concealed from potential purchasers, consumers, and users in and around the City, including the City, data and information demonstrating the risk that their fossil fuel products and derivatives would cause grave climate changes.

371.    Defendants also misled potential purchasers, consumers, and users in and around the City, including the City, about such data and information by widely disseminating marketing materials, refuting the scientific knowledge generally accepted at the time, advancing and promoting pseudo-scientific theories of their own, and developing public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Defendants' fossil fuel products and derivatives would cause grave climate changes.

372.    Defendants' actions caused the precise Climate-Related Harms that the fossil fuel industry had foreseen.

373.    By engaging in these actions, Defendants have and continue to reap monetary benefits as a direct result of Defendants' deceptive marketing campaign to promote, inflate, and sustain the consumption of and reliance on fossil fuels that they would not have otherwise obtained.

374.    The City suffered and continues to suffer the detriment of the Defendants' deceptive marketing campaign as the City must now incur substantial costs to reduce and withstand the effects of Climate-Related Harms.

375.    Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

S.A. 206

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

376.    Defendants have received a benefit from the City's response activities because Defendants should bear the cost of reducing and withstanding the effects of Climate-Related Harms.

377.    The City has incurred expenditures for relief over and above the City's ordinary services.

378.    Defendants' enrichment was without justification and the City lacks a remedy provided by law.

379.    Defendants' ability to amass massive earnings by knowingly and intentionally introducing fossil fuels to the stream of commerce as described above without disclosing the devastating impacts and risks posed by such products, at the City's expense, violates the fundamental principles of justice, equity, and good conscience.

380.    Placing the financial burden of Defendants' deceptive practices on taxpayers is against the fundamental principles of justice, equity, and good conscience.

381.    Under Illinois law, the principles of justice and established common law require Defendants to reimburse the City for performing a duty properly owed by Defendants as a result of their conduct, as alleged herein.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.    finding that Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the fossil fuel products and their derivatives;

b.    holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing

**S.A. 207**

infrastructure, damage to property, any other compensatory and exemplary

damages available under Illinois law, interest on the damages according to law, and

any other relief necessary to remedy climate change-related harms that the City will

face;

c.      awarding any other damages as permitted by law;

d.      awarding litigation costs and attorneys' fees permitted by law;

e.      awarding pre-judgment and post-judgment interest on all monies awarded, as

permitted by law; and

f.      granting such other and further relief as this Court deems appropriate and just.

## COUNT IX
## CONSUMER FRAUD—MISLEADING, UNFAIR, AND
## DECEPTIVE PRACTICES IN VIOLATION OF MCC § 2-25-090
## (Against All Defendants)

382.    The City repeats, re-alleges, and incorporates by reference each and every

allegation contained in paragraphs 1-257, as though fully set forth herein.

383.    Subsection 2-25-090(a) of the MCC provides that:

No person shall engage in any act of consumer fraud, unfair method of competition,
or unfair or deceptive act or practice while conducting any trade or business in the
city. Any conduct constituting an unlawful act or practice under the Illinois
Consumer Fraud and Deceptive Business Practices Act . . . or any other section of
this Code relating to business operations or consumer protection, shall be a
violation of this section. In construing this section, consideration shall be given to
court interpretations relating to the Illinois Consumer Fraud and Deceptive
Business Practices Act, as amended. In construing this section, consideration shall
also be given to the interpretations of the Federal Trade Commission and the federal
courts relating to Section 5(a) of the Federal Trade Commission Act, 15 U.S.C.A.,
Section 45.

384.    The Illinois Consumer Fraud and Deceptive Business Practices Act makes

unlawful, among other things, "unfair or deceptive acts or practices, including but not limited to

the use or employment of any deception fraud, false pretense, false promise, misrepresentation or

176

**S.A. 208**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'" 815 ILCS 505/2.

385.     Defendants had abundant knowledge that fossil fuel products and their derivatives caused and continue to cause Climate-Related Harms, and actively campaigned to keep that knowledge from becoming open and obvious.

386.     Defendants are each a "person" as defined by MCC § 1-4-090(e), which includes "any natural individual, firm, trust, partnership, association, joint venture, corporation or other legal entity."

387.     Defendants violated MCC § 2-25-090 by engaging in deceptive acts or practices. Defendants also violated MCC § 2-25-090 by engaging in unfair acts or practices because Defendants' conduct offends public policy, is immoral, unethical, oppressive, and unscrupulous, and causes substantial injury to consumers in the City of Chicago.

388.     Specifically, Defendants violated and continue to violate MCC § 2-25-090 by:

a.     Affirmatively promoting the use of fossil fuels within the City of Chicago while knowing that fossil fuels would lead to devastating consequences on the climate, and affirmatively misleading the public and casting doubt on climate science;

b.     Marketing fossil fuels and their derivatives through misstatements and omissions of material facts in targeted and national campaigns aimed at reaching Chicago consumers regarding: (i) the reasonably foreseeable or knowable severe risks posed by their fossil fuel products and their derivatives; (ii) the purported environmental benefits of their fossil fuel products and their derivatives; (iii) the actions they have taken to reduce their carbon footprint, invest in more renewables, or lower their fossil fuel production; and/or (iv) their purportedly

177

**S.A. 209**

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

diversified energy portfolio with meaningful renewable and low-carbon fuel components. For example, Defendants engaged in deceptive marketing and promotion of their products by, *inter alia*, disseminating misleading marketing materials and publications refuting the scientific knowledge generally accepted at the time, advancing pseudo-scientific theories of their own, and developing public relations materials that prevented reasonable consumers from recognizing the risk that fossil fuel products would cause grave climate changes, and undermining and rendering ineffective any warnings that Defendants may have separately disseminated.

        c.      Failing to include material facts regarding the risks and benefits of their fossil fuel products and their derivatives in their advertisements and promotional materials that targeted the City's consumers;

        d.      Knowingly or recklessly disregarding the Climate-Related Harms inherently caused by the normal use and operation of their fossil fuel products, which they were aware of based on information passed to them from their internal research divisions and affiliates, from trade associations and industry groups, and/or from the international scientific community, and failing to disclose this information to the City's consumers to prevent their advertising and marketing statements from being misleading; and

        e.      Engaging in misleading "greenwashing" advertisements within the City of Chicago, which deceitfully represented Defendants as leaders in renewable energy, made misleading claims that Defendants' businesses were substantially invested in lower carbon technologies and renewable energy sources, and misrepresented material facts about the environmental impacts of their products.

    389.    The MCC provides that any person "who violates any of the requirements of this section shall be subject to a fine of not less than $500 nor more than $10,000 for each offense.

S.A. 210

Each day that a violation continues or occurred, and each violation committed per day, shall constitute a separate and distinct offense to which a separate fine shall apply." MCC § 2-25-090(h).

390.     The City is entitled to fines for each day that Defendants violated MCC § 2-25-090 and for each offense that Defendants committed.

391.     The MCC also authorizes "restitution, disgorgement, equitable, injunctive, declaratory relief, and attorney's fees and costs" for violations of Section 2-25-090. MCC § 2-25-090(g).

392.     The City is entitled to those remedies as described below.

393.     For the avoidance of doubt, the City does not seek any extraterritorial application of MCC § 2-25-090.

WHEREFORE, Plaintiff, THE CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.     finding that Defendants have violated Subsection § 2-25-090 of the MCC, by the unlawful acts and practices alleged herein;

b.     preliminarily and permanently enjoining the Defendants, their agents, employees, and all other persons and entities, corporate or otherwise, in active concert or participation with any of them, from engaging in the deceptive and unfair acts and practices alleged herein;

c.     assessing Defendants a fine for each violation of MCC § 2-25-090, in the amount of $10,000 for each violation and day such violation has existed and continues to exist;

d.     requiring Defendants to disgorge profits;

e.     awarding litigation costs and attorneys' fees; and

S.A. 211

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

f.    granting such other and further relief as the Court deems equitable and proper.

### COUNT X
### MISREPRESENTATIONS IN CONNECTION WITH
### SALE OR ADVERTISEMENT OF MERCHANDISE
### IN VIOLATION OF MCC §§ 4-276-470, *et seq.*
### (Against All Defendants)

394.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

395.    MCC § 4-276-470 ("Sale or Advertisement of Merchandise Act") prohibits making and disseminating deceptions and misrepresentations to promote the sale and use of merchandise.

396.    Subsection § 4-276-470 of the MCC provides that it shall be a violation of this section, among others:

> (1) to act, use or employ any deception, fraud, false pretense, false promise or misrepresentation, or to conceal, suppress or omit any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, for cash or on credit, or advertisement of any merchandise, whether or not any person has in fact been misled;
>
> …
>
> (3) to represent that merchandise or services are of a particular standard, grade or quality, or to represent that merchandise is of a particular style or model, if it is not;
>
> …
>
> (6) to represent that merchandise or services are those of another, when in fact they are not;
>
> …
>
> (10) to fail to state a material fact, if such failure tends to deceive or mislead[.]

397.    Defendants are each a "person" as defined by MCC § 1-4-090(e), which includes "any natural individual, firm, trust, partnership, association, joint venture, corporation or other legal entity."

## S.A. 212

398.     Defendants' practices, as described herein, violate MCC § 4-276-470(1), (3), (6), and (10) because the practices were intended to deceive and mislead Chicago consumers in connection with the marketing, advertisement, and sale of fossil fuels and their derivatives.

399.     Since at least as early as the 1970s, Defendants, directly, through their control of third parties, and by aiding and abetting third parties, have and continue to (1) make and disseminate deceptions and misrepresentations to promote the sale and use of fossil fuels and their derivatives, and (2) cause untrue, false, and misleading statements about the foreseeable environmental and health risks posed by fossil fuel products and their derivatives in order to promote the sale and use of fossil fuel products and their derivatives.

400.     Defendants, collectively and individually, knew at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were untrue, false, or misleading, and failed to disclose material environmental and health risks posed by the use of fossil fuel products and their derivatives and were therefore likely to deceive Chicago consumers.

401.     Defendants, collectively and individually, intended that their deceptive and misrepresentative marketing and promotional efforts would create an untrue, false, and misleading impression of the environmental and health risks resulting from the use of fossil fuel products and their derivatives.

402.     Defendants, collectively and individually, repeatedly and intentionally made material omissions and misrepresentations by failing to disclose material facts about the environmental and health risks of fossil fuel products and their derivatives.

403.     In omitting and misrepresenting material facts about the environmental and health risks with respect to the use of fossil fuel products and their derivatives, Defendants, collectively

181

S.A. 213

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

and individually, intended to cause Chicago consumers to rely on such material omissions and misrepresentations.

404.    Defendants, collectively and individually, were aware and are aware of the misleading nature of the misrepresentations and material omissions made in connection with the sale or advertisement of fossil fuel products and their derivatives, and yet Defendants, collectively and individually, actively promoted dissemination of such misstatements and material omissions in campaigns targeting and reaching Chicago consumers.

405.    Defendants engaged in, and continue to engage in, misleading acts and practices alleged herein, with the intent to deceive Chicago consumers who used or paid for fossil fuel products and their derivatives.

406.    Defendants have received, or will receive, income, profits, and other benefits, which they received as a direct result of engaging in misleading acts and practices in violation of MCC § 4-276-470(1) and (10).

407.    The MCC provides that any person who violates "any of the provisions of Section 4-276-470 shall be fined not less than $50.00 nor more than $2,000.00 for each offense." MCC § 4-276-480.

408.    The City is entitled to fines for each violation of MCC § 4-276-470.

409.    For the avoidance of doubt, the City does not seek any extraterritorial application of MCC § 4-276-470.

WHEREFORE, Plaintiff, THE CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.    finding that Defendants have violated Subsection §§ 4-276-470, *et seq*. of the MCC, by the unlawful acts and practices alleged herein;

S.A. 214

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

b.      assessing Defendants a fine for each violation of MCC § 4-276-470, in the amount

of $2,000 for each day such violation has existed and continues to exist; and

c.      granting such other and further relief as the Court deems equitable and proper.

**COUNT XI**
**RECOVERY OF CITY COSTS OF PROVIDING SERVICES**
**IN VIOLATION OF MCC § 1-20-020**
**(Against All Defendants)**

410.    The City repeats, re-alleges, and incorporates by reference each and every

allegation contained in paragraphs 1-257, as though fully set forth herein.

411.    Defendants' violations caused the City and/or its agents to incur costs in order to

protect the City and residents caused by Climate-Related Harms and are therefore liable for the

costs pursuant to the City's Cost Recovery Ordinance of the MCC. MCC §§ 1-20-020, *et seq.*

412.    Section 1-20-020 of the MCC provides:

Any person who causes the city or its agents to incur costs in order to provide
services reasonably related to such person's violation of any . . . state or local law,
or such person's failure to correct conditions which violate any . . . state or local
law when such person was under a legal duty to do so, shall be liable to the city for
those costs. This liability shall be collectible in the same manner as any other
personal liability.

413.    Defendants committed the violations of state and local law described in Counts I

through X. For the avoidance of doubt, the City does not allege any violation of federal law.

414.    These violations have caused and will continue to cause the City to incur costs

reasonably related to these violations of law.

415.    These costs include the costs of all past damages the City has incurred, and future

damages the City will incur, as a result of Defendants' conduct, including responding to and

remedying Climate-Related Harms, such as the costs of enhancing infrastructure and property

damage costs.

183

**S.A. 215**

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

416. For the avoidance of doubt, the City does not seek any extraterritorial application of MCC § 1-20-020.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

    a.      holding Defendants jointly and severally liable for any costs incurred by the City in response to all unlawful conduct described in Counts I-X in an amount to be proven at trial;

    b.      litigation costs and attorneys' fees permitted by MCC § 1-20-060;

    c.      pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

    d.      granting such other and further relief as this Court deems appropriate and just.

## REQUEST FOR RELIEF

WHEREFORE, in addition to the relief requested in each individual Cause of Action listed above, Plaintiff, CITY OF CHICAGO, seeks judgment in its favor and against Defendants for:

    A.      Compensatory damages in an amount according to proof;

    B.      Equitable relief, including abatement of the nuisances complained of herein;

    C.      Penalties and recovery for injury or loss sustained as the result of a practice prohibited by the Chicago Consumer Protection Act and other provisions of the Chicago Municipal Code as alleged herein;

    D.      Disgorgement of profits;

    E.      Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

    F.      Pre-judgment interest; and

    G.      Any other and further relief as the Court deems just, proper, and equitable.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

Date: February 20, 2024

Respectfully submitted,

Mary R. Richardson-Lowry
**Corporation Counsel of the City of Chicago**


By:  */s/Stephen J. Kane*
Stephen J. Kane

Rebecca A. Hirsch
Chelsey Metcalf
**CITY OF CHICAGO DEPARTMENT OF LAW
AFFIRMATIVE LITIGATION DIVISION**
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: (312) 744-6934
stephen.kane@cityofchicago.org
rebecca.hirsch2@cityofchicago.org
chelsey.metcalf@cityofchicago.org

Adam J. Levitt
Daniel Rock Flynn
Anna Claire Skinner*
Anna C. Laird*
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
askinner@dicellolevitt.com
alaird@dicellolevitt.com

Victor M. Sher*
Matthew K. Edling*
Paul Stephan*
**SHER EDLING LLP**
100 Montgomery Street, Suite 1410
San Fracisco, California 94104
Tel: (628) 231-2500
vic@sheredling.com
matt@sheredling.com
paul@sheredling.com

*Motions for admission *pro hac vice* to be filed

**S.A. 217**

FILED DATE: 2/20/2024 12:34 PM  2024CH01024

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| CITY OF CHICAGO,<br><br>Plaintiff,<br><br>v.<br><br>BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORPORATION; CHEVRON U.S.A. INC.; CONOCOPHILLIPS COMPANY; CONOCOPHILLIPS; PHILLIPS 66 COMPANY; PHILLIPS 66; EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION; SHELL OIL PRODUCTS COMPANY LLC; SHELL PLC; SHELL USA, INC.; and AMERICAN PETROLEUM INSTITUTE,<br><br>Defendants. | Civil Action No.<br><br>**NOTICE OF REMOVAL**<br><br>[Removal from the Circuit Court of Cook County, County Department, Chancery Division, Case No. 2024CH01024]<br><br>Action Filed: March 27, 2024 |

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corporation and Chevron U.S.A. Inc. (collectively, "the Chevron Parties") remove this action—with reservation of all defenses and rights—from the Circuit Court of Cook County, Illinois, Chancery Division, Case No. 2024CH01024, to the United States District Court for the Northern District of Illinois, pursuant to 28 U.S.C. §§ 1331, 1367(a), 1441(a), 1442, and 1446. All other defendants that have been properly joined and served (collectively with the Chevron Parties, "Defendants") have consented to this Notice of Removal.

This Court has original federal question jurisdiction pursuant to the Federal Officer

**S.A. 218**

Removal Statute, 28 U.S.C. § 1442.  Removal is also proper under 28 U.S.C. §§ 1331 and 1441(a),

because the action necessarily arises under federal law.  This Court has supplemental jurisdiction

under 28 U.S.C. § 1367(a) over any claims for which it does not have original federal question

jurisdiction because they form part of the same case or controversy as those claims over which the

Court has original jurisdiction.

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................1

II.     TIMELINESS OF REMOVAL ...................................................................4

III.    SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL.......................5

IV.     THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER
        REMOVAL STATUTE ...............................................................................8

        A.      The Courts Construe The Federal Officer Removal Statute Broadly In Favor
                Of Removal..................................................................................9

        B.      Defendants Satisfy All Elements Of The Federal Officer Removal Statute........11

                1.      Defendants "Acted Under" Federal Officers and Agencies ...................12

                        a.      Defendants Acted Under Federal Officers During World
                                War II And The Korean War ......................................................15

                        b.      Defendants Acted Under Federal Officers By Supplying
                                Highly Specialized Fuels For Military Use ...............................23

                        c.      Defendants Acted Under Federal Officers By Operating The
                                Elk Hills Reserve "In the Employ" Of The U.S. Navy ..............30

                        d.      Defendants Acted Under Federal Officers By Constructing,
                                Operating, And Managing Government Petroleum
                                Production Facilities ................................................................38

                        e.      Defendants Have Acted Under Federal Officers By
                                Developing Mineral Resources On The Outer Continental
                                Shelf For Decades....................................................................41

                        f.      Defendants Acted Under Federal Officers By Developing
                                Mineral Resources On Federal Lands .......................................56

                        g.      Defendants Acted Under Federal Officers By Supplying
                                And Managing The Strategic Petroleum Reserve ......................58

                        h.      Defendants Acted Under Federal Officers By Constructing
                                Pipelines For Oil Transportation................................................62

                2.      Defendants' Activities Are Related To Plaintiff's Claims......................65

                3.      Defendants Have Colorable Federal Defenses .......................................71

V.    THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS
      NECESSARILY ARISE UNDER FEDERAL LAW....................................................75

VI.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER.........................84

**S.A. 221**

## I.    INTRODUCTION

1.      For over a century, United States policy has expressly recognized the fundamental strategic importance of oil and gas to the Nation's economic well-being and national security.  It is not an accident that the United States Department of Defense is the single largest consumer of energy in the United States and one of the world's largest users of petroleum fuels.  In fact, for vital security and economic reasons, every Administration since that of Franklin D. Roosevelt has taken active steps to increase U.S. oil production, including from Defendants.  While the alleged risks of global climate change have increased focus on alternative sources of energy, petroleum remains the backbone of United States energy policy.

2.      Now, however, Plaintiff asks the court to find that this same petroleum production and use contributes to, among other things, an unlawful "public nuisance" under Illinois state law.  Invoking various theories, the Complaint seeks to hold Defendants liable as companies that have "extracted," "sold," and "promote[d]" fossil fuel products.   Exhibit 1 to Notice of Removal ("Compl."), ¶¶ 3, 4; *see also id.* ¶ 13.   Plaintiff seeks "[c]ompensatory damages," penalties, disgorgement, and "equitable relief, including abatement of the nuisances complained of."  *Id.* at 184, Request for Relief.  Plaintiff also seeks to "enjoin[] Defendants from further acts constituting" the alleged nuisance of global climate change.  *Id.* at 169, 170.

3.      Plaintiff's claims depend on Defendants' production, promotion and/or sale of oil and gas that create greenhouse gas emissions when combusted by end users.  Because Plaintiff seeks damages for harms allegedly caused by global greenhouse gas emissions, Plaintiff does not—and cannot—limit its claims to harms allegedly caused by oil and gas extracted, produced, promoted, sold, marketed, or used in Chicago, or even Illinois.  Plaintiff's claims expressly target Defendants' nationwide and *global* activities.   In fact, Plaintiff's claims sweep even more broadly—they depend on the activities of billions of oil and gas consumers, including not only

entities like the U.S. government and military, but also countless hospitals, schools, manufacturing facilities, individual households, and state and local governments around the world—including the City of Chicago itself.

4.      The scope of Plaintiff's theory is breathtaking—it seeks to regulate the sale of oil and gas anywhere in the world, including all past and otherwise lawful sales, including sales to the federal government.  Because Plaintiff challenges the extraction, sale, and consumption of fossil fuels over the past several decades, *see, e.g.*, Compl. ¶¶ 1, 4, 34, the Complaint necessarily calls into question longstanding decisions by the federal government regarding, among other things, national security, national energy policy, environmental protection, the maintenance of a national strategic petroleum reserve program, development of energy resources on the United States' outer continental shelf lands, mineral extraction on federal lands (which has produced billions of dollars in revenue for the federal government), and the negotiation of international agreements bearing on the development and use of fossil fuels and the appropriate response to the problem of global climate change.  Likewise, the Complaint implicates numerous actions that have been taken under the direction and supervision of the federal government, including by Defendants, aimed at ensuring the Nation's national defense and energy and economic security.

5.      The federal and international issues and implications of Plaintiff's Complaint and requests for relief demand resolution by a federal court under federal law.  The determination of how best to address *global* climate change, and the balancing of the costs and benefits of the use of fossil fuels that goes into that equation, has been and should continue to be made by the federal government through federal policies and international cooperation.  As the Ninth Circuit recently explained, "any effective plan [to reduce greenhouse gas emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and

legislative branches." *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020). A patchwork of fifty different state-law attempts to regulate this necessarily global issue would be unworkable and is precluded under our federal constitutional system. *See North Carolina ex. rel. Cooper v. TVA*, 615 F.3d 291, 298 (4th Cir. 2010) ("If courts across the nation were to use the vagaries" of state "public nuisance doctrine to overturn the carefully enacted rules governing air-borne emissions, it would be increasingly difficult for anyone to determine what standards govern."); *see also Illinois v. City of Milwaukee*, 731 F.2d 403, 414 (7th Cir. 1984) ("*Milwaukee III*") ("For a number of different states to have independent and plenary regulatory authority over a single discharge [of pollutants] would lead to chaotic confrontation between sovereign states."). Moreover, the inherently global nature of climate change means that any effort to regulate this issue through state law would infringe upon the federal government's exclusive authority to conduct the nation's foreign policy.

6.      Although these questions of federal jurisdiction have been considered by other federal courts in the context of similar climate change suits in other States, this suit is the first to be brought within the Seventh Circuit. As such, these important questions present issues of first impression for this circuit.

7.      At bottom, this case is about the global production, sale, and consumption of vital products that virtually every person on the planet uses and relies upon every day. Oil and gas power our national defense; keep our homes, offices, factories, hospitals and other essential facilities illuminated, heated, cooled, and ventilated; and transport people and products, including virtually every consumer good—from food to medicine to clothing—across the nation and around the world. The national energy policy necessarily reflects a balance between fueling our everyday activities, being prepared to defend national interests wherever they are threatened, and

environmental concerns. By means of this lawsuit, Plaintiff seeks to upset that balance, overturn decades of federal energy policy, penalize actions taken at the behest of the federal government, and threaten the reliable, affordable supply of energy on which this country, and the world, depends. But "the basic scheme of the Constitution . . . demands" that federal law (not state law) serve as the exclusive source of governing law for such inherently interstate and international policy matters. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"). Accordingly, and because Plaintiff's Complaint relates to and seeks substantial relief from Defendants' production of oil and gas under the direction, supervision, and control of federal officers, Plaintiff's action should be heard in this federal forum.

## II.    TIMELINESS OF REMOVAL

8.    Plaintiff filed a Complaint against the Chevron Parties and other named Defendants in the Circuit Court of Cook County, Illinois, Chancery Division, Case No. 2024CH01024, on February 20, 2024. A copy of all process, pleadings, or orders in the possession of the Chevron Parties is attached as Exhibit 1 to this Notice of Removal.

9.    This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after service. 28 U.S.C. § 1446(b). Chevron Corporation was served on February 28, 2024. Declaration of Joshua D. Dick ("Dick Decl."), ¶ 2. The consent of the other Defendants is not required because removal does not proceed "solely under section 1441(a)." 28 U.S.C. § 1446(b)(2)(A). The Chevron Parties remove this action to federal court on several bases, including 28 U.S.C. § 1442(a)(1). Nevertheless, all properly joined and served Defendants have consented to removal. Dick Decl. ¶ 3. Consent is not required from any Defendant that has not

been served.  *See* 28 U.S.C. § 1446(b)(2)(A).[1]

## III.    SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

10.    Plaintiff brings claims against Defendants seeking damages and equitable relief for "climate change impacts" it claims to have suffered or allegedly will suffer, such as sea level rise, extreme weather, and other natural phenomena.  *See, e.g.*, Compl. ¶¶ 10, 39, 214.  Plaintiff asserts the following claims:  strict products liability for failure to warn, negligent products liability for failure to warn, negligence, public nuisance, private nuisance, nuisance in violation of the Municipal Code of Chicago ("MCC"), civil conspiracy, unjust enrichment, consumer fraud in violation of the MCC, misrepresentations in violation of the MCC, and recovery of city costs of providing services in violation of the MCC.  *Id.* ¶¶ 258–416.  In addition to compensatory damages, Plaintiff seeks "[d]isgorgement of profits," fines and "[p]enalties and recovery for injury or loss sustained as the result of a practice prohibited" by the MCC, and equitable relief, including abatement of the alleged nuisances.  *Id.* at 184, Request for Relief.  Plaintiff also requests that the Court enjoin Defendants from "further acts constituting" a nuisance and order Defendants to "immediately undertake the necessary action" to abate the alleged nuisance as well as enjoin Defendants from "engaging in the deceptive and unfair acts and practices" alleged by Plaintiff.  *Id.* at 170–71, 179.

---

[1]    In filing this Notice of Removal, the Chevron Parties, and all other Defendants, do not waive, and expressly preserve, any right, defense, affirmative defense, or objection, including, without limitation, lack of personal jurisdiction, insufficient process, and/or insufficient service of process.  A number of Defendants contend that personal jurisdiction in Illinois is lacking over them, and these Defendants intend to preserve that defense and move to dismiss for lack of personal jurisdiction at the appropriate time.  *See, e.g.*, *Prod. Components, Inc. v. Regency Door and Hardware, Inc.*, 568 F. Supp. 651, 655 (S.D. Ind. 1983) ("Nor does removal of an action from state to federal court result in a waiver of the defense of lack of personal jurisdiction"); *Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) (removal to federal court does not waive objection to personal jurisdiction).

11.     The Complaint makes clear that Plaintiff seeks to regulate global energy policy and production.  Plaintiff's claims center on Defendants' worldwide "extract[ion]" and sale of oil and natural gas that Plaintiff alleges has led to a "substantial[]" "increase[]" in "[f]ossil fuel emissions." Compl. ¶ 4.  While Plaintiff purports to challenge certain alleged misrepresentations related to climate change, its theory of liability and requested relief is far broader and is necessarily based on carbon emissions.  Under Plaintiff's theory of relief, alleged misrepresentations matter for Plaintiff's tort claims only insofar as they purportedly led to a marginal increase in greenhouse gas emissions that allegedly have caused Plaintiff's harms.  If Plaintiff's tort claims were based *solely* on misrepresentations, the requested relief sought would look much different.  But Plaintiff instead seeks damages for the alleged effects of global climate change allegedly due to increased greenhouse gas emissions.  Accordingly, Plaintiff's theory of liability necessarily depends on proof that Defendants' conduct led to increased production, sale, and consumption of oil and gas that in turn produced increased emissions and thus led to Plaintiff's climate-change-induced injuries.

12.     For purposes of meeting the jurisdictional requirements for removal only, the Chevron Parties submit that removal is proper on at least two independent and alternative grounds.[2]

13.     *First*, Defendants are authorized to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  The Chevron parties and multiple Defendants: (1) were "acting under" a federal officer or agency; (2) have claims against them that relate to acts under color of federal office; and (3) assert colorable federal defenses.  *See, e.g.*, *Baker v. Atl. Richfield*

---

[2]     As noted, the Chevron Parties deny that any Illinois court has personal jurisdiction over them, and they further deny any liability as to Plaintiff's claims.  The Chevron Parties expressly reserve all rights in this regard.

*Co.*, 962 F.3d 937, 941–47 (7th Cir. 2020); *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 461, 469 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*"); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998); *Illinois ex rel. Raoul v. 3M Co.*, ___ F. Supp. 3d ___, 2023 WL 6160610, at *2–6 (C.D. Ill. Sept. 21, 2023) (citing *Baker*). Despite Plaintiff's purported disclaimer of injuries arising on federal property and through the provision of products to the government, *see* Compl. ¶ 11 n.6, the Complaint expressly alleges that the cumulative impact of Defendants' *global* extraction and production activities over the past several decades—which necessarily include Defendants' substantial activities under the direction, supervision and control of federal officers—contributed to the *global* greenhouse gas emissions that Plaintiff claims caused its alleged injuries. *See, e.g.*, Compl. ¶¶ 28–40.

14. *Second*, Plaintiff's claims arise under federal common law because federal law exclusively governs claims for interstate and international pollution, as well as claims implicating the foreign affairs of the United States. *See, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ("*Milwaukee I*"); *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ("*Milwaukee II*"); *AEP*, 564 U.S. at 421–23. Federal law applies in those few areas of the law that so implicate uniquely federal interests that "borrowing the law of a particular State would be inappropriate." *AEP*, 564 U.S. at 422; *see also Milwaukee I*, 406 U.S. at 99 ("[P]ollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. § 1331].");

*City of New York v. Chevron Corp.*, 993 F.3d 81, 95 (2d Cir. 2021). Because this action necessarily arises under federal law, it is removable under 28 U.S.C. §§ 1331 and 1441(a). *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985) ("*National Farmers*") (explaining that it is "well settled" that section 1331's "grant of 'jurisdiction will support claims

founded upon federal common law as well as those of a statutory origin.'" (quoting *Milwaukee I*, 406 U.S. at 100)).

15.     The Chevron Parties will address each of these grounds in additional detail below.[3]

## IV.     THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

16.     The federal officer removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1).  A party seeking removal under section 1442 must show: (1) that it "act[ed] under a federal officer or agency"; (2) that the suit is "connected or associated[] with acts under color of federal office"; and (3) that it has a "colorable federal defense." *Baker*, 962 F.3d at 942–45 (cleaned up); *see also Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 291 (5th Cir. 2020) (en banc); *Def. Ass'n of Philadelphia*, 790 F.3d at 467.[4]  So long as federal officer jurisdiction can be exercised as to one claim against one Defendant, the entire action is properly removed. *See also Baker*, 962 F.3d at 945 ("[R]emoval need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case."); 28 U.S.C. §§ 1442(a), 1367.  Defendants easily meet these criteria.

---

[3]    Should Plaintiff challenge this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds and will not be limited to the specific articulations in this Notice. *Cf., e.g.*, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014–16 (7th Cir. 2018) (holding that district court erred by requiring evidentiary submissions by defendant to support removal).  Indeed, the Supreme Court has upheld removal where jurisdictional facts required to support the removal were found in later-filed affidavits rather than in the notice of removal. *See, e.g.*, *Willingham v. Morgan*, 395 U.S. 402, 407 n.3 (1969).  Defendants do not waive and expressly reserve all rights to argue that this action is properly removable on these grounds.

[4]    The defendant must also be "a person within the meaning of the statute," which includes corporations.  *Baker*, 962 F.3d at 941.

**S.A. 229**

**A.    The Courts Construe The Federal Officer Removal Statute Broadly In Favor Of Removal**

17.    "[T]he federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *Def. Ass'n of Philadelphia*, 790 F.3d at 467.  The Supreme Court has emphasized that "the statute must be 'liberally construed'" and, in particular, "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).  Courts have repeatedly affirmed that "removal rights under section 1442 are much broader than those under" the general removal statute.  *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006).  At this stage, a defendant's allegations "in support of removal" need only be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged."  *Baker*, 962 F.3d at 941, 945.  A federal court must "credit the defendant's theory of the case," *Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014), and "construe the facts in the removal notice in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 466; *see also id.* at 474 ("[W]e must accept the [defendant's] theory of the case at this juncture."); *Baker*, 962 F.3d at 947 ("Our role at this stage of the litigation is to credit only the [defendant's] theory.").  Defendants need not, at this juncture, affirmatively prove that they will prevail on the merits of any federal issue, because the sole issue is *where* such merits will be adjudicated.  *See Willingham*, 395 U.S. at 407 (holding that a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed"); *Baker*, 962 F.3d at 947 (noting that "[a]t this point," "we are concerned with who makes the ultimate determination, not what that determination will be") (cleaned up).  In *Acker*, for example, the Supreme Court "credit[ed] the [defendants'] theory of the case for purposes of [all] elements of [the] jurisdictional inquiry and conclude[d] that the [defendants] made an adequate threshold showing that the suit is 'for a[n] act under color of office.'"  527 U.S. at 432.

18.    Where both the plaintiffs and the defendants have "reasonable theories of this case," the court's role is "to credit only the [defendants'] theory" so long as the theory is "plausible." *Baker*, 962 F.3d at 941, 947.  Here, Defendants' theory is more than plausible and should be credited by this Court.

19.    Plaintiff alleges its injuries arise from global climate change, a phenomenon that arises from all of Defendants' production and sales activities (as well as activities of innumerable other sources).  The alleged injuries cannot arise from any speech untethered to any oil and gas production.  In the Complaint, Plaintiff alleges that greenhouse gas emissions caused by billions of consumers' use of fossil fuels allegedly resulted in Plaintiff's purported harms.  Plaintiff's claims thus implicate all of Defendants' oil and gas production, including production undertaken under the federal government's control.

20.    For purposes of removal, Plaintiff need not allege that *all* of Defendants' actions give rise to federal jurisdiction, only that *some* of them do.  *Baker*, 962 F.3d at 945 (rejecting district court's reasoning that "removing defendant must operate under government orders for most of the relevant time frame").  That standard is met here.  In *County Board of Arlington County, Virginia v. Express Scripts Pharmacy, Inc.*, for example, the Fourth Circuit held that the defendants' provision of opioids pursuant to Department of Defense ("DOD") contracts was sufficient to establish federal officer removal jurisdiction, even though the complaint there sought relief for opioid sales more generally and "did not even mention the distribution of opioids to veterans, the DOD contract, or the operation of the [military pharmacy]."  996 F.3d 243, 256 (4th Cir. 2021) ("*Arlington*").  So too here.  Plaintiff's claims encompass harm from every greenhouse gas emission, just as the plaintiff in *Arlington* targeted "every opioid prescription" filled by the defendants there.  *Id.* at 257.

**S.A. 231**

**B.      Defendants Satisfy All Elements Of The Federal Officer Removal Statute**

21.     Defendants satisfy all three elements of the federal officer removal statute.

22.     First, Defendants have acted under federal officers and agencies by repeatedly performing critical and necessary functions for the U.S. military to further the national defense and pursuant to government mandates, leases, and contracts under which they assisted the federal government in achieving federal objectives under federal direction, supervision, and control. Defendants have acted under federal officers and agencies in numerous ways, including by: (1) producing oil and gas for the U.S. military during wartimes under specific government guidance and directives; (2) producing and supplying large quantities of highly specialized, noncommercial-grade fuels for U.S. military use that conformed (and still conform) to unique military specifications; (3) operating the Elk Hills reserve "in the employ" of the U.S. Navy; (4) building, operating, and managing government petroleum production facilities; (5) developing mineral resources on the outer continental shelf ("OCS") through highly technical leases that were overseen and managed by federal supervisors; (6) developing mineral resources on federal lands through specialized leases that were overseen and managed by federal supervisors; (7) supplying fuel for and managing the Strategic Petroleum Reserve; and (8) constructing pipelines for oil transportation at the direction and control of the federal government.

23.     Second, Plaintiff's action is "connected or associated" "with [these] acts under color of federal office." *Baker*, 962 F.3d at 943 (quoting *Latiolais*, 951 F.3d at 292) (emphasis omitted); *see also id.* at 944–45 (Defendants do "not need to allege 'that the complained-of conduct *itself* was at the behest of a federal agency'"; "'[i]t is sufficient . . . that the allegations are directed at the relationship' between the [Defendants] and the federal government." (quoting *Def. Ass'n of Philadelphia*, 790 F.3d at 470)). Plaintiff has brought suit against Defendants for the downstream effects of all global combustion of oil and gas and the resulting emissions of greenhouse gases,

which necessarily includes the combustion of products created for and at the direction of the federal government.

24.     Third, Defendants have several "colorable federal defenses," including the government-contractor defense, preemption, federal immunity, commerce clause defenses, due process, the foreign affairs doctrine, and the First Amendment.

### 1.     Defendants "Acted Under" Federal Officers and Agencies

25.     Oil and gas are at the heart of economic, energy, and security policies of the United States, and have been for decades.  It has long been the policy of the United States that fossil "fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports."  42 U.S.C. § 15927(b)(1); *see also* 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) ("[F]ossil fuels" are "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production.").  As Professor Mark Wilson, a professor of history at the University of North Carolina, has explained in declarations submitted in similar climate change cases: "Over the last 120 years, the U.S. government has relied upon and controlled the oil and gas industry to obtain oil supplies and expand the production of petroleum products, in order to meet military needs and enhance national security."  Dick Decl. Ex. 1 ("Wilson Decl.") ¶ 1.

26.     Defendants "acted under" federal officers and agencies because the government exerted extensive "subjection, guidance, or control" over Defendants' fossil fuel production.  Defendants also "acted under" federal officers and agencies because they engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior" by performing a job the government would otherwise have to perform itself—whether by producing oil under government directives in wartime, producing specialized fuel for the military, developing mineral resources on

the OCS and federal land, constructing pipelines under federal direction, or more. *Watson*, 551

U.S. at 151–52, 154; *see also id.* at 147 (defendant must be "acting under" any "officer" *or*

"agency"); *St. Charles Surgical Hosp., LLC v. Louisiana Health Serv. & Indem. Co.*, 990 F.3d

447, 454–55 (5th Cir. 2021) ("In order to satisfy the 'acting under' requirement, a removing

defendant need not show that its alleged conduct was precisely dictated by a federal officer's

directive. . . . Instead, the 'acting under' inquiry examines the *relationship* between the removing

party and relevant federal officer, requiring courts to determine whether the federal officer

'exert[s] a sufficient level of subjection, guidance, or control' over the private actor.").

27.     As noted, both the Supreme Court and the Seventh Circuit have made clear that

"the statute must be 'liberally construed'" and, in particular, "[t]he words 'acting under' are

broad." *Watson*, 551 U.S. at 147; *see also Baker*, 962 F.3d at 941–43. "Acting under" can

encompass a broad range of relationships, including "contract" or "payment,"

"employer/employee," and "principal/agent." *Watson*, 551 U.S. at 156; *see also, e.g.*, *Doe v.

UPMC*, 2020 WL 5742685 at *3 (W.D. Pa. Sept. 25, 2020). Where, as here, a private party has

specifically contracted with "the Government to produce an item that [the Government] needs,"

such assistance "goes beyond simple compliance with the law" and satisfies the "acting under"

prong. *Baker*, 962 F.3d at 942.

28.     *Baker* confirms that Defendants here meet the "acting under" requirement. In that

case, residents of a housing complex sued nearby chemical manufacturing companies for alleged

contamination of soil with hazardous substances like lead and arsenic. 962 F.3d at 939–40. The

chemical companies removed the case to federal court on the grounds that, during World War II,

"the United States government directed them to produce certain materials [including lead] for the

military, supervised distribution of these goods, and controlled their ultimate usage." *Id.* The

Seventh Circuit held that the companies made an adequate threshold showing for removal under the federal officer removal statute, because the companies: (1) acted under federal authority by "provid[ing] the federal government with materials that it needed to stay in the fight at home and abroad;" and (2) were "under contract with the United States Military itself for the procurement of" the materials, without which "the government would have had to manufacture the relevant items on its own." *Id.* at 942. The government's "detailed specifications" for production of the materials, the "'compulsion to provide the product to the government's specifications,'" and the "continuous federal supervision" all supplied "the necessary relationship" between the companies and the government. *Id.* at 943 (quoting *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998)). In other words, *Baker* was "not simply a case of compliance, but of *assistance*." *Id.* at 942 (emphasis in original). And, as discussed in detail below, here the relationship between Defendants and the federal government extended far beyond the relationship at issue in *Baker*.

29.    For decades—including during World War II, the Korean War, and the Cold War—Defendants have acted under the direction, supervision, or control of federal officers and have assisted them in securing domestic energy independence and meeting the requirements of the U.S. military and the national economy. Under these circumstances, 28 U.S.C. § 1442(a)(1) affords Defendants a right to insist that any claims connected to this "special relationship" be heard in federal court. *Baker*, 962 F.3d at 941–42 ("The crux of the ['acting under'] inquiry . . . is whether there was a special relationship between the defendant and the federal government."). The federal government has required and promoted the production of oil and gas for decades to meet the U.S. military and national economy needs, even as the public and the world increasingly recognized and understood the potential link between greenhouse gas emissions and global climate change.

Indeed, the federal "government affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land." *Juliana*, 947 F.3d at 1167. For example, the Office of Fossil Energy states that the government seeks to "promote[] U.S. domestic homegrown energy development to achieve energy security and jobs in energy and technology around the world."[5]

30.    Defendants acted under federal officers in many respects, each directly stemming from the U.S. government's policies designed to meet the vital national interest in assuring adequate energy sources for the national defense and economic well-being. Each of the examples provided below demonstrates that Defendants have produced or supplied oil and gas under the direction, supervision, and control of the federal government. Any one of them alone is sufficient to support federal officer removal, and each demonstrates the strong federal interest in petroleum production, which Plaintiff now seeks to disrupt.[6]

>    **a.    Defendants Acted Under Federal Officers During World War II And The Korean War**

31.    World War II confirmed petroleum's role as a key American resource and underscored the government's interest in maintaining and managing it. *See* Dick Decl. Ex. 4 (Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, Special Committee Investigating Petroleum Resources, S. Res. 36 at 4 (Nov. 28, 1945)) ("Our overseas forces required

---

[5]    U.S. Dep't of Energy, Office of Fossil Energy, 2018-2022 Strategic Vision, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf.

[6]    The examples provided in this section, and other sections, of this Notice of Removal are meant only to provide illustrative examples. These examples are not an exhaustive collection of the factual bases that support the grounds for removal asserted herein. Defendants expressly reserve all rights to include additional support for any and all grounds for removal in any further briefing should Plaintiff challenge removal.

nearly twice as many tons of oil as arms and armament, ammunition, transportation and construction equipment, food, clothing, shelter, medical supplies, and all other materials together. In both essentiality and quantity, oil has become the greatest of all munitions."); Dick Decl. Ex. 2 (National Petroleum Council, *A National Oil Policy for the United States* at 1 (1949)) ("A prime weapon of victory in two world wars, [oil] is a bulwark of our national security.").  As the United States prepared for war in 1941, its need for large quantities of oil and gas to produce high-octane fuel for airplanes ("avgas"), oil for ships, lubricants, and synthetic rubber far outstripped the nation's current capacity.  Avgas, for example, has been described as "the most critically needed refinery product during World War II," and "essential to the United States' war effort." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) ("*Shell II*").  The government created agencies to control the petroleum industry, including Defendants, to build refineries, direct the production of certain petroleum products, and manage scarce resources for the war effort.  "No one who knows even the slightest bit about what the *petroleum industry* contributed to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government* . . . in bringing about a victory."  Dick Decl. Ex. 3, at 1 (Statement of Senator O'Mahoney, Chairman, Special Committee Investigating Petroleum Resources, S. Res. 36 (Nov. 28, 1945)) (emphases added).

32.     In 1941, President Roosevelt created the Office of Petroleum Coordinator and designated Interior Secretary Harold Ickes as the Petroleum Coordinator for National Defense. *See Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *10 (S.D. Tex. Sept. 16, 2020), *appeal dismissed*, 2021 WL 5545961 (5th Cir. June 18, 2021) (alteration and omissions in original).  President Roosevelt explained that:

> [r]ecent significant developments indicate the need of coordinating
> existing Federal authority over oil and gas and insuring that the

> supply of petroleum and its products will be accommodated to the needs of the Nation and the national defense program ... One of the essential requirements ... which must be made the basis of our petroleum defense policy ... is the development and utilization with maximum efficiency of our petroleum resources and our facilities, present and future, for making petroleum and petroleum products available, adequately and continuously, in the proper forms, at the proper places, and at reasonable prices to meet military and civilian needs.

*Id.* The Office of Petroleum Coordinator promptly began "directives" and "recommendations" to the oil and gas industry, requiring refineries to prioritize the production of aviation gasoline.

33.    In 1942, for example, President Roosevelt established several *agencies* to oversee wartime production by the petroleum industry, including Defendants.[7]  Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW").  The WPB established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production; it also limited the production of nonessential goods.  The PAW centralized the government's petroleum-related activities.  It made policy determinations regarding the construction of new facilities and allocation of raw materials, had the authority to issue production orders to refineries and enter into contracts that gave extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies."  Dick Decl. Ex. 4 at 6; *see also Shell I*, 294 F.3d at 1049 (discussing federal control of petroleum production).  The "PAW told the refiners what to make, how much of it to make, and what quality."  *Shell II*, 751 F.3d at 1286 (quoting John W.

---

[7]    The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this notice of removal only, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that Plaintiff's Complaint, as pleaded, can and should be removed to federal court.

**S.A. 238**

Frey & H. Chandler Ide, *A History of the Petroleum Administration for War*, 1941-1945, at 219 (1946)); *see also* Dick Decl. Ex. 4 at 11 ("The supply of crude to each refinery, the finished and intermediate products to be made in each plant, and the disposition of the products were all closely scheduled, by daily telegraphic directives when necessary."); Dick Decl. Ex. 5 (Statement of George A. Wilson, Director of Supply and Transportation Division, Wartime Petroleum Supply and Transportation, Petroleum Administration for War, Special Committee Investigating Petroleum Resources, S. Res. 36 at 212 (Nov. 28, 1945)) ("PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by each company and the time when the product would be available.").  In the days after the attack on Pearl Harbor, the Office of the Petroleum Coordinator for National Defense stated that "[i]t is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*."  *Shell II*, 751 F.3d at 1286 (quoting Office of Petroleum Coordinator for National Defense Recommendation No. 16).

34.     The government dictated where and how to drill, rationed essential materials, and set statewide minimum levels for oil production.  Dick Decl. Ex. 6 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War*, 1941-1945 (1946)) at 171, 177–78, 184. As Professor Wilson explains:  "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them."  Wilson Decl. ¶ 11.  Professor Wilson establishes that "[s]ome directives restricted the use of certain petroleum products for high-priority war programs; others dictated the blends of products; while others focused on specific pieces of the industry, such as the use of individual pipelines."  *Id.*

35.     The PAW's directives to Defendants were often coercive.  The PAW would "get

**S.A. 239**

the results" it desired—namely the effective facilitation of petroleum for the war effort—and if "[it] can't get them by cooperation, then [it] will have to get them some other way."[8]  The PAW also maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance."[9]  In sum, the federal government deployed an array of directions, threats, and sanctions to ensure Defendants assented to PAW's production directives.

36.     The court in *Exxon Mobil Corp. v. United States* acknowledged the long history of federal government control over Defendants' lawful oil production-related activities in finding that the government was responsible for certain environmental response costs under federal law: "By controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry."  2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020), *appeal dismissed*, 2021 WL 5545961 (5th Cir. June 18, 2021).  The *Exxon Mobil* court rejected the argument that private refiners "voluntarily cooperated" and instead found that they had "no choice" but to comply with the federal officer's direction.  *Id.* at *11, *see also* *12 ("J. Howard Marshall, the former Chief Counsel for the Petroleum Administration for War, testified that companies that weren't making essential war materials were simply not able to run their refineries." (internal quotation marks omitted)).  In fact, the federal government "insiste[d] on having the plants operate 24 hours a day, 7 days a week, year round."  *Id.* at *8.  Put simply, the federal government "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas,

---

[8]  Dick Decl. Ex. 7 (Secretary Harold Ickes, Conference of Petroleum Industry Chairmen, 8 (Aug. 11, 1941)).

[9]  Dick Decl. Ex. 8 (Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams (Aug. 12, 1942)).

synthetic rubber, and other war materials." *Id.* at *14. Certain Defendants or their predecessors or subsidiaries also produced toluene, a component of the explosive TNT, under direct contract with the Army Ordnance Department. *See also id.* at *13; Harold Nockolds, *The Engineers* 28 (1949).

37. The controls placed on the production of petroleum during World War II extended through the Korean War. *See Exxon Mobil*, 2020 WL 5573048 at *15 (detailing the government's use of the Defense Production Act of 1950 "to force" the petroleum industry to "increase [its] production of wartime . . . petroleum products"). For example, the United States government authorized the full development of its own energy resources by directing large-scale oil production at the Naval Petroleum Reserve at Elk Hills, which was operated by Chevron Corporation's predecessor, Standard Oil of California, under contract with the U.S. Navy. *See infra* ¶¶ 58–76.

38. At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81–774 ("DPA"). The PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.[10] As Professor Wilson explains, the DPA "gave the U.S. government broad powers to direct industry for national security purposes," and "PAD directed oil companies to expand production during the Korean War, for example, by calling on [the] industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952." Wilson Decl. ¶ 28.

39. The government also invoked the DPA immediately after the 1973 Oil Embargo to

---

[10] *See* Dick Decl. Ex. 9, at 122 (Fourth Annual Report of the Activities of the Joint Committee on Defense Production, H. Rep. No. 84-1, at 122 (Jan. 5, 1955, 1st Sess.)). *See also Exxon Mobil Corp.*, 2020 WL 5573048, at *15 (detailing the government's use of the DPA "to force" the petroleum industry to "increase their production of wartime . . . petroleum products").

address immediate and critical petroleum shortages by the military.[11]  Interior Priority Regulation

2 authorized "directives" to ensure "normal supply of petroleum products required by the

Department of Defense" and provided companies that complied with immunity from "damages or

penalties."[12]  The Interior Department subsequently "issued directives to 22 companies [including

Defendants or their predecessors or subsidiaries[13]] to supply a total of 19.7 million barrels of

petroleum during the two-month period from November 1, 1973, through December 31, 1973, for

use by the DOD."[14]

40.     The DOD is the United States' single largest consumer of energy, and one of the

world's largest users of petroleum fuel.  *See* Dick Decl. Ex. 10; Lengyel, Colonel, USAF, Gregory

J., *Department of Defense Energy Strategy: Teaching an Old Dog New Tricks* (August 2007),

http://military-gospel.tygae.org.za/pdf/2007-08_USAF-B_DoD-EnergyStrat-OldDogNewTricks-

LengyelCol.pdf.  For more than a century, petroleum "products [have been] used for the war

effort," including "many 'ordinary' products [that are] *crucial* to the national defense, such as . . .

fuel and diesel oil used in the Navy's ships; and lubricating oils used for various military

---

[11]  *See* Dick Decl. Ex. 11 (Twenty-Fourth Annual Report of the Activities of the Joint Committee on Defense Production, S. Rep. No. 94-1, Pt. 1, at 442 (Jan. 17, 1975, 1st Sess.)).

[12]  Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30572 §§ 1, 3 (Nov. 6, 1973).

[13]  The companies included Amoco Oil Co., Exxon Co., U.S.A., Mobil Oil Corp., Marathon Oil Co., Standard Oil Co. of California, and Shell Oil Co.  Dick Decl. Ex. 12 (*Naval Petroleum Reserve Numbered 1, Elk Hills, Calif.: Hearing Before the Subcommittee On National Stockpile and Naval Petroleum Reserve of the Committee on Armed Services on S.J. Res. 176*, 93d Cong. 73-74 (1st Sess. 1973)) (reprinting Department of Interior, Office of Oil and Gas, *News Release: Companies Directed to Supply the Needs of Defense Department* (Nov. 28, 1973) (listing companies and quantities)).  Dick Decl. Ex. 13 (John W. Finney, *Fuel is Diverted for the Military*, N.Y. Times (Nov. 28, 1973) (reporting on directives)).

[14]  *See* Dick Decl. Ex. 13.

machines." *Exxon Mobil Corp.*, 2020 WL 5573048, at \*31 (emphasis added); *see also id.* at \*47

(noting the "value of [the] petroleum industry's contribution to the nation's military success").  In

fiscal year 2019 alone, the DOD purchased 94.2 million barrels of fuel products in compliance

with military specifications, totaling $12.1 billion in procurement actions.[15]

     41.    As two former Chairmen of the Joint Chiefs of Staff have explained in amicus briefs

submitted in other climate change-related cases, the "history of the Federal Government's control

and direction of the production and sale of gasoline and diesel to ensure that the military is

'deployment-ready'" spans "more than a century," and during their tenure, petroleum products

were "crucial to the success of the armed forces."  Dick Decl. Ex. 14, at 2–3 (Amici Curiae Brief

of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen, in Support of

Petitioners, *BP p.l.c. v. Mayor and City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020));

*see also* Dick Deck. Ex. 15, at 7–8, 20–23 (Amici Curiae Brief of General (Retired) Richard B.

Myers and Admiral (Retired) Michael G. Mullion, in Support of Defendants-Appellants, *City and

Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022) (No. 21-15313)) (similar).

"Because armed forces have used petroleum-based fuels since the 1910s, oil companies have been

essential military contractors, throughout the last century."  Wilson Decl. ¶ 2.  The "U.S.

government has controlled and directed oil companies in order to secure and expand fuel supplies

for its military forces and those of its allies, both in wartime and in peacetime."  *Id.*

     42.    The extent of the federal government's wartime control over Defendants far

exceeds that presented in *Baker*, in which the Seventh Circuit found that the "acting under"

requirement was satisfied in the context of the federal government's "detailed specifications,"

"compulsion," and "continuous federal supervision" over the manufacturing defendants during

---

[15]   Dick Decl. Ex. 10 (Def. Logistics Agency Fact Book).

World War II.  962 F.3d at 943.

**b.    Defendants Acted Under Federal Officers By Supplying Highly Specialized Fuels For Military Use**

43.    Many of the Defendants have continuously produced and supplied to the U.S. military highly specialized petroleum products required for national defense and wartime efforts for the last eighty years.  The federal officer removal "acting under" prong precisely "covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012).  Defendants acted under federal officers by producing and supplying highly specialized, noncommercial-grade fuels for the military that continue to be the "lifeblood of the full range of Department of Defense capabilities," Dick Decl. Ex. 16.  As in *Baker* or *Arlington*, these specialized fuels have "detailed federal specifications" pursuant to government contracts and must be produced "in accordance with those specifications."  *Baker*, 962 F.3d at 940–41, 43; *see also Arlington*, 996 F.3d at 252 (similar); *Winters*, 149 F.3d at 400 (noting "the government's detailed specifications concerning the make-up, packaging, and delivery of Agent Orange" and holding "the defendants acted pursuant to federal direction").

44.    During World War II, the federal government asserted substantial control over Defendants, directing the development and production of avgas.[16]  Because, as noted, avgas was "'the most critically needed refinery product' during World War II and was essential to the United States' war effort," *Shell II*, , 751 F.3d at 1285, the United States government "exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor," *Exxon Mobil Corp.*, 2020 WL 5573048, at *1.  It did so to maximize production of

---

[16]  During the war, approximately 80% of the seven billion barrels of crude oil needed to support the U.S. war effort was produced in this country.  Dick Decl. Ex. 6, at 1, 169.

fuel for the military and direct the allocation of pivotal resources, *see, e.g.*, *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049–50 (9th Cir. 2002) ("*Shell I*"). This is like the federal government's conduct in *Baker*, mandating defendant manufacturers to produce "critical wartime commodities" according to strict regulations, "direct[ing] nearly every aspect of [the] production process" at one site and controlling the "operation," "plans," "designs," and "schedules" at another. 962 F.3d at 940–41.

45.    To this day, Defendants supply the DOD with highly specialized fuels to meet its need to power planes, ships, and other vehicles, and to satisfy other national defense requirements. U.S. Navy Captain Matthew D. Holman recently explained that "[f]uel is truly the lifeblood of the full range of DOD capabilities, and, as such, must be available on specification, on demand, on time, every time. In meeting this highest of standards, we work hand-in-hand with a dedicated team of Sailors, civil servants, *and contractors* to deliver fuel to every corner of the world, ashore and afloat." Dick Decl. Ex. 17 (emphasis added). "By 2010, the U.S. military remained the world's biggest single purchaser and consumer of petroleum products" and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel." Wilson Decl. ¶ 40. Defendants Shell USA, Inc. (f/k/a Shell Oil Company), BP, and ExxonMobil (or their predecessors, subsidiaries, or affiliates), for example, have been three of the top four suppliers of fossil fuel products to the United States military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").[17] DESC procures a range of military-unique, petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the

---

[17]  *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009), https://fas.org/sgp/crs/natsec/R40459.pdf.

**S.A. 245**

U.S. Air Force and Army, JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative fuels.  Several other Defendants have also produced (and continue to produce) these critical products for the U.S. military.

46.     For example, during the Cold War, Shell Oil Company developed and produced for the federal government specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs.[18]  Shell Oil Company produced millions of gallons of "Processing Fluid (PF-1)" under government contracts with specific testing and inspection requirements, as well as packaging that mandated "no other identification."[19]  Shell Oil Company also constructed "special fuel facilities" to handle and store PF-1, including a hangar, pipelines, and storage tanks at Air Force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program.[20]  Under the OXCART program, Shell Oil Company also

---

[18]  *See* Dick Decl. Ex. 18, at 61–62 (Gregory W. Pedlow & Donald E. Welzenbach, The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954-1974 (1992)), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-doc01.pdf ("Gen. James H. Doolittle (USAF, Ret.) . . . arranged for Shell to develop a special low-volatility, low-vapor-pressure kerosene fuel for the craft.  The result was a dense mixture, known as LF-1A, JP-TS (thermally stable), or JP-7, with a boiling point of 300ºF at sea level. Manufacturing this special fuel required petroleum byproducts."); *id.* Ex. 19 (CIA Doc. No. CIA-RDP90B00170R000100080001-5, Clarence L. Johnson, Development of the Lockheed SR-71 Blackbird (Aug. 3, 1981)) ("The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . The extreme environment presented a severe cooling problem. . . . A new fuel and a chemical lubricant had to be developed to meet the temperature requirements. . . . Shell, and [other] [c]ompanies[,] took on the task of developing these fluids."); *see also id.* Ex. 20 (Ben Rich & Leo Janos, Skunk Works 127, 205 (1994)).

[19]  Dick Decl. Ex. 21 (CIA Doc No. CIA-RDP67B00074R000500400016-2, Contract No. AF33(657)-8577 (SH-511) (Aug. 14, 1962)); *see id.* Ex. 22 (CIA Doc. No. CIA-RDP67B00074R000500400012-6, Amendment No. 2 to Contract No. AF33(657)-5577 (SH-511) (Aug. 26, 1963)).

[20]  Dick Decl. Ex. 23 (CIA Doc. No. CIA-RDP67B00074R000500440005-0, Concurrence in

"tested" "refinery procedures" to ensure fuels were "up to standard."[21]  In providing specialized

fuel and facilities under contracts for the federal government's overhead reconnaissance programs,

Shell Oil Company acted under federal officers, *see, e.g.*, Dick Decl. Ex. 23 ("This work is under

the technical direction of Colonel H. Wilson."), and helped the government to produce an essential

item that it needed for national defense purposes and would otherwise have had to produce itself,

*see Watson*, 551 U.S. at 153.

47.     As another example, from at least 2010 to 2013, Shell Oil Company or its affiliates

entered into billion-dollar contracts with the DOD's Defense Logistics Agency ("DLA") to supply

specialized JP-5 and JP-8 military jet fuel.  *See* Dick Decl. Exs. 30–38.  The DOD's detailed

specifications for the makeup of the military jet fuels require that they "shall be refined

hydrocarbon distillate fuel oils" made from "crude oils" with "military unique additives that are

required by military weapon systems."  *See* Dick Decl. Ex. 39, at 5, 10, §§ 3.1, 6.1; *id.* Ex. 40 at

5, 11, §§ 3.1, 6.1.

48.     Similarly, BP entities have contracted with the DLA to provide a significant

quantity of specialized military fuels over decades.  For example, BP entities contracted with the

DLA to provide approximately 1.5 billion gallons of specialized military fuels for the DOD's use

in the years 2016 to 2020 *alone*.  Dick Decl. Ex. 41, at 6.  Since 2016, BP entities entered into

---

Contract No. SH-515 with Shell Oil Company, Project OXCART (Sept. 20, 1963)); *see id.* Ex.
24 (CIA Doc. No. CIA-RDP67B00074R000500450004-0, Contract No. AF33(657)-13272
(SH-516) (June 30, 1964)); *id.* Ex. 25 (CIA Doc. No. CIA-RDP67B00074R000500440006-9,
Contract No. AF33(657)-12525 (SH-515) (Sept. 20, 1963)); *id.* Ex. 26 (CIA Doc. No. CIA-
RDP67B00074R000500430003-3, Concurrence in Contract No. SH-514 with Shell Oil
Company, New York, N.Y. (June 28, 1963)); *id.* Ex. 27 (CIA Doc. No. CIA-
RDP67B00074R000500420006-1, Contract No. AF33(657)10449 (SH-513) (Feb. 25, 1963));
*id.* Ex. 28 (CIA Doc. No. CIA-RDP67B00074R000500410006-2, Contract No. AF33(657)-
8582 (SH-512) (Sept. 13, 1962)).

[21] Dick Decl. Ex. 29 (CIA Doc. No. CIA-RDP63-00313A000500130031-9, Summary of OSA
Activities for Week Ending 21 August 1963 (Aug. 23, 1963)).

approximately 25 contracts to supply various military-specific fuels, such as JP-5, JP-8, and F-76.

DLA required that the fuels contain specialized additives, including fuel system icing inhibitor

("FSII"), corrosion inhibitor/lubricity improver ("CI/LI"), and, for F-76 fuels, lubricity improver

additives ("LIA"). *See generally id.* Such additives are essential to support the high performance

of the military engines they fuel.

49.     The DOD exerted significant control over the BP entities' actions in fulfilling these

contracts, seeking to ensure that these unique fuels (1) ignite, but do not freeze, at low temperatures

from high altitudes; (2) rapidly dissipate accumulated static charge so as not to produce sparks or

fires during rapid refueling (such as on an aircraft carrier where such a fire would be devastating);

(3) efficiently combust to allow for longer flights on less fuel; and (4) maintain the integrity of the

fuel handling systems over a long period of time.[22]

50.     To meet its unique operational needs, the DOD required that the BP entities supply

each fuel in accordance with highly specialized, DOD-mandated specifications. As one would

expect when dealing with highly specialized military equipment, these fuel contracts are far more

specialized and prescriptive than contractual requirements for fuel intended for consumer-type

vehicles. Like the contracts in *Arlington*, the contracts for these specialized fuels established "how

[Defendants] must operate" and fixed "[p]ricing, . . . shipping, payment, and many other

specifications." *Arlington*, 996 F.3d at 252.

51.     In particular, the contract specifications require express amounts of "military

---

[22]   Dick Decl. Ex. 42 § 1.2.2 (MIL-HDBK-510A); *id.* Ex. 43, tbl. 1, 2–9 (Air Force Wight
Aeronautical Lab., *Military Jet Fuels, 1944-1987*, AFWAL-TR-87-2062 (Dec. 1987))
[hereinafter "Air Force Lab, *Military Jet Fuels*"]; NREL, *Investigations of Byproduct
Application to Jet Fuel*, NREL/SR-510-30611, at 4–6 (Oct. 2001),
https://www.nrel.gov/docs/fy02osti/30611.pdf.

unique additives that are required by military weapon systems," such as SDA, FSII, and CI/LI.[23] "[T]his [additive] requirement is unique to military aircraft and engine designs,"[24] and each additive served a vital role in allowing the DOD to fulfill its mission safely and efficiently.

52.    The DOD *required* the BP entities to use SDA, a conductivity improver additive, to dissipate static charge created during military jet distribution and refueling. If the charge is not dissipated, refueling could result (and has resulted) in a spark or fire, especially when rapid refueling is necessary during combat with hot military engines.[25]

53.    The DOD *required* the BP entities to use FSII to depress the freezing point of military jet fuels. FSII ensures that the fuels' natural water content does not freeze at low temperatures encountered by military jets at high altitudes, which would result in slush or ice crystal formation causing blockages of fuel filters, pumps, or lines and could ultimately cause engine flameout.[26]

---

[23] Dick Decl. Ex. 39, at 5, 7, 10 (DLA, *Detail Specifications, Turbine Fuels, Aviation Kerosene Types, NATO F-34(JP-8), NATO F-35, AND JP-8+100, MIL-DTL-83133E* (April 1, 1999)). Several of the BP entities' DLA contracts to supply JP-8 required that the BP entities meet the specifications of MIL-DTL-83133J. Dick Decl. Ex. 41, at 4; *id.* 44 (MIL-DTL-83133J specs).

[24] *Id.* at 10.

[25] Dick Decl. Ex. 42 § 1.4.1.2 (MIL-HDBK-510A); *id.* Ex. 43 at 28, 35 (Air Force Wright Aeronautical Laboratories, *Effect of Corrosion Inhibitors on Conductivity of Avian Turbine Fuel*, ARWAL-TR-85-2076), at 1 ("The Air Force and Navy have reported numerous incidents in the [1980s] solely related to electrostatic discharge."), https://apps.dtic.mil/dtic/tr/fulltext/u2/b100948.pdf.

[26] Dick Decl. Ex. 45 (Dep't of Defense, FSII Specifications, MIL-DTL-85470B (June 1999)); *id.* Ex. 42 § 1.4.1.1; *id.* Ex. 43, at 30, 41–44) (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 46 (Department of Army Technical Manual, *Petroleum Handling Operations for Aviation Fuel*, TM 10-1107 at 6 (Feb. 1960)) ("The jet aircraft is subject to wider and more rapid changes of temperature. . . . Consequently, any water present may freeze before it can reach the sumps of jet aircraft. When this happens, ice particles may clog the fuel screen and cause fuel starvation.").

54.     The DOD *required* the BP entities to use CI/LI to (1) improve lubricity, which reduces friction and ensures that the military engines do not seize during operation; and (2) prevent corrosion in military fuel handling, transportation, and storage equipment, primarily constructed of uncoated steel.[27]

55.     In addition, the DOD specifications required the BP entities to conform the fuels to specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, thermal stability, and freezing point, specifications which are essential to performance of the military function.[28]  The specifications also required adherence to specific testing methods for the various additives and chemical and physical requirements in accordance with enumerated American Society for Testing and Materials ("ASTM") standards, such as ASTM D2624 for conductivity and ASTM D3241 for thermal stability.[29]

56.     If the fuels did not conform to the exact specifications, the DOD retained and exerted control over the BP entities by requiring them to either repair or replace the products at no increase in contract price.

57.     The DOD's detailed specifications for the makeup of the military jet fuels—which, according to Plaintiff, is a contributing cause of climate change and Plaintiff's asserted harms— and "the compulsion to provide the product to the government's specifications" demonstrate the

---

[27]  Dick Decl. Ex. 47 (Dep't of Defense, Performance Specification, Inhibitor, Corrosion / Lubricity Improver Fuel Soluble, MIL-PRF-25017H); *id.* Ex. 42 § 1.4.1.3 (MIL-HDBK-510A); *id.* Ex. 43, at 28, 30, 38–39 (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 48 (MIL-PRF-32490 (LIA) specs).

[28]  Dick Decl. Ex. 39, at 6 (MIL-DTL-83133E); *id.* Ex. 43, at 17–35 (Air Force Lab, *Military Jet Fuels*) (describing the necessity for specific physical and chemical requirements in military jet fuels); *id.* Exs. 44, 49–52 (the JP-5 specs (MIL-DTL-5624W); the NATO-76 specs (MIL-DTL-16884N and -16884P); and Def Stan 091-91 (Jet A-1) Issue 9 specs).

[29]  Dick Decl. Ex. 39, at f76 (MIL-DTL-83133E); *see also id.* Ex. 53 (ASTM D1655-20 Jet A specs).

**S.A. 250**

necessary "acted under" special relationship between Defendants and the government in each of these examples. *See Baker*, 962 F.3d at 943. These specialized jet fuels are designed specifically to assist the military in fulfilling its unique and essential missions and thus fall into the category of specialized military products that support federal officer jurisdiction, *see Baker*, 962 F.3d at 943.

> ### c.    Defendants Acted Under Federal Officers By Operating The Elk Hills Reserve "In the Employ" Of The U.S. Navy

58.    Defendants have played an essential role in assisting the federal government with meeting its petroleum needs to power the nation's economy and the U.S. military to ensure national security. The connection between oil and national security began in the early 1900s, when the world's leading navies switched from coal to oil as the preferred energy source for ships. President Taft recognized the national interest in developing domestic oil sources in his address to Congress on December 6, 1910: "As not only the largest owner of oil lands, but as a propsective [sic] large consumer of oil by reason of the increasing use of fuel oil by the Navy, the Federal Government is directly concerned both in encouraging rational development and at the same time insuring the longest possible life to the oil supply."[30] This national security concern led to the September 2, 1912, Executive Order creating the Naval Petroleum Reserve at Elk Hills, California, which was intended to preserve oil in the ground for national emergencies. Dick Decl. Ex. 55.

59.    At the turn of the twentieth century, government lands in the Western United States were being rapidly turned over to private owners. At the same time, there was a growing realization of the importance of oil for the Navy, which was then changing its ships from coal-burning to oil-burning. In response to arguments that the government should preserve oil for naval

---

[30]  Dick Decl. Ex. 54 (Hearings Before Committee on Naval Affairs of the House of Representatives on Estimates Submitted by the Secretary of the Navy, 64th Cong. 761 (1915)).

purposes, President Taft withdrew large portions of land in California and Wyoming from eligibility for private ownership, and in 1912 set aside Naval Petroleum Reserve No. 1 at Elk Hills by an Executive Order. The establishment of the Reserve, however, was expressly made subject to preexisting private ownership. There are approximately 46,000 acres within the Reserve, and Standard Oil of California ("Standard Oil") (Chevron's predecessor) owned approximately one-fifth of that land and the Navy owned the remainder. The Standard Oil lands were not in one block, but were checker-boarded throughout the Reserve.[31]

60.    "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."[32] "Congressional intent [was] to retain the oil [at the Reserve] in the ground except when it was needed for national defense or to avoid damage to the field and the irretrievable loss of oil."[33] In other words, Congress's policy objective was to take those steps necessary to maintain and preserve the fields exclusively for federal defense purposes. Before World War II, Standard Oil and the Navy developed an understanding that neither would drill additional wells or produce oil inside the Reserve without providing six months' notice to the other. *See United States v. Standard Oil Co. of California*, 545 F.2d 624, 627 (9th Cir. 1976). In doing so, Standard Oil agreed to maintain the Reserve for national security purposes. The maintenance of the Reserve itself under

---

[31]  The history of Elk Hills is recounted in *United States v. Standard Oil Co. of California*, 545 F.2d 624 (9th Cir. 1976).

[32]  Dick Decl. Ex. 56 U.S. Gov't Accountability Off., GAO/RCED-87-75FS, Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (1987) ("GAO Fact Sheet"), http://www.gao.gov/assets/90/87497.pdf.

[33]  Dick Decl. Ex. 57 (U.S. Gov't Accountability Off., *Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve*, GAO/RCED-88-198 at 15 (July 1988) ("GAO Report"), https://www.gao.gov/assets/220/210337.pdf).

the direction of the federal government in furtherance of federal policy gives rise to federal officer removal.[34]  Standard Oil's efforts originally ensured that the Reserve was ready to produce oil for the U.S. war efforts in World War II.

61.    World War II marked a new phase.  "Shortly after the entrance of the United States into World War II, it became apparent that additional crude oil production would be required on the West Coast."[35]  Standard Oil and the Navy thus began negotiations for production on the Reserve.  On March 21, 1942, President Roosevelt "stated that if satisfactory arrangements could not be promptly concluded with [Standard Oil], the Secretary of the Navy was authorized to start condemnation proceedings through the Department of Justice to acquire the property" for the federal government.[36]

62.    The Navy and Standard Oil entered into a Unit Plan Contract ("UPC") that President Roosevelt approved on June 28, 1944.  The UPC "govern[ed] the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve." *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014).  It provided that the Elk Hills Reserve "was to be operated as a single property (a unit) and granted the Navy, subject to the provisions of the contract, *absolute control* over (1) the time and rate of exploration and development and (2) the quantity and rate of production."[37]  The UPC shows the federal government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the reserve.  *See* Dick Decl. Ex. 58 (Statement of Gerald D. Morgan, Special Counsel to the Committee on Naval Affairs, Hearing on Amendment Proposed to Unit Plan Contract Governing Development and Operation

---

[34]  *See generally* GAO Report.

[35]  *Id.* at 14.

[36]  *Id.*

[37]  *Id.* at 15 (emphasis added).

of Naval Reserve Petroleum No. 1 (Elk Hills), U.S. House of Representatives, Committee on Naval Affairs, at 3737–38 (Sept. 9, 1946)) ("It must be recognized that although Navy and Standard entered into a unit-plan contract . . . the interests of each are conflicting. It is to Navy's interest to conserve as much oil as possible in the ground . . . [and] it is to Standard's interests to produce its oil as rapidly as is consistent with maintaining a balance between economical production and greatest ultimate recovery. The conflict of interest between Navy and Standard Oil was decided in Navy's favor upon the execution of the unit-plan contract, for absolute control over the time, manner, and rate of production is vested in the Secretary of the Navy subject to the control of Congress.").

63. The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom*."[38] *See* Dick Decl. Ex. 58 (Statements of Commodore W.G. Greenman, U.S. Navy, Director, Naval Petroleum Reserves, Hearing Records at 3693–94) ("[The] agreement between Navy and Standard . . . placed the control of production from both Standard and Navy lands under the absolute control of the Secretary of the Navy.").

64. Specifically, the UPC provided that "[the] Navy shall, subject to the provisions hereof, have the *exclusive control* over the exploration, prospecting development and operation of the Reserve."[39]

65. The UPC also provided that "[the] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate

---

[38]  Dick Decl. Ex. 59, Recitals § 6(d)(i) (emphases added).

[39]  *Id.* § 3(a) (emphasis added).

**S.A. 254**

of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires."[40]

66.     Under the UPC, "all exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve."[41]  In the event of disagreement, such matter shall be referred "to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard."[42]

67.     The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard Oil was entitled to receive, or increase the rate of production.[43]

68.     Standard Oil (and later Chevron) could participate in an Operating Committee, which was responsible for production decisions, such as the number, design, and location of wells and facilities.  Both the Navy and Standard Oil had an equal vote on the Committee, but in the event of a tie the Secretary of the Navy held the tiebreaker.[44]

69.     Critically, the federal government had to decide who would operate its portion of the Reserve—the Navy, a private contractor, or someone else.  The "*Navy chose to operate the*

---

[40] *Id.* § 4(a) (emphasis added).

[41] *Id.* § 3(b)(4).

[42] *Id.* § 9(a).

[43] *Id.* §§ 4(b), 5(d)(1).

[44] *See* GAO Report at 15.

*reserve through a contractor rather than with its own personnel*" and opened the contract to competitive bidding.[45]  Standard Oil "bid for the operator's contract in 1944, was awarded the contract, and continued to operate NPR-1 [for the Navy] for the next 31 years."[46]  Although the Navy could have developed the resources on the Reserve itself, it decided to use a third-party contractor to maximize production as quickly as possible.  This is reflected in government documents explaining the decision to hire Standard Oil to operate the Reserve, which also noted that Standard Oil offered to perform the work without making a profit:

> A substantial increase in production at the earliest possible date was urgently requested by the Joint Chiefs of Staff to meet the critical need for petroleum on the West Coast to supply the armed forces in the Pacific theatre. . . .  The Standard Oil Company of California was chosen as operator because it was the only large company capable of furnishing the facilities for such a development program and partially because it was the largest private owner of lands in the Reserve.  The Navy has expressed its appreciation of the patriotism of the Standard Oil Company in undertaking such a project at cost with no profit to be received by the Company.[47]

70.    The Operating Agreement provided that "OPERATOR *[Standard Oil] is in the employ of the Navy Department* and is responsible to the Secretary thereof."  *See* Dick Decl. Ex. 61, at 3 (emphasis added).  Standard's Oil's operation and production at Elk Hills for the Navy were subject to substantial supervision by Navy officers; and naval officers directed Standard Oil to conduct operations to further national policy.  For example, "[s]hortly after the unit plan contract was signed, the Congress, according to DOE, authorized the production at [the Elk Hills Reserve] at a level of 65,000 B/D [barrels per day] to address fuel shortages and World War II military

---

[45]    *Id.* (emphasis added).

[46]    *Id.*

[47]    *See* Dick Decl. Ex. 60, at 1 (Elk Hills Historical Documents).

**S.A. 256**

needs."[48] Production reached this "peak of 65,000 barrels per day in 1945."[49] As another example, in November 1974, the Navy directed Standard Oil to increase production to 400,000 barrels per day to meet the unfolding energy crisis, advising Standard Oil that "you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary [of] the Navy." *See* Dick Decl. Ex. 62, at 3.

71.     Standard Oil's operation and production at Elk Hills for the Navy were subject to substantial and continued oversight and inspections by Navy officers.  The Operating Agreement between the U.S. Navy and Standard Oil directs that "OPERATOR *[Standard Oil] is in the employ of the Navy Department* and is responsible to the Secretary thereof through the Officer in Charge and the Director, Naval Petroleum and Oil Shale Reserves."[50]  In November 1974, for example, when a dispute arose concerning whether it was possible to produce 400,000 barrels per day to meet the unfolding energy crisis, the Navy directed the Unit Operator (Standard Oil) to prepare a plan, rejecting objections and advising Standard Oil that "since you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary of Navy to order accomplished, the approval of the Operating Committee is not to be considered a prerequisite to the initiation of the above action on your part."[51]

72.     Accordingly, for at least 31 years, Standard Oil operated Elk Hills under the "subjection, guidance or control" of federal Navy officers.  *Watson*, 551 U.S. at 151; *see id.* at 153–54 (noting that removal was proper where company "fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war").  At a

---

[48]   GAO Report at 15.

[49]   GAO Fact Sheet at 3.

[50]   *See* Dick Decl. Ex. 61 (Contract No. NOd-9930).

[51]   *See* Dick Decl. Ex. 62 at 3–4.

minimum, Defendants' theory, which must be credited for purposes of removal, *see Def. Ass'n of Philadelphia*, 790 F.3d at 474, is that Standard Oil's relationship with the federal government was "an unusually close one involving detailed regulation, monitoring, or supervision," *id.* at 468.

73.     After the OPEC oil embargo in 1973–74, Congress authorized preliminary activity to develop Elk Hills and other National Reserves to their full economic potential.    *See* Supplemental Appropriation Act of 1974, Pub. L. No. 93-245 (1974).  In 1975, Standard Oil chose to withdraw from operating Elk Hills to concentrate on other federal objectives:

> [T]he current domestic energy situation is so serious that all oil companies are devoting their available resources to the discovery and production of new oil reserves.  The President has requested that every effort be made to increase domestic production of petroleum, and Standard is focusing its attention on this objective. [52]

74.     A year later, Congress enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976), which reopened the Elk Hills Reserve and "authorized and directed that [the Reserve] be produced at the *maximum efficient rate for 6 years*." [53]  Congress directed production at Elk Hills to be significant.  Indeed, Commander Roger Martin, the naval officer in charge of the facility, explained: "We expect to reach a level of about 100,000 barrels daily in a few months, and 300,000 by the end of the [1970s]." [54]  Production of 100,000 barrels would amount to about 5% of then-current imports and result in a cost saving to the federal government of approximately $1 billion annually.

75.     In 1977, Congress transferred the Navy's interests and management obligations to

---

[52]  *See* Dick Decl. Ex. 63 (letter from J.R. Grey, Standard, to Jack L. Bowers, Acting Secretary of the Navy, requesting to terminate its position as Operator of the Elk Hills Reserve).

[53]  Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976) (emphasis added); *see also* Dick Decl. Ex. 64.

[54]  Dick Decl. Ex. 64.

DOE, and Chevron continued its interest in the joint operation until 1997, when the Reserve was sold. From 1976 to 1998, Elk Hills generated over $17 billion for the United States Treasury.[55]

76. Although other prime contractors operated Elk Hills for the Navy following 1975, Standard Oil and later Chevron were still actively involved in the operations, both through their role on the Operating Committee *and* as subcontractors.[56] Under the Navy's direction and control, Chevron conducted exploration and production on the Reserve to fulfill the government's demand for significant production from the Reserve. Accordingly, Chevron's activities under federal officers went far beyond its role as co-owner under the auspices of the UPC or simple compliance with the law as a participant in a regulated industry.

> **d.  Defendants Acted Under Federal Officers By Constructing, Operating, And Managing Government Petroleum Production Facilities**

77. Defendants also acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities. During World War II, the government built "dozens of large government-owned industrial plants" that were "*managed by private companies under government direction.*" Wilson Decl. ¶ 14 (emphasis added). "The U.S. government enlisted oil companies to operate government-owned industrial equipment . . . to comply with urgent government orders." *Id.* ¶ 15. These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or government-owned equipment within

---

[55] *See* U.S. Dep't of Energy, *Naval Petroleum Reserves*, https://www.energy.gov/fe/services/petroleum-reserves/naval-petroleum-reserves (last visited Oct. 7, 2020).

[56] *See* Dick Decl. Ex. 65, at 192–93 (History of Naval Petroleum Reserve No. 1) (describing the June 13, 1978 contract between Chevron and Williams Brothers for 60 million cubic feet of gas to be processed by Chevron's 17Z McKittrick plant, and an agreement with Chevron and Atlantic Richfield to acquire pipeline capacity of 220,000 barrels per day).

industrial facilities. *Id.* ¶ 19. Among the largest facilities was a refinery site in Richmond, California, operated by Socal (a Chevron predecessor), which was "the second-largest of all the facilities focused on aviation gasoline production, providing 10 percent of total global output of aviation fuel" by 1945. *Id.* Several other Defendants or their predecessors operated similar production equipment and facilities for the government. *Id.* ¶ 20. *Arlington* confirmed that courts "have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." 996 F.3d at 251–52 (emphasis in original).

78.     Defendants built plants and manufactured war products for the Allied effort. For example, "[o]n January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two-year period. The contract provided that Shell would construct a toluene plant at Shell['s] Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. . . . Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war" "to manufacture TNT" and later "as a blending agent" to make "avgas." Dick Decl. Ex. 66; *see also* Wilson Decl. ¶ 23.

79.     In addition, the government's need for highly specialized fuels, discussed *supra* Section IV.B.1.b., necessitated changes to Defendants' refining equipment and operations.[57] And the impacts of the government's particular fuel specifications on Defendants' operations were

---

[57] *See* Dick Decl. Ex. 67 at 40 (W. J. Sweeney, Aircraft Fuels and Propellants, Report for the Army Air Force Scientific Advisory Group (1946)) ("The refiner cannot build the equipment for making the fuel without knowing what its composition must be to meet the needs of the engine.").

typically long-lasting.[58]  For example, JP-4 was developed in 1951 and was the most heavily used

Air Force fuel until it was phased out around 1998.[59]

80.     The federal government entered into contracts with predecessors or affiliates of

Defendants Chevron, Shell USA, Inc., and ExxonMobil, to obtain "vast quantities of avgas."[60]

These contracts provided federal officers with the power to direct the operations of Defendants.

For example, the government's contract with Shell USA, Inc.'s predecessor or affiliate specified

that it "*shall* use its best efforts" and work "*day and night*" to expand facilities producing avgas

"*as soon as possible* and not later than August 1, 1943." *Shell Oil Co. v. United States*, No. 1:06-

cv-00141-SGB (Fed. Cl. Nov. 20, 2012), ECF No. 106-1 at JA002, JA027 (emphases added).  To

maximize production of this critical product, the "Government directed [those companies] to

undertake extraordinary modes of operation which were often uneconomical and unanticipated at

the time of the refiners' entry into their [avgas] contracts."  *Shell II*, 751 F.3d at 1287 (internal

citations omitted).  At the direction of the federal government, the oil companies, which include

certain Defendants here, increased avgas production "over twelve-fold from approximately 40,000

barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied

success in the war."  *Id.*

81.     With respect to Exxon Mobil's affiliates, the government "exerted substantial

control and direction over the refineries' actions, including decisions on how [and when] to use

---

[58]  Dick Decl. Ex. 68 (I. Waitz, S. Lukachko, & J. Lee, Military Aviation and the Environment: Historical Trends and Comparison to Civil Aviation, 42 J. of Aircraft 2 (2005)).

[59]  *See* Dick Decl. Ex. 69 (Coordinating Research Council, Handbook of Aviation Fuel Properties, CRC Report No. 635 (2004)).

[60]  Several prior decisions discuss these contracts and the power that the federal government held over Defendants to control production of oil and gas.  *See, e.g.*, *Shell II*, 751 F.3d at 1286; *Exxon Mobil Corp.*, 2020 WL 5573048, at *31.

raw materials and labor." *Exxon Mobil Corp.*, 2020 WL 5573048, at \*1, \*8. Courts have concluded that "[b]y controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry," and "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at \*11, \*14.

### e. Defendants Have Acted Under Federal Officers By Developing Mineral Resources On The Outer Continental Shelf For Decades

82. Defendants also acted under federal officers by producing oil and gas pursuant to the federal mineral exploitation and production regime created by the Outer Continental Shelf Lands Act ("OCSLA"). Congress enacted OCSLA in 1953 to govern the "exploration, development, [and] production of minerals" in the OCS, which includes all submerged lands that belong to the United States but are not part of any State. 43 U.S.C. § 1349(b)(1); *see also* 43 U.S.C. §§ 1301, 1331. OCSLA provides for federal control over the OCS to ensure the "expeditious and orderly development" of what Congress recognized to be a "vital national resource" in "a manner which is consistent with . . . national needs." 43 U.S.C. § 1332(3). The initial regulations "went well beyond those that governed the average federally regulated entity at that time." Declaration of Professor Tyler Priest, Dick Decl. Ex. 70 ("Priest Decl.") ¶ 19. "An OCS lease was a contractual obligation on the part of lessees to ensure that all operations *'conform to sound conservation practice'* . . . and *effect the 'maximum economic recovery'* of the natural resources on the OCS." *Id.* (citing 19 Fed. Reg. 90 (May 8, 1954), 30 C.F.R. § 250.11, 2656) (emphases added). In fact, the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS." *Id.* ¶ 20. As in *Arlington*, Defendants "are required to comply with all of these contractual requirements along with the statutes, regulations and policy manuals governing" their operations. 996 F.3d at 252.

**S.A. 262**

83.    Federal officials in the Department of the Interior—whom the Code of Federal Regulations called "supervisors"—exerted substantial control and oversight over Defendants' operations on the OCS from the earliest OCS exploration.  *See* Priest Decl. ¶ 19.  Federal supervisors had complete authority to control and dictate the "rate of production from OCS wells," *id.* ¶ 26, and had authority to suspend operations in certain situations, *id.* ¶ 20.  The supervisors also "had the final say over methods of measuring production and computing royalties," which were based on "the estimated reasonable value of the product as determined by the supervisor." *Id.* (internal quotation marks omitted).[61]  As Professor Priest explains, these federal officials "did not engage in perfunctory, run-of-the-mill permitting and inspection."  *Id.* ¶ 22.  Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands. *Id.* ¶ 28.

84.    In addition, the federal government exerted substantial control by issuing highly specific and technical orders, known as "OCS Orders," which, among other things: "specified how wells, platforms, and other fixed structures should be marked"; "dictated the minimum depth and methods for cementing well conductor casing in place"; "prescribed the minimum plugging and abandonment procedures for all wells"; and "required the installation of subsurface safety devices on all OCS wells." *Id.* ¶ 24 (citations omitted).  Professor Priest observes that through these OCS

---

[61]    The federal government uniquely reserves the authority to determine the value of production for purposes of determining how much royalty a lessee owes.  *See* Dick Decl. Ex. 71 § 6(b) ("The value of production for purposes of computing royalty shall be the reasonable value of the production *as determined by the Lessor*.") (emphasis added).  A typical commercial private lease would never reserve similar unilateral authority to one contracting party to control a material term of the lease contract.  *See* Dick Decl. Ex. 72 (Commercial Lease – Texas Association of Realtors, Form TAR-2101).  This would be akin to a commercial rental lease providing that the landlord has sole discretion to specify the rent owed.

Orders, federal officials "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety." *Id.* ¶ 25. These controls went far beyond typical regulations, as the federal government imposed requirements as the resource owner to achieve its economic and policy goals. *E.g.*, *id.* ¶¶ 28, 32.

85.     During the 1960s, U.S. domestic oil consumption increased 51%, compared to only 36% during the previous decade.[62] Demand continued to climb into the early 1970s, and domestic supply failed to keep pace, so the United States soon found itself facing a precarious shortage of oil. The United States increasingly turned to foreign countries, particularly in the Middle East, for oil. The amount of oil that the United States imported grew from 3.2 million barrels per day in 1970 to 6.2 million barrels per day in 1973.[63] By April 1973, President Nixon warned Congress of an impending energy crisis:

> As America has become more prosperous and more heavily industrialized, our demands for energy have soared. Today, with 6 per cent of the world's population, we consume almost a third of all the energy used in the world. Our energy demands have grown so rapidly that they now outstrip our available supplies, and at our present rate of growth, our energy needs a dozen years from now will be nearly double what they were in 1970. . . . If recent trends continue unchecked, we could face a genuine energy crisis. But that crisis can and should be averted, for we have the capacity and the resources to meet our energy needs if only we take the proper steps—and take them now.[64]

86.     To avert a national energy crisis, President Nixon ordered a dramatic increase in possible production on the OCS:

---

[62]  Dick Decl. Ex. 73, at 17 (Jay Hakes, *A Declaration of Energy Independence* (2008)).

[63]  Dick Decl. Ex. 74, at 591 (Yergin, *The Prize*).

[64]  Dick Decl. Ex. 75 (Excerpts From Nixon Message, N.Y. Times, Apr. 19, 1973, https://www.nytimes.com/1973/04/19/archives/excerpts-from-nixon-message-developing-our-domestic-energy.html).

> Approximately half of the oil and gas resources in this country are
> located on public lands, primarily on the Outer Continental Shelf
> [OCS]. The speed at which we can increase our domestic energy
> production will depend in large measure on how rapidly these
> resources can be developed. I am therefore directing the Secretary
> of the Interior to take steps which would triple the annual acreage
> leased on the Outer Continental Shelf by 1979, beginning with
> expanded sales in 1974 in the Gulf of Mexico and including areas
> beyond 200 meters in depth under conditions consistent with my
> oceans policy statement of May, 1970.[65]

87. Before the nation's precarious energy balance could stabilize, events abroad would exacerbate the crisis. The 1973 OPEC Oil Embargo "led to nationwide shortages of petroleum, a $60 billion drop in GNP, [and] more rapid inflation," among other harms.[66] The government called upon the oil and gas industry, including Defendants, to address this shortage. The nation's energy woes continued to mount in the mid-to-late 1970s, with a natural gas shortage caused by an abnormally cold winter in 1976 to 1977, a national coal strike in 1978, and a substantial reduction in crude oil supplies following the Iranian Revolution of 1979.[67] Yet the nation's dependency on imported oil continued to increase. By 1977, the United States was importing up to 8.8 million barrels per day—fully half of the nation's total domestic oil consumption.[68] The growing influence of OPEC, the quadrupling of oil prices during the energy crises of the 1970s, the staggering loss in GNP, and the now-infamous gas lines, price controls, and rationing that accompanied these energy crises spurred the U.S. government to take action over the ensuing decades to quickly and dramatically increase domestic oil production.

---

[65] *Id.*

[66] U.S. Dep't of Energy, National Energy Plan II, at 1 (1979), https://books.google.com/books?id=VR7PpPbRKFgC&printsec=frontcover#v=onepage&q&f=false.

[67] *Id.*

[68] *Id.* at tbl. IV-1.

88.     In 1973, President Nixon established the goal of energy independence for the U.S.

by 1980.  President Nixon dubbed this plan "Project Independence 1980" and, among other things,

ordered the Secretary of the Interior "to increase the acreage leased on the [OCS] to 10 million

acres beginning in 1975, more than tripling what had originally been planned."[69]  President Nixon

explained:

> Let me conclude by restating our overall objective.  It can be
> summed up in one word that best characterizes this Nation and its
> essential nature.  That word is "independence."  From its beginning
> 200 years ago, throughout its history, America has made great
> sacrifices of blood and also of treasure to achieve and maintain its
> independence.  In the last third of this century, our independence
> will depend on maintaining and achieving self-sufficiency in
> energy. . . .  What I have called Project Independence 1980 is a
> series of plans and goals set to [e]nsure that by the end of this
> decade, Americans will not have to rely on any source of energy
> beyond our own.[70]

89.     In 1978, Congress amended OCSLA to further encourage the leasing of the OCS

to meet national energy and security needs created by the oil embargoes of the 1970s.  Congress's

express purpose in amending the statute was to foster "expedited exploration and development of

the OCS in order to achieve national economic and energy policy goals, assure national security,

reduce dependence on foreign sources, and maintain a favorable balance of payments."[71]  Congress

---

[69]  Special Message to the Congress on the Energy Crisis, 1 Pub. Papers 17, 29 (Jan. 23, 1974),
https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001/69?rgn=full+text;view=image;q1=to
+increase+the+acreage.

[70]  Address to the Nation about National Energy Policy, 1 Pub. Papers 973, 976 (Nov. 25, 1973),
https://quod.lib.umich.edu/p/ppotpus/4731942.1973.001/1030?rgn=full+text;view=image.
After the Arab Oil Embargo, there was immense public pressure for Washington to "do
something"— to return prices to what they had been before the embargo and, at the same time,
ensure adequate domestic supplies.  Dick Decl. Ex. 74, at 660 (Yergin, *The Prize*).  *See also*
Meg Jacobs, *America's Never-Ending Oil Consumption*, Atlantic (May 15, 2016),
https://www.theatlantic.com/politics/archive/2016/05/american-oil-consumption/482532/.

[71]  43 U.S.C. § 1802 (1) & (2);  *see California ex rel. Brown v. Watt*, 668 F.2d 1290, 1296 (D.C.

expressly underscored the national public interest in "develop[ing] oil and natural gas resources in the [OCS] in a manner which is consistent with the need . . . to make such resources available to meet the Nation's energy needs as rapidly as possible." 43 U.S.C. § 1802(2).

90.    During the debate over the 1978 amendments, Senator Fritz Hollings proposed that the federal government create a national oil company to facilitate the development of oil and gas on the OCS: "My bill authorizes and directs the Secretary of the Interior to initiate a major program of offshore oil exploration—including deep drilling—in frontier areas of the [OCS]. . . . The Federal Government can conduct this program by using the same drilling and exploration firms that are usually hired by oil companies. The taxpayers of the United States—rather than the oil companies—would be the clients for these drilling companies, and the information received would pass directly into the public domain."[72] The proposal to create a government agency to develop the OCS was ultimately rejected. Instead, the government decided to contract with private energy companies to perform these essential tasks on its behalf with expanded oversight and control by the government. Dick Decl. Ex. 76; Priest Decl. ¶¶ 55–56.

91.    This was not the only proposal at the time to create a national oil company. *See* Priest Decl. ¶¶ 52–53; Cong. Rec. H4490 (daily ed. Feb. 26, 1975) (statement of Rep. McFall); Dick Decl. Ex. 76. Another proposal "would have formally established a 'Federal Oil and Gas Corporation'" that would be "'owned by the federal government' and 'in case of any shortage of natural gas or oil and serious public hardship, could itself engage in production on Federal lands

---

Cir. 1981); *see also* S. Rep. No. 93-1140, at 4937 (1974) ("During the next decade, development of conventional oil and gas from the United States Outer Continental Shelf can be expected (a) to provide the largest single source of increased domestic energy, (b) to supply this energy at a lower average cost to the U.S. economy than any alternative and (c) to supply it with substantially less harm to the environment than almost any other source.").

[72] *See* Dick Decl. Ex. 77 (121 Cong. Rec. S903-11 (1975)).

in sufficient quantities to mitigate such shortage and hardship.'" Priest Decl. ¶ 53. Yet another

proposal, from Representatives Harris and McFall, "would provide for the establishment of a

National Energy and Conservation Corporation—to be called Ampower—similar to the Tennessee

Valley Authority." 121 Cong. Rec. H4490 (daily ed. Feb. 26, 1975). Representative Harris

explained: "The creation of a quasi-public corporation such as Ampower can and should perform

these functions on public lands" to "[e]nsure that the public's oil and gas is developed in the public

interest." Dick Decl. Ex. 76, 9275–76. These proposals were ultimately rejected in favor of an

arrangement by which the government would contract with private companies, including

Defendants—*acting as agents*—to achieve this federal objective with expanded federal

supervision and control. *See* Priest Decl. ¶ 55.

92.     It is significant that Congress considered creating a national oil corporation to

develop the federally owned oil and gas resources located on the OCS, as many other countries

seeking to exploit their domestic petroleum resources have done. Ultimately, Congress decided

that the best and most efficient way to meet its enumerated national public policy goals and

objectives was to contract with private energy companies, including many of the Defendants here,

to produce federally owned oil and gas from these federal lands. The result was a closely

supervised leasing program directed by the Department of the Interior and providing the federal

government with control over the production sufficient to protect the national interests.[73] This

program thus required private companies to "perform[] a job that, in the absence of a contract with

a private firm, the Government itself would have had to perform," making removal appropriate.

*Watson*, 551 U.S. at 154.

93.     One of the Federal Energy Administration's first undertakings in 1974 was to

---

[73]    *See* Dick Decl. Ex. 77 (Cong. Rec. S903-11 (Jan. 27, 1975)).

propose significantly expanding the OCS leasing program, because "[r]ecent world events have spotlighted the growing dependence of the United States on imported crude oil and petroleum products" and "[i]nterruptions in oil imports impose severe costs on the United States due to the pervasive economic role of petroleum in almost every sector of the economy."[74]  This increased OCS leasing represented a crucial federal policy, because "the Outer Continental Shelf represents one of the most important potential sources of increased domestic energy production, [and so] the President has called for an accelerated leasing program as a mechanism to [e]nsure that the most favorable OCS exploration prospects become available for near-term development."  *Id.*

94.    Around this time, it was necessary to spur production of oil and gas on the OCS because alternatives were not feasible.  In the lead-up to the 1978 amendments, the Ad Hoc Select Committee on the OCS published a report stating that "alternative sources of energy will not be commercially practical for years to come," and thus, "a healthy economy remains dependent on supplies of oil and gas."[75]  The Committee concluded that "[d]evelopment of our OCS resources will afford us needed time—as much as a generation—within which to develop alternative sources of energy."[76]

95.    The 1978 OCSLA amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national goals.[77]  The amendments instructed the Secretary of the Interior to create an oil and gas leasing program on a five-year review cycle that provides as precisely as possible the size, timing, and location of leasing activities

---

[74]  Dick Decl. Ex. 78, at App'x 2 (H.R. Doc. No. 93-406 (1974)).

[75]  Dick Decl. Ex. 79, at 254 (H.R. Rep. No. 94-1084 (1976)).

[76]  Dick Decl. Ex. 80, at 53 (H.R. Rep. No. 95-590 (1977)).

[77]  *See id.* (recognizing that the amendments provided the federal government with the power and oversight capability to "expedite the systematic development of the OCS, while protecting our marine and coastal environment").

"which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. § 1344(a)–(e). Since 1978, several federal statutes have further expanded the OCS leasing program to promote the development of national energy supplies, including reductions in royalty payments to increase participation by Defendants to explore and develop deepwater resources.[78]

96.    In the 1990s, the Clinton Administration amended OCSLA to permit the Secretary of the Interior to grant certain royalty relief payments aimed at "reduc[ing] America's dependence on unreliable sources of imported oil by helping unlock an estimated 15 billion barrels of oil in the central and western Gulf of Mexico" for energy companies' exploration and production. Press Secretary, White House Office of Communications, Statement on North Slope Oil Bill Signing, 1995 WL 699656, at *1 (Nov. 28, 1995). And in the 2000s, the Bush Administration opened approximately 8 million additional acres of OCS lands for leasing in the Gulf of Mexico, stating: "By developing these domestic resources in a way that protects the environment, we will help address high energy prices, protect American jobs, and reduce our dependence on foreign oil." [79]

97.    As Professor Priest explains, these OCS leases are "*not merely commercial transactions* between the federal government and the oil companies. They reflect the creation of a valuable national security asset for the United States over time." Priest Decl. ¶ 7(1) (emphasis added). The development of the OCS was a "political and policy-driven project to incorporate ocean space and the OCS into the nation's public lands and manage OCS resources in the long-

---

[78]  *See, e.g.*, Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. No. 104-58, 109 Stat. 557 (1995); Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006).

[79]  The White House, *Fact Sheet: Tax Relief and Health Care Act of 2006* (Dec. 20, 2006), https://georgewbush-whitehouse.archives.gov/news/releases/2006/12/text/20061220.html.

term interest of U.S. energy security." *Id.* The federal OCS program "procured the services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own." *Id.* The federal government "had no prior experience or expertise," and "[t]herefore . . . had little choice but to enlist the service of the oil firms who did." *Id.* ¶ 18. But it was the federal government, not the oil companies, that "dictated the terms, locations, methods and rates of hydrocarbon production on the OCS" in order to advance federal interests in the production of these federally owned resources and accordingly, "[t]he policies and plans of the federal OCS program did not always align with those of the oil firms interested in drilling offshore." *Id.* ¶ 7(2). "Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." *Id.* The importance of the OCS to domestic energy security and economic prosperity has continued to the present, and across every administration. *See* Priest Decl. ¶ 79. For example, in 2010, President Obama announced "the expansion of offshore oil and gas exploration" because "our dependence on foreign oil threatens our economy." *Id.* ¶ 78.

98.     The leases require Defendants to maximize the ultimate recovery of the hydrocarbons from the leased area; require that drilling take place in accordance with a government approved exploration plan, development and production plan, or development operations coordination document as well as approval conditions; and specify that the federal government retains the right to oversee the lessee's rate of production from its leases.[80] The U.S. Bureau of Ocean Energy Management ("BOEM") maintains oversight over the lessees as they operate on

---

[80]  *See generally* Dick Decl. Exs. 59, 71, 81, 82; Adam Vann, Congressional Research Service, RL33404, *Offshore Oil and Gas Development: Legal Framework* (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multistep process for approval of development plans and BOEM oversight procedures).

federal land. Prior to exploration, development, or production, lessees must prepare and comply with detailed plans that are subject to comment and amendment by BOEM, state reviewers, or other agencies.[81] Indeed, for decades, Defendants' OCSLA leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."[82]

99.    Under these requirements, OCS lessees are subject to exacting oversight by BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property.[83] At all stages—from exploration, to preparation for developing and producing oil and gas reserves that have been discovered, to actual drilling and production—OCS lessees must submit exhaustive operational plans demonstrating how they will comply with the complex and detailed technical requirements imposed by these agencies. The relevant agency must then find, complete, and approve these plans before any such work can begin. BSEE then carefully monitors compliance with the approved plan and must approve any significant modification thereof.

100.    The federal government retains the right to control a lessee's rate of production on

---

[81]    *See* Offshore Oil and Gas Development: Legal Framework at 11–13.

[82]    Dick Decl. Ex. 81 § 10 (emphases added).

[83]    *See, e.g.*, 30 C.F.R. §§ 250.101–115, 250.130–146, 250.168–295, 250.400–463 (BSEE) & 550.101–147 (BOEM).

the OCS from its lease.[84]  In particular, BSEE, within the Interior Department, may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir.[85]  This requirement has existed since 1974,[86] and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises."[87]

101.    Through these federal leases, the government retains supervision and control over the use of federal property.  The mineral leasing laws, including OCSLA and the Mineral Leasing Act of 1920, 30 U.S.C. §181 *et seq.* ("MLA"), discussed below, are an exercise of Congress's power under the Property Clause of the Constitution.  U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").  The government issues onshore and offshore leases for a primary term of five to ten years, with a habendum clause under which the lessee retains the lease for so long after the primary term as the lease produces oil and gas in paying quantities.  30 U.S.C. § 226(e) (onshore); 43 U.S.C. § 1337(b)(2) (OCS); Dick Decl. Ex. 71 § 3.  But when the lease terminates, the property interest reverts to the United States; the lessee cannot acquire fee title interest.  Nor may a federal lessee assign its lease to another person without express government approval.  30 U.S.C. § 187; 43 C.F.R. § 3106 (onshore leases); 30 C.F.R. §§ 556.701(a), 556.800 (OCS leases).

102.    The United States controls federal mineral lessees like Defendants in other ways.

---

[84]  *See* Dick Decl. Ex. 81 § 10; 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law.").

[85]  30 C.F.R. § 250.1159.

[86]  *See* 39 Fed. Reg. 15885 (May 6, 1974) (approving OCS Order No. 11).

[87]  75 Fed. Reg. 20271, 20272 (Apr. 19, 2010).

An OCS lessee does not have an absolute right to develop and produce; rather, it has priority over other parties to seek approval from the United States to develop and produce under the lease. *See Sec'y of the Interior v. California*, 464 U.S. 312, 337–39 (1984); *Vill. of False Pass v. Clark*, 733 F.2d 605, 614–16 (9th Cir. 1984). The government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe."[88] The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. The government reserves the right to purchase up to 16⅔% of lease production, less any royalty share taken in-kind.[89] The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[90]

    103.    Through federal leases, the government balances economic development with environmental considerations. The Secretary of the Interior may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.[91] The Secretary may also suspend production from an OCS lease "if there is a threat of

---

[88]  Dick Decl. Ex. 81 § 14; Dick Decl. Ex. 71 § 15(d); *see* 43 U.S.C. § 1341(b).

[89]  43 U.S.C. § 1353(a)(2). The United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit. *See* 43 U.S.C. § 1341(f).

[90]  *Id.* In addition, the Secretary may compel a lessee to offer a percentage of lease production "to small or independent refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners). Dick Decl. Ex. 71 § 15(c); *see* 43 U.S.C. § 1337(b)(7).

[91]  43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.").

serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."[92]

104.    As these statutory and lease provisions demonstrate, a federal oil and gas lease is the means by which the federal government directs a lessee to develop federal minerals on the government's behalf.  Through these leases, the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives.  Without these federal leases on federal lands, the federal government would itself have to undertake these activities.  Indeed, it is the kind of "special relationship" that supports federal officer removal.  *Watson*, 551 U.S. at 157.

105.    Authorization of each five-year OCS leasing program is subject to environmental review under the National Environmental Policy Act, requiring the preparation of an Environmental Impact Statement ("EIS") to support the Record of Decision approving the scope of the program.  The EIS approving each five-year leasing program details the national need for oil and gas and how the leasing program meets those needs.[93]

106.    These environmental analyses confirm that the OCS leasing program exists to fulfill Congress's mandate to manage and encourage production of oil and natural gas from the OCS to further the national interest, not merely the commercial interests of the lessees.  In 2009, for example, oil produced from the OCS accounted for 30% of all domestic production.  The U.S. Treasury averages more than $10 billion per year from OCS bonuses, rental payments, and

---

[92]  43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons).

[93]  *See, e.g.*, 2012–2017 EIS.

royalties.  In evaluating alternatives that could replace OCS leases or the required "no action" alternative (*i.e.*, no OCS leases), the 2012-2017 EIS concluded that such alternatives would not meet the federal government's purpose or needs because any reduction in production would be replaced mostly by foreign imports of oil and gas, frustrating congressional intent.[94]

107.    The Record of Decision approving the 2017–2022 OCS Leasing Programs recognizes that the Secretary of the Interior must develop schedules of OCS oil and gas leasing that "best meet national energy needs for the 5-year period following its approval or re-approval."[95]    Although the federal government identified the no-lease alternative as the most environmentally preferred alternative, the government rejected it because it did "not meet the purpose and need for action . . . as it leaves a void in planning for national energy needs."[96]

108.    In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department reached nearly one billion barrels.  Historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production.[97]    The federal government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands in the form of royalty regimes that have resulted in billions of dollars of revenue to the federal government.  Moreover, the activities of lessees

---

[94]    *See id.* at 1–4, 4-606, 4-643 (projecting changes in oil markets if OCS production was halted).

[95]    43 U.S.C. § 1344(a)–(e).

[96]    U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Record of Decision and Approval of the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program (Jan. 17, 2017), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-Record-of-Decision.pdf.

[97]    *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

(including Defendants) pursuant to these leases further Congress's directives to the Executive Branch to facilitate and manage the production of oil and natural gas from the OCS to achieve the federal government's policy objectives.  If not for these activities of lessees under the direction and control of federal resource-management agencies, the federal government would have needed to perform those activities itself to implement Congress's directives regarding production of oil and gas from the OCS.

109.    The federal government's control over oil and gas production is thus fundamentally different from situations in which a highly regulated private party "simply compl[ies] with the law" and is outside the scope of the federal officer removal statute.  *Watson*, 551 U.S. at 152. Plaintiff's claims seek to punish Defendants for activities conducted under the close supervision of the federal government that effectuate national energy policy and support the national defense. Plaintiff's claims thus implicate precisely the type of "special relationship" that supports federal officer removal.  *Id.* at 157.

### f.    Defendants Acted Under Federal Officers By Developing Mineral Resources On Federal Lands

110.    Defendants also acted under the direction, supervision and control of the federal government in developing mineral resources on federal lands onshore.  The Interior Department's Bureau of Land Management ("BLM") leases, similar to OCS leases, provide that the United States "reserves the right to specify rates of development and production in the *public interest*."[98]

111.    The federal government maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property.  The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration

---

[98]    Dick Decl. Ex. 82 § 4 (emphasis added).

(government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[99]  "Oil and gas produced from the Federal and Tribal mineral estate are significant parts of the nation's energy mix.  For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States."  Dick Decl. Ex. 83.

112.    For onshore leases, the Secretary of the Interior may take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States."[100]  BLM leases also provide that "Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly."[101]  In addition, the Secretary may compel a lessee to offer a percentage of lease production to "small refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners).[102]

113.    As with OCS leases, the federal government also reserves the authority in BLM leases to determine the value of production for purposes of determining how much royalty a lessee owes.[103]  A typical commercial private lease would never reserve similar unilateral authority to one contracting party to control a material economic term of the lease contract.  *See* Dick Decl. Ex. 72 (Commercial Lease – Texas Association of Realtors, Form TAR-2101).  This would be akin to a commercial lease providing that the landlord has sole discretion to specify the rent owed.

---

[99]  *Id.*

[100]  30 U.S.C. § 192.

[101]  Dick Decl. Ex. 82 § 10.

[102]  43 USC § 1353(b).

[103]  *See* Dick Decl. Ex. 82 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products . . . .").

114.    Through federal leases, the government balances economic development with environmental considerations.  The Secretary of the Interior may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.[104]  The Secretary may also direct or grant suspensions of operations.[105]  BLM onshore leases also require the lessee to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest.[106]

115.    The MLA limits the onshore federal oil and gas lease acreage that may be held by any one person, enforceable by an action in federal court.  30 U.S.C. § 184(d), (h).  The government has the right to obtain "prompt access" to facilities and records.  *See* 30 U.S.C. § 1713.  And the United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit.  *See* 30 U.S.C. § 181.

116.    As discussed with respect to OCS leases, *supra* Section IV.B.1.e., a federal oil and gas lease is a contract to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees.  These are activities that the federal government would itself have to undertake without Defendants and thus removal is proper.  *Watson*, 551 U.S. at 157.

> **g.    Defendants Acted Under Federal Officers By Supplying And Managing The Strategic Petroleum Reserve**

117.    In response to the oil embargoes of the 1970s, Congress created the Strategic Petroleum Reserve ("SPR") in the Energy Policy Conservation Act of 1975, Pub. L. No. 94-163,

---

[104]  43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (MLA leases).

[105]  *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.

[106]  Dick Decl. Ex. 82 § 6.

**S.A. 279**

89 Stat. 871, to protect the country's energy security.  The SPR was a "stockpile of government-owned petroleum managed by the DOE [created] as a response to gasoline supply shortages and price spikes . . . to reduce the impact of disruptions in supplies of petroleum products and to carry out U.S. obligations under the 1974 Agreement on an International Energy Program."[107]  Several Defendants "acted under" federal officers in producing oil for the SPR and managing it for the federal government.

118.    The Act "declar[ed] it to be U.S. policy to store up to 1 billion barrels of petroleum products, provid[ed] for an early reserve, to contain at least 150 million barrels by December 1[9]78, and for an eventual storage system of at least 500 million barrels by December 1982.  It [was] estimated that a 500 million barrel reserve, combined with conservation measures, [could] essentially replace lost imports, for a period of 6 months for the most likely interruptions."  Dick Decl. Ex. 84 (Statement of Hon. John F. O'Leary, Administrator, Federal Energy Administration, Hearing before the Committee on Interior and Insular Affairs, U.S. Senate, on FEA's Strategic Petroleum Reserve Plan, at 30 (Feb. 4, 1977)).

119.    Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United States under any oil and gas lease [under OCSLA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas."  For example, after the September 11, 2001 attacks, President George W. Bush ordered that the SPR, "an important element of our Nation's energy security," "will be filled . . . principally through royalty-in-kind transfers to be implemented by the DOE and the Department of the Interior."[108]  From 1999 through December 2009, the U.S. government's

---

[107] *See* H.R. Rep. No. 115-965, at 3 (2018), https://www.congress.gov/115/crpt/hrpt965/CRPT-115hrpt965.pdf.

[108] Statement on the Strategic Petroleum Reserve, 2 Pub. Papers 1406 (Nov. 13, 2001),

"primary means of acquiring oil for the [SPR]" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called Royalty In Kind ("RIK") program.[109]   During that time, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion.[110]

120.    The federal government required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations.[111]   The federal government also contracted with some of the Defendants (including their predecessors, subsidiaries, or affiliates) to deliver to the SPR millions of barrels of oil under the RIK program.[112]   The government also contracted with those Defendants to assist in the physical delivery of these RIK payments to the Strategic Petroleum Reserve.   *See,*

---

https://www.govinfo.gov/content/pkg/PPP-2001-book2/pdf/PPP-2001-book2.pdf.

[109] U.S. Dep't of Energy, *Filling the Strategic Petroleum Reserve*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited May 25, 2021).

[110] Dick Decl. Ex. 85 (U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report for Calendar Year 2010, at 18, 37 (2011) ("SPR 2010 Report")); *see id.* at 39 (Table 13).

[111] *See, e.g.*, Dick Decl. Ex. 86 (Dear Operator Letter) (invoking OCSLA and royalty provisions in federal leases operated by certain Defendants, and/or their predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").

[112] *See, e.g.*, Dick Decl. Ex. 87 (U.S. Dep't of Interior, Minerals Management Service, *MMS RIK Program to Help Fill Strategic Petroleum Reserve* (May 31, 2007)) (describing such contracts "to transport Royalty in Kind (RIK) crude oil that will be used to resume filling the nation's Strategic Petroleum Reserve (SPR)"); Minority Staff of the Permanent Subcomm. on Investigations of the Comm. on Governmental Affairs, S. Prt. 108-18, U.S. Strategic Petroleum Reserve: Recent Policy Has Increased Cost to Consumers But Not Overall U.S. Energy Security (1st Sess. 2003) (describing government contract with a predecessor affiliate of Defendant Shell Oil Company to deliver nearly 19 million barrels of oil to the Strategic Petroleum Reserve as part of the RIK program), https://www.govinfo.gov/content/pkg/CPRT-108SPRT85551/html/CPRT-108SPRT85551.htm.

**S.A. 281**

*e.g.*, Dick Decl. Ex. 88, at 19.

121.    Finally, some of the Defendants acted under federal officers by operating the SPR infrastructure for the government.  For example, from 1997 to 2019, DOE leased to Defendant Shell USA, Inc. affiliates the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana.  "Under the lease agreement, Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s required to support the Strategic Petroleum Reserve as a sales and distribution point in the event of a drawdown."[113]  Starting January 2020, the DOE leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company).[114]  Similarly, "[u]nder the lease agreement, Exxon Mobil [Pipeline Company] . . . *must support the SPR as a sales and distribution point in the event of an SPR drawdown*."[115]  And the DOE has leased to the same ExxonMobil affiliate two government-owned pipelines that are part of the SPR near Freeport, Texas.[116]

122.    The SPR subjects Defendants to the federal government's supervision and control in the event of the President's call for an emergency drawdown.[117]  The United States has exercised

---

[113]  *See* SPR 2010 Report at 16.

[114]  *See* U.S. Dep't of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil.

[115]  U.S. Dep't of Energy, *Strategic Petroleum Reserve Annual Report for Calendar Year 2018*, at 15 (Jan. 2020) (emphasis added) https://www.energy.gov/sites/prod/files/2020/01/f70/2018%20SPR%20Report%20to%20Congress.pdf.

[116]  *See* Dick Decl. Ex. 85 (SPR 2010 Report) at 25, 49; U.S. Dep't of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[117]  *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under

this control, including as a result of President Bush's Executive Order to draw down the reserve in response to Hurricane Katrina in 2005 and President Obama's Executive Order to draw down the reserve in response to disruptions to oil supply in Libya in 2011.[118] Thus, the hundreds of millions of barrels of oil flowing through these facilities—the sale and combustion of which are part of the causal chain leading to Plaintiff's alleged injuries—were subject to federal government direction, control, and supervision.[119]

### h. Defendants Acted Under Federal Officers By Constructing Pipelines For Oil Transportation

123. Defendants also acted under the federal government as agents in constructing and operating pipelines to transport oil for national defense purposes. During World War II, oil transportation by tankers "experienced major disruption as a result of attacks by German submarines."[120]

124. "To [e]nsure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfields and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively" (together, the "Inch Lines"). *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*"). War Emergency Pipelines, Inc. ("WEP"), "a Delaware

---

the international energy program.").

[118] *See* Dick Decl. Ex. 89 U.S. Dep't of Energy, *History of SPR Releases*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last visited May 25, 2021); Dick Decl. Ex. 90, at 17, 18, 21.

[119] *See generally* U.S. Dep't of Energy, *2018-2022 Strategic Vision*, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf (last visited Oct. 23, 2020).

[120] Dick Decl. Ex. 91, at 3 (National Park Service, Historic American Engineering Record No. TX-76, War Emergency Pipeline (Inch Lines) Inch Lines Historic District (1968)).

corporation created by eleven of the major oil companies," including predecessors or affiliates of Defendants,[121] constructed and operated the Inch Lines "under contracts" and "as agent" for the federal government.  *WEP II*, 175 F. 2d at 335; *Schmitt v. War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 158 (E.D. Ark. 1947) ("*WEP I*").[122]

125.    Federal officers exerted operational control over the Inch Lines and Defendants' affiliates.  WEP operated wholly on capital from the government, and "received no fee or profit." *WEP II*, 175 F.2d at 336; *see also, e.g.*, *WEP I*, 72 F. Supp. at 158.  The government also required approval and set the salaries of all personnel that WEP employed.  *See WEP II*, 175 F.2d at 336.

> After completion of the pipe lines, [WEP], in the name of, and acting as agent for [the government], purchased petroleum or petroleum products at the origins of the respective pipe lines, at OPA prices, and as such agent delivered and sold the through-put at the respective termini.  The sales price was cost plus a sum specified by Defense Supplies Corporation.  The Petroleum Administration for War issued directives to . . . [WEP], which, among other things, designated from whom products should be purchased and to whom they should be sold.

*WEP I*, 72 F. Supp. at 158.

126.    Petroleum Directives 63 and 73 governed the Big Inch and Little Big Inch pipelines, respectively, and exerted substantial control over WEP, and thus Defendants.  The government

---

[121] The eleven companies that constituted WEP were Shell Oil Company, Inc., Standard Oil Company (New Jersey), The Texas Company, Gulf Refining Company, Pan American Petroleum & Transport Company, Cities Service Company, Atlantic Pipe Line Company, Sinclair Oil Corporation, Sun Pipe Line Company (Texas), Socony-Vacuum Oil Company, Inc. and Tidal Pipe Line Company.  Several of these companies are predecessors or affiliates of current Defendants.  *See* Dick Decl. Ex. 92 (Certificate of Dissolution of War Emergency Pipelines, Inc. 1–2 (Aug. 28, 1947)); *id.* Ex. 6, at 108 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War: 1941-1945* (1946)).

[122] These decisions provide details of the construction contracts under which the government "delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement.'" *WEP I*, 72 F. Supp. at 157.

required WEP to prepare and file "daily reports" and a monthly "forecast" regarding its operation of the Inch Lines.[123] The government had power to "direct such affirmative action as may be necessary to accomplish the purposes" of the Inch Lines—namely, "relieving shortages" and "augmenting supplies for offshore shipments" while replacing "tankers normally engaged in the transportation of petroleum products from the United States Gulf Coast to Atlantic ports" that were "los[t] through enemy action." *Id.* The goal was to ensure "maximum operating capacity for the prosecution of the war and most effective utilization of petroleum." *See* Dick Decl. Ex. 93, at 25–26 (Statement of W. Alton Jones, Chairman, Committee on Postwar Disposal of Pipe Lines, Refineries, and Tankers, Hearings before the Special Committee Investigating Petroleum Resources (Nov. 15, 1945)) ("Under wartime operation, the oil business operated under directives of the Petroleum Administration for War. . . . [Oil companies] w[ere] ordered to divert oil and deliver at the receiving terminals of the big lines sometimes by expensive means to keep these lines running to capacity, and that was done in the interest of the war effort because we needed every barrel of oil we could deliver to the East.").

127. The government controlled all oil WEP moved through the pipelines on its behalf.[124] During their operation by WEP, the Inch Lines provided "life lines to the east," delivering "379,207,208 barrels of crude oil and refined products" and serving "military necessity" for "the cross-Atlantic fronts."[125] The Inch Lines *were built for a single purpose, to meet a great*

---

[123] Utilization of War Emergency Pipeline, 8 Fed. Reg. 1068–69 (Jan. 20, 1943) (Petroleum Directive 63); War Emergency Petroleum Products Pipeline, 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73).

[124] 8 Fed. Reg. at 1069, 1555.1 § (e)(4) ("No petroleum or petroleum products shall be transported through the facilities of the War Emergency Pipeline System except in pursuance of this Directive or amendments and supplements thereto."); *id.* at 13343, § (d)(3) (same).

[125] Dick Decl. Ex. 6, at 104–05, 108.

*war emergency*. . . . [T]hey helped to win a war that would have taken much longer to win without them." Dick Decl. Ex. 4 at 17 (emphasis added). Without Defendants as contractors and agents (via WEP), "the Government itself would have had to perform" these essential wartime activities. *Watson*, 551 U.S. at 154.[126]

### 2. Defendants' Activities Are Related To Plaintiff's Claims

128.    Plaintiff's claims are "for or relating to" acts Defendants performed under color of federal office. 28 U.S.C. § 1442(a)(1). To meet this prong, there need only be "connect[ion] or associat[ion] with acts under color of federal office." *Baker*, 962 F.3d at 943 (quoting *Latiolais*, 951 F.3d at 292) (emphasis omitted); *see also Def. Ass'n of Philadelphia*, 790 F.3d at 471. Indeed, the Seventh Circuit recently affirmed that Congress has abandoned the former (and narrower) requirement of a "causal connection," under which defendants previously were required to "demonstrate that the acts for which they were being sued occurred at least in part because of what they were asked to do by the Government." *Baker*, 962 F.3d at 943 (emphasis omitted). The Removal Clarification Act of 2011 altered this standard by inserting the words "or relating to" into the statute, which intentionally "broaden[ed] the universe of acts that enable Federal officers to

---

[126] The federal government has taken a number of other actions to promote the domestic production of oil and gas to protect important state interests. These include the Energy Petroleum Allocation Act of 1973, Pub L. No. 93-159, 87 Stat. 627 (1973) and the Federal Energy Administration ("FEA") Act of 1974, Pub. L. No. 93-275, 88 Stat. 96 (1974). The FEA congressional report published stated, "Prospects for large, new discoveries of onshore oil and gas deposits in the lower 48 States are small. For this reason, it is proposed that leasing of the Federal OCS be accelerated, to include frontier areas of Alaska, the Atlantic and Pacific coasts, and the Gulf of Mexico." Dick Decl. Ex. 78, at 1012 (H.R. Doc. No. 93-406). The report further noted that "there would be strategic foreign policy and national security advantages in having energy sources which are not susceptible to interruption by a foreign power." *Id.* More recent administrations have continued to promote the development of oil and gas on the OCS. For example, the Energy Policy Act of 2005 sought, among other things, "to promote oil and natural gas production from the [OCS] and onshore Federal lands under lease by providing royalty incentives to use enhanced recovery techniques." Pub. L. No. 109-58, § 357(a)(2)(B), 119 Stat. 594 (2005).

remove to Federal court." *Def. Ass'n of Philadelphia*, 790 F.3d at 467 (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425).

129.    Even before the Removal Clarification Act, the Supreme Court had "never utilized a rigid causation standard for removal," and a removing party was required only to "'demonstrate that the acts for which they [we]re being sued' occurred at least in part '*because of* what they were asked to do by the Government.'" *Baker*, 962 F.3d at 943–44 (quoting *Def. Ass'n of Philadelphia*, 790 F.3d at 471). "'[T]he statute [did] not require that the [lawsuit] must be for the very acts which the [defendant] admits to have been done . . . under federal authority. It is enough that [the] acts . . . constitute the basis . . . of the state [lawsuit].'" *Baker*, 962 F.3d at 944 (quoting *Maryland v. Soper*, 270 U.S. 9, 33 (1926)). The Removal Clarification Act then "'broadened federal officer removal to actions . . . *connected* or *associated*[] with acts under color of federal office.'" *Baker*, 962 F.3d at 943 (quoting *Latiolais*, 951 F.3d at 292).

130.    It is, therefore, not necessary "that the complained-of conduct *itself* was at the behest of a federal agency." *Baker*, 962 F.3d at 944. The plaintiff's *lawsuit* must simply be connected or associated with acts under color of federal office. It is "sufficient" if Plaintiff's "allegations are directed at the relationship between the [Defendants] and the federal government," for at least *some* of the time frame relevant to Plaintiff's claims. *Id.* at 944–45; *accord Def. Ass'n of Philadelphia*, 790 F.3d at 470–71; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016).

131.    Again, *Baker* is directly on point. There, the Seventh Circuit held that removal under the federal officer removal statute was proper where certain chemicals underlying plaintiff's purported pollution-based harms had, at times, been in materials that were "critical wartime commodities" subject to "price control[s]," detailed federal oversight, and mandatory orders

**S.A. 287**

"setting aside" a portion of the defendants' products for the government's own use. *Baker*, 962 F.3d at 940–41, 945.[127]  The defendants did not need to show that federal officers directed the alleged pollution itself, or even the defendants' storage and waste disposal practices; rather, it was "enough for the present purposes of removal that *at least some* of the pollution arose from the federal acts." *Id.* at 945 (emphasis added).  To the extent there were "questions" about whether the alleged pollution flowed from defendants' activities under federal direction, "those are *merits questions* that a federal court should decide." *Id.* at 944.  *See also, e.g.*, *Def. Ass'n of Philadelphia*, 790 F.3d at 471–72 ("for or relating to" element satisfied because conduct "related to" acts done under federal supervision, even though no specific conduct at issue in the suit was directed by the government).

132.    In *Papp*, likewise, the "for or relating to" element was satisfied in a failure-to-warn lawsuit where the defendant established a "connection" between manufacturing aircraft for the federal government and the plaintiffs' alleged asbestos exposure, even though the government had not directly prohibited the defendants from issuing asbestos-related warnings.  842 F.3d at 813.

133.    Most recently, in *Arlington*, the Fourth Circuit held that nuisance claims premised on defendants' distribution of opioids were sufficiently "related to" defendants' federally directed distribution of opioids, even though the plaintiffs' allegations did not reference any federal distribution, which was just a subset of the distribution at issue.  996 F.3d at 256–57.

134.    Here, numerous federal activities are encompassed in Plaintiff's Complaint and relate to Plaintiff's causes of action, especially when construed "in the light most favorable to the"

---

[127] *See also Williams v. Todd Shipyards Corp.*, 154 F.3d 416, 1998 WL 526612, at *1, *6 (5th Cir. 1998) (per curiam) (federal officer removal was proper even under causal standard, where the plaintiff was exposed to asbestos while working for the defendant, even though the defendant "did both commercial work for private parties" and worked under government contract on ships owned or operated by the federal government).

existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 466, and giving Defendants the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 945.

135.    Plaintiff alleges that Defendants' production and sale of oil and gas—which necessarily includes production and sales under the direction, supervision and control of federal officers described above—led to the combustion of these oil and gas products, which led to the release of greenhouse gases by end users, also including the federal government.  Critically, the oil and gas upon which Plaintiff bases its claims include the *very same* oil and gas that Defendants extracted and produced under the direction, supervision, and control of the federal government. Moreover, the federal government directed, supervised, and controlled Defendants' production, sale, and distribution of oil and gas to help it accomplish critical domestic and foreign policy objectives.

136.    Accordingly, Plaintiff seeks to hold Defendants liable for the activities Defendants performed in the implementation of federal policy initiatives under federal direction, supervision, and control of federal officers.   Their claims "necessarily include[] activity that is directly connected to . . . DOD contract[s]." *Arlington*, 996 F.3d at 257.  Such a close association is more than enough to satisfy the nexus element of the federal officer removal statute, which requires only that the plaintiff's action be "connected or associated" "with acts under color of federal office." *Baker*, 962 F.3d at 943 (quoting *Latiolais*, 951 F.3d at 292) (emphasis omitted); *see also Def. Ass'n of Philadelphia*, 790 F.3d at 474.  At a minimum, under Defendants' reasonable theory of the case, which the Court must credit in assessing whether the nexus element is satisfied, *Acker*, 527 U.S. at 432; *Def. Ass'n of Philadelphia*, 790 F.3d at 474, a clear connection or association exists between Defendants "acting under" federal officers by extracting and producing oil and gas

**S.A. 289**

pursuant to federal contracts and specifications, and Plaintiff's attempt to impose liability on Defendants for that very same conduct. *See also Leite*, 759 F.3d at 1124 ("In assessing whether a causal nexus exists, we credit the defendant's theory of the case.").

137.    Plaintiff's allegations regarding Defendants' alleged misrepresentations and "deception" do not preclude removability. As explained above, Plaintiff's claims, as pleaded, depend on the theory that Defendants' alleged misrepresentations resulted in the increased production, sale, and use of oil and gas, thereby producing increased global emissions that allegedly exacerbated climate change and thus Plaintiff's alleged injuries. *See, e.g.*, Compl. ¶¶ 1, 4, 13. Because Defendants have acted under the direction, supervision, and control of federal officers in producing oil and gas for decades, Plaintiff's lawsuit is "connected or associated, with [Defendants'] acts under color of federal office." *Baker*, 962 F.3d at 943.

138.    Similarly, Plaintiff's attempt to disclaim "injuries arising on federal property and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government" cannot defeat removal, because the government-related emissions are inextricable from other emissions. Compl. ¶ 11 n.6. Courts consistently reject attempts to frustrate federal removal with disclaimers where, as here, Defendants' federal officer defenses are still applicable to one or more of Plaintiff's claims. In *Baker*, for example, the plaintiffs attempted to assert that their action did not pertain to manufacturing activities by one defendant that acted under federal direction in an obvious attempt to evade federal officer removal. *See* 962 F.3d at 945 n.3. The Seventh Circuit decisively rejected this gambit, holding that, when the plaintiffs allege that certain manufacturing "waste streams" "harmed them," they cannot "have it both ways" by "purport[ing] to disclaim" that their lawsuit challenged a defendant's similar actions "for the government." *Id.* Plaintiffs' attempted disclaimer was "just another example of a difficult

causation question that a federal court should be the one to resolve." *Id.* Likewise, here, greenhouse gas emissions attributable to Defendants' production of oil and gas under the direction of the federal government have precisely the same alleged impact on Plaintiff as do emissions from any other source. *See e.g.*, Compl. ¶¶ 1, 4, 9; *AEP*, 564 U.S. at 422 ("Greenhouse gases once emitted 'become well mixed in the atmosphere'; emissions in New Jersey may contribute no more to flooding in New York than emissions in China.") (citation omitted); *see also, e.g.*, *Rhodes v. MCIC, Inc.*, 210 F. Supp. 3d 778, 786 (D. Md. 2016) (in failure-to-warn suit with attempted disclaimer, holding that "[plaintiffs] have cited no authority that allows such language to bar the assertion of the federal officer defense where it is otherwise applicable," and plaintiffs were "clearly keeping in play a claim against Defendants who could legitimately assert the federal officer defense"); *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *1 n.2, *4 (N.D. Cal. June 22, 2007) (finding disclaimer ineffective where the plaintiff waived claims for exposure committed at the direction of a federal officer but nonetheless sought relief for exposure aboard Navy vessels).

139.   Moreover, the disclaimer is meaningless because, as the Supreme Court has recognized, greenhouse gases cannot be traced to any particular source or any particular jurisdiction; "once emitted[, they] 'become well mixed in the atmosphere.'" *See AEP*, 564 U.S. at 422 (quoting 74 Fed. Reg. 66514, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act (Dec. 15, 2009)); *see also* Compl. ¶ 33–38. Plaintiff's claims are thus based on *global* emissions that are impossible to trace to any particular source.  Accordingly, Plaintiff has no basis on which to attempt to carve out fuel extraction and production on federal lands and at the direction of the federal government, or anywhere else for that matter.

140.   For similar reasons, the Western District of Michigan recently rejected an attempt

**S.A. 291**

by a group of plaintiffs to avoid federal officer removal that went even further than Plaintiff's disclaimer attempts here. Plaintiffs in *Nessel v. Chemguard, Inc.* alleged injuries caused by environmental contamination from certain firefighting agents that were sold for both military and civilian purposes. 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021). Plaintiffs attempted to avoid removal with respect to civilian production and sales by *filing two separate complaints*— one for injuries resulting from chemicals produced for the military, and one for the commercially produced versions of those same agents. The court concluded that it had federal officer removal jurisdiction over both complaints because plaintiffs did not establish that injuries from commercial chemicals and military chemicals "will be distinguishable." *Id.* at *3. Plaintiff here does not even try to separate its claims and injuries into two separate complaints—rather, Plaintiff flatly asserts that its injuries are caused by the cumulative production and combustion of *all* oil and gas production for decades. *See, e.g.*, Compl. ¶ 4; *see also Nessel*, 2021 WL 744683, at *3 ("Plaintiffs' artful pleading does not obviate the facts on the ground" demonstrating that "Defendants were at least plausibly acting under color of federal office during the relevant timeframe.").

### 3. Defendants Have Colorable Federal Defenses

141. Defendants intend to raise several meritorious federal defenses, including the government-contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 504–14 (1988); preemption, *see Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010); and federal immunity, *see Campbell-Ewald v. Gomez*, 577 U.S. 153, 166–69 (2016). Defendants satisfy all elements of the government-contractor defense, which precludes liability related to alleged defects in military equipment when: (1) the United States approved reasonably precise specifications for that equipment; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *Boyle*, 487 U.S. at 512. This defense allows government contractors, like

Defendants here, to receive the benefits of sovereign immunity when a contractor complies with the specifications of a federal government contract. *Id.* at 511–12.

142. *Boyle* is analogous. In *Boyle*, the Supreme Court applied a federal common-law government contractor defense in a state-law product liability action because (1) the suit involved a unique federal interest and (2) a state law holding government contractors liable for design defects in military equipment would present a significant conflict with federal policy. 487 U.S. at 504–13. In addition, as the Court acknowledged in *Campbell-Ewald*, "[w]here the Government's 'authority to carry out the project was validly conferred,'" a contractor "who simply performed as the Government directed," may be immune from liability. 577 U.S. at 167 (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940)). Here, Defendants produced oil and gas at the direction of the federal government, and thus have a colorable argument that they are immune from liability.

143. *Baker* also confirms the viability of Defendants' government contractor defense where, as here, defendants provided "critical wartime supplies" to the federal government as "dictated" by the federal government according to its "detailed specifications." 962 F.3d at 946–47. "[A]ll that the defense requires," the Seventh Circuit explained, is that the contractor supplied products for government use in conformity with "the government's 'reasonably precise specifications.'" *Id.* at 946 (quoting *Boyle*, 487 U.S. at 512). As discussed in detail above, Defendants have done, and continue to do, exactly that.

144. Plaintiff's claims are also barred by the U.S. Constitution, including the Interstate and Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3, the Supremacy Clause, *id.* art. VI, cl. 2, the Due Process Clauses, *id.* amends. V & XIV, § 1, and the foreign affairs doctrine, *see United States v. Pink*, 315 U.S. 203, 230–31 (1942).

**S.A. 293**

145.     For example, although Plaintiff purports to plead state-law claims, state law cannot constitutionally apply here and thus is preempted.  As the U.S. Supreme Court has long made clear, the federal Constitution's structure generally precludes States from using their own laws to resolve disputes caused by out-of-state and international conduct.  Thus, in cases involving "interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations," "our federal system does not permit the controversy to be resolved under state law" "because the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981).  Consistent with this principle, the Supreme Court has repeatedly recognized that one State cannot apply its own law to claims that "'deal with air and water in their ambient or interstate aspects'"; in that context, "borrowing the law of a particular State would be inappropriate." *AEP*, 564 U.S. at 421–22 (citation omitted).  Every federal court to consider the question has held that plaintiffs cannot rely on state law to obtain relief for the alleged consequences of global climate change.  *See, e.g.*, *City of New York*, 993 F.3d 81.  The Constitution bars the application of state law here to avoid subjecting the same interstate and worldwide emissions to adjudication under conflicting state laws, and thus preempts the state-law causes of action Plaintiff asserts.

146.     Moreover, Plaintiff's claims are preempted by the federal Clean Air Act.  In an analogous matter more than thirty years ago, the U.S. Supreme Court held that the Clean Water Act "precludes a court from applying the law of an affected State against an out-of-state source" because doing so would "upset[] the balance of public and private interests so carefully addressed by the Act." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).  The preemptive scope of the Clean Air Act is materially identical to that of the Clean Water Act.  *See, e.g.*, *Cooper*, 615 F.3d at 304 (applying *Ouellette*'s reasoning to the Clean Air Act based on the two statutes' similar

**S.A. 294**

structure).  The "Clean Air Act entrusts such complex balancing" of total permissible nationwide greenhouse gas emissions "to [the] EPA."  *AEP*, 564 U.S. at 427.  The Clean Air Act thus precludes Plaintiff's attempt to use Illinois law to obtain damages for injuries allegedly caused by innumerable worldwide sources of greenhouse gas emissions.  *See State of Delaware v. BP Am., Inc.*, 2024 WL 98888, at *24 (Del. Super. Ct. Jan. 9, 2024) (holding in a materially identical case that "seeking damages for injuries resulting from out-of-state or global greenhouse, are pre-empted by the CAA" and "beyond the limits of [state] common law").

147.    The relief Plaintiff seeks would also have the practical effect of imposing liability for conduct far outside the borders of Illinois—and the United States.  But imposing such extraordinary extraterritorial liability on lawful, government-encouraged conduct, namely the release of greenhouse gas emissions, would constitute "a due process violation of the most basic sort."  *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).  A "State cannot," consistent with due process, "punish a defendant for conduct that may have been lawful where it occurred."  *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 409, 421 (2003); *see also BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 573 (1996).  Moreover, such extraterritorial liability for conduct lawful in other States would exceed "the usual 'legislative power of a State to act upon persons and property within the limits of its own territory,'" a principle that respects the vital "role territory and sovereign boundaries play in our federal system."  *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1156 (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)).

148.    The foreign affairs doctrine also precludes exercises of state law and state-law causes of action that would "impair the effective exercise of the Nation's foreign policy."  *Garamendi*, 539 U.S. at 419 (quoting *Zschernig v. Miller*, 389 U.S. 429, 440 (1968)); *Pink*, 315 U.S. at 230–31 ("[S]tate law must yield when it is inconsistent with or impairs the policy or

provisions of a treaty or of an international compact or agreement."). Plaintiff's claims would interfere with the U.S. government's control of foreign policy, now and prospectively, including governmental efforts to address climate change and the allocation of costs through multilateral negotiations.

149. And, finally, to the extent Plaintiff's claims target Defendants' statements, they are barred by the First Amendment. In the Complaint, Plaintiff alleges that Defendants "oppos[ed] GHG emission-reduction initiatives," "disseminated" information to "government," and sought to "prevent U.S. adoption" of the Kyoto Protocol. Compl. ¶¶ 23, 92, 114. As the Supreme Court has held, lobbying activity is protected from civil liability. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 671 (1965); *see also Baltimore Scrap Corp. v. David J. Joseph Co.*, 81 F. Supp. 2d 602, 620 (D. Md. 2000), *aff'd*, 237 F.3d 394 (4th Cir. 2001) ("*Noerr–Pennington* immunity . . . applies to . . . state common law claims."). This is true even if "the campaign employs unethical and deceptive methods." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500 (1988); *see also New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) ("[T]he holding of *Noerr* is that lobbying is protected whether or not the lobbyist used deceit.").

150. These and other federal defenses are more than colorable, and thus satisfy the test for federal officer removal under the statute. *See Willingham*, 395 U.S. at 407 (defendant invoking § 1442(a)(1) "need not win his case before he can have it removed"); *Baker*, 962 F.3d at 947 (noting that a case may "present[] complex issues, but the propriety of removal does not depend on the answers") (cleaned up). Accordingly, removal under Section 1442 is proper.

## V.    THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS NECESSARILY ARISE UNDER FEDERAL LAW

151. This action is removable because, as a matter of federal constitutional law and

structure, Plaintiff's claims necessarily arise under federal, not state, law. Under our federal constitutional system, state law cannot be used to resolve claims seeking redress for injuries allegedly caused by out-of-state and international emissions. The issues presented by the Complaint are thus exclusively federal in nature, and state law has no role to play. As the Supreme Court has repeatedly confirmed: "When we deal with air and water in their ambient or interstate aspects, there is a federal common law." *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103). Claims resulting from greenhouse gas emissions, like Plaintiff's, "must be brought under federal common law." *City of New York*, 993 F.3d at 95. And under 28 U.S.C. § 1331, federal courts have original jurisdiction over "claims founded upon federal common law as well as those of a statutory origin." *Nat'l Farmers*, 471 U.S. at 850 (quoting *Milwaukee I*, 406 U.S. at 100). Because Plaintiff's claims necessarily arise under federal law, this Court has federal-question jurisdiction and removal is proper.[128]

152.    As relevant here, a claim that "arise[s] under federal common law . . . is a permissible basis for jurisdiction based on a federal question" under Section 1331's grant of such jurisdiction. *Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 383 (7th Cir. 2007); *see also Milwaukee I*, 406 U.S. at 100 ("a cause of action . . . 'arises under' federal law if the dispositive issues stated in the complaint require the application of federal common law"); *Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 126 (2d Cir. 1999) ("[I]f federal common law governs a case, that case [is] within the subject matter jurisdiction of the federal courts.").

---

[128] Because claims for interstate and international pollution are "exclusively the province of federal law," Plaintiff's claims are also completely preempted by federal law and removable on that basis. *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 670 (1974).

153.    Federal common law governs when "a federal rule of decision is 'necessary to protect uniquely federal interests.'" *Texas Indus., Inc.*, 451 U.S. at 640.  Claims for interstate or international pollution implicate "uniquely federal interests" and must be subject to uniform federal law as a matter of fundamental constitutional structure.  In our federal system, each State may make law within its own borders, but no State may "impos[e] its regulatory policies on the entire Nation," *see Gore*, 517 U.S. at 585, or dictate our "relationships with other members of the international community," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964).  Federal law therefore must govern inherently interstate or international matters to the exclusion of state law, because "the basic scheme of the Constitution so demands." *AEP*, 564 U.S. at 421.

154.    The Supreme Court has confirmed repeatedly that when, as here, "we deal with air and water in their ambient or interstate aspects, there is a federal common law." *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103); *see also, e.g.*, *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area 'within national legislative power,' one in which federal courts may fill in 'statutory interstices,' and, if necessary, even 'fashion federal law.'").  Indeed, "[f]or over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 91.  Because federal law governs to protect uniquely federal interests, state law *cannot* apply to such claims: "if federal common law exists, it is because state law cannot be used." *Milwaukee II*, 451 U.S. at 313 n.7; *see also Milwaukee I*, 406 U.S. at 105 n.6, 107 n.9 (noting that the "basic interests of federalism . . . demand[]" that "the varying common law of the individual States" cannot govern disputes involving interstate air and water); *City of New York*, 993 F.3d at 98.  The Supreme Court put the point succinctly in *International Paper Co. v. Ouellette*, observing that "interstate . . . pollution is a matter of federal, *not state*, law." 479 U.S. at 488 (emphasis added).  "[S]ome areas involving

**S.A. 298**

'uniquely federal interests' may be so important to the federal government that a 'federal common law' related to those areas will supplant state law . . . *regardless* of whether Congress has shown any intent to preempt the area." *Caudill v. Blue Cross & Blue Shield of N.C.*, 999 F.2d 74, 78 (4th Cir. 1993) (emphasis added). This is one such area.

155.    Under the applicable two-step approach, courts must engage in a two-step analysis: (1) determine for jurisdictional purposes whether the source of law is federal or state based on the nature of the issues at stake; and (2) if federal law is the source, determine the substance of the federal law and decide whether the plaintiff has stated a viable federal claim. *United States v. Swiss American Bank, Ltd.*, 191 F.3d 30, 42–45 (1st Cir. 1999) (citing *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 305 (1947) ("*Standard Oil*")). As the Third Circuit has explained, "the power of federal courts to craft federal rules of decision is established in cases in which a federal common law rule is 'necessary to protect uniquely federal interests,' such as federal proprietary interests, federal interests in international law and to resolve conflicts among the states." *McGurl v. Trucking Emps. of N.J. Welfare Fund, Inc.*, 124 F.3d 471, 480 (3d Cir. 1997) (internal citations omitted). That principle controls here. Notably, the *Standard Oil* two-step analysis makes clear that the threshold question of whether a claim arises under federal law does *not* depend on the answer to the distinct substantive question of whether the plaintiff has stated a viable claim under federal law.

156.    Although Plaintiff purports to style its nuisance and other claims as arising under state law, the inherently federal nature of the claims stated on the face of the Complaint controls.[129]

---

[129] *See* 14C Wright *et al.*, Fed. Prac. & Proc. Juris. § 3722.1 (rev. 4th ed.) ("[A] plaintiff cannot frustrate a defendant's right to remove by pleading a case without reference to any federal law when the plaintiff's claim is necessarily federal."); *accord, e.g.*, *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981) (noting courts will "determine whether the real nature

It is well-settled that the question of whether a case arises under state or federal law is a question of subject matter jurisdiction that the federal court must resolve for itself, subject to its "unflagging obligation" to exercise such jurisdiction where it does exist.[130]  A federal court would contravene this fundamental obligation were it to treat as controlling a complaint's characterization of a plaintiff's claims as state-law claims where, as here, the substance of the complaint's allegations and demands for relief reveal that those claims are exclusively federal by virtue of the structure of our Constitution and, therefore, necessarily arise under federal law.

157.    Adhering to the "two-part approach" first articulated in *Standard Oil*, the First Circuit in *Swiss American* recognized the key distinction between the "source question and the substance question."  191 F.3d at 43, 45.  The Court explained that the "source question" asks whether "the source of the controlling law [should] be federal or state."  *Id.* at 43.  The substance question, on the other hand, "which comes into play only if the source question is answered in favor of a federal solution," asks whether the governing rule should be borrowed from state law or instead be a "uniform federal rule."  *Id.*  Whether a claim "arises under" federal law "turns on the resolution of the source question."  *Id.* at 44.  Only that first question—which law applies—is relevant to the removal question, and it must be resolved by a federal court.  *Id.* at 44–45.  As the

of the claim is federal, regardless of plaintiffs' characterization"); *Club Comanche, Inc. v. Gov't of Virgin Islands*, 278 F.3d 250, 259 (3d Cir. 2002) (in determining whether "a federal question is presented on the face of the Plaintiffs' properly pleaded complaint . . . [a] plaintiff's lack of reference . . . to federal law is not controlling" (citing *N. Am. Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 233 (2d Cir. 1978)); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928 (5th Cir. 1997) (same).

[130] *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (federal courts have "the 'virtually unflagging obligation' . . . to exercise the jurisdiction given them"); *England v. Louisiana Bd. of Medical Examiners*, 375 U.S. 411, 415 (1964) ("When a federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.") (quoting *Wilcox v. Consolidated Gas Co.,* 212 U.S. 19, 40 (1909)); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not").

Supreme Court explained, this "choice-of-law task is a federal task for federal courts." *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592 (1973).

158.    Because Plaintiff alleges that climate change occurs as the result of undifferentiated, cumulative emissions from sources across the world over an extended period of time, *see, e.g.*, Compl. ¶¶ 4, 28–39, any judgment as to the reasonableness of particular emissions or their alleged causal contribution to the overall phenomenon of climate change inherently requires an evaluation at an interstate and, indeed, international level*, see AEP*, 564 U.S. at 422 (noting that "[g]reenhouse gases once emitted become well mixed in the atmosphere") (internal quotation marks omitted); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 880 (N.D. Cal. 2009) ("Significantly, the source of the greenhouse gases are undifferentiated and cannot be traced to any particular source, let alone defendant, given that they 'rapidly mix in the atmosphere' and 'inevitably merge[ ] with the accumulation of emissions in California and the rest of the world.'"). Thus, even assuming state tort law may address local source emissions within Illinois, those emissions are not the basis of Plaintiff's claims, nor could they be. Plaintiff seeks to impose liability under state tort law for Defendants' alleged contributions to *global* climate change, based on *global* production and sales, which would require an overarching consideration of *all* the emissions traceable to the extraction and sale of Defendants' products in each of the States, and in the approximately 195 countries of the world. Plaintiff does not seek damages from Defendants as a result of their *intrastate* activity. Plaintiff did not even attempt to disclaim oil and gas sales and their attendant emissions to the extent they occurred outside Illinois or internationally. Nor could it under its theory of causation and injury. Just as Plaintiff cannot exclude emissions resulting from sales to the federal government, it cannot distinguish the effect of emissions originating inside or outside the forum. As in *City of New York*, "[a]rtful pleading

cannot transform the [County]'s complaint into anything other than a suit over global greenhouse gas emissions." 993 F.3d at 91.

159.    Therefore, given the federal government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, state law claims concerning climate change directly implicate uniquely federal interests as "the immense and complicated problem of global warming requires a comprehensive solution." *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 475 (S.D.N.Y. 2018), *aff'd*, 993 F.3d 81. As the Ninth Circuit has noted, "any effective plan [to reduce fossil fuel emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches" of the federal government. *Juliana*, 947 F.3d at 1171. "Global warming presents a uniquely international problem of national concern" that has been addressed with "numerous federal statutory regimes and international treaties" governing greenhouse gas emissions. *City of New York*, 993 F.3d at 85–86. "It is therefore not well-suited to the application of state law." *Id.*; *AEP*, 564 U.S. at 422 (explaining that in cases involving greenhouse gas emissions "borrowing the law of a particular State would be inappropriate").

160.    Plaintiff's claims also arise under federal law because they seek to regulate the production and sale of oil and gas abroad and, therefore, implicate the federal government's foreign affairs power and the Constitution's Foreign Commerce Clause. The federal government has exclusive authority over the nation's international policy on climate change and relations with foreign nations. *Pink*, 315 U.S. at 233 ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."). Accordingly, "our federal system does not permit the controversy to be resolved under state law," "because the authority and duties of the United States as sovereign are intimately involved" and "because the interstate [and] international

**S.A. 302**

nature of the controversy makes it inappropriate for state law to control." *Texas Indus.*, 451 U.S. at 641; *see also Sabbatino*, 376 U.S. at 425 (noting that issues involving "our relationships with other members of the international community must be treated exclusively as aspects of federal law"); *Republic of Philippines v. Marcos*, 806 F.2d 344, 353 (2d Cir. 1986) (explaining that "there is federal question jurisdiction over actions having important foreign policy implications" under federal common law); *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 231 (4th Cir. 2012) ("[T]he federal government has exclusive power over foreign affairs, and . . . states have very little authority in this area.").

161.    As is evident from Plaintiff's repeated use of the term "*global* warming," the causes of Plaintiff's alleged injuries are not confined to particular sources, cities, counties, or even States, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes.  *See* Compl. ¶ 35, Figure 2 (describing "[g]lobal" $CO_2$ emissions from various sources); *see also, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 509, 523–24 (2007) (describing Senate rejection of the Kyoto Protocol because emissions reduction targets did not apply to "heavily polluting nations such as China and India," and the EPA's determination that the predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427–29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *accord* Dick Decl. Ex. 94 (Remarks Announcing United States Withdrawal From the United Nations Framework Convention on Climate Change Paris Accord (June 1, 2017), https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-trump-paris-climate-accord/ (statement by President Trump announcing United States' withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on China's emissions)); Dick Decl. Ex. 95 (Executive Order signed by

**S.A. 303**

President Biden rejoining the Paris Climate Accord).

162.    For example, the federal balancing of interests is evident in the Clinton Administration Commerce Department's report on whether oil imports threaten national security by hindering the development of domestic sources of oil and gas.[131]  Despite the Commerce Department's conclusion that petroleum imports do threaten to impair the national security, it recommended that the President not take action to restrict imports because this could increase the price of oil and gas, and "low oil prices contributed to a reduction in inflation, a rise in real disposable income, and an increase in the Gross Domestic Product."  Rather than increasing the cost of oil and gas, the investigation recommended the Administration rely on existing programs "to increase domestic energy production" by increasing natural gas production and supporting "research, design, and development to promote the use of advanced technologies to recover more oil and gas from existing reservoirs without environmental degradation."[132]

163.    As the United States explained as amicus in a similar case, "federal law and policy has long declared that fossil 'fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports.'"  Brief of the United States as Amicus Curiae at 10, *City of Oakland v. BP p.l.c*, No. 18-16663 (9th Cir. Aug. 3, 2020) (ECF No. 198) (quoting 42 U.S.C. § 15927(b)(1)).

164.    The Complaint itself demonstrates that the unbounded nature of greenhouse gas

---

[131]    Dick Decl. Ex. 96 ("The Effect on the National Security of Imports of Crude Oil and the Refined Petroleum Products: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended," U.S. Department of Commerce, Bureau of Export Administration (November 1999)).

[132]    *Id*. at ES-10.

**S.A. 304**

emissions, diversity of sources, and the magnitude of the alleged attendant consequences have catalyzed myriad federal and international efforts to understand and address such emissions. *See, e.g.*, Compl. ¶ 90(e) (United Nations Earth Summit), ¶ 114 (Kyoto Protocol). But these are complex policy-balancing problems, on a necessarily national scale, and without fixed "right answers." As the Supreme Court put it in *AEP*, "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum: As with other questions of national or international policy, informed assessment of competing interests is required. Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *AEP*, 564 U.S. at 427. As a "question[] of national or international policy," the question of how to address greenhouse gas emissions (which underlies Plaintiff's claims and its requested relief) involves inherently federal concerns and can be resolved only by application of federal law. *See id.*

165.    Because federal common law governs this "transboundary pollution" and climate change suit regardless of how Plaintiff *labeled* its claims, this action is within this Court's original jurisdiction. *See, e.g.*, *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928 (5th Cir. 1997).

## VI.    THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

166.    Based on the allegations in the Complaint, this Court has original jurisdiction over this action under 28 U.S.C. §§ 1331, 1442, and 1367(a). Accordingly, removal of this action is proper under 28 U.S.C. §§ 1441(a) and 1446.

167.    The United States District Court for the Northern District of Illinois is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff originally filed this case, in the Circuit Court of Cook County. *See* 28 U.S.C. § 1441(a).

168.    All defendants that have been properly joined and served have consented to the

removal of the action, *see* Dick Decl. ¶ 3, and there is no requirement that any party not properly joined and served consent. *See* 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and served"); *see also, e.g.*, *Romashko v. Avco Corp.*, 553 F. Supp. 391, 392 (N.D. Ill. 1983).[133] Copies of all process, pleadings, and orders from the state-court action being removed to this Court that are in the possession of the Chevron Parties are attached hereto as Exhibit 1 to this Notice of Removal. Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by the Chevron Parties in the action. Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Circuit Court of Cook County, pursuant to 28 U.S.C. § 1446(d).

169.    Accordingly, Defendants remove to this Court the above action pending against them in the Circuit Court of Cook County, Chancery Division.

Respectfully submitted,

Dated: March 27, 2024

By: */s/ Patricia Brown Holmes*
Patricia Brown Holmes

RILEY SAFER HOLMES & CANCILA LLP
Patricia Brown Holmes
Ronald S. Safer
Lauren E. Jaffe
Christopher L. Schaeffer
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
pholmes@rshc-law.com

---

[133] In addition, the consent of all defendants is not required for federal officer removal under 28 U.S.C. § 1442. *See Durham*, 445 F.3d at 1253 ("Whereas all defendants must consent to removal under section 1441, . . . a federal officer or agency defendant can unilaterally remove a case under section 1442.") (citation omitted).

rsafer@rshc-law.com
ljaffe@rshc-law.com
cschaeffer@rshc-law.com
docketdept@rshc-law.com

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr., *pro hac vice forthcoming*
    tboutrous@gibsondunn.com
William E. Thomson, *pro hac vice forthcoming*
    wthomason@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua D. Dick, *pro hac vice forthcoming*
    jdick@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.374.8451

Thomas G. Hungar, *pro hac vice forthcoming*
    thungar@gibsondunn.com
1050 Connecticut Ave., N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

Andrea E. Smith, *pro hac vice forthcoming*
    aesmith@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

SUSMAN GODFREY L.L.P.
Erica W. Harris, *pro hac vice forthcoming*
    eharris@susmangodfrey.com
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: 713.651.9366
Facsimile: 713.654.6666

STERN, KILCULLEN & RUFOLO, LLC

**S.A. 307**

Herbert J. Stern, *pro hac vice forthcoming*
  hstern@sgklaw.com
Joel M. Silverstein, *pro hac vice forthcoming*
  jsilverstein@sgklaw.com
325 Columbia Turnpike, Suite 110
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Defendants*
*Chevron Corporation and Chevron U.S.A. Inc.*

**S.A. 308**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| CITY OF CHICAGO, | |
| Plaintiff, | |
| v. | Civil Action No. |
| BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORPORATION; CHEVRON U.S.A. INC.; CONOCOPHILLIPS COMPANY; CONOCOPHILLIPS; PHILLIPS 66 COMPANY; PHILLIPS 66; EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION; SHELL OIL PRODUCTS COMPANY LLC; SHELL PLC; SHELL USA, INC.; and AMERICAN PETROLEUM INSTITUTE, | **DECLARATION OF JOSHUA D. DICK IN SUPPORT OF NOTICE OF REMOVAL BY DEFENDANTS CHEVRON CORPORATION AND CHEVRON U.S.A. INC.** |
| Defendants. | |

I, Joshua D. Dick, declare as follows:

1.      I am an attorney admitted to practice in the State of California, and my application for admission *pro hac vice* before this Court is forthcoming.  I am a partner in the law firm of Gibson, Dunn & Crutcher, LLP, and I am one of the attorneys responsible for the representation of Defendants Chevron Corporation and Chevron U.S.A. Inc. (together "the Chevron Parties") in this matter.  I make this declaration in support of the Chevron Parties' Notice of Removal, filed concurrently herewith.

2.      I have consulted with my clients, and I have been informed that Chevron Corporation was served on February 28, 2024 by Plaintiff City of Chicago with a copy of the Complaint filed in the Circuit Court of Cook County, Illinois, Chancery Division on February 20,

2024.  The Notice of Removal is filed not more than thirty (30) days after Chevron Corporation was served with a copy of the initial pleading setting forth the claims for relief upon which this action is based.  28 U.S.C. § 1446(b).

3.    The consent of the other Defendants is not required because removal does not proceed "solely under 28 U.S.C § 1441."  28 U.S.C § 1446(b)(2)(A).  The Chevron Parties have removed this action to federal court on several bases including, for example, 28 U.S.C § 1442(a)(1).  Further, consent is not required from any Defendant that has not been served.  *See, e.g.*, 28 U.S.C § 1446(b)(2)(A); *Grandinetti v. Uber Tech., Inc.*, 476 F. Supp. 3d 747, 751–52 (N.D. Ill. 2020).  Nevertheless, "all defendants who have been properly joined and served" consent to the removal of this action. 28 U.S.C. § 1446(b)(2)(A).  Such consents were provided to counsel for the Chevron Parties in correspondence with the other served Defendants and/or their counsel.

4.    Unless otherwise stated, the following facts are within my personal knowledge through personal review of the documents and information described herein or through information gathered and provided to me by individuals at my firm, at my direction. If called and sworn as a witness, I could and would testify competently thereto.

5.    Attached hereto as **Exhibit 1** is a true and correct copy of the Affidavit of Dr. Mark R. Wilson, filed in *Anne Arundel County v. BP p.l.c., et al.*, No. 21-cv-01323 (D. Md.), filed May 27, 2021.

6.    Attached hereto as **Exhibit 2** is a true and correct excerpted copy of the National Petroleum Council's *A National Oil Policy for the United States*, published in 1949.

7.    Attached hereto as **Exhibit 3** is a true and correct excerpted copy of a Statement of Senator Joseph C. O'Mahoney, Chairman of the United States Senate Special Committee Investigating Petroleum Resources, made on November 28, 1945.

8.     Attached hereto as **Exhibit 4** is a true and correct copy of a Statement of Ralph K. Davies, Deputy Petroleum Administrator for War, made to the Special Committee Investigating Petroleum Resources, S. Res. 36, on November 28, 1945.

9.     Attached hereto as **Exhibit 5** is a true and correct excerpted copy of a Statement of George A. Wilson, Director of Supply and Transportation Division, Wartime Petroleum Supply and Transportation, PAW, made to the Special Committee Investigating Petroleum Resources, S. Res. 36, on November 28, 1945.

10.     Attached hereto as **Exhibit 6** is a true and correct excerpted copy of John W. Frey and H. Chandler Ide's *A History of the Petroleum Administration for War*, published in 1946.

11.     Attached hereto as **Exhibit 7** is a true and correct excerpted copy of the Remarks of Secretary Harold Ickes to the Conference of Petroleum Industry Chairmen on August 11, 1941.

12.     Attached hereto as **Exhibit 8** is a true and correct copy of a Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, dated August 12, 1942.

13.     Attached hereto as **Exhibit 9** is a true and correct excerpted copy of the Fourth Annual Report of the Activities of the Joint Committee on Defense Production, printed at House Report No. 84-1, dated January 5, 1955.

14.     Attached hereto as **Exhibit 10** is a true and correct excerpted copy of the *Defense Logistics Agency Energy Fiscal Year 2019 Fact Book*, as prepared and published by the United States Department of Defense, Defense Logistics Agency ("DLA"), available at https://www.dla.mil/Portals/104/Documents/Energy/Publications/FactBookFiscalYear2019_high res.pdf?ver=2020-01-21-103755-473.

15.     Attached hereto as **Exhibit 11** is a true and correct excerpted copy of the Twenty-Fourth Annual Report of the Activities of the Joint Committee on Defense Production, dated January 17, 1975.

16.     Attached hereto as **Exhibit 12** is a true and correct excerpted copy of the records of the Hearing on Senate Joint Resolution 176, To Authorize the Production of Petroleum from Naval Petroleum Reserve Numbered 1 (Elk Hills, Calif.), before the Subcommittee on National Stockpile and Naval Petroleum Reserve, of the Committee on Armed Services, United States Senate, December 1973.

17.     Attached hereto as **Exhibit 13** is a true and correct copy of an article by John W. Finney, *Fuel is Diverted for the Military*, published in the New York Times on November 28, 1973.

18.     Attached hereto as **Exhibit 14** is a true and correct copy of the Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen in Support of Petitioners, filed in *BP p.l.c. v. Mayor & City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020).

19.     Attached hereto as **Exhibit 15** is a true and correct copy of the Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen in Support of Defendants-Appellants, filed in *City and Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022) (No. 21-15313).

20.     Attached hereto as **Exhibit 16** is a true and correct copy of the Navy Supply Corps Newsletter, *A Word about Fuels*, dated May 29, 2020, available at https://scnewsltr.dodlive.mil/2020/05/29/a-word-about-fuels/.

21.     Attached hereto as **Exhibit 17** is a true and correct copy of the Navy Supply Corps Newsletter, *NAVSUP Fuels: What the Fleet Runs On*, dated Spring 2020, available at https://scnewsltr.dodlive.mil/files/2020/04/2020-SCNews-Spring_web.pdf.

22.     Attached hereto as **Exhibit 18** is a true and correct excerpted copy of Gregory Pedlow and Donald Welzenbach's 1992 report, *The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954-1974*.

23.     Attached hereto as **Exhibit 19** is a true and correct copy of CIA Doc. No. CIA-RDP90B00170R000100080001-5, Clarence L. Johnson, Development of the Lockheed SR-71 Blackbird (Aug. 3, 1981).

24.     Attached hereto as **Exhibit 20** is a true and correct excerpted copy of Ben Rich and Leo Janos's *Skunk Works*, published in 1994.

25.     Attached hereto as **Exhibit 21** is a true and correct copy of CIA Doc No. CIA-RDP67B00074R000500400016-2, Contract No. AF33(657)-8577 (SH-511), dated August 14, 1962.

26.     Attached hereto as **Exhibit 22** is a true and correct copy of CIA Doc. No. CIA-RDP67B00074R000500400012-6, Amendment No. 2 to Contract No. AF33(657)-5577 (SH-511), dated August 26, 1963.

27.     Attached hereto as **Exhibit 23** is a true and correct copy of CIA Doc. No. CIA-RDP67B00074R000500440005-0, Concurrence in Contract No. SH-515 with Shell Oil Company, Project OXCART, dated September 20, 1963.

28.     Attached hereto as **Exhibit 24** is a true and correct copy of CIA Doc. No. CIA-RDP67B00074R000500450004-0, Contract No. AF33(657)-13272 (SH-516), dated June 30, 1964.

29.     Attached hereto as **Exhibit 25** is a true and correct copy of CIA Doc. No. CIA-RDP67B00074R000500440006-9, Contract No. AF33(657)-12525 (SH-515), dated September 20, 1963.

30.     Attached hereto as **Exhibit 26** is a true and correct copy of CIA Doc. No. CIA-RDP67B00074R000500430003-3, Concurrence in Contract No. SH-514 with Shell Oil Company, New York, N.Y., dated June 28, 1963.

31.     Attached hereto as **Exhibit 27** is a true and correct copy of CIA Doc. No. CIA-RDP67B00074R000500420006-1, Contract No. AF33(657)10449 (SH-513), dated February 25, 1963.

32.     Attached hereto as **Exhibit 28** is a true and correct copy of CIA Doc. No. CIA-RDP67B00074R000500410006-2, Contract No. AF33(657)-8582 (SH-512), dated September 13, 1962.

33.     Attached hereto as **Exhibit 29** is a true and correct copy of CIA Doc. No. CIA-RDP63-00313A000500130031-9, Summary of OSA Activities for Week Ending 21 August 1963, dated August 23, 1963.

34.     Attached hereto as **Exhibit 30** is a true and correct excerpted copy of Solicitation SP0600-10-R-0061 and Addendum, dated July 27, 2009.

35.     Attached hereto as **Exhibit 31** is a true and correct excerpted copy of Solicitation SP0600-12-R-0061 and Addendum, dated December 12, 2011.

36.     Attached hereto as **Exhibit 32** is a true and correct copy of the Report reflecting procurement contract SP060012D0510, dated September 20, 2012, last modified May 15, 2013, available at https://www.fpds.gov/fpdsng_cms/indphp/en/.

37.     Attached hereto as **Exhibit 33** is a true and correct copy of the Report reflecting procurement contract SP060012D0498, dated September 20, 2012, last modified February 19, 2013, available at https://www.fpds.gov/fpdsng_cms/indphp/en/.

38.     Attached hereto as **Exhibit 34** is a true and correct copy of the Report reflecting procurement contract SP060010D0470, dated April 26, 2010, last modified June 2, 2011, available at https://www.fpds.gov/fpdsng_cms/indphp/en/.

39.     Attached hereto as **Exhibit 35** is a true and correct copy of the Report reflecting procurement contract SP060011D0482, dated May 13, 2011, last modified June 15, 2011, available at https://www.fpds.gov/fpdsng_cms/indphp/en/.

40.     Attached hereto as **Exhibit 36** is a true and correct copy of the Report reflecting the Bid Summary of Award Information for products F76, JAA, JP5, and JP8, dated October 11, 2012.

41.     Attached hereto as **Exhibit 37** is a true and correct copy of the Minimum Cost Solution Bid Award Sheet detailing the shipping terminals to receive products F76, JAA, JP5, and JP8, dated October 11, 2012.

42.     Attached hereto as **Exhibit 38** is a true and correct copy of the Solicitation SP0600-10-R-0061 Award Report, dated July 22, 2010.

43.     Attached hereto as **Exhibit 39** is a true and correct copy of the DLA Detail Specifications for Turbine Fuels, Aviation Kerosene Types, NATO F-34(JP-8), NATO F-35, and JP-8+100, MIL-DTL-83133E, dated April 1, 1999.

44.     Attached hereto as **Exhibit 40** is a true and correct copy of the DLA Detail Specification for Turbine Fuels, Grades JP-4 and JP-5, MIL-DTL-5624U, dated January 5, 2004.

45. Attached hereto as **Exhibit 41** is a true and correct copy of Tables summarizing the contracts between BP entities and Defense Logistics Agency ("DLA") Energy Bulk Petroleum Products, which coordinates the acquisition of fuels and fuel-related services for the U.S. Department of Defense, for the period 2016-2020, along with excerpts of the contracts described therein.

46. Attached hereto as **Exhibit 42** is a true and correct excerpted copy of the Department of Defense's Defense Handbook on Aerospace Fuels Certification, MIL-HDBK-510A, published in August 2014.

47. Attached hereto as **Exhibit 43** is a true and correct excerpted copy of Air Force Wright Aeronautical Laboratory's Military Jet Fuels, 1944-1987, AFWAL-TR-87-2062, dated December 1987, available at https://apps.dtic.mil/dtic/tr/fulltext/u2/a186752.pdf.

48. Attached hereto as **Exhibit 44** is a true and correct copy of the U.S. Department of Defense Detail Specifications for Turbine Fuel, Aviation, Kerosene Type, JP-8 (NATO F-34), NATO F-35, and JP-8+100 (NATO F-37), MIL-DTL- 83133J, dated December 16, 2015.

49. Attached hereto as **Exhibit 45** is a true and correct copy of the U.S. Department of Defense FSII Specifications, MIL-DTL-85470B, dated June 15, 1999.

50. Attached hereto as **Exhibit 46** is a true and correct excerpted copy of the Department of Army Technical Manual on Petroleum Handling Operations for Aviation Fuel, TM 10-1107, dated February 1960.

51. Attached hereto as **Exhibit 47** is a true and correct copy of the U.S. Department of Defense Performance Specification, Inhibitor, Corrosion/Lubricity Improver Fuel Soluble [CI/LI], MIL-PRF-25017H, dated August 4, 2011.

52.     Attached hereto as **Exhibit 48** is a true and correct copy of the U.S. Department of Defense Performance Specification, Additive, Lubricity Improver, Diesel [LIA], MIL-PRF-32490A, dated February 3, 2014.

53.     Attached hereto as **Exhibit 49** is a true and correct copy of the U.S. Department of Defense Detail Specifications for Turbine Fuel, Aviation, Grades JP-4 and JP-5, MIL-DTL-5624W, dated March 28, 2016.

54.     Attached hereto as **Exhibit 50** is a true and correct copy of the U.S. Department of Defense Detail Specifications for Fuel, Naval Distillate NATO F-76, MIL-DTL-16884N, dated April 22, 2014.

55.     Attached hereto as **Exhibit 51** is a true and correct copy of the U.S. Department of Defense Detail Specifications for Fuel, Naval Distillate NATO F-76, MIL-DTL-16884P, dated September 26, 2017.

56.     Attached hereto as **Exhibit 52** is a true and correct copy of Defence Standard 91-091, Turbine Fuel, Kerosene Type, Jet A-1, NATO Code: F-35; Joint Service Designation: AVTUR, Issue 9 adopted by the U.S. Department of Defense, dated October 3, 2016.

57.     Attached hereto as **Exhibit 53** is a true and correct copy of the Standard Specification for Aviation Turbine Fuels, ASTM D1655, for Jet A fuels, adopted by the U.S. Department of Defense, approved May 1, 2020.

58.     Attached hereto as **Exhibit 54** is a true and correct excerpted copy of records of the Hearings before the Committee on Naval Affairs of the House of Representatives on Estimates Submitted by the Secretary of the Navy, which took place in 1915, reprinting excerpts of President William H. Taft's September 6, 1910 address at the Proceedings of the Second National Conservation Congress.

59.     Attached hereto as **Exhibit 55** is a true and correct copy of President William H. Taft's executive order dated September 2, 1912, as excerpted from a book titled *Oil Leasing Lands – Hearings Before the Committee on the Public Lands*, published in 1918.

60.     Attached hereto as **Exhibit 56** is a true and correct copy of the U.S. General Accounting Office's ("GAO") *Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986*, GAO/RCED-87-75FS, dated January 1987.

61.     Attached hereto as **Exhibit 57** is a true and correct copy of the U.S. GAO's *Report on Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve*, dated July 1988.

62.     Attached hereto as **Exhibit 58** is a true and correct copy of Statements of Gerald D. Morgan, Special Counsel to the Committee on Naval Affairs, and Commodore W.G. Greenman, U.S. Navy, Director, Naval Petroleum Reserves, in Hearing Records.

63.     Attached hereto as **Exhibit 59** is a true and correct copy of the Unit Plan Contract between Navy Department and Standard Oil Company of California Relating to Naval Petroleum Reserve No. 1 (Elk Hills) dated June 19, 1944.

64.     Attached hereto as **Exhibit 60** is a true and correct copy of Records Concerning Reserves in the U.S. and PAW Districts 1941-45, Elk Hills, collected at the National Archives in Suitland, Maryland.

65.     Attached hereto as **Exhibit 61** is a true and correct copy of the Operating Agreement between Navy Department and Standard Oil Company of California, Relating to Naval Petroleum Reserve No. 1 (Elk Hills), dated November 3, 1971, Contract No. NOd-9930.

66.     Attached hereto as **Exhibit 62** is a true and correct copy of the Supplemental Affidavit of John W. Walker in Support of Motion for Staying Judgment, filed in *United States v. Standard Oil Co. of California*, No. F-74-11-MDC (E.D. Cal. Mar. 3, 1978).

**S.A. 318**

67.     Attached hereto as **Exhibit 63** is a true and correct copy of a Letter from J.R. Grey, President of the Standard Oil Company of California, to Jack L. Bowers, Secretary of the Navy, requesting to terminate its position as Operator of the Elk Hills Reserve, dated January 7, 1975.

68.     Attached hereto as **Exhibit 64** is a true and correct copy of Robert Lindsey's article, *Elk Hill Reserve Oil Will Flow Again*, published in the New York Times on July 3, 1976.

69.     Attached hereto as **Exhibit 65** is a true and correct excerpted copy of *History of Naval Petroleum Reserve No. 1 (Elk Hills) 1912-1987*, prepared by Systematic Management Services, Inc., published on May 15, 1989.

70.     Attached hereto as **Exhibit 66** is a true and correct excerpted copy of the Stipulated Facts in *United States v. Shell Oil Co.*, No. 91-0589 (C.D. Cal.), ECF No. 364, dated June 23, 1995, as reprinted in the Joint Appendix, *United States v. Shell Oil Co.*, No. 13-5051 (Fed. Cir. July 19, 2013), ECF No. 59-1.

71.     Attached hereto as **Exhibit 67** is a true and correct excerpted copy of W.J. Sweeney's *Aircraft Fuels and Propellants: A Report for the Army Air Force Scientific Advisory Group*, published in 1946.

72.     Attached hereto as **Exhibit 68** is a true and correct excerpted copy of I. Waitz, S. Lukachko, and J. Lee's *Military Aviation and the Environment: Historical Trends and Comparison to Civil Aviation*, published in Volume 45 of the Journal of Aircraft at 2, in 2005.

73.     Attached hereto as **Exhibit 69** is a true and correct excerpted copy of the Handbook of Aviation Fuel Properties, CRC Report No. 635, published by the Coordinating Research Council in 2004.

74.     Attached hereto as **Exhibit 70** is a true and correct copy of the Affidavit of Richard Tyler Priest, filed in *Anne Arundel County v. BP p.l.c., et al.*, No. 21-cv-01323 (D. Md.), filed May 27, 2021.

75.     Attached hereto as **Exhibit 71** is a true and correct copy of Oil and Gas Lease of Submerged Lands Under the Outer Continental Shelf Lands Act dated February 2017.

76.     Attached hereto as **Exhibit 72** is a true and correct copy of Texas Association of Realtors' Form TAR-2101.

77.     Attached hereto as **Exhibit 73** is a true and correct excerpted copy of Jay Hakes's *A Declaration of Energy Independence*, published in 2008.

78.     Attached hereto as **Exhibit 74** is a true and correct excerpted copy of Daniel Yergin's *The Prize: The Epic Quest for Oil, Money & Power*, published in 1991.

79.     Attached hereto as **Exhibit 75** is a true and correct copy of *Excerpts From Nixon Message*, published in the New York Times on April 19, 1973.

80.     Attached hereto as **Exhibit 76** is a true and correct excerpted copy of the Remarks of Representative Herbert E. Harris II made on April 8, 1975, 121 Cong. Rec. 9201, 9275–76.

81.     Attached hereto as **Exhibit 77** is a true and correct copy of Records of the Proceedings and Debates on the Outer Continental Shelf Lands Act ("OCSLA") Amendments of 1975, Congressional Record pages S903-11, dated January 27, 1975.

82.     Attached hereto as **Exhibit 78** is a true and correct copy of the Comprehensive Energy Plan, House of Representatives Document Number 93-406, dated December 10, 1974.

83.     Attached hereto as **Exhibit 79** is a true and correct excerpted copy of the Report by the Ad Hoc Select Committee on the Outer Continental Shelf, published in House Report No. 94-1084 in 1976.

84.     Attached hereto as **Exhibit 80** is a true and correct excerpted copy of the Outer Continental Shelf Lands Act Amendments of 1977, published in House Report No. 95-590.

85.     Attached hereto as **Exhibit 81** is a true and correct copy of Mineral Lease of Submerged Lands Under the Outer Continental Shelf Lands Act dated June 1991.

86.     Attached hereto as **Exhibit 82** is a true and correct copy of Oil and Gas Lease Under the Mineral Lands Leasing Act, Form 3100-11, dated October 2008.

87.     Attached hereto as **Exhibit 83** is a true and correct copy of *About the BLM Oil and Gas Program*, on the Department of the Interior, Bureau of Land Management web site, current as of January 26, 2021, available at https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/about.

88.     Attached hereto as **Exhibit 84** is a true and correct excerpted copy of a Statement of Hon. John F. O'Leary, Administrator, Federal Energy Administration ("FEA") at a Hearing before the Senate Committee on Interior and Insular Affairs, on FEA's Strategic Petroleum Reserve Plan Submitted to the Congress for Review Pursuant to Public Law 94-163, held on February 4, 1977.

89.     Attached hereto as **Exhibit 85** is a true and correct copy of the U.S. Department of Energy's Strategic Petroleum Reserve ("SPR") Annual Report to Congress for Calendar Year 2010,          published          in          2011,          available          at https://www.energy.gov/sites/prod/files/2015/02/f20/2010%20SPR%20Annual%20Report.pdf.

90.     Attached hereto as **Exhibit 86** is a true and correct copy of a Letter addressed to the Operator from L. Dennett, Associate Director for Royalty Management, United States Department of the Interior, Minerals Management Service ("MMS"), dated December 14, 1999.

91.     Attached hereto as **Exhibit 87** is a true and correct copy of a news release, *MMS RIK Program to Help Fill Strategic Petroleum Reserve*, published by the MMS on May 31, 2007.

92.     Attached hereto as **Exhibit 88** is a true and correct copy of a Report Prepared by the Minority Staff of the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate, entitled *U.S. Strategic Petroleum Reserve: Recent Policy Has Increased Costs to Consumers But Not Overall U.S. Energy Security*, dated March 5, 2003.

93.     Attached hereto as **Exhibit 89** is a true and correct copy of the web page, *History of SPR Releases*, on the United State Department of Energy web site, available at https://energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr.

94.     Attached hereto as **Exhibit 90** is a true and correct copy of the U.S. Department of Energy's SPR Annual Report to Congress for Calendar Year 2018, published in 2020, available at https://www.energy.gov/sites/prod/files/2020/01/f70/2018%20SPR%20Report%20to%20Congress.pdf.

95.     Attached hereto as **Exhibit 91** is a true and correct excerpted copy of the 1968 Historic American Engineering Record No. TX-76, War Emergency Pipeline Inch Lines Historic District, from the National Parks Service.

96.     Attached hereto as **Exhibit 92** is a true and correct excerpted copy of the Certificate of Dissolution of War Emergency Pipelines, Inc., dated August 28, 1947.

97.     Attached hereto as **Exhibit 93** is a true and correct excerpted copy of a Statement of W. Alton Jones, Chairman of the Committee on Postwar Disposal of Pipe Lines, Refineries, and Tankers, made to the Special Committee Investigating Petroleum Resources, on November 15, 1945.

98.     Attached hereto as **Exhibit 94** is a true and correct copy of Remarks by President Trump on the Paris Climate Accord, released by The White House Office of the Press Secretary, dated June 1, 2017, 3:32 PM, available at https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-trump-paris-climate-accord/.

99.     Attached hereto as **Exhibit 95** is a true and correct copy of President Joseph R. Biden's Executive Order 13990 of January 20, 2021, titled *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, published January 25, 2021.

100.    Attached hereto as **Exhibit 96** is a true and correct copy of "The Effect on the National Security of Imports of Crude Oil and the Refined Petroleum Products: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended, U.S. Department of Commerce, Bureau of Export Administration (November 1999).

I declare under penalty of perjury under the laws of the State of Illinois and the United States of America that the foregoing is true and correct and that I executed this Declaration on March 27, 2024, at San Francisco, California.

*/s/ Joshua D. Dick*
Joshua D. Dick

**S.A. 323**